RECEIVED

APR 1 - 2015

AT 8:30_____
WILLIAM T. WALSH, CLERK

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | No. 15 CR 155 (WHW) |
| | ) | |
| v. | ) | Count 1: 18 U.S.C. § 371 |
| | ) | (Conspiracy to Commit Bribery |
| ROBERT MENENDEZ | ) | and Honest Services Wire Fraud) |
| (Counts 1, 2, 3, 5, 7, 9, 11, 13, 15, 17, | ) | |
| 19, 20, 21, & 22) | ) | Count 2: 18 U.S.C. §§ 1952, 2 |
| | ) | (Travel Act) |
| and | ) | |
| | ) | Counts 3-18: 18 U.S.C. § 201(b) |
| SALOMON MELGEN | ) | (Bribery) |
| (Counts 1, 2, 4, 6, 8, 10, 12, 14, 16, 18, | ) | |
| 19, 20, & 21), | ) | Counts 19-21: 18 U.S.C. §§ 1341, |
| | ) | 1343, 1346, 2 |
| Defendants. | ) | (Honest Services Fraud) |
| | ) | |
| | ) | Count 22: 18 U.S.C. § 1001 |
| | ) | (False Statements) |
| | ) | |
| | ) | Forfeiture Notice |

## INDICTMENT

THE GRAND JURY CHARGES:

### COUNT ONE

**18 U.S.C. § 371**
**(Conspiracy to Commit Bribery and Honest Services Wire Fraud)**

1. At all times material to this indictment:

2. Defendant ROBERT MENENDEZ was a United States Senator from the State of New Jersey. He was previously a member of the United States House of Representatives. MENENDEZ was sworn in as a United States Senator on or about January 17, 2006. As a United States Senator, MENENDEZ owed a fiduciary duty to the United States and the citizens of New Jersey to perform the duties and responsibilities of his office free from corrupt influence.

1

3.      Defendant SALOMON MELGEN was an ophthalmologist who lived and practiced in the State of Florida.

## RELEVANT INDIVIDUALS AND ENTITIES

4.      Vitreo-Retinal Consultants of the Palm Beaches, P.A. (VRC) was the company through which MELGEN operated his ophthalmology practice. MELGEN was VRC's sole owner.

5.      The Office of Senator Robert Menendez, based in Washington, D.C., and New Jersey, was MENENDEZ's official government office.

6.      Menendez for Senate, based in New Jersey, was a MENENDEZ campaign entity.

7.      Person A was MELGEN's personal assistant and son-in-law.

8.      Staffer 1 was MENENDEZ's Chief of Staff from in or about June 2008 to in or about March 2014.

## THE CONSPIRACY AND ITS OBJECTS

9.      From at least in or about January 2006 through in or about January 2013, in the District of New Jersey and elsewhere, the defendants,

## ROBERT MENENDEZ and
## SALOMON MELGEN,

did knowingly combine, conspire, confederate, and agree with each other and others known and unknown to the Grand Jury to commit an offense against the United States; that is:

a.      to, directly and indirectly, corruptly give, offer, and promise anything of value to a public official and to any other person and entity, with intent to influence an official act; that is, offering to give to MENENDEZ, a United States Senator, and to other persons and entities, things of value to influence official acts benefitting MELGEN's personal and business interests, in violation of 18 U.S.C. § 201(b)(1)(A);

b. to, being a public official, directly and indirectly, corruptly demand, seek, receive, accept, and agree to receive and accept anything of value personally and for any other person and entity, in return for being influenced in the performance of an official act; that is, MENENDEZ, a United States Senator, sought and received things of value from MELGEN in order to influence MENENDEZ's official acts, in violation of 18 U.S.C. § 201(b)(2)(A); and

c. to devise and intend to devise a scheme and artifice to defraud and deprive the United States and the citizens of New Jersey of the honest services of a public official; that is, to deprive the United States and the citizens of New Jersey of the honest services of MENENDEZ, a United States Senator elected by the citizens of New Jersey, in violation of 18 U.S.C. §§ 1341, 1343, and 1346.

## PURPOSE OF THE CONSPIRACY

10. The purpose of the conspiracy was for the defendants to use MENENDEZ's official position as a United States Senator to benefit and enrich themselves through bribery.

## MANNER AND MEANS

11. The manner and means by which the defendants and others carried out the conspiracy included, but were not limited to, the following:

12. MELGEN offered and gave, and MENENDEZ solicited and accepted from MELGEN, things of value, including domestic and international flights on private jets, first-class domestic airfare, use of a Caribbean villa, access to an exclusive Dominican resort, a stay at a luxury hotel in Paris, expensive meals, golf outings, and tens of thousands of dollars in contributions to a legal defense fund.

13. MELGEN financed things of value he gave to MENENDEZ through corporate entities.

3

14.     MELGEN, through his companies, gave MENENDEZ and his guests free flights on his private jets. MELGEN's company, Melissa Aviation, owned a ten-seat Hawker Siddeley, from in or about April 2003 to in or about December 2011. MELGEN used another company, DRM Med Assist, LLC, to purchase a twelve-seat Challenger in or about June 2009. These aircraft were flown by MELGEN's private flight staff and stocked with refreshments for passengers. MELGEN furnished MENENDEZ with many flights on these private jets over the course of several years, which MENENDEZ accepted at no cost to himself. On more than one occasion, MENENDEZ brought a guest. On at least one occasion, MENENDEZ's guest flew on the plane without MENENDEZ in order to meet MENENDEZ for a weekend stay at MELGEN's villa in the Dominican Republic.

15.     MELGEN offered and gave, and MENENDEZ solicited and accepted from MELGEN, vacations at MELGEN's villa in Casa de Campo, a luxury golf and sporting resort located in La Romana, on the Caribbean coast of the Dominican Republic. The ocean-side community has a marina, three golf courses, thirteen tennis courts, three polo playing fields, equestrian facilities, a 245-acre shooting facility, a spa, beaches, restaurants, and a hotel. MELGEN owns a Spanish-style vacation villa at Casa de Campo. Located on one of the three golf courses, MELGEN's villa opens to a courtyard, has its own pool, and is serviced by MELGEN's private staff, which cooks, cleans, provides transportation, and generally caters to the needs of MELGEN and his guests.

16.     MELGEN offered and gave, and MENENDEZ solicited and accepted from MELGEN, hundreds of thousands of dollars of contributions to entities that benefitted MENENDEZ's 2012 Senate campaign, in exchange for specific requested exercises of MENENDEZ's official authority.

4

17.    MENENDEZ concealed things of value he solicited and accepted from MELGEN by knowingly and willfully omitting them from the annual Financial Disclosure Reports he was statutorily required to complete under the Ethics in Government Act.  Specifically, in reports MENENDEZ filed between 2007 and 2012, he never disclosed any of the reportable gifts that he received from MELGEN.

18.    MENENDEZ withheld information from his Senate staff to conceal the extent of his official action on MELGEN's behalf.

19.    MELGEN used his personal assistant and agent, Person A, to help manage his dealings with MENENDEZ, including agreeing to MENENDEZ's solicitations for things of value, offering and providing MENENDEZ with things of value, equipping MENENDEZ and MENENDEZ's Senate staff with information and resources to promote MELGEN's personal and business interests, and requesting official action from MENENDEZ and MENENDEZ's Senate staff as needed.

20.    MENENDEZ used the Chief of Staff of his Senate Office, Staffer 1, to help manage his dealings with MELGEN, including soliciting and accepting things of value from MELGEN, accommodating MELGEN's requests for official action, monitoring the progress of MENENDEZ's Senate staff's advocacy on MELGEN's behalf, and updating MELGEN on the status and progress of MENENDEZ's official action on MELGEN's behalf.

21.    MENENDEZ used his Senate staff to accommodate MELGEN's requests for official action, including collecting information from MELGEN and his agents about MELGEN's needs and interests, arranging for MELGEN to meet with a United States Senator, and advocating on MELGEN's behalf to Executive Branch officials.

22. MENENDEZ used the prestige, authority, and influence of his status as a United States Senator to promote MELGEN's personal and business interests with a United States Ambassador, fellow United States Senators, and Executive Branch officials, including a member of the President's Cabinet.

23. MENENDEZ used the power of his Senate office to do the following:

a. influence the immigration visa proceedings of MELGEN's foreign girlfriends;

b. pressure the U.S. Department of State (State Department) to influence the Government of the Dominican Republic to abide by MELGEN's multi-million dollar foreign contract to provide exclusive cargo screening services in Dominican ports;

c. stop the U.S. Customs and Border Protection (CBP), a component of the U.S. Department of Homeland Security, from donating shipping container monitoring and surveillance equipment to the Dominican Republic—a donation that would threaten MELGEN's multi-million dollar foreign contract to provide exclusive cargo screening services in Dominican ports; and

d. influence the outcome of the Centers for Medicare and Medicaid Services's (CMS's) administrative action seeking millions of dollars in Medicare overbillings that MELGEN owed to the Federal Government.

## OVERT ACTS

24. In furtherance of the conspiracy, and to accomplish its objects, MENENDEZ, MELGEN, and others committed the following overt acts in the District of New Jersey and elsewhere:

### I.   Things of Value

#### A.   Private, Chartered, and First-Class Commercial Flights

25.   MELGEN, directly and through his companies and personal assistant, Person A, gave MENENDEZ and his guests free private, chartered, and first-class commercial flights for personal trips, including the following:

a.   On or about August 18, 2006, MENENDEZ and his guest, Guest 1, traveled on MELGEN's private jet from West Palm Beach, Florida, to the Dominican Republic for a vacation at MELGEN's villa in Casa de Campo.

b.   On or about August 24, 2006, MELGEN sent his private jet from West Palm Beach, Florida, to the Dominican Republic in order to pick up MENENDEZ and his guest, Guest 1, to fly them to New Jersey after their vacation at MELGEN's villa in Casa de Campo.

c.   On or about August 24, 2006, MENENDEZ and his guest, Guest 1, traveled on MELGEN's private jet from the Dominican Republic to Teterboro, New Jersey, with a stop in West Palm Beach, Florida.

d.   On or about April 4, 2007, MENENDEZ traveled on MELGEN's private jet from West Palm Beach, Florida, to the Dominican Republic for a vacation at MELGEN's villa in Casa de Campo.

e.   On or about April 8, 2007, after MENENDEZ's vacation at MELGEN's villa in Casa de Campo, MELGEN furnished MENENDEZ with a free flight from the Dominican Republic to Fort Lauderdale, Florida, on a private jet owned by MELGEN's business associate. MELGEN's own private jet had suffered a mechanical problem and was unavailable to fly back to the United States.

f.      On or about August 30, 2008, MELGEN sent his private jet from the Dominican Republic to Teterboro, New Jersey, in order to pick up MENENDEZ and his guest, Guest 2, to fly them to the Dominican Republic for a vacation at MELGEN's villa in Casa de Campo.

g.      On or about August 30, 2008, MENENDEZ and his guest, Guest 2, traveled on MELGEN's private jet from Teterboro, New Jersey, to West Palm Beach, Florida, where they stayed overnight before traveling to the Dominican Republic the next day.

h.      On or about August 31, 2008, MENENDEZ and his guest, Guest 2, traveled on MELGEN's private jet from West Palm Beach, Florida, to the Dominican Republic.

i.      On or about September 4, 2008, MELGEN sent his private jet from West Palm Beach, Florida, to the Dominican Republic in order to pick up MENENDEZ and his guest, Guest 2, to fly them to New Jersey after their vacation at MELGEN's villa in Casa de Campo.

j.      On or about September 4, 2008, MENENDEZ and his guest, Guest 2, traveled on MELGEN's private jet from the Dominican Republic to Teterboro, New Jersey, with a stop in West Palm Beach, Florida.

k.      On or about May 28, 2010, MENENDEZ's guest, Guest 3, traveled on MELGEN's private jet from West Palm Beach, Florida, to the Dominican Republic, in order to meet MENENDEZ for a vacation at MELGEN's villa in Casa de Campo.

l.      On or about June 1, 2010, MENENDEZ's guest, Guest 3, returned from the Dominican Republic to West Palm Beach, Florida, on MELGEN's private jet, after vacationing with MENENDEZ at MELGEN's villa in Casa de Campo.

8

m.      On or about August 6, 2010, MELGEN sent his private jet from West Palm Beach, Florida, to the Washington Metropolitan Area, in order to pick up MENENDEZ to fly him to the Dominican Republic for a vacation at MELGEN's villa in Casa de Campo.

n.      On or about August 6, 2010, MENENDEZ traveled on MELGEN's private jet from the Washington Metropolitan Area to the Dominican Republic, with a stop in West Palm Beach, Florida.

o.      On or about August 9, 2010, after his vacation at MELGEN's villa in Casa de Campo, MENENDEZ traveled on MELGEN's private jet from the Dominican Republic to Teterboro, New Jersey, with a stop in West Palm Beach, Florida.

p.      On or about September 3, 2010, MELGEN sent his private jet from the Dominican Republic to Teterboro, New Jersey, in order to pick up MENENDEZ and his guest, Guest 3, to fly them to the Dominican Republic for a vacation in Punta Cana.

q.      On or about September 3, 2010, MENENDEZ and his guest, Guest 3, traveled on MELGEN's private jet from Teterboro, New Jersey, to the Dominican Republic, with a stop in West Palm Beach, Florida.

r.      On or about September 6, 2010, after their vacation in Punta Cana, MENENDEZ and his guest, Guest 3, traveled on MELGEN's private jet from the Dominican Republic to Teterboro, New Jersey, with a stop in West Palm Beach, Florida.

s.      On or about October 8, 2010, MELGEN, through Person A, bought MENENDEZ a first-class airline ticket at a cost of approximately $890.70 for a flight from Newark, New Jersey, to West Palm Beach, Florida, departing the next day.

t.      On or about October 11, 2010, MELGEN, through Person A, paid approximately $8,036.82 to charter a private jet to fly MENENDEZ that day from West Palm

9

Beach, Florida, to the Washington Metropolitan Area. MENENDEZ was the only passenger on that chartered flight.

26.     MENENDEZ did not pay for any of these flights at the time he took them.

**B.      Vacations at MELGEN's Caribbean Villa at Casa de Campo**

27.     Between in or about August 2006 and in or about January 2013, MENENDEZ stayed at MELGEN's vacation villa in Casa de Campo on numerous occasions, with and without MELGEN present. On more than one occasion, MENENDEZ was accompanied by a guest.

**C.      Three Nights at the Park Hyatt Paris-Vendôme**

28.     From on or about April 8, 2010, through on or about April 11, 2010, MENENDEZ stayed in an executive suite at the five-star Park Hyatt Paris-Vendôme valued at $4,934.10. MENENDEZ solicited and accepted from MELGEN 649,611 American Express Membership Rewards points (hereinafter "AmEx points") in order to pay for the suite.

29.     MENENDEZ planned the personal trip to Paris to spend a weekend with a woman with whom he had a personal relationship. That woman was planning to travel to Paris with her sister, who was going on a business trip.

30.     On or about March 8, 2010, MENENDEZ emailed the sister, asking her where she was planning to stay in Paris. The sister responded that day and informed him that she would be staying at the Park Hyatt. MENENDEZ confirmed that he would also book a room there.

31.     Also on or about March 8, 2010, MENENDEZ emailed Staffer 2, his Office Manager, asking him to research the Park Hyatt rates, including whether they had a government rate available for the dates April 8, 9, and 10, 2010.

32.     Later that day, Staffer 2 responded that the Park Hyatt did have a government rate, and that it would be $798.75 per night for a Park Deluxe King and $934.82 per night for a Park Suite King.  The standard rates for these rooms were $870.87 and $1,006.94, respectively.

33.     On or about March 18, 2010, MENENDEZ emailed the sister and asked her if her company (through which she would be making the reservation for her business trip) had "any special rates at the Park Hyatt."

34.     On or about March 24, 2010, MENENDEZ sent MELGEN an email in which he asked MELGEN to book either the Park Suite King or the Park Deluxe King at the Park Hyatt on his behalf—both rooms featuring, according to MENENDEZ's email, "king bed, work area with internet, limestone bath with soaking tub and enclosed rain shower, [and] views of courtyard or streets." MENENDEZ explained, "You call American Express Rewards and they will book it for you.  It would need to be in my name."

35.     The next day, MELGEN redeemed an American Express Travel Credit for 649,611 points to cover the cost of a three-night stay in a Park Executive Suite for MENENDEZ.  Person A emailed MENENDEZ the reservation confirmation, reflecting that the suite's value was $1,536.96 per night, plus $323.22 in fees and tax recovery charges, for a total value of $4,934.10 for the three nights.

**D.      Weekend in Punta Cana**

36.     On or about the weekend of September 3, 2010, through September 6, 2010, MENENDEZ and a guest, Guest 3, traveled to a wedding in Punta Cana in the Dominican Republic, traveling roundtrip free of charge on MELGEN's private jet, as described in paragraphs 25p through 25r above.

11

37. From on or about September 3, 2010, through on or about September 6, 2010, MENENDEZ and his guest, Guest 3, stayed free of charge in a two-bedroom suite with MELGEN and his wife at the Tortuga Bay Hotel Puntacana Resort and Club. MELGEN paid approximately $769.40 to the Tortuga Bay Hotel Puntacana Resort and Club for the accommodations.

### E. $40,000 to MENENDEZ's Legal Defense Trust Fund

38. To pay for litigation arising from a recall effort, MENENDEZ created a legal defense trust fund called The Fund to Uphold the Constitution.

39. On or about September 21, 2011, Staffer 1, MENENDEZ's Chief of Staff, emailed Person A:

> The attached memo has the information on the legal defense trust fund that Senator Menendez discussed with the doctor. When I spoke with the doctor, he said he and Mrs. Melgen and his children also wanted to contribute. Obviously, that is a very, very generous offer. For the time being, I think the best approach is for the doctor and Mrs. Melgen to contribute. Should we need additional contributions next week, I will come back to you to discuss this matter further.

> I hope that works for you and the [sic] Dr. Melgen.

40. That same day, MELGEN and his wife wrote a $20,000 check to MENENDEZ's legal defense trust fund from their joint bank account.

41. On or about April 30, 2012, Staffer 1 sent an email to Person A with the subject line "Humbly Asking," in which he solicited, among other things, another $20,000 donation to MENENDEZ's legal defense trust fund. Staffer 1 explained:

> There is a second part to this ask and it is for Dr. Melgen to have two additional members of his family contribute to the Senator's legal defense fund. Dr. Melgen and Mrs. Melgen have already contributed $10,000 each. At the time they made their contributions Dr. Melgen mentioned to me that he would try to help out more if we needed it. The ask of Dr. Melgen is for him to consider having two other members of his family contribute $10,000 each. The name of this account is The Fund to Uphold the Constitution. It is not a federally-controlled FEC account and, as such, contributions into the account do not count to federal giving limits.

12

This request is more than considerable. I truly hope Dr. Melgen will understand that we do not take it lightly nor the sacrifice it represents.

42. That same day, Person A responded:

Regarding your request . . . don't worry. We will take care of it. Dr. Melgen will be calling you tomorrow to speak further.

43. On or about May 16, 2012, MELGEN and his wife wrote another $20,000 check to MENENDEZ's legal defense trust fund.

### F. Other Things of Value

44. On or about October 4, 2008, MELGEN hired a car service company to drive MENENDEZ from Hoboken, New Jersey, to and around New York City, New York, at a cost of $875.12.

45. On or about January 10, 2013, MENENDEZ, MELGEN, and Person A golfed together at the private Banyan Golf Club in West Palm Beach, Florida. MELGEN paid for the greens fees. After the round of golf, Person A paid $356.80 for a meal at the Raindancer Steak House in West Palm Beach, Florida.

### G. $751,500 in 2012 Campaign Contributions

46. MENENDEZ ran for and won reelection to the United States Senate in November 2012. From in or about May 2012 through in or about October 2012, MELGEN contributed over $750,000 to entities supporting MENENDEZ's reelection effort.

#### i. $143,500 to New Jersey State and County Democratic Party Entities

47. On or about April 30, 2012, in the same email to Person A described above in paragraph 41, Staffer 1 solicited MELGEN for contributions to the New Jersey Democratic State Committee to benefit MENENDEZ's reelection efforts. In that email, Staffer 1 wrote that "the Senator and I humbly wanted to put a big ask before [MELGEN]," specifying that:

13

> I am trying to raise money into the New Jersey Democratic State Committee. The Committee is vital to the Senator's efforts as the state party will conduct voter contact and get out the vote activities on behalf of Senator Menendez and other congressional candidates in the state. The account is named New Jersey Democratic State Committee Victory Federal. The limit per individual is $10,000. Could Dr. Melgen and family members consider giving a total of $40,000?

Staffer 1 observed that MELGEN had "been as loyal and helpful as anyone out there" and noted that "there may be bigger opportunities out there for the doctor to join in later this summer that will be beneficial to the Senator's re-election effort."

48.     As noted above in paragraph 42, that same day, Person A responded:

> Regarding your request . . . don't worry. We will take care of it. Dr. Melgen will be calling you tomorrow to speak further.

49.     Just over ten days later, on or about May 10, 2012, Staffer 1 and MELGEN spoke on the phone. MELGEN told Staffer 1 that he would make the contributions Staffer 1 had requested and that Person A would manage the process. The following day, Staffer 1 emailed Person A to memorialize his conversation with MELGEN and stated, "It would be great if the contributions could be sent via Fedex to my home address and I'll distribute them once I receive them."

50.     On or about May 16, 2012, MELGEN and his wife wrote a $20,000 check to "New Jersey Democratic State Committee Victory Federal Account." On the check's memo line "MFS Contribution" was written and subsequently crossed out. Person A overnighted the checks to Staffer 1 via Federal Express to his home address.

51.     That same day, on or about May 16, 2012, MELGEN's daughter and her husband, Person A, wrote a $20,000 check to "New Jersey Democratic State Committee Victory Federal Account." On the check's memo line "(MFS) Menendez Contribution" was written and subsequently crossed out.

14

52.     Also that same day, on or about May 16, 2012, MELGEN issued a $20,000 check through VRC, his ophthalmology practice, to MELGEN's daughter.

53.     In or about September and October 2012, MELGEN issued more than $100,000 in checks through VRC to several New Jersey county Democratic Party committees and organizations that supported MENENDEZ's reelection bid:

        a.      On or about September 30, 2012, MELGEN, through VRC, gave $16,500 to the Union County Democratic Organization;

        b.      On or about October 1, 2012, MELGEN, through VRC, gave $37,000 to the Passaic County Democratic Organization;

        c.      On or about October 12, 2012, MELGEN, through VRC, gave $25,000 to the Camden County Democratic Committee; and

        d.      On or about October 12, 2012, MELGEN, through VRC, gave $25,000 to the Essex County Democratic Committee.

### ii.     $8,000 Contribution to Satisfy MENENDEZ's Financial Obligation to Another Senator's Campaign

54.     During the 2012 election cycle, Senator 1, a United States Senator, raised approximately $25,000 to support MENENDEZ's reelection efforts. MENENDEZ agreed to raise a commensurate amount of money for Senator 1, who was also running for reelection in 2012.

55.     On or about July 17, 2012, a MENENDEZ fundraiser emailed Person A soliciting a contribution from MELGEN to Senator 1. Specifically, the fundraiser wrote the following:

> The Senator asked me to write you and ask for your help. We are raising money for Senator [1] because she helped us earlier this Spring. She raised $25k for our campaign and now we are returning the favor because she is facing a primary in August.

Will you and [your wife] help us meet our obligations and contribute $5k each to Senator [1]'s campaign? We feel indebted to Senator [1] and we would really appreciate your help.

56. On or about July 20, 2012, a different MENENDEZ fundraiser emailed MENENDEZ stating that MELGEN would contribute the requested $10,000 to Senator 1, "but you [(MENENDEZ)] have to email him and ask? Will you?" MENENDEZ responded, "Do we need that much? I will but want to make sure we need that much, as I thought we were close on commitments." The fundraiser replied that they had obtained $17,000 in commitments to Senator 1, to which MENENDEZ replied, "Ok so I will ask for 8k."

57. Three days later, on or about July 23, 2012, Person A emailed the fundraiser referenced in paragraph 55, stating, "FYI. $8,000 will be sent tomorrow on Dr. and Mrs. Melgen's behalf."

58. That same day, on or about July 23, 2012, MELGEN and his wife gave $8,000 to the campaign of Senator 1. Prior to this contribution, MELGEN had never given any money to Senator 1's campaign.

### iii. $600,000 to Majority PAC, Earmarked for the New Jersey Senate Race

59. Between on or about June 1, 2012, and on or about October 12, 2012, MELGEN gave $600,000 to Majority PAC, a Super PAC whose purpose was to protect and expand the Democratic majority in the U.S. Senate. The $600,000 was divided into two $300,000 payments, both of which MELGEN made through VRC. MELGEN earmarked both $300,000 payments for the New Jersey Senate race. MENENDEZ was the only Democrat running for the Senate in New Jersey that year.

16

60. On or about June 1, 2012, MELGEN issued a $300,000 check from VRC to Majority PAC. This occurred on the same day that MELGEN attended and served on the Host Committee for MENENDEZ's annual fundraising event in New Jersey.

61. MELGEN gave this first $300,000 payment to Person B, a close personal friend of MENENDEZ, who also attended and served on the Host Committee for MENENDEZ's annual fundraising event in New Jersey. Person B sent the check to Fundraiser 1, a fundraiser for Majority PAC, via FedEx from New Jersey to Washington, D.C. Upon receiving the check on June 7, 2012, Fundraiser 1 wrote an email to Fundraiser 2, another Majority PAC fundraiser, with the subject line "Majority PAC (not PMUSA): $300,000 earmarked for New Jersey."

62. On or about October 12, 2012, MELGEN issued a second $300,000 check from VRC to Majority PAC.

63. On or about October 16, 2012, Fundraiser 1 wrote Fundraiser 2 an email with the subject line, "Vitreo-Retinal Consultants – Entire $300k to [Majority PAC] is earmarked for New Jersey."

## II. Concealment

64. As a United States Senator, MENENDEZ was required by the Ethics in Government Act of 1978 to submit a yearly Financial Disclosure Report. In reports MENENDEZ filed from 2007 to 2012, he did not disclose any of the reportable gifts that he received from MELGEN.

65. On or about June 26, 2007, MENENDEZ filed a Financial Disclosure Report in which he certified that he did not receive any reportable gifts in calendar year 2006. He signed, "I CERTIFY that the statements I have made on this form and all attached schedules are true, complete and correct to the best of my knowledge and belief."

66.     On or about April 29, 2008, MENENDEZ filed a Financial Disclosure Report in which he certified that he did not receive any reportable gifts in calendar year 2007. He signed, "I CERTIFY that the statements I have made on this form and all attached schedules are true, complete and correct to the best of my knowledge and belief."

67.     On or about May 6, 2009, MENENDEZ filed a Financial Disclosure Report in which he certified that he did not receive any reportable gifts in calendar year 2008. He signed, "I CERTIFY that the statements I have made on this form and all attached schedules are true, complete and correct to the best of my knowledge and belief."

68.     On or about May 16, 2011, MENENDEZ filed a Financial Disclosure Report in which he certified that he did not receive any reportable gifts in calendar year 2010. He signed, "I CERTIFY that the statements I have made on this form and all attached schedules are true, complete and correct to the best of my knowledge and belief."

69.     On or about May 9, 2012, MENENDEZ filed a Financial Disclosure Report in which he certified that he did not receive any reportable gifts in calendar year 2011. He signed, "I CERTIFY that the statements I have made on this form and all attached schedules are true, complete and correct to the best of my knowledge and belief."

III.    **Official Acts**

A.      **MENENDEZ's Advocacy on Behalf of the United States Visa Applications of MELGEN's Foreign Girlfriends**

70.     MENENDEZ used his position as a United States Senator to influence the visa proceedings of MELGEN's foreign girlfriends.

i.      **Melgen's Girlfriend from Brazil**

71.     MELGEN and Girlfriend 1, a Brazilian national who worked as an actress, model, and lawyer, began a romantic relationship in approximately 2007.

72.     Sometime in 2007, MELGEN suggested that Girlfriend 1 pursue a graduate degree in the United States, specifically in South Florida, where MELGEN lived.

73.     At MELGEN's urging, Girlfriend 1 applied to the LLM program at the University of Miami, which required her to obtain a student visa.

74.     MELGEN contacted MENENDEZ regarding Girlfriend 1's student visa application. Specifically, on or about July 24, 2008, the day before Girlfriend 1's visa application appointment in Brasilia, Brazil, Staffer 3, MENENDEZ's Senior Policy Advisor, emailed the Deputy Assistant Secretary (DAS) at Visa Services, Bureau of Consular Affairs, Department of State, stating the following:

> The Senator asked me to get in touch with you about the following visa applicant. If it is helpful, I can send over a signed letter from the Senator with the details. Thank you for your help with anything you can do to facilitate the following application:
>
> [Girlfriend 1] (no relation to me) has her visa application appointment in Brasilia, Brazil, tomorrow. I understand she is an attorney in Brazil and is coming to the U.S. on a student visa with support from Dr. Solomon [sic] Melgen. Sen. Menendez would like to advocate unconditionally for Dr. Melgen and encourage careful consideration of [Girlfriend 1]'s visa application.
>
> [Girlfriend 1's personal identifying information]
>
> Please don't hesitate to contact me if I can provide additional information and thank you for any help you can provide.

75.     Within hours, the DAS responded to Staffer 3, saying, "Thanks much. I have reached out to our folks in Brasilia and will be back in touch tomorrow."

76.     On or about July 25, 2008, the day of Girlfriend 1's appointment, the visa was approved, and the DAS sent an email to Staffer 3, saying, "The visa was approved today in Brasilia. She was a perfect student visa case—no problems." Staffer 3 replied, "Thanks a lot [DAS], the Senator very much appreciates your help."

77.     Within minutes of receiving the approval email from the DAS, Staffer 3 emailed MENENDEZ and Staffer 1 to say, "Sir: Dr. Solomon [sic] visa applicant, [Girlfriend 1], was APPROVED for her student visa this morning in Brasilia.  Should someone call Dr. Melgen?" Staffer 1 responded, "Good work!  Thanks."

78.     Girlfriend 1 completed her application to the University of Miami listing MELGEN as the guarantor that she would have sufficient funds for tuition as well as living and housing expenses.  MELGEN partially funded Girlfriend 1's tuition through The Sal Melgen Foundation, a non-profit organization with the self-described purpose of "help[ing] with the educational needs of disadvantaged persons" and "assist[ing] with the economic educational needs of children in develeoping [sic] countires [sic] and the U.S."  In an email arranging payment, Person A sent Girlfriend 1 an Application Information Form for funds from The Sal Melgen Foundation.  In the email, Person A informed Girlfriend 1, "I also need you to fill the attached application and send it back to me, since we will make the check payable from the foundation and IRS is very strict."

79.     Girlfriend 1 met MENENDEZ several times while with MELGEN in New York, New Jersey, Florida, Spain, and the Dominican Republic, including at MELGEN's villa in Casa de Campo.  Before her July 25, 2008, visa interview, MELGEN introduced Girlfriend 1 to MENENDEZ as his, MELGEN's, girlfriend.

### ii.     Melgen's Girlfriend from the Dominican Republic, and Her Sister

80.     MELGEN and Girlfriend 2, a Dominican national who worked as a model, began a romantic relationship in approximately 2005.

81.     Girlfriend 2 and her younger sister sought to visit MELGEN in the United States on tourist visas in or about 2008.

82.     On or about October 13, 2008, MELGEN sent a letter to the United States Embassy in the Dominican Republic, stating the following:

Dear Consul,

I hope this letter finds you well. I write in reference to [Girlfriend 2] (Passport# [REDACTED]) and [Girlfriend 2's sister] (Passport# [REDACTED]). To whom I have extended an invitation to visit me in West Palm Beach, Florida. During their visit here in the United States I will cover all their expenses and assure that they will return back to Dominican Republic.

I appreciate your assistance in this matter. If you should need further information please contact me at any of the numbers listed below.

Sincerely,
Salomon Melgen, M.D.

83.     On or about the same day he sent the letter to the Embassy, MELGEN called MENENDEZ and asked for MENENDEZ's assistance in securing visas for Girlfriend 2 and Girlfriend 2's sister.

84.     MENENDEZ instructed MELGEN to speak with Staffer 3, the same Senior Policy Advisor for MENENDEZ who assisted with Girlfriend 1's visa application in or about July 2008.

85.     On or about October 14, 2008, Person A attempted to call Staffer 3, but could not reach him and instead spoke with Staffer 4, another MENENDEZ staffer. Following their conversation, Person A emailed to Staffer 4 a copy of the letter that MELGEN had written to the Embassy. Staffer 4 forwarded the letter to Staffer 3, explaining:

[Person A] from Dr. Melgan's [sic] office called me. The doctor spoke with RM last night about this letter he sent to the DR embassy. He asked RM if he could "move the letter along." RM then said he needed to talk to you..and since you're out, they called me. Make sense? Anyhoo, the letter is attached, please let me know if you need me to do anything. See you manana!

86.     Minutes later, Staffer 3 replied:

THanks [sic], can you call [Person A] and find out all the detials [sic] – 1) why are they coming, 2) have they come before, 3) what is the status of their visa

21

application? 4) when did they submit their application? 5) what have they heard in response? 6) when do they plan to travel, 7) is there any reason to think they would not be approved? Any problems? History we should know about etc…

87.     Staffer 4 then responded:

This is the info that [Person A] (Melgans [sic] assistant) gave me:

1) Sight see and tour around Palm Beach, very good friends with Melgan [sic] (I pressed for more info but he wouldn't go beyond that)
2) They have not been to the US before – this is their first visa they have applied for the US
3) Their status is that they have an appointment on Nov 6 with the embassy in the DR – where they will go over the paperwork and it will be decided if they get the visa or not
4) [Person A] doesn't know when they submitted their application
5) Only response is to come in for their appointment
6) They hopefully plan to travel around Christmas time
7) [Person A] said there is no reason why they would be denied and have no history problems

*He did mention that these people have traveled to Europe and around the world and have never had any problems with their paperwork in these countries.

88.     The staffers drafted a letter from MENENDEZ supporting Girlfriend 2's and her sister's visa applications. The letter was addressed to the Consul General of the United States Embassy in the Dominican Republic and dated October 22, 2008. It read as follows:

Dear [Consul General]:

I wanted to bring your attention to the pending non-immigrant visa applications of two citizens of the Dominican Republic: [Girlfriend 2] (Passport no. [REDACTED]), and [Girlfriend 2's sister] (Passport no. [REDACTED]). I understand they are scheduled for interviews at the Embassy on November 6.

While [Girlfriend 2 and Girlfriend 2's sister] have traveled before to Europe and other destinations outside the Dominican Republic, this would be their first trip to the U.S. They plan to visit someone I know well, Dr. Salomon Melgen, who is an eye doctor in Florida.

I appreciate very much your giving these applications all due consideration within the requirements of the law.

Sincerely,

22

Robert Menendez
United States Senator

89.     On or about October 22, 2008, Staffer 3 asked MENENDEZ if he should send the "general letter of support" that the staff had prepared.  MENENDEZ replied, "Yes.  As well as call if necessary."

90.     On or about October 28, 2008, Girlfriend 2 emailed MELGEN to ask for a copy of MENENDEZ's letter of support.  The email read as follows:

[ENGLISH TRANSLATION]

Hello my love,

I write to remind you that you need to send me a copy of what Senator Bob Menendez's office sent you, which I need for the embassy.

And also remember the bank thing please.

Thank you.  A kiss.

[Girlfriend 2]

91.     On or about November 3, 2008, Person A emailed Staffer 4 to inquire whether Staffer 3 had sent the letter of support to the United States Consulate in the Dominican Republic, and to ask for a scanned copy.

92.     The next day, on or about November 4, 2008, Staffer 4 emailed the letter of support to Person A.

93.     On or about November 6, 2008, the United States Embassy denied Girlfriend 2's and her sister's applications for tourist visas.  In the memorandum describing the reasons for refusal, the Embassy employee explained, "Siblings, 18 and 22 yrs old.  No children.  No previous travel.  To go visit a friend in Florida.  Neither is working.  No solvency of their own.  Not fully convinced of motives for travel."

94.     That same day, on or about November 6, 2008, Person A alerted MENENDEZ's staff of the Embassy's decision, emailing Staffer 4 the following update:

> Dr. Melgen just called me that there [sic] Visa was denied. I tried calling you at the office, but it went straight to voicemail. The Doctor tells me that the lady just took a quick look at the papers and told them "you are students" and denied there [sic] Visa. The lady was very rude to them. The doctor wanted to see if there is something he can do, since the lady obviously didn't read or checked [sic] any papers.

95.     Additionally, MELGEN alerted MENENDEZ on or about November 6, 2008, forwarding him an email Girlfriend 2 had written describing details of the visa interview. MENENDEZ forwarded Girlfriend 2's email to Staffer 3, stating, "Theu [sic] were denied their visa. I would like to call Ambassador tomorrow and get a reconsideration or possibly our contact at State. Thanks."

96.     Staffer 3 replied within minutes, informing MENENDEZ,

> Yes, we talked to his office today and are preparing a follow-up letter to send out in the morning to the consul general in the DR. We should get a response within a couple of days. Then, we could follow-up with a phone call if need be, since it's not yet clear why they were denied?

> Would you rather wait for the outcome of a follow-up letter or call the Ambo asap?

97.     Minutes later, MENENDEZ responded, "Call Ambassador asap."

98.     On or about November 9, 2008, MELGEN sent Staffer 3 and Staffer 4 scanned copies of all of the documents that Girlfriend 2 and her sister gave to the Embassy.

99.     On or about November 12, 2008, the Chief of the Nonimmigrant Visa Unit sent MENENDEZ a letter regarding the visa denial. The letter stated as follows:

> Dear Senator Menendez:

> Thank you for your recent inquiry regarding the nonimmigrant visa application of [Girlfriend 2] and [Girlfriend 2's sister].

24

[Girlfriend 2] and [Girlfriend 2's sister] were denied visas on November 6, 2008, under Section 214(b) of the U.S. Immigration and Nationality Act. Under this law, all applicants for nonimmigrant visas are presumed to be intending immigrants. In order to be approved for a visa, applicants must satisfy the interviewing consular officer that they are entitled to the type of visa for which they are applying and that they will depart the United States at the end of their authorized temporary stay. This means that before a visa can be issued, applicants must demonstrate strong social, economic, and/or family ties outside the United States.

Unfortunately during their interview, [Girlfriend 2] and [Girlfriend 2's sister] were unable to overcome the presumption of the law. I have reviewed the applications and the interviewing officer's notes, in addition to the information we received from you, and I must agree with the decision of the interviewing officer in the case.

Any applicant found ineligible under Section 214(b) may schedule an appointment for a new interview. During the interview, the applicants will be given another opportunity to demonstrate their qualifications for visas.

I hope this information has been helpful to you and to your constituent.

Sincerely,
[REDACTED]
Chief, Nonimmigrant Visa Unit

100.     On or about November 13, 2008, Staffer 3 emailed MELGEN, "Dr Melgen: I forwarded the information you send [sic] to the Embassy in the DR on Monday of this week. We haven't heard back but will let you know when we do. Let's stay in touch."

101.     Person A followed up with MENENDEZ's staff, emailing Staffer 4 on or about November 21, 2008, to ask if they "had heard anything from the Embassy in Dominican Republic on why the visas were denied." Staffer 4 replied, "As of right now, we have not heard anything. We will let you know as soon as we get some news."

102.     On or about November 24, 2008, Staffer 3 emailed MELGEN and Person A to say, "State notified me today that the visa applicants in the DR have been called back for a 2nd interview."

25

103.    Person A responded, "Thanks for the email.  Dr. Melgen asks if you want them to contact a certain person or if someone from the embassy will contact them, since they haven't done it yet.  Please let me know so I can tell the Doctor.  He also would like to thank you for all your help."

104.    Staffer 3 replied, "The latter, if they don't hear from the Embassy in a week, let me know."

105.    Girlfriend 2 and her sister were re-interviewed on or about December 1, 2008.  At the conclusion of the interview, Girlfriend 2 and her sister were informed that their visa applications were approved.

106.    On or about December 10, 2008, Staffer 3 sent an email from his personal account to Staffer 1's personal account with the subject line "2 people from the DR who wanted visas to visit Dr. Melgem [sic] GOT THEM."  Staffer 3 wrote, "In my view, this is ONLY DUE to the fact that RM intervened.  I've told RM."

107.    MENENDEZ first met Girlfriend 2 in the Dominican Republic prior to when she received her visa in or about 2008, when MELGEN, Girlfriend 2, and MENENDEZ stayed together at MELGEN's home in Casa de Campo.

###    iii.    MELGEN's Girlfriend from Ukraine

108.    Girlfriend 3, a Ukrainian national who worked as a model and actress, was another woman with whom MELGEN had a romantic relationship.

109.    In or about 2006 or 2007, MELGEN invited Girlfriend 3, who was residing in Spain at the time, to visit him in Miami, Florida.  Girlfriend 3 needed a tourist visa in order to do so.

110.    Sometime in or about 2007, MELGEN sought MENENDEZ's assistance in obtaining Girlfriend 3's visa.  On or about February 13, 2007, Staffer 5, MENENDEZ's Chief of

26

Staff at the time, wrote an email to Staffer 6, a MENENDEZ staffer, asking her, "did we send dr. Melgen's letter?" Staffer 6 responded:

> I'm assuming your [sic] referring to an issue I discussed with RM?
>
> RM asked me to work on an issue of a Ukrainian visa for a woman in Spain related to Dr. Melgen. I passed all the information on to [Staffer 7, a MENENDEZ staffer] and she knew it was an RM personal request. She has followed up on it.

111.    On or about February 15, 2007, Staffer 7 sent an email to Staffer 5 stating, "This will be the new version of the letter. However, I am still missing the new interview date. This is so you can have an idea of what the letter will say….." The draft of the letter read as follows:

> Dear Consul General:
>
> I am writing on behalf of Salomon Melgen, who has contacted my district office in reference to a non-immigrant visa for his friend, [Girlfriend 3] (DOB: [REDACTED]).
>
> According to Dr. Melgen, he has extended an invitation to his good friend [Girlfriend 3] to undergo medical evaluation for plastic surgery as well as to visit with him within the U.S. Upon receiving the invitation, [Girlfriend 3] had contacted the U.S. Embassy in Madrid (Spain) and subsequently, she was scheduled for a non-immigrant visa interview for February 12, 2007. Unfortunately, [Girlfriend 3] had to reschedule the interview. Dr., [sic] Melgen states that [Girlfriend 3] has no intentions of abandoning her residency abroad due to the fact that she has such strong ties to Spain. Furthermore, [Girlfriend 3] is enrolled at the University of Blanca ford in Barcelona, Spain and she is also the broadcast image for channel Tele 5 Spana and thus, a famous person in Spain. Thus, Dr. Melgen assures that if [Girlfriend 3] is granted a non-immigrant visa, she will remain in the U.S. only for the time allotted by the visa and will return to her home abroad before the non-immigrant visa expires. Dr., [sic] Melgen will assume all financial responsibilities during her stay in the United States. Therefore, Dr. Melgen respectfully requests that his good friend, [Girlfriend 3], be granted a non-immigrant visa so that she may be able to travel to the U.S. to obtain a medical evaluation and visit with him.
>
> Dr. Melgen is a person of the highest caliber. He is a fine citizen and held in high esteem by his peers. In this time of heightened security, I can appreciate the gravity of your task. Fastidious review of visa appointments is vital to the future of this great nation. Therefore, if there is anything my office or Dr. Melgen can do to assist you in making a prompt and fair decision to grant [Girlfriend 3] a visa petition, please inform my office at your earliest convenience.

In view of these circumstances, I respectfully request that your good office review this matter and kindly consider granting the non-immigrant visa with guidance from the Immigration and Nationality Act.

Thank you for your cooperation. Please feel free to contact my Newark office if I can be of assistance to you or contact my Director of Immigration Services, [Staffer 7], at [REDACTED] should you have additional questions.

Sincerely,
Robert Menendez
United States Senator

112. Girlfriend 3 was granted a visa on or about February 22, 2007.

113. After receiving her visa, Girlfriend 3 traveled to Florida. While there, she stayed in an apartment that MELGEN owned in Palm Beach. She visited Miami, where she joined MELGEN and MENENDEZ for dinner at Azul, a restaurant in the Mandarin Hotel. MELGEN introduced MENENDEZ to Girlfriend 3 as the man who helped Girlfriend 3 with her visa.

**B.  MENENDEZ's Efforts to Advance MELGEN's Interests in a Foreign Contract Dispute**

114. In or about 2006, MELGEN purchased an option to buy a 50-percent share of a company called ICSSI, SA, which he exercised in or about 2011. ICSSI was a company that had entered into a contract with the Dominican Republic on or about July 18, 2002. Under the contract, ICSSI acquired the exclusive rights to install and operate X-ray imaging equipment in Dominican ports for up to 20 years. The contract required all shipping containers entering Dominican ports to be X-rayed at a tariff of up to $90 per container, which made this contract worth potentially many millions of dollars. Soon after the contract was executed, ICSSI and the Dominican Republic began litigating its legitimacy and legality.

115. In or about 2011, MELGEN established an American company, Boarder Support Services, LLC (also known as Border Support Services) as a holding company for the contract.

28

116. In or about February 2012, MELGEN acquired the remaining 50 percent of ICSSI, thereby obtaining exclusive ownership and control of any enforceable rights under the contract.

### i. MENENDEZ's Meeting with the Assistant Secretary of State for INL to Advance MELGEN's Interests in his Contract Dispute with the Dominican Republic

117. On or about May 16, 2012, MENENDEZ advocated for MELGEN's interests in his Dominican contract dispute in a meeting with the Assistant Secretary of State for the Bureau of International Narcotics and Law Enforcement Affairs (INL).

118. Prior to this meeting, on or about March 12, 2012, Person C, a friend of MELGEN's who was a former MENENDEZ staffer, contacted the U.S. Department of State to request a phone call with the Assistant Secretary of State for INL.

119. On or about March 13, 2012, State 1, an aide to the Assistant Secretary, called Person C on the Assistant Secretary's behalf. That same day, State 1 emailed the Assistant Secretary the following note:

> Sir: I called back [Person C]. He said the current scanners are inadequate and the port security is deteriorating quickly. The customs director is highly corrupt. He proposes going after visas for corruption purposes, which would have a cultural impact and send a message to the president. I agreed to discuss it with him when he's back in town. However, he says he still wants to talk to you briefly about this. [Person C] doesn't currently represent anyone involved in this contract dispute over scanners but he will soon join the board of Border Security Services. And, he dropped the name of Sen. Menendez pretty squarely as having an interest in this case.

120. After State 1's call with Person C, in or about March or early April 2012, the Assistant Secretary met with Person C, who represented to the Assistant Secretary that he was there to speak on behalf of a United States entity involved in a contract dispute with the Government of the Dominican Republic concerning the screening of shipping containers at Dominican ports. Person C asked the Assistant Secretary to incorporate this contract into larger

law enforcement conversations with the Dominican government, arguing that the contract would help INL meet drug interdiction and port security objectives in the region. Person C referenced New Jersey connections to the issue.

121. On or about April 6, 2012, Person C emailed the Assistant Secretary regarding the ICSSI issue. In that email, Person C stated, "Below, along with three brief attachments, I have tried to succinctly summarize the issues at hand in the matter of the DR port security contract and ask that you consider taking appropriate actions in this serious matter."

122. MENENDEZ was in the Dominican Republic from on or about April 5 to on or about April 11, 2012, and MELGEN was in the Dominican Republic from on or about April 2 to on or about April 10, 2012.

123. On or about May 10, 2012, Staffer 8, MENENDEZ's Senior Policy Advisor, reached out to State 2, a staffer to the Assistant Secretary, to arrange a meeting between MENENDEZ and the Assistant Secretary. That same day, MELGEN promised Staffer 1 that he would send the $60,000 that Staffer 1 requested in the April 30, 2012, email, as set forth in paragraphs 41 to 42 and 47 to 49. Staffer 8 and State 2 exchanged the following emails:

**12:22 p.m. (Staffer 8 to State 2)**

[State 2] –

Just saw Menendez and he would like to see [the Assistant Secretary] next week to talk about DR (cargo from DR coming into US ports) and [REDACTED].

I'll put in the request through H [the Office of Legislative Affairs in the State Department], but wanted to give you a heads up.

[Staffer 8]

**12:24 p.m. (State 2 to Staffer 8)**

Cool, thanks for the heads up – my long lost friend!! I've been waiting anxiously for you to pop up! The second piece I get – can you help me with the first. . . . Any more specificity?

Hope to see you next week!

[State 2]

**12:27 p.m. (Staffer 8 to State 2)**

Hah! [REDACTED]. I had to drag even this information out of him. He was just in the DR for a personal visit and imagine he has some observations to share, but he continues to have concerns about what is flowing through the ports either unobserved or with tacit permission.

**12:29 p.m. (State 2 to Staffer 8)**

Roger that. I know [the Assistant Secretary] will be happy to opine and be helpful however he can – that said, it might be the case that WHA [(the Bureau of Western Hemisphere Affairs at the Department of State)] is the true angle he will want to pursue on the DR point.   But since [the Assistant Secretary] can chat [REDACTED], what the heck – he can always offer his two cents.

If H is in the room – best if the good Senator from New Jersey doesn't mention the prior private meeting they had ☺

[State 2]

**12:32 p.m. (Staffer 8 to State 2)**

Understood. I think it would behoove [the Assistant Secretary] to have some talkers on any new DR initiatives, particularly at the ports.

124.    The meeting between the Assistant Secretary and MENENDEZ occurred on or about May 16, 2012, the same day that MELGEN and his family gave $40,000 to the New Jersey Democratic State Committee Victory Federal Account and $20,000 to MENENDEZ's legal defense fund, as set forth in paragraphs 43 and 50 to 52. During the meeting, MENENDEZ questioned the Assistant Secretary about the contract dispute between MELGEN and the Dominican Republic. MENENDEZ expressed dissatisfaction with INL's lack of initiative in enforcement of the contract.

31

125. That same day, the Assistant Secretary sent the following email to his staffers describing the meeting:

> DR port issue. [State 1] will remember the Senator raised several months ago the issue of a US company attempting to sell a tracking and security system to the DR port authority, and suggesting they were being blocked by corrupt officials. This is what he was alluding to today. If I recall correctly, our investigation last time suggested this was more a commercial dispute than a law enforcement issue. I told the Senator we were working up some sort of port initiative, once we had a concrete initiative we would see if it could leverage a correct GODR decision on the port contract, and I would let him know how this developed. He said he wanted to hear of a solution by July 1. If not, he would call a hearing to discuss it.

126. On or about June 14, 2012, Staffer 8 emailed State 2, "Can we talk DR? Anything to share based on [MENENDEZ and the Assistant Secretary's] last conversation?"

127. Approximately two hours later, State 2 replied to Staffer 8, "We're working on getting an update on the specific issue he raised. I took it that the particular matter was most important to him, right? We are unfortunately not the lead so we've been working the phones hard to get info from the embassy."

128. On or about June 15, 2012, the Assistant Secretary received an email from Person C attaching a copy of a letter that MELGEN sent to Dominican government officials urging that they enforce the contract.

129. Three days later, on or about June 18, 2012, the Assistant Secretary forwarded the email and attachment to his staff with the following message:

> FYI
> This is the case about which Sen. Menendez threatened to call me to testify at an open hearing. I suspect that was a bluff, but he is very much interested in its resolution. A reminder that I owe the Senator an answer to the question "What can we do to resolve this matter?"

130. That same day, State 2 responded to the Assistant Secretary's email:

> I chatted with the Senator's staff on Thursday in an effort to temper expectations and to indicate that we're working to gather any info that we can to pass along.

32

This is most certainly still on their minds. The response will most appropriately come from a phone call from you to the Senator, ideally as soon as tomorrow. If not tomorrow, the last opportunity before the Senator's deadline will be directly after your return from Peru. Absent a real warm and fuzzy answer, it's better to reach out sooner than later.

131. On or about June 20, 2012, Person C sent the Assistant Secretary another email regarding the ICSSI situation, with the subject "ICCSI [sic]-Border Security Solutions documents." The Assistant Secretary forwarded it to his staff that same day with the message, "More on Menendez' favorite DR port contract case."

### ii.      MENENDEZ's Attempt to Stop CBP from Donating Cargo Screening Equipment to the Dominican Republic

132. On or about January 11, 2013, MENENDEZ called Staffer 9, his Chief Counsel, and asked her to contact CBP to stop them from donating shipping container monitoring and surveillance equipment to the Dominican Republic—a donation that would hurt MELGEN's financial interests in the contract he had to provide exclusive cargo screening in Dominican ports.

133. Shortly after the call, at 1:56 p.m., Staffer 9 sent an email to CBP 1 at CBP entitled "Customs equipment– Dom Republic." The email said the following:

Dear [CBP 1],

My boss asked me to call you about this. Dominican officials called him stating that there is a private company that has a contract with DHS to provide container shipment scanning/monitoring in the DR. Apparently, there is some effort by individuals who do not want to increase security in the DR to hold up that contract's fulfillment. These elements (possibly criminal) want CBP to give the government equipment because they believe the government use of the equipment will be less effective than the outside contractor. My boss is concerned that the CBP equipment will be used for this ulterior purpose and asked that you please consider holding off on the delivery of any such equipment until you can discuss this matter with us– he'd like a briefing. Could you please advise whether there is a shipment of customs surveillance equipment about to take place?

Thanks. My number is [REDACTED.]

33

134.    At 2:41 p.m., CBP 1 responded, "We need to look into the matter.  I'm adding [CBP 2], whose team can assist in running this down.  We'll get back to you ASAP."

135.    At 2:48 p.m., MENENDEZ sent an email to Staffer 9 with the subject, "Any info?"

136.    At 3:01 p.m., Staffer 9 replied to CBP 1 and CBP 2, "Thanks, my boss considers it very urgent so would love any update by the end of the day.  My cell is [REDACTED.]  Thanks!"

137.    At 4:04 p.m., CBP 2 replied to Staffer 9 with the following information:

I just spoke with our Office of Field Operations.  The contract that you are referring to for additional equipment is between the Government of the Dominican Republic and a private company.  CBP has not been a part of this contract, as CBP is present at one port in the Dominican Republic, Port of Caucedo, and the equipment that is being used there was donated by CBP when the operations started in 2006.  CBP has not agreed to any expanded operations in the Dominican Republic and has not provided any additional equipment.

138.    At 4:13 p.m., Staffer 9 notified MENENDEZ,

This is their response:

The contract that you are referring to for additional equipment is between the Government of the Dominican Republic and a private company.  CBP has not been a part of this contract, as CBP is present at one port in the Dominican Republic, Port of Caucedo, and the equipment that is being used there was donated by CBP when the operations started in 2006.  CBP has not agreed to any expanded operations in the Dominican Republic and has not provided any additional equipment.

139.    At 4:18 p.m., MENENDEZ replied to Staffer 9, "What is the name of the private company?"

140.    At 4:39 p.m., Staffer 9 replied to CBP 2, "Thanks very much- sounds like our information was incorrect.  What is the name of the private company to be sure we are discussing the same thing?  Thanks[.]"

141.    At 4:41 p.m., CBP 2 replied, "The company is called ICCSI [sic]."

142.    At 9:46 p.m., Staffer 9 replied to MENENDEZ, "The company is called ICSSI."

34

143.    This series of emails occurred one day after MENENDEZ, MELGEN, and Person A golfed together at the private Banyan Golf Club in West Palm Beach, Florida, where MELGEN paid for the greens fees, as referenced in paragraph 45. After the round of golf, Person A paid $356.80 for a meal at the Raindancer Steak House in West Palm Beach, also referenced in paragraph 45.

### C.    MENENDEZ's Advocacy on Behalf of MELGEN in a Medicare Billing Dispute Worth Approximately $8.9 Million

144.    For several years, MENENDEZ, personally and through his aides, advocated for MELGEN's interests in a Medicare billing dispute MELGEN had with CMS and HHS involving millions of dollars.

145.    MELGEN's health care dispute arose in or about July 2008, when the Zone Program Integrity Contractor (ZPIC) for CMS began to investigate MELGEN's billing practices for a drug called Lucentis. Lucentis is an injectable drug that is stored in single-use vials as a preservative-free solution. Although the Lucentis vials contain excess solution, called overfill, in case of spillage, the Food and Drug Administration (FDA) has only approved the use of one dose per vial, which means that each vial should only be used for a single eye of a single patient. The Centers for Disease Control and Prevention (CDC) has also issued guidelines warning that reusing a single-use vial, or harvesting the preservative-free solution to treat more than one patient, spreads the risk of infection. The manufacturing label for Lucentis also instructs that "each vial should be used for the treatment of a single eye." Although the FDA, CDC, and manufacturing label caution against harvesting Lucentis, MELGEN did so, using overfill from the single-dose vials to treat up to three patients. Then, through his company, VRC, MELGEN sought and obtained reimbursement from CMS for the full cost of a single vial of Lucentis for each dose he administered, even though he had not incurred the expense of purchasing a new vial for each dose.

35

In other words, MELGEN billed CMS for multiple vials of Lucentis that he never actually used and for which he never incurred any cost.

146. In or about July 2008, the ZPIC requested patient records from MELGEN's practice in connection with the administration of Lucentis for patients treated from on or about February 1, 2007, through on or about December 21, 2007.

147. In or about January 2009, the ZPIC requested patient records from MELGEN's practice in connection with the administration of Lucentis for patients treated from on or about January 2, 2008, through on or about December 23, 2008.

### i.    MENENDEZ Directs His Staff to Assist MELGEN in His Medicare Billing Dispute

148. On or about June 12, 2009, after MELGEN learned that an audit of his Medicare billing was likely to result in a multi-million dollar overpayment finding, MENENDEZ emailed Staffer 10, his Legislative Assistant handling health care issues. The email's subject line was "Dr melgen." In the email, MENENDEZ instructed Staffer 10 to "[p]lease call him asap at [REDACTED] re a Medicare problem we need to help him with."

149. Staffer 10 replied that evening that she and Staffer 11, MENENDEZ's Deputy Chief of Staff, had called MELGEN twice that day and were "looking into how [they could] be helpful."

150. On or about June 19, 2009, Staffer 11 emailed MENENDEZ to inform him that she and Staffer 10 had had a conference call with MELGEN "in which he asked [Staffer 11 and Staffer 10] to weigh in with CMS," but that MELGEN's attorneys had told them to wait for strategic reasons.

151. The next day, on or about June 20, 2009, Person A sent Staffer 10 an email entitled "Dr. Melgen." Person A copied Lobbyist 1, MELGEN's lobbyist and lawyer, on the email, sharing

36

with Staffer 10 "some points that Dr. Melgen wanted [Person A] to provide" in support of MELGEN's position in his Medicare billing dispute with CMS. In the email, Person A also said that MELGEN "wants to see if [Staffer 10] and [Lobbyist 1] could meet early this week to speak. He wants everyone to know the facts and to be on the same page."

152.    That same day, on or about June 20, 2009, Staffer 10 responded, "Thank you. Yes, setting up a call early next week would be great.  What day and time works [sic] best?"

153.    Approximately three minutes later, Person A forwarded Staffer 10's response to MELGEN.

154.    On or about June 21, 2009, MELGEN emailed Staffer 10, copying MENENDEZ, with more information about MELGEN's specific case so that she would "better understand the facts."

155.    Over the next few days, MELGEN requested more calls with Staffer 10, and Lobbyist 1 sent more information about the status of MELGEN's dispute to her.

156.    On or about June 30, 2009, the ZPIC formally notified MELGEN that it had conducted a post-payment review of claims and concluded that Medicare had overpaid MELGEN on claims he submitted, through VRC, for Lucentis. The ZPIC informed MELGEN that it had preliminarily determined that his practice owed approximately $8,981,514.42.

157.    Beginning in or about July 2009, MENENDEZ's staff reached out to CMS to advocate for MELGEN.  To address MELGEN's pressing concern, Staffer 10 inquired as to whether a CMS administrative contractor would be issuing a new policy that would affect the future coverage of Lucentis in Florida.

158.    On or about July 10, 2009, HHS 1, the then-Deputy Assistant Secretary for Legislation at HHS, emailed Staffer 10 to notify her that "CMS has confirmed that [the contractor] has not issued, nor does it plan to issue, a revision to its local coverage determination for Lucentis."

159.    Staffer 10 forwarded that email to Staffer 11, who responded, "Yeah, but what are they talking about being in the works….a decision on Melgen specifically?  I think we have to weigh in on his behalf….to say they can't make him pay retroactively."

160.    That same day, Staffer 10 sent MENENDEZ the following email, with the subject line, "Update on Dr. Melgen and CMS":

> I understand that Dr. Melgen might be calling you this afternoon so I wanted to let you know where things stand.  [Staffer 11] and I have spoken to Dr. Melgen every few days to update him on the situation.  We have reached out to a good contact at HHS (who used to work at the DPC) to ask them to look into the situation and find out what is going on.  They are hoping to get back to us by the end of the day with additional information so that we can best advise you about how to proceed for your involvement.  Also, just fyi, we received an email from Dr. Melgen yesterday sharing a letter he sent to the lead investigator on his case that summarizes his situation well and we asked him if we could share that with HHS to further explain his situation.

161.    While Staffer 10 was communicating with CMS officials, she continued to receive case-specific information from MELGEN's lobbyists/lawyers.

### ii.    MENENDEZ Advocates on Behalf of Melgen to the Director and Acting Principal Deputy of CMS

162.    On or about July 22, 2009, Staffer 11 emailed MENENDEZ to inform him, "As you know we've been working on the Melgen case everyday and just this morning got an update from his lawyer that we expect a response to be made public this week."  Staffer 11 requested a breakfast meeting with MENENDEZ to update him, which would precede "find[ing] a time for [MENENDEZ] to call the Sec" that day.

163.    That same day, Lobbyist 1 emailed MELGEN, copying Staffer 10 and Staffer 11, to inform them that he had received a document regarding Lucentis that CMS proposed to publish that week.    Lobbyist 1 complained that there was "no legal basis" for the contents of the document—which were adverse to MELGEN's interests—and wrote, "I am forwarding this to Senator Menendez's office.    Clearly, if there is a way to stop publication, we need to do so immediately."

164.    Later that day, Staffer 10 thanked him for the update and informed him that she was "working to schedule a time for the Senator to call the Secretary today, so thanks for the update."

165.    In the meantime, Staffer 10 arranged a phone call with CMS officials that day in which she insisted that the CMS regulations regarding Lucentis were unclear, and that there existed "conflicting information" that supported MELGEN's position in his financial dispute.

166.    At this point, MENENDEZ sought to speak to a high-level official to advance MELGEN's position.    HHS determined that the proper person to speak with MENENDEZ was HHS 2, the Director and Acting Principal Deputy of CMS.    In arranging this conversation, HHS 1 sent HHS 2 the following email:

> Hi, [HHS 2].  Just tried to call you but understand you are in Baltimore today.  We have a bit of a situation with Senator Menendez, who is advocating on behalf of a physician friend of his in Florida.  The bottom line is that he wants to talk to someone today – I talked his office out of the Secretary, but therefore through [sic] you under the bus.  Would you be able to speak with Senator Menendez some time today?  Can I give you a call this a.m. to give you some background on discussions thus far? . .

> Many thanks and sorry!

167.    The call between MENENDEZ and HHS 2 occurred on or about July 27, 2009.  To prepare MENENDEZ for this call, Staffer 10 prepared a "Talking Points" memorandum, which began, "I was contacted by Dr. Melgen regarding an audit by First Coast, the Medicare

39

administrative contractor in Florida." The opening section continued, "I understand that you are familiar with his situation and Lucentis but let me go through his concerns," and then outlined MELGEN's arguments for why he should not have to pay the approximately $8.9 million to CMS. The opening section ended, "I am not weighing on how you should administer Lucentis, nor on how his specific audit should be resolved but rather asking you to consider the confusing and unclear policy on this issue and not punish him retroactively as a result."

168. While Staffer 10 was preparing the "Talking Points" memorandum for MENENDEZ, Lobbyist 2, another one of MELGEN's lobbyists/lawyers, emailed Staffer 11 arguments that MELGEN wanted to emphasize in support of his position. Staffer 11 forwarded the email to Staffer 10 and asked her to incorporate the arguments into the memorandum for MENENDEZ. Staffer 10 did so, including sections in the memorandum entitled "arguments we received from [Lobbyist 2]" and "Dr. Melgen also asked that you have these points."

169. During the call on or about July 27, 2009, between HHS 2 and MENENDEZ, MENENDEZ asserted that CMS's policy guidelines regarding single-use vials were vague and that a doctor in Florida was being treated unfairly as a result. HHS 2 responded that he had reviewed the bills and spoken to the contractors, and that they should allow the case to take its course. HHS 2 reminded MENENDEZ that the doctor had due process and appellate rights. MENENDEZ told HHS 2 not to tell him (MENENDEZ) about MELGEN's appellate rights and abruptly ended the call.

170. On or about July 31, 2009, Person A sent Staffer 10 an email entitled "Dr. Melgen Call." In it, Person A informed Staffer 10, "Dr. Melgen is available now. If you can call him again at [REDACTED.] He is waiting for your call."

40

171. Later that day, Staffer 10 sent Staffer 11 an email with the subject line, "talking to dr melgen," writing that "He is v upset."

### iii. MENENDEZ Attempts to Speak to the Secretary of HHS to Advocate on MELGEN's Behalf After MELGEN Receives Unfavorable Rulings in His Medicare Billing Dispute

172. On or about August 5, 2009, the Medicare Administrative Contractor (MAC-1) adopted the ZPIC's finding and issued a revised Overpayment Demand to MELGEN in the amount of approximately $8,982,706.98.

173. One week later, on or about August 12, 2009, MENENDEZ emailed Staffer 1, "Dr. Melgen is still in the nonlitigant stage, so we should determine who has the best juice at CMS and Dept of Health."

174. On or about August 13, 2009, Lobbyist 1 emailed Staffer 10 and Staffer 11 to inform them that "Dr. Melgen received the overpayment demand letter from First Coast," which he stated was sent prematurely because MELGEN was preparing to appeal the underlying decision. Staffer 11 forwarded the email to MENENDEZ the next day, asking, "Do you want us to ask our CMS leg affairs contact to look into this?" MENENDEZ replied, "Yes I do want us to contact them on this issue."

175. On or about August 20, 2009, Staffer 10 emailed HHS 1 and copied Staffer 11, requesting a call regarding MELGEN's "issue regarding repayment demand letters from several Medicare supplemental insurers."

176. On or about August 21, 2009, MELGEN filed a Request for Redetermination with the MAC-1.

177. Between in or about September 2009 and January 2010, MELGEN's team continued to update MENENDEZ's staff regarding the status of MELGEN's dispute.

41

178. On or about October 13, 2009, the MAC-1 issued a denial of MELGEN's Request for Redetermination. After the MAC-1 issued this denial, on or about November 25, 2009, Person A sent an email to Staffer 1 with the subject, "Dr. Melgen," that included an attachment entitled, "Medicare Second Appeal." In the email, Person A said, in part, "Dr. Melgen asked me to forward the attached QIC Appeal."

179. On or about January 29, 2010, the Qualified Independent Contractor (QIC) affirmed the Overpayment Determination against MELGEN in the amount of approximately $8.9 million. After the QIC issued its decision, on or about March 30, 2010, MELGEN requested a hearing before an Administrative Law Judge.

180. On or about August 4, 2010, Staffer 10 emailed HHS 3, an HHS staffer, with the following request:

> My boss would like to try and set up a call with [the] Secretary [of HHS] (not clear on the topic at this point—will try and find out). Could you connect us to her scheduler or whomever you think is best so we can arrange a time?

181. That same day, HHS 3 put Staffer 10 in touch with HHS 4, the Deputy Director for Scheduling and Advance for the Secretary of HHS, but specified that HHS "do[es] need to know what's on [MENENDEZ's] agenda."

182. On or about August 5, 2010, HHS 4 entered the email exchange, again asking for "any background on the topic" for the call.

183. That same day, Staffer 12, MENENDEZ's scheduler, emailed HHS 4 that MENENDEZ wants "to try and speak with the Secretary as soon as possible," listing potential available times for that evening and the following day. In response to the HHS requests for the topic of the call, she wrote, "Unfortunately my boss didn't share with me the topic—just that he really wished to speak with the Secretary as soon as possible."

42

184. Also that same day, HHS 4 suggested that the call occur at 1:15 p.m. on August 6, 2010, but Staffer 12 stated that MENENDEZ would be on a flight at that time and therefore unable to take a call. In fact, the flight MENENDEZ took that day was on MELGEN's private jet from West Palm Beach, Florida, to MELGEN's villa in Casa de Campo.

### iv. MENENDEZ Arranges for MELGEN to Lobby the Chair of the Senate HELP Committee Regarding His Medicare Billing Dispute

185. In or about May 2011, MENENDEZ arranged for MELGEN to meet with Senator 2, Chair of the Senate Health, Education, Labor, and Pensions (HELP) Committee, so that MELGEN could personally solicit Senator 2's assistance with his Medicare billing dispute.

186. MENENDEZ first spoke to Senator 2 about MELGEN directly, and then, on or about May 5, 2011, Staffer 1 emailed Senator 2's Chief of Staff, requesting a meeting between Senator 2 and MELGEN. The email noted that "[t]he doctor Senator Menendez spoke to [Senator 2] about is Dr. Sal Melgen," and stated that "CMS is pursuing Dr. Melgen for a matter around dosing procedures and relevant charges to Medicare."

187. On or about May 16, 2011, the Health Policy Director for the Senate HELP Committee reached out to MENENDEZ's office for more information, and Staffer 10 and Staffer 11 arranged to speak to her about MELGEN's Medicare billing dispute.

188. The meeting that MENENDEZ arranged between MELGEN and Senator 2 took place on or about May 18, 2011. MENENDEZ introduced MELGEN to Senator 2 at the beginning of the meeting and remained while MELGEN solicited Senator 2's assistance.

189. On or about June 24, 2011, MELGEN forwarded to MENENDEZ a memorandum he had received from Lobbyist 1, his lobbyist/lawyer, which memorialized a conversation between a staffer for Senator 2 and CMS that was unfavorable to MELGEN. In the email, MELGEN said to MENENDEZ, "These people are unbelievable. Again, they continue to lie."

43

### v. After MELGEN Receives More Unfavorable Rulings, MENENDEZ Enlists the Office of the Senate Majority Leader to Assist MELGEN in His Medicare Billing Dispute

190. On or about June 13, 2011, the Administrative Law Judge issued a decision affirming the decision of the QIC.

191. On or about August 14, 2011, MELGEN filed an appeal before the Medicare Appeals Council (MAC-2).

192. On or about September 19, 2011, MELGEN forwarded to MENENDEZ an email from Lobbyist 1 entitled "Secretary Authority." Among other things, the email said the following:

> [I]f the MAC[-2] were contacted by CMS and advised that CMS believed that the position of the provider were correct, it would eliminate the dispute and the MAC would dismiss the appeal. Naturally, in that case, First Coast would be directed by CMS to make payment to you. Since CMS is subject to the Secretary's oversight, my contact believed that the Secretary could direct CMS to drop its opposition and notify the MAC that it agreed with the position of the provider.
>
> Overall, this makes sense, because if you consider the fact that if the MAC ruled against us, and we went to court, we would be suing the Secretary as the head of HHS -- so that means that the Secretary would be making the decision in the litigation.
>
> Given these facts, it seems to me that the best approach to the Secretary is not to ask for the Secretary to direct the MAC to find in your favor, but to ask the Secretary to direct CMS to reverse its position and to notify the MAC that it agrees with you.

193. At least as early as in or about March 2012, Staffer 13, Staffer 10's replacement as MENENDEZ's Legislative Assistant in charge of health care matters, worked with MELGEN's lobbying/legal team to provide information to the Senior Health Counsel for Senator 3, the Senate Majority Leader, regarding MELGEN's Medicare billing dispute.

194. On or about April 6, 2012, Staffer 13 sent the following email, entitled "Melgan [sic]," to Staffer 1:

> Can you circle back with Dr. Melgan's [sic] attorney to find out specifically what they're asking for? I just heard from [the Senior Health Counsel for Senator 3],

44

who needs to know because CMS is asking. I know they've changed from their original ask, so we need to know what they're seeking now.

195. That same day, Staffer 1 responded, "Will do. Thanks."

196. Staffer 13 arranged for MELGEN's lobbying/legal team to meet on or about May 8, 2012, with the Senior Health Counsel for Senator 3.

197. On or about May 22, 2012, Person A sent MENENDEZ an email entitled "Email – [Lobbyist 1]" that contained the email address for Lobbyist 1.

### vi.   MENENDEZ Advocates on MELGEN's Behalf to the Acting Administrator of CMS

198. Approximately six days after MELGEN issued a $300,000 check from VRC to Majority PAC, earmarked for New Jersey, MENENDEZ advocated on behalf of MELGEN's position in his Medicare billing dispute to the Acting Administrator of CMS.

199. On or about June 5, 2012, MENENDEZ and his staff met with Lobbyist 1 to prepare MENENDEZ to advocate on MELGEN's behalf to the Acting Administrator of CMS.

200. On or about June 7, 2012, MENENDEZ met with the Acting Administrator of CMS and raised the issue at the core of MELGEN's Medicare billing dispute. Specifically, MENENDEZ pressed the Acting Administrator of CMS about multi-dosing and Medicare payments, and advocated on behalf of the position favorable to MELGEN in his Medicare billing dispute.

201. On or about June 12, 2012, Lobbyist 1 sent Staffer 1 a memorandum entitled "Talking Points: CMS Policy" for MENENDEZ to use during future advocacy with the Acting Administrator of CMS. Approximately two weeks later, after Lobbyist 1 asked Staffer 1 if there had been "any follow up with respect to the conversation with [the Acting Administrator of CMS]," Staffer 1 emailed Lobbyist 1 the following:

[Lobbyist 1]:

The Senator is scheduled to receive a call from [the Acting Administrator of CMS] mid-morning this coming Tuesday. I shared you're [sic] your memo with [Staffer 13] that contains arguments to use in response [sic] [the Acting Administrator of CMS] should she try to make the case that other agencies have policies in place that prohibit multi-dosing.

[Staffer 13] is preparing a memo for the Senator that covers your points for the first meeting, a review of the conversation in the first meeting, and your most recent memo with proposed counter-arguments.

I am out next week but the Senator may want to do a call to prep for his Tuesday call with [the Acting Administrator of CMS]. Should this be the case, will you be around Monday afternoon or Tuesday morning.

Thanks.

[Staffer 1]

202.   On or about June 30, 2012, Staffer 13 prepared the memorandum to MENENDEZ described in Staffer 1's email in the preceding paragraph, and sent it to Lobbyist 1 for his review. That memorandum notes that "[t]he subject of the call [with the Acting Administrator of CMS] is to discuss the issue [of] Medicare reimbursement when a physician multi-doses from a single-dose vial." The memorandum also includes as one of four "Talking Points for the Call" the following argument: "The CDC guidelines, while necessary to ensure patient safety and reduce the number of healthcare-associated infections, has no bearing on Medicare reimbursement policy[.]" Another talking point notes that "[w]e're talking about payments made in 2007-2008," the years in which MELGEN was found to have received approximately $8.9 million in Medicare overpayments. The final talking point argues the following: "It's clear that CMS is taking steps to clarify both multi-dosing from single-dose vials and overfills going forward. This is, in effect, admitting that these policies didn't exist before and don't apply during the 2007-2008 period. Therefore they don't have any bearing on the issue at hand."

46

203.    Lobbyist 1 reviewed the memorandum and sent his edits to Staffer 13 on or about July 1, 2012.

204.    The follow-up call between MENENDEZ and the Acting Administrator of CMS occurred on or about July 2, 2012.  During the call, the Acting Administrator of CMS told MENENDEZ that CMS would not alter its position regarding billing for vials used for multiple patients.  The Acting Administrator of CMS also explained that CMS's enforcement of Medicare billing followed the CDC guidelines, which warn that reusing a single-use vial, or harvesting the preservative-free solution to treat more than one patient, increases the risk of infection.  In response, MENENDEZ expressed dissatisfaction with the Acting Administrator of CMS's answers and stated that he would speak directly with the Secretary of HHS about the matter.

205.    On or about July 2, 2012, Lobbyist 1 emailed Staffer 1 and Staffer 13, "I am eager to learn how the call went today – please advise."

206.    On or about July 2, 2012, Staffer 13 responded to Lobbyist 1, "[G]ive me a call tomorrow afternoon and I'll fill you in."

207.    On or about July 3, 2012, MENENDEZ emailed Staffer 13, "Followup [sic] yield anything of value?"  Staffer 13 responded by summarizing a follow-up conversation he had with CMS regarding multi-dosing and whether overfill could be considered in Medicare payments, while noting that he, Staffer 13, spoke with Lobbyist 1 after the call. Specifically, Staffer 13 noted that Lobbyist 1 is "encouraged, but mainly because he's increasingly confident they won't have a leg to stand on should he litigate.  But we're all hopeful it won't come to that."

208.    On or about July 16, 2012, Lobbyist 1 responded to an email sent by Staffer 13 with a subject line that read, in part, "CDC report emphasizes importance of adhering to single-dose/single use vial protocols."  Lobbyist 1 added Staffer 1 to the email, in which Lobbyist 1 said,

47

"[L]et me know if you hear back from [the Acting Administrator of CMS's] office -- at some point I have to make a decision whether to recommend to the doctor to go to court rather than wait any longer. I did not want to take any action until I knew that other avenues were shut down."

### vii. MENENDEZ Elevates His Advocacy on MELGEN's Behalf to the Secretary of HHS

209. On or about July 10, 2012, Senator 3's scheduler contacted HHS, stating that "[Senator 3] would like to have a meeting with [the Secretary of HHS] and Senator Menendez sometime in the next couple of weeks."

210. On or about July 13, 2012, Staffer 1 emailed MENENDEZ asking whether he, MENENDEZ, had informed MELGEN that Senator 3 was organizing a meeting with the Secretary of HHS. MENENDEZ responded, "Haven't told Dr Melgen yet. Prefer to know when we r meeting her so that I don't raise expectation just in case it falls apart."

211. On or about July 19, 2012, Person A forwarded to MENENDEZ an email MELGEN received from Lobbyist 1 entitled "CMS recent justification for denial of payment." The email from Lobbyist 1 contained a "summary of the latest information provided by CMS in connection with its denial of reimbursement and subsequent recoupment in connection with claims submitted that reflected the multi-dosing of Lucentis, for the years 2007 – 2008." In his email to MENENDEZ, Person A wrote, "Dr. Melgen had mistakenly sent you the draft version earlier that was not complete. Below please find the final version."

212. On or about July 20, 2012, Person A forwarded to Staffer 1 the same email from Lobbyist 1 described in the preceding paragraph. In his email to Staffer 1, Person A wrote, "Dr. Melgen had asked me to forward you the email below."

48

213.   Also on that same date, HHS 5, the Secretary of HHS's scheduler, emailed Senator 3's scheduler to suggest dates and times for the Secretary of HHS's meeting with MENENDEZ and Senator 3.

214.   On or about July 24, 2012, Person A sent an email to MENENDEZ entitled "Dr. Melgen" with an attachment entitled "Letter to [the Acting Administrator of CMS] (7-23-12)." In the email to MENENDEZ, Person A wrote, "Attached please find the proposed letter that was sent to [Staffer 1] by [Lobbyist 1]. Dr. Melgen wanted me to send it to you as well." The draft letter submitted by MELGEN's lobbyist/lawyer does not mention MELGEN by name, but advocates on behalf of his position and twice references "the Medicare contractor in Florida."

215.   MENENDEZ's meeting with the Secretary of HHS occurred on or about August 2, 2012. On or about August 1, MENENDEZ spoke to Lobbyist 1, MELGEN's lobbyist/lawyer, to prepare for the meeting.

216.   During MENENDEZ's meeting with the Secretary of HHS, MENENDEZ advocated on behalf of MELGEN's position in his Medicare billing dispute, focusing on MELGEN's specific case and asserting that MELGEN was being treated unfairly. The Secretary of HHS disagreed with MENENDEZ's position, explaining that CMS was not going to pay for the same vial of medicine twice, and emphasizing that CDC guidelines expressly advised against multiple applications from the same vial to prevent potential contamination. The Secretary of HHS also informed MENENDEZ that because MELGEN's case was in the administrative appeals process, she had no power to influence it.

217.   After MENENDEZ advocated on behalf of MELGEN directly to the Secretary of HHS, Lobbyist 1 emailed Staffer 1 and Staffer 13, saying, "I have spoken with [the] doctor and

49

understand that the meeting with the Secretary was quite 'lively.'" Lobbyist 1 then asked for "further briefing."

218. On or about September 12, 2012, Lobbyist 1 emailed Staffer 13 asking if he "had heard back from [the Secretary of HHS's] office following the meeting last month." Staffer 13 forwarded the email to Staffer 1, asking what he should tell Lobbyist 1.

219. On or about September 13, 2012, Staffer 1 replied to Staffer 13, "I think you should try to get some feedback without raising attention."

220. On or about September 19, 2012, Staffer 13 reached out by email to HHS 6, an Assistant Secretary at HHS, to see if "there might be any news from your end on the meeting our boss's [sic] had right before recess." HHS 6 did not respond.

### viii. MELGEN Gives $375,000 to Entities Supporting MENENDEZ's Reelection Efforts to Renew MENENDEZ's Advocacy to the Secretary of HHS in Support of MELGEN's Medicare Billing Dispute

221. On or about October 19, 2012, one week after MELGEN, through his company, VRC, issued a $300,000 check to Majority PAC, earmarked for New Jersey, and three $25,000 checks to New Jersey Democratic County Committees, MELGEN sent MENENDEZ an email with the subject "MAC Appeal." The email stated, "Here is the latest memo with the most recent developments," and included an attachment entitled "MAC Appeal Update and Recent Developments 10-1-2012." The memorandum was authored by MELGEN's lobbyists/lawyers and addressed to MELGEN. The four-page memorandum is entitled "Status of Medicare Audit and Appeal," and opens with the following introduction: "You have asked for a brief summary of the current status of the pending Medicare Overpayment Determination appeal for Vitreo Retinal Consultants (the 'Practice'). You have also asked us to provide an update on recent developments in other litigation matters relating to drug product overfill." The memorandum concludes with a

section entitled "The Secretary's Authority," asserting that "[i]t would be appropriate for the Secretary of the Department of Health and Human Services to intervene during the pendency of the Practice's appeal before the MAC to clarify that, as to the period prior to January 1, 2011, CMS policy permitted physicians and providers to bill for overfill." MELGEN sent this email to MENENDEZ at approximately 5:01 p.m.

222. On or about October 19, 2012, also at approximately 5:01 p.m., MELGEN emailed to Staffer 1 the same attachment described in the preceding paragraph.

223. On or about October 19, 2012, at approximately 5:03 p.m., MELGEN emailed the same attachment described in paragraph 221 to Fundraiser 2, a Majority PAC fundraiser and former staffer to and fundraiser for Senator 3.

224. On or about October 20, 2012, Fundraiser 2 responded to MELGEN's email, stating,

> Dr. Sal,
>
> I'm going to see him on Tuesday. I will give this to him directly. Is that ok?
>
> I am sure he will forward this to [the Senior Health Counsel for Senator 3] in his office. She was the staff person in the meeting before. I would suggest that someone come in and brief her on the updated information.

225. On or about October 22, 2012, MELGEN forwarded to MENENDEZ an email he received from Lobbyist 1 on or about October 20, 2012. The email from Lobbyist 1 to MELGEN read as follows:

> Sal - - the sleeping bear has awakened. I attach a letter received today from the Medicare Appeals Council. The letter denies our request for oral argument but gives us an additional 30 days to submit a supplemental brief. It would not surprise me if this was triggered by the meetings earlier this summer and someone looking into the status of the case. When they found that it was not moving, they pushed it, hoping that this would satisfy you.

226.    On or about October 22, 2012, MELGEN separately forwarded to Staffer 1 the same email that he, MELGEN, received from Lobbyist 1 on or about October 20, 2012, described in the preceding paragraph.

227.    On or about October 22, 2012, Staffer 1 responded to MELGEN, "Thanks. Will call you."

All in violation of Title 18, United States Code, Section 371.

## COUNT TWO

### 18 U.S.C. §§ 1952, 2
### (Travel Act)

228.    The allegations contained in paragraphs 1 through 227 of this Indictment are hereby repeated, realleged, and incorporated by reference as though fully set forth herein.

229.    On or about April 8, 2010, in the District of New Jersey and elsewhere, the defendant,

**ROBERT MENENDEZ,**

aided, abetted, induced, and caused by the defendant, **SALOMON MELGEN**, traveled in interstate and foreign commerce from Newark, New Jersey, to Paris, France, with the intent to promote, manage, establish, and carry on, and facilitate the promotion, management, establishment, and carrying on, of an unlawful activity, to wit, bribery, in violation of Title 18, United States Code, Sections 201(b)(2)(A) and 201(b)(1)(A), and thereafter did perform and attempt to perform acts to promote, manage, establish, and carry on, and facilitate the promotion, management, establishment, and carrying on, of that unlawful activity; that is, MENENDEZ, a United States Senator, corruptly demanded, sought, received, accepted, and agreed to receive and accept, and MELGEN corruptly gave, offered, promised, and agreed to give MENENDEZ, a hotel stay in the Park Hyatt Paris Vendôme, necessitating that MENENDEZ fly from Newark, New

52

Jersey, to Paris, France, with intent to influence MENENDEZ in the performance of official acts, as opportunities arose.

All in violation of Title 18, United States Code, Sections 1952 and 2.

## COUNT THREE

### 18 U.S.C. § 201(b)(2)(A)
### (Bribery)

230.    The allegations contained in paragraphs 1 through 227 of this Indictment are hereby repeated, realleged, and incorporated by reference as though fully set forth herein.

231.    Between on or about August 6, 2010, and on or about August 9, 2010, in the District of New Jersey and elsewhere, the defendant,

### ROBERT MENENDEZ,

being a public official, directly and indirectly, corruptly did demand, seek, receive, accept, and agree to receive and accept anything of value personally in return for MENENDEZ being influenced in the performance of an official act; that is, MENENDEZ, a United States Senator, sought and received from SALOMON MELGEN a roundtrip flight on MELGEN's private jet to the Dominican Republic, starting in the Washington Metropolitan Area and ending in Teterboro, New Jersey, with stops in West Palm Beach, Florida, in return for MENENDEZ being influenced in the performance of official acts, as opportunities arose.

All in violation of Title 18, United States Code, Section 201(b)(2)(A).

## COUNT FOUR

### 18 U.S.C. § 201(b)(1)(A)
### (Bribery)

232.    The allegations contained in paragraphs 1 through 227 of this Indictment are hereby repeated, realleged, and incorporated by reference as though fully set forth herein.

233.   Between on or about August 6, 2010, and on or about August 9, 2010, in the District of New Jersey and elsewhere, the defendant,

**SALOMON MELGEN,**

directly and indirectly, corruptly did give, offer, and promise anything of value to a public official with intent to influence an official act; that is, MELGEN offered and gave to ROBERT MENENDEZ, a United States Senator, a roundtrip flight on his, MELGEN's, private jet to the Dominican Republic, starting in the Washington Metropolitan Area and ending in Teterboro, New Jersey, with stops in West Palm Beach, Florida, in order to influence MENENDEZ's official acts, as opportunities arose.

All in violation of Title 18, United States Code, Section 201(b)(1)(A).

## COUNT FIVE

### 18 U.S.C. § 201(b)(2)(A)
### (Bribery)

234.   The allegations contained in paragraphs 1 through 227 of this Indictment are hereby repeated, realleged, and incorporated by reference as though fully set forth herein.

235.   Between on or about September 3, 2010, and on or about September 6, 2010, in the District of New Jersey and elsewhere, the defendant,

**ROBERT MENENDEZ,**

being a public official, directly and indirectly, corruptly did demand, seek, receive, accept, and agree to receive and accept anything of value personally and for another person in return for MENENDEZ being influenced in the performance of an official act; that is, MENENDEZ, a United States Senator, sought and received from SALOMON MELGEN a roundtrip flight on MELGEN's private jet to the Dominican Republic for himself and a guest, starting and ending in

54

Teterboro, New Jersey, with stops in West Palm Beach, Florida, in return for MENENDEZ being influenced in the performance of official acts, as opportunities arose.

All in violation of Title 18, United States Code, Section 201(b)(2)(A).

## COUNT SIX

### 18 U.S.C. § 201(b)(1)(A)
### (Bribery)

236.    The allegations contained in paragraphs 1 through 227 of this Indictment are hereby repeated, realleged, and incorporated by reference as though fully set forth herein.

237.    Between on or about September 3, 2010, and on or about September 6, 2010, in the District of New Jersey and elsewhere, the defendant,

## SALOMON MELGEN,

directly and indirectly, corruptly did give, offer, and promise anything of value to a public official and another person with intent to influence an official act; that is, MELGEN offered and gave to ROBERT MENENDEZ, a United States Senator, and MENENDEZ's guest, a roundtrip flight on his, MELGEN's, private jet to the Dominican Republic, starting and ending in Teterboro, New Jersey, with stops in West Palm Beach, Florida, in order to influence MENENDEZ's official acts, as opportunities arose.

All in violation of Title 18, United States Code, Section 201(b)(1)(A).

## COUNT SEVEN

### 18 U.S.C. § 201(b)(2)(A)
### (Bribery)

238.    The allegations contained in paragraphs 1 through 227 of this Indictment are hereby repeated, realleged, and incorporated by reference as though fully set forth herein.

55

239.   Between on or about October 8, 2010, and on or about October 11, 2010, in the District of New Jersey and elsewhere, the defendant,

**ROBERT MENENDEZ,**

being a public official, directly and indirectly, corruptly did demand, seek, receive, accept, and agree to receive and accept anything of value personally in return for MENENDEZ being influenced in the performance of an official act; that is, MENENDEZ, a United States Senator, sought and received from SALOMON MELGEN a roundtrip flight to West Palm Beach, Florida, starting with a first-class commercial flight from Newark, New Jersey, costing approximately $890.70, and ending with a private chartered flight to the Washington Metropolitan Area costing approximately $8,036.82, in return for MENENDEZ being influenced in the performance of official acts, as opportunities arose.

All in violation of Title 18, United States Code, Section 201(b)(2)(A).

### COUNT EIGHT

### 18 U.S.C. § 201(b)(1)(A)
### (Bribery)

240.   The allegations contained in paragraphs 1 through 227 of this Indictment are hereby repeated, realleged, and incorporated by reference as though fully set forth herein.

241.   Between on or about October 8, 2010, and on or about October 11, 2010, in the District of New Jersey and elsewhere, the defendant,

**SALOMON MELGEN,**

directly and indirectly, corruptly did give, offer, and promise anything of value to a public official with intent to influence an official act; that is, MELGEN offered and gave to ROBERT MENENDEZ, a United States Senator, a roundtrip flight to West Palm Beach, Florida, starting with a first-class commercial flight from Newark, New Jersey, costing approximately $890.70,

and ending with a private chartered flight to the Washington Metropolitan Area costing approximately $8,036.82, in order to influence MENENDEZ's official acts, as opportunities arose.

All in violation of Title 18, United States Code, Section 201(b)(1)(A).

## COUNT NINE

### 18 U.S.C. § 201(b)(2)(A)
### (Bribery)

242.   The allegations contained in paragraphs 1 through 227 of this Indictment are hereby repeated, realleged, and incorporated by reference as though fully set forth herein.

243.   On or about September 21, 2011, in the District of New Jersey and elsewhere, the defendant,

## ROBERT MENENDEZ,

being a public official, directly and indirectly, corruptly did demand, seek, receive, accept, and agree to receive and accept anything of value personally and for another entity in return for MENENDEZ being influenced in the performance of an official act; that is, MENENDEZ, a United States Senator, sought and received $20,000 from SALOMON MELGEN for The Fund to Uphold the Constitution, a legal defense trust fund that benefitted MENENDEZ, in return for MENENDEZ being influenced in the performance of official acts, as opportunities arose.

All in violation of Title 18, United States Code, Section 201(b)(2)(A).

## COUNT TEN

### 18 U.S.C. § 201(b)(1)(A)
### (Bribery)

244.   The allegations contained in paragraphs 1 through 227 of this Indictment are hereby repeated, realleged, and incorporated by reference as though fully set forth herein.

245.    On or about September 21, 2011, in the District of New Jersey and elsewhere, the defendant,

**SALOMON MELGEN,**

directly and indirectly, corruptly did give, offer, and promise anything of value to a public official and another entity with intent to influence an official act; that is, MELGEN offered and gave $20,000 to The Fund to Uphold the Constitution, a legal defense trust fund that benefitted ROBERT MENENDEZ, a United States Senator, in order to influence MENENDEZ's official acts, as opportunities arose.

All in violation of Title 18, United States Code, Section 201(b)(1)(A).

### COUNT ELEVEN

### 18 U.S.C. § 201(b)(2)(A)
### (Bribery)

246.    The allegations contained in paragraphs 1 through 227 of this Indictment are hereby repeated, realleged, and incorporated by reference as though fully set forth herein.

247.    On or about May 16, 2012, in the District of New Jersey and elsewhere, the defendant,

**ROBERT MENENDEZ,**

being a public official, directly and indirectly, corruptly did demand, seek, receive, accept, and agree to receive and accept anything of value personally and for another entity in return for MENENDEZ being influenced in the performance of an official act; that is, MENENDEZ, a United States Senator, sought and received $20,000 from SALOMON MELGEN for The Fund to Uphold the Constitution, a legal defense trust fund that benefitted MENENDEZ, in return for MENENDEZ being influenced in the performance of official acts, as opportunities arose.

All in violation of Title 18, United States Code, Section 201(b)(2)(A).

## COUNT TWELVE

### 18 U.S.C. § 201(b)(1)(A)
### (Bribery)

248.    The allegations contained in paragraphs 1 through 227 of this Indictment are hereby repeated, realleged, and incorporated by reference as though fully set forth herein.

249.    On or about May 16, 2012, in the District of New Jersey and elsewhere, the defendant,

### SALOMON MELGEN,

directly and indirectly, corruptly did give, offer, and promise anything of value to a public official and another entity with intent to influence an official act; that is, MELGEN offered and gave $20,000 to The Fund to Uphold the Constitution, a legal defense trust fund that benefitted ROBERT MENENDEZ, a United States Senator, in order to influence MENENDEZ's official acts, as opportunities arose.

All in violation of Title 18, United States Code, Section 201(b)(1)(A).

## COUNT THIRTEEN

### 18 U.S.C. § 201(b)(2)(A)
### (Bribery)

250.    The allegations contained in paragraphs 1 through 227 of this Indictment are hereby repeated, realleged, and incorporated by reference as though fully set forth herein.

251.    On or about May 16, 2012, in the District of New Jersey and elsewhere, the defendant,

### ROBERT MENENDEZ,

being a public official, directly and indirectly, corruptly did demand, seek, receive, accept, and agree to receive and accept anything of value personally and for another entity in return for

59

MENENDEZ being influenced in the performance of an official act; that is, MENENDEZ, a United States Senator, sought and received $40,000 from SALOMON MELGEN for the New Jersey Democratic State Committee Victory Federal Account, which benefitted MENENDEZ, in return for MENENDEZ's advocacy to the State Department on behalf of MELGEN in his contract dispute with the Government of the Dominican Republic.

All in violation of Title 18, United States Code, Section 201(b)(2)(A).

## COUNT FOURTEEN

### 18 U.S.C. § 201(b)(1)(A)
### (Bribery)

252. The allegations contained in paragraphs 1 through 227 of this Indictment are hereby repeated, realleged, and incorporated by reference as though fully set forth herein.

253. On or about May 16, 2012, in the District of New Jersey and elsewhere, the defendant,

### SALOMON MELGEN,

directly and indirectly, corruptly did give, offer, and promise anything of value to a public official and another entity with intent to influence an official act; that is, MELGEN offered and gave $40,000 to the New Jersey Democratic State Committee Victory Federal Account, which benefitted ROBERT MENENDEZ, a United States Senator, in return for MENENDEZ's advocacy to the State Department on behalf of MELGEN in his contract dispute with the Government of the Dominican Republic.

All in violation of Title 18, United States Code, Section 201(b)(1)(A).

60

## COUNT FIFTEEN

### 18 U.S.C. § 201(b)(2)(A)
### (Bribery)

254.    The allegations contained in paragraphs 1 through 227 of this Indictment are hereby repeated, realleged, and incorporated by reference as though fully set forth herein.

255.    On or about June 1, 2012, in the District of New Jersey and elsewhere, the defendant,

### ROBERT MENENDEZ,

being a public official, directly and indirectly, corruptly did demand, seek, receive, accept, and agree to receive and accept anything of value personally and for another entity in return for MENENDEZ being influenced in the performance of an official act; that is, MENENDEZ, a United States Senator, sought and received from SALOMON MELGEN approximately $300,000 for Majority PAC that was earmarked for the New Jersey Senate race, which benefitted MENENDEZ, in return for MENENDEZ's advocacy at the highest levels of CMS and HHS on behalf of MELGEN in his Medicare billing dispute.

All in violation of Title 18, United States Code, Section 201(b)(2)(A).

## COUNT SIXTEEN

### 18 U.S.C. § 201(b)(1)(A)
### (Bribery)

256.    The allegations contained in paragraphs 1 through 227 of this Indictment are hereby repeated, realleged, and incorporated by reference as though fully set forth herein.

61

257.  On or about June 1, 2012, in the District of New Jersey and elsewhere, the defendant,

**SALOMON MELGEN,**

directly and indirectly, corruptly did give, offer, and promise anything of value to a public official and another entity with intent to influence an official act; that is, MELGEN offered and gave approximately $300,000 to Majority PAC that was earmarked for the New Jersey Senate race, which benefitted ROBERT MENENDEZ, a United States Senator, in return for MENENDEZ's advocacy at the highest levels of CMS and HHS on behalf of MELGEN in his Medicare billing dispute.

All in violation of Title 18, United States Code, Section 201(b)(1)(A).

### COUNT SEVENTEEN

### 18 U.S.C. § 201(b)(2)(A)
### (Bribery)

258.  The allegations contained in paragraphs 1 through 227 of this Indictment are hereby repeated, realleged, and incorporated by reference as though fully set forth herein.

259.  From on or about September 30, 2012, to on or about October 12, 2012, in the District of New Jersey and elsewhere, the defendant,

**ROBERT MENENDEZ,**

being a public official, directly and indirectly, corruptly did demand, seek, receive, accept, and agree to receive and accept anything of value personally and for another entity in return for MENENDEZ being influenced in the performance of an official act; that is, MENENDEZ, a United States Senator, sought and received from SALOMON MELGEN approximately $103,500 for various New Jersey county Democratic Party entities, and approximately $300,000 for Majority PAC that was earmarked for the New Jersey Senate race, all of which benefitted

62

MENENDEZ, in return for MENENDEZ's advocacy at the highest levels of HHS on behalf of MELGEN in his Medicare billing dispute.

All in violation of Title 18, United States Code, Section 201(b)(2)(A).

### COUNT EIGHTEEN

### 18 U.S.C. § 201(b)(1)(A)
### (Bribery)

260. The allegations contained in paragraphs 1 through 227 of this Indictment are hereby repeated, realleged, and incorporated by reference as though fully set forth herein.

261. From on or about September 30, 2012, to on or about October 12, 2012, in the District of New Jersey and elsewhere, the defendant,

### SALOMON MELGEN,

directly and indirectly, corruptly did give, offer, and promise anything of value to a public official and another entity with intent to influence an official act; that is, MELGEN offered and gave approximately $103,500 to various New Jersey county Democratic Party entities, and approximately $300,000 to Majority PAC that was earmarked for the New Jersey Senate race, all of which benefitted ROBERT MENENDEZ, a United States Senator, in return for MENENDEZ's advocacy at the highest levels of HHS on behalf of MELGEN in his Medicare billing dispute.

All in violation of Title 18, United States Code, Section 201(b)(1)(A).

### COUNTS NINETEEN THROUGH TWENTY-ONE

### 18 U.S.C. §§ 1341, 1343, 1346, 2
### (Honest Services Fraud)

262. The allegations contained in paragraphs 1 through 227 of this Indictment are hereby repeated, realleged, and incorporated by reference as though fully set forth herein.

263.    From at least in or about January 2006 through in or about January 2013, in the District of New Jersey and elsewhere, the defendants,

**ROBERT MENENDEZ and
SALOMON MELGEN,**

devised and intended to devise a scheme and artifice to defraud and deprive the United States and the citizens of New Jersey of their right to the honest services of ROBERT MENENDEZ, a United States Senator, through bribery.

### USE OF INTERSTATE WIRES TO EXECUTE THE SCHEME

264.    On or about the dates listed below, in the District of New Jersey and elsewhere, MENENDEZ and MELGEN, for the purpose of executing the above-described scheme and artifice to defraud and deprive, transmitted and caused to be transmitted by means of wire and radio communication in interstate commerce, signals and sounds; that is, they caused pilots to communicate via interstate wire and radio the following signals and sounds:

| Count | Date | Signal and Sound |
|-------|------|------------------|
| 19 | August 9, 2010 | Pilot of MELGEN's private jet, on which MENENDEZ was a passenger, in New Jersey air space to air traffic control in New York |
| 20 | September 6, 2010 | Pilot of MELGEN's private jet, on which MENENDEZ was a passenger, in New Jersey air space to air traffic control in New York |

All in violation of Title 18, United States Code, Sections 1343, 1346, and 2.

### USE OF PRIVATE OR COMMERCIAL INTERSTATE CARRIER TO EXECUTE THE SCHEME

265.    On or about the date listed below, in the District of New Jersey and elsewhere, MENENDEZ and MELGEN, for the purpose of executing the above-described scheme and artifice to defraud and deprive, and attempting to do so, deposited and caused to be deposited the following

64

matter and thing to be sent and delivered by any private and commercial interstate carrier, and knowingly caused the matter and thing to be delivered by such carrier according to the direction thereon:

| Count | Date | Mail |
|-------|------|------|
| 21 | June 5, 2012 | MELGEN's June 1, 2012, $300,000 check, through VRC, to Majority PAC, earmarked for New Jersey, sent from Person B in New Jersey to Fundraiser 1 in Washington, D.C., via FedEx |

All in violation of Title 18, United States Code, Sections 1341, 1346, and 2.

## COUNT TWENTY-TWO

### 18 U.S.C. §§ 1001(a)(1), (c)(1)
### (False Statements)

266.    The allegations contained in paragraphs 1 through 227 of this Indictment are hereby repeated, realleged, and incorporated by reference as though fully set forth herein.

267.    The Ethics in Government Act of 1978 required all United States Senators to file an annual financial disclosure form reporting, among other things, income, gifts, and financial interests from the prior calendar year.  These financial disclosure forms were required to be submitted to and filed with the Secretary of the United States Senate, an office within the Legislative Branch, and were available to the public.

268.    A purpose of the financial disclosure forms was to disclose, monitor, and deter conflicts of interest, thereby maintaining public confidence in the integrity of the United States Senate and its Members.  The financial disclosure forms provided the public at large with the information necessary to evaluate and consider official conduct by United States Senators in light of their income, gifts, and financial interests, among other things.

269. As a United States Senator, MENENDEZ was statutorily mandated to file an annual financial disclosure form by the Ethics in Government Act of 1978.

270. The financial disclosure form required that MENENDEZ disclose, among other things, "any reportable gift in the reporting period." In calendar year 2006, reportable gifts were those that aggregated more than $305 and were not otherwise exempt; in calendar years 2007, 2008, and 2010, the minimum reporting threshold was $335.

271. From in or about June 2007 through in or about May 2011, in the District of New Jersey and elsewhere, the defendant,

**ROBERT MENENDEZ,**

knowingly and willfully falsified, concealed, and covered up by a trick, scheme, and device, material facts in a matter within the jurisdiction of the Legislative Branch. Specifically, in reports he filed from 2007 to 2011, MENENDEZ did not disclose any of the reportable gifts that he received from MELGEN.

272. It was part of the scheme to conceal that MENENDEZ received things of value from MELGEN without reporting them as required on his annual financial disclosure forms, including, but not limited to, the following: MENENDEZ did not disclose the private, chartered, and first-class commercial flights he received from MELGEN and MELGEN's companies on his financial disclosure forms covering calendar years 2006, 2007, 2008, and 2010; nor did MENENDEZ report the car service he received from MELGEN on his financial disclosure form covering calendar year 2008; nor did MENENDEZ report the Paris and Punta Cana hotel stays he received from MELGEN on his financial disclosure form covering calendar year 2010—all of which were reportable gifts over the minimum dollar value threshold.

All in violation of Title 18, United States Code, Sections 1001(a)(1) and (c)(1).

66

## NOTICE AS TO CRIMINAL FORFEITURE

## 18 U.S.C. § 981(a)(1)(C); 28 U.S.C. § 2461
## (Criminal Forfeiture)

273.    The allegations contained in paragraphs 1 through 272 of this Indictment are hereby repeated, realleged, and incorporated by reference as though fully set forth herein for the purpose of alleging forfeitures pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461.

274.    Pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461, the defendant, ROBERT MENENDEZ, upon conviction of the offense in violation of Title 18, United States Code, Section 371, set forth in Count 1; conviction of the offense in violation of Title 18, United States Code, Section 1952, set forth in Count 2; conviction of the offense(s) in violation of Title 18, United States Code, Section 201(b), set forth in Counts 3, 5, 7, 9, 11, 13, 15, and 17; and conviction of the offense(s) in violation of Title 18, United States Code, Sections 1341, 1343, and 1346, set forth in Counts 19, 20, and 21, the defendant,

## ROBERT MENENDEZ,

shall forfeit to the United States of America pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461, any property, real or personal, which constitutes or is derived from proceeds traceable to said violations. The property to be forfeited includes, but is not limited to, the following:

a.    A sum of money, the amount to be determined, in United States currency representing the total amount of proceeds traceable, directly or indirectly, to the offense(s) in violation of Title 18, United States Code, Sections 371, 1952, 201(b), and 1341, 1343 & 1346.

275.    If any of the property described above, as a result of any act or omission of the defendant:

67

a.    cannot be located upon the exercise of due diligence;

b.    has been transferred or sold to, or deposited with, a third party;

c.    has been placed beyond the jurisdiction of the court;

d.    has been substantially diminished in value; or

e.    has been commingled with other property which cannot be divided without

difficulty,

the United States of America shall be entitled to forfeiture of substitute property pursuant to Title

21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section

2461(c).

A TRUE BILL.

FOREPERSON                                    4/1/15
                                              DATE

RAYMOND HULSER
Acting Chief, Public Integrity Section
Criminal Division
U.S. Department of Justice

By: _____
Peter Koski
Deputy Chief
J.P. Cooney
Deputy Chief
Monique Abrishami
Trial Attorney
Public Integrity Section
Criminal Division
U.S. Department of Justice

68

# United States District Court
## District of New Jersey

### UNITED STATES OF AMERICA

v.

### ROBERT MENENDEZ

and

### SALOMON MELGEN

# INDICTMENT FOR

## 18 U.S.C. §§ 371, 1952, 201(b), 1341, 1343, 1346, 1001, & 2

**A True Bill,**

**Foreperson**

**LESLIE CALDWELL**
*ASSISTANT ATTORNEY GENERAL*

PETER KOSKI
*DEPUTY CHIEF*
*202.307.3589*

USA-48AD 8
(Ed. 1/97)