**FOR PUBLICATION**

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| v. | **OPINION** <br> Cr. No. 15-155 |
| ROBERT MENENDEZ and <br> SALOMON MELGEN, | |
| Defendants. | |

**Walls, Senior District Judge**

Defendants Robert Menendez and Salomon Melgen move to transfer this criminal case to the District Court for the District of Columbia under Federal Rule of Criminal Procedure 21(b). After oral argument on June 16, 2015,[1] the Court denies the motion.

## FACTUAL AND PROCEDURAL BACKGROUND

The defendants have been indicted in the District of New Jersey on charges of bribery and related crimes. Indictment, ECF No. 1. Robert Menendez has represented New Jersey in the United States Senate since 2006. Salomon Melgen is an ophthalmologist who resides and practices his profession in Florida.

Senator Menendez and Dr. Melgen were indicted on April 1, 2015 by a grand jury convened in Newark, New Jersey.

---

[1] Oral argument was a repeat by the parties of the contentions raised and explicated in their briefs. No material new issues were raised at argument.

**FOR PUBLICATION**

Count One of the indictment charges Defendants with conspiracy to commit bribery and honest services wire fraud. *Id.* ¶¶ 1-227. Count Two charges Senator Menendez with violation of the Travel Act, and Dr. Melgen with aiding and abetting the violation. *Id.* ¶¶ 228-29.

Counts Three through Eight charge Defendants with bribery, alleging that Senator Menendez sought and received flights from Dr. Melgen in return for being influenced in his performance of official acts. *Id.* ¶¶ 230-41. Counts Three and Four relate to private flights Senator Menendez allegedly received "to the Dominican Republic, starting in the Washington Metropolitan Area and ending in Teterboro, New Jersey, with stops in West Palm Beach, Florida." *Id.* ¶¶ 230-33. Counts Five and Six relate to private flights Senator Menendez allegedly received "to the Dominican Republic for himself and a guest, starting and ending in Teterboro, New Jersey, with stops in West Palm Beach, Florida." *Id.* ¶¶ 234-37. Counts Seven and Eight relate to flights Senator Menendez allegedly received from Newark, New Jersey to West Palm Beach, Florida and from West Palm Beach to Washington, D.C. *Id.* ¶¶ 238-41.

Counts Nine through Eighteen also charge Defendants with bribery, alleging that Senator Menendez sought and received financial contributions from Dr. Melgen that benefitted his personal and political interests in return for being influenced in his performance of official acts. *Id.* ¶¶ 242-61. Counts Nine through Twelve relate to two alleged $20,000 contributions by Dr. Melgen to The Fund to Uphold the Constitution, "a legal defense trust fund that benefitted" Senator Menendez. *Id.* ¶¶ 242-49. Counts Thirteen and Fourteen relate to Dr. Melgen's alleged $40,000 contribution to the New Jersey Democratic State Committee Victory Federal Account. *Id.* ¶¶ 250-53. Counts Fifteen and Sixteen relate to Dr. Melgen's first alleged $300,000 contribution to Majority PAC "that was earmarked for the New Jersey Senate race." *Id.* ¶¶ 254-57. Counts Seventeen and Eighteen relate to Dr. Melgen's alleged $103,500 contribution to "various New

**FOR PUBLICATION**

Jersey county Democratic Party entities" and to his alleged second $300,000 contribution to Majority PAC "earmarked for the New Jersey Senate race." *Id.* ¶¶ 258-61.

Counts Nineteen through Twenty-One charge Defendants with honest services fraud. *Id.* ¶¶ 262-65. These counts allege that Senator Menendez and Dr. Melgen intentionally devised a scheme to defraud and deprive the United States and New Jersey citizens of Senator Menendez's honest services. To meet the pleading requirements for these counts, the indictment alleges that in furtherance of their scheme Defendants caused airplane pilots to communicate over interstate wires from New Jersey air space and caused a $300,000 check to be sent from New Jersey by interstate mail. *Id.* Finally, Count Twenty-Two charges Senator Menendez with making false statements in Senate financial disclosure forms when he failed to disclose gifts from Dr. Melgen. *Id.* ¶¶ 266-72.

In exchange for the alleged flights and financial contributions, among other things, the indictment asserts that Senator Menendez took official actions to benefit Dr. Melgen. These actions fall into three categories. First, the indictment alleges that Senator Menendez "used his position as a United States Senator to influence the visa proceedings of [Dr. Melgen's] foreign girlfriends." *Id.* ¶ 70. Second, it alleges that Senator Menendez advocated for Dr. Melgen's financial interests regarding a contract dispute between a private company and the Dominican Republic. *Id.* ¶¶ 117-43. Third, the indictment charges that Senator Menendez advocated for Dr. Melgen's financial interests regarding a Medicare billing dispute at the U.S. Department of Health & Human Services and the Centers for Medicare & Medicaid Services. *Id.* ¶¶ 144-227. Much of Senator Menendez's and his staff members' alleged activity and advocacy took place over email or in meetings with other government officials and employees.

## LEGAL STANDARD

Upon a defendant's motion, a "court may transfer the proceeding, or one or more counts, against that defendant to another district for the convenience of the parties, any victim, and the witnesses, and in the interest of justice." Fed. R. Crim. P. 21(b). Motions under Rule 21(b) are "generally committed to the discretion of the district courts." *In re U.S.*, 273 F.3d 380, 387 (3d Cir. 2001). The burden is on the defendant to show that transfer is appropriate. *Id.* at 389. The defendant need not show "truly compelling circumstances," but rather that, "all relevant things considered, the case would be better off transferred to another district." *Id.* at 388 (quoting *In re Balsimo*, 68 F.3d 185, 186 (7th Cir. 1995)).

The Supreme Court has endorsed ten factors for courts to consider in deciding Rule 21(b) motions:

> (1) location of [the] defendant; (2) location of possible witnesses; (3) location of events likely to be in issue; (4) location of documents and records likely to be involved; (5) potential disruption of defendant's business unless the case is transferred; (6) expense to the parties; (7) location of counsel; (8) relative accessibility of place of trial; (9) docket condition of each district or division involved; and (10) any other special elements which might affect the transfer.

*Platt v. Minnesota Mining & Manufacturing Co.*, 376 U.S. 240, 243-44 (1964).[2] "Ordinarily the various factors appear in combination, with some pointing in favor of transfer and others against transfer." *United States v. Coffee*, 113 F. Supp. 2d 751, 753-54 (E.D. Pa. 2000). The court must strike a balance "among the most important factors in the particular case to determine whether transfer is appropriate." *In re U.S.*, 273 F.3d at 388.

---

[2] "Although *Platt* involved a corporate defendant, the ten *Platt* factors are used in cases involving individual defendants as well." *In re U.S.*, 273 F.3d at 388.

**DISCUSSION**

Defendants now argue that eight of the *Platt* factors favor transfer and the others are neutral.[3] Defs.' Mem. 4-5, ECF No. 18-1. The Government contends that the *Platt* factors weigh against transfer. Govt.'s Opp. 3, ECF No. 25. In their reply brief, Defendants call the Government's analysis disingenuous because it contradicts the Government's arguments about transferring the 2008 prosecution of Senator Ted Stevens. Defs.' Reply 1-2, ECF No. 28.

Before proceeding, the Court must make clear that the *Stevens* case is neither controlling nor influencing precedent. It involved a different defendant, different charges, different facts, and a strikingly different geographic choice—the question of whether to transfer the case 4,350 miles from its origin in Washington, D.C. to Anchorage, Alaska. By comparison, the 218 miles between Newark and Washington seem negligible. Nor is the Court impressed by Defendants' claim that the Government must take the same positions here that it took in *Stevens*. The Court knows of no law, regulation, or case that prohibits the Government or any party from taking different positions in different cases at different times.

The Court begins the *Platt* analysis. The parties admit that two factors are neutral and do not merit extended discussion. Both Newark and Washington, D.C. are easily accessible, and the location of documents and records is not an issue. Defs.' Mem. 12, 14; Govt.'s Opp. 8, 12. The Court considers the remaining factors.

**1. Location of the Defendants**

Defendants argue that although "Senator Menendez is a New Jersey resident, his 'location' is primarily in Washington, D.C." where he spends "the majority of the work week." Defs.' Mem.

---

[3] Defendants do not challenge the propriety of venue in New Jersey, Defs.' Mem. 1, but Senator Menendez reserves his right to move to dismiss Count 22 for improper venue. Defs.' Mem. 10 n.6. The Government asserts that venue would be improper for a majority of counts in Washington, but does not elaborate. Govt.'s Opp. 2. The Court does not address these issues.

**FOR PUBLICATION**

5. The Government responds that Senator Menendez is foremost a New Jersey resident, because without his New Jersey residence, the Constitution would have prohibited his election to the Senate from New Jersey. Govt.'s Opp. 3 (citing U.S. Const. art. I, § 3, cl. 3).

The Court agrees with the Government that Senator Menendez's New Jersey residence is paramount. "Although a defendant does not have [a] right to be tried in his or her home district, within the *Platt* analysis defendant's residence deserves 'real weight.'" *United States v. Negron*, Cr. No. 08-501, 2008 WL 5272056, at *3 (D.N.J. Dec. 16, 2008) (internal citations omitted). Senator Menendez has long maintained residence in New Jersey. He was elected to the Union City, New Jersey Board of Education in 1974, elected Mayor of Union City in 1986, elected to represent New Jersey's 33rd District in the State Senate in 1991, and represented New Jersey's 14th Congressional District in the U.S. House of Representatives from 1993 until his appointment to the U.S. Senate in 2006. He won election to the Senate in 2006 and re-election in 2012.[4] *See* Bob Menendez for New Jersey, http://www.menendez.senate.gov/about (last visited June 15, 2015). Despite working in Washington during much of the week, Senator Menendez spends weekends in New Jersey. Defs.' Mem. 13 (stating that part of Senator Menendez's job "now occurs on weekends in New Jersey"). Trial in Newark might require Senator Menendez to spend more weeknights at his New Jersey residence than he usually does, but staying at one residence instead of another is not the kind of inconvenience this factor addresses.[5] *See, e.g.*, *Coffee*, 113 F. Supp. 2d at 754 (finding transfer appropriate where defendants "spent the night sleeping in their car because they could not afford lodging" in original district); *Negron*, 2008 WL 5272056, at *3

---

[4] The Court judicially notices these historical events in Senator Menendez's political career.
[5] The Court later separately considers whether trial in Newark would be more disruptive to Senator Menendez's official business than trial in Washington.

(finding transfer appropriate where indigent defendant had lived in Puerto Rico for thirty years and had no friends or family in New Jersey).

Because Dr. Melgen resides in Florida (and is presently incarcerated there), he will travel from there to either Newark or Washington for trial. Defendants assert that Dr. Melgen's "home in Florida is closer to Washington, D.C. than New Jersey" and that "he has traveled to Washington, D.C. occasionally." Defs.' Mem. 5. Washington may be closer to Dr. Melgen's Florida home, but it is by no means close. Flights from Florida to Newark and Washington are comparable. There is no practical difference.

The Court finds that the location of the defendants weighs against transfer because New Jersey is Senator Menendez's long-time home state and political base and Dr. Melgen can just as easily come to Newark as to Washington from Florida.

### 2. Location of Possible Witnesses

Defendants argue that the location of possible witnesses favors transfer because the "vast majority" of witnesses likely to testify at trial are located in Washington. Defs.' Mem. 6. The Government responds that Defendants "inaccurately predict the . . . disproportionate representation from Washington, D.C." and contends that the likely witnesses are "all over the world" rather than concentrated anywhere. Govt.'s Opp. 4-5.

Defendants' lists of likely witnesses represent that a majority of witnesses would travel from Washington to Newark for trial. Defs.' Mem., Exs. 1-5. Defendants' lists also show that a smaller but still substantial group of likely witnesses is located in the New Jersey/New York area near Newark. *Id.* The Government challenges the accuracy of Defendants' lists, but makes few specific objections. Govt.'s Opp. 5-6. The Government points to several names which appear on Defendants' lists more than once, and also contends that Defendants left out "at least one likely

7

witness based in New Jersey." *Id.* These objections do not subvert Defendants' calculation that a majority of likely witnesses are based in Washington. Defendants' predictions are also generally corroborated by the locations of the witnesses who testified before the grand jury. Defendants indicate that more witnesses from Washington testified before the grand jury than did witnesses from New Jersey, although it is unclear how many grand jury witnesses traveled to Newark from nearby New York. Defs.' Mem. 6. Based on the available information, the Court anticipates that a small majority of likely trial witnesses will be located in Washington and a lesser concentration of likely witnesses will exist in the New Jersey/New York area.

Despite the number of witnesses in Washington, the practical inconvenience of traveling to Newark from Washington is little. The cities are about an hour apart by flight, three plus hours by train, and four hours by car or bus. Courts faced with similar geographic dispersions of likely witnesses have evaluated the distances witnesses would be required to travel. In *McDade*, the court found that "the Pennsylvania Turnpike allows one to drive from Scranton to Philadelphia in less than three hours, which is not so great a trip as to require a transfer." *United States v. McDade*, 827 F. Supp. 1153, 1189 (E.D. Pa. 1993), *aff'd in part, appeal dismissed in part*, 28 F.3d 283 (3d Cir. 1994).

There is no evidence that the distance between Washington and Newark will deprive Defendants of any witness testimony, nor are Defendants bound to produce any witness testimony. In other cases, courts have given particular weight to the location of witnesses if denying transfer threatened to frustrate a defendant's trial presentation. *See*, *e.g.*, *United States v. Haley*, 504 F. Supp. 1124, 1127 (E.D. Pa. 1981) (granting transfer where defense witnesses would only be able to testify in the transferee district); *United States v. Campestrini*, 993 F. Supp. 2d 69, 72 (D.P.R. 2014) (granting transfer where defendant's potential character witnesses faced difficulty in

travelling to Puerto Rico for trial). There is no indication that Defendants will lose any desired testimony if trial stays in Newark. Defendants say that they will be using the Government's witnesses. Defs.' Mem. 6 n.3. The defendants do not assert that any witnesses they may actually call will be inconvenienced. *See United States v. Spy Factory, Inc.*, 951 F. Supp. 450, 457 (S.D.N.Y. 1997) (Sotomayor, J.) (denying transfer where defendants did not identify defense witnesses who would be inconvenienced); *United States v. Baltimore & O. R. R.*, 538 F. Supp. 200, 205 (D.D.C. 1982) (finding that defendants had "not demonstrated to this Court's satisfaction that any witness would be so greatly inconvenienced by a trial here that this matter should be transferred"). Defendants' concern is for the convenience of witnesses to be called by the Government. Defs.' Mem. 6 n.3. Their concern may be sincere, but it is less urgent when the Government, not Defendants, will be responsible for securing and facilitating these witnesses' trial appearances.

Because the defendants fail to indicate that any witnesses who may be called by the Government or by them will be inconvenienced or that any such inconvenience will affect Defendants' case, and given the ease of travel between Washington and Newark, the Court finds that the number of witnesses in Washington does not warrant transfer.

### 3. Location of Events Likely to Be in Issue

Defendants argue that the location of events favors transfer because "the vast majority of events at issue took place in Washington, D.C.," including nearly all of Senator Menendez's alleged advocacy for Dr. Melgen's interests. Defs.' Mem. 8-10. The Government counters that Defendants focus disproportionately on Senator Menendez's alleged acts, ignoring the "things of value [he] accepted in New Jersey." Govt.'s Opp. 6-8. The Government concedes that "some official acts certainly occurred in Washington, D.C.," but argues that many of them "occurred over

email" and that "the power to take those official acts is derived from the people of New Jersey." *Id.* at 8.

The Court's consideration of the location of events "ensures that the trial is held near where the allegedly criminal activity occurred, rather than in a district where venue has a more remote connection to the crime." *Coffee*, 113 F. Supp. 2d at 755-56. Courts have given this factor weight when key events overwhelmingly occurred in another district. *See, e.g.*, *id.* at 755 (approving transfer from Pennsylvania to Ohio where no defendant "set foot in this district, and there was no communication with Pennsylvania other than the telephone calls, faxes and packages sent from Ohio to Pennsylvania"); *Haley*, 504 F. Supp. at 1128 (finding that "Georgia, the state from which defendants hail, appears to be the 'nerve center' of the alleged illicit operations"); *United States v. Alter*, 81 F.R.D. 524, 526 (S.D.N.Y. 1979) (transferring case when "most, if not all, of the acts and conduct . . . occurred in Miami").

Defendants claim that Washington, D.C. is the "nerve center" of this case, but the Court sees no prime nerve center there. The indictment's allegations span states and countries, including New Jersey, Washington, D.C., Florida, the Dominican Republic, and France. Courts facing similar circumstances have rejected "nerve center" arguments. *See United States v. Christian*, Cr. No. 12-41, 2012 WL 1134035, at *2 (S.D.N.Y. Apr. 2, 2012) (denying transfer after finding Arizona was not the "nerve center" of alleged fraud "of nationwide breadth and reach"); *Spy Factory, Inc.*, 951 F. Supp. at 457 (finding the location of events a neutral factor "[b]ecause the criminal activity that was alleged to have occurred . . . was concededly national in scope."); *United States v. Cournoyer*, Cr. No. 12-65, 2012 WL 6539659, at *7 (E.D.N.Y. Dec. 14, 2012) (denying transfer where alleged conduct "extend[ed] from coast to coast and across the border into Canada.").

Although many of Senator Menendez's alleged official acts took place in Washington, these acts form only part of the Government's case. The things of value Senator Menendez allegedly sought and received from Dr. Melgen have strong ties to New Jersey. All of the alleged flights started and/or ended in New Jersey. Many of Dr. Melgen's alleged financial contributions are alleged to have been provided to New Jersey entities or directed to convincing New Jersey voters to re-elect Senator Menendez in the 2012 New Jersey Senate race. Indictment ¶¶ 46, 221, 251, 255, 259. Also, although Senator Menendez and his staff members undoubtedly sent many of the alleged emails from Washington, the geographic origin of most emails is not alleged in the indictment. Presumably this is because, in this case, the emails may be important for what they say, not from where they were sent. The Court sees no reason to transfer this case so that it can be held near to where emails were sent. Because the alleged events important to this case are not concentrated in any one place, and because many allegations in the indictment have strong ties to New Jersey, Defendants fail to persuade the Court that transfer is warranted.

### 4. Disruption of Defendants' Businesses If the Case Is Not Transferred

Defendants argue that trial in Washington would be less disruptive to Senator Menendez's Senate service than trial in Newark. Defs.' Mem. 12-13. The Government responds that criminal trials are inherently "disruptive to a defendant's life and business." Govt.'s Opp. 10. The Government also contends that the federal government will continue to function wherever Senator Menendez is tried, as it has when other federal legislators have been tried outside of Washington. *Id.* at 9.

"Every life is significantly disrupted during a trial wherever it is held." *United States v. Wilson*, Cr. No. 01-53, 2001 WL 798018, at *3 (S.D.N.Y. July 13, 2001). This trial is no different. It must be taken seriously; Senator Menendez faces the possibility of incarceration and financial

punishment. His trial will and should consume much of his time and attention. To the extent Senator Menendez does have capacity to divert attention from defending himself against criminal conviction, the benefit of working early mornings and evenings in his Washington office instead of his Newark office is speculative. As another court concluded on a motion to transfer Congressman Joseph McDade's criminal trial, "it is the fact of the trial, not its situs, which will be the preoccupying factor tending to distract Mr. McDade from the performance of his congressional business." *McDade*, 827 F. Supp. at 1189-90 (finding that "trial in Philadelphia will not disrupt Mr. McDade's business substantially more than any other defendant's business is disrupted by having to defend criminal charges").

This analysis is affirmed by the Senator's own conduct. The Court judicially notices that Senator Menendez has relinquished his position as the Ranking Member of the Senate Foreign Relations Committee. Letter from Robert Menendez, U.S. Senator, to Harry Reid, Democratic Leader, U.S. Senate (Apr. 1, 2015), http://www.menendez.senate.gov/imo/media/doc/LETTER.pdf (last visited June 15, 2015). The Senator is capable of adjusting his Senate responsibilities to devote time to defend himself. Moreover, thinking practically, the Court is not even certain that the Senate will be in session when this case is tried to its completion.

Defendants also argue that requiring Senator Menendez's Washington staff members to travel to Newark for trial will increase the trial's disruptiveness to Senator Menendez's Senate service. Defs.' Mem. 13. Witnesses from the Senator's Washington office will presumably give the same amount of testimony wherever trial is held, making the disruption caused by their testimony equivalent across venues. Although D.C.-based staff members may have to travel to Newark, the potential disruptiveness of individual staff members' three-hour trips to and from Newark is minimal in the era of constant communication. More importantly, the Court agrees with

the Government that the Senate's business will proceed during Senator Menendez's trial wherever it occurs. As the parties have noted, trials of sitting federal legislators have occurred both in and outside Washington in the past. Govt.'s Opp. 9; Defs.' Reply 10 n.9. This factor is of no relevance to Dr. Melgen because his medical practice has been suspended. Defs.' Mem. 13. Again Defendants fail to persuade the Court that this matter should be transferred.

   5. **Location of Counsel**

Of the defense counsel who have appeared in court or are registered on the docket, two attorneys are based in Washington, one "works primarily from his firm's D.C. office" but keeps an office in New York, one is based in New York, and one is based in Miami. Defs.' Reply 12-13, 13 n.12. The Government's attorneys are based in Washington, but they brought the case here, oppose transfer, and represent that they "routinely prosecute cases where they are properly venued, even if that requires travel." Govt.'s Opp. 12. The Court will not impose geographic convenience on the Government's attorneys or any other lawyers against their preference. Also, Senator Menendez's principal counsel advised the Court that he "will be in between New York and Washington" during this case. Govt.'s Opp. 12 (citing Tr. of Apr. 2, 2015 Hearing). His New York office is in Manhattan. The distance between Manhattan and Newark is approximately nine to eleven miles.

As Dr. Melgen joins in the motion to transfer, it is noted that at the time of arraignment, initial conferences before the Court, and the filing of this motion, Florida resident Dr. Melgen was represented by Florida-based lawyers. He sought and obtained judicial acknowledgement to substitute his present Washington-based counsel on May 26, 2015. The Court recognizes that a defendant, for myriad reasons, may change counsel. That said, that a defendant exercises his right to engage counsel from the district to which he, a non-resident, urges transfer—without more—

does not impress this Court in the evaluation of the motion. Otherwise, a defendant could always affect—or even effect—the grant of a Rule 21(b) motion. This factor, as presented by the defendants, does not impress the Court to grant transfer, particularly since location of lawyers does not rank high in this Court's overall evaluation of the *Platt* factors.

   6. **Expense to the Parties**

Defendants argue that the expense to the parties favors transfer because "the vast majority of witnesses likely to be called," as well as the majority of counsel, will travel from Washington if trial is held in Newark. Defs.' Mem. 14. The Government again challenges Defendants' assertion that the likely witnesses are concentrated in Washington, and notes that Defendants "will not be prejudiced" by the cost of witness travel because they claim that they will rely on testimony from witnesses called by the Government. Govt.'s Opp. 10-11 (citing Defs.' Mem. 6 n.3). Regarding travel costs for its legal team, the Government notes that its team includes FBI agents based in Newark who would travel to Washington if trial is held there. *Id.* at 11.

Because Defendants represent that they will elicit testimony primarily from witnesses called by the Government, Defs.' Mem. 6 n.3, they will not be prejudiced by the expense of witness travel. The Court recognizes that Defendants may still call their own witnesses, but they have provided nothing to the Court about their identity and contemplated costs. As such, what remains for the Court to consider is whether the cost to the Government of witness travel is significant to favor transfer.

As discussed, the Court anticipates that a small majority of likely witnesses will be located in Washington and a lesser concentration of likely witnesses will be in the New Jersey/New York area. "[P]ublic funds are to be safeguarded," *United States v. Atwood*, 538 F. Supp. 1206, 1209 (E.D. Pa. 1982), but it is not clear that the Government would save a substantial sum by bringing

14

this case in Washington. Travel between Washington and Newark is not expensive, especially if done by car or bus. Hotels will only be necessary for witnesses who testify for multiple days, because the distance between Washington and Newark is short enough for day trips. Hotel costs are speculative at this time because it is unknown how many witnesses might testify for multiple days, and whether those witnesses will be traveling to Newark from outside the New Jersey/New York area.

Although the differential in witness travel costs is uncertain, trial in Newark will impose lodging costs for three defense attorneys and four Government attorneys that would not exist in Washington. The expense of lodging defense and prosecution team members from New York and New Jersey in Washington appears likely to be less. After considering all available information, the Court finds that the expense to the parties weighs slightly in favor of transfer to Washington.

### 7. Docket Conditions of Each District Involved

Defendants argue that the relative docket conditions in the District of New Jersey and District of Columbia make this factor neutral. Defs.' Mem. 15. The Government contends that keeping the case in New Jersey allows the parties to benefit from this Court's "ability and willingness to prioritize this case over all others," rather than risk delays upon transfer. Govt.'s Opp. 12.

First, this Court has already scheduled and is prepared to begin trial on October 13, 2015. While the median time from filing to disposition of criminal cases is comparable between the District of New Jersey and the District of Columbia, this comparison ignores the reality that this Court is ready to conduct trial as soon as possible. *See* United States Courts, Federal Court Management Statistics – Profiles (Dec. 31, 2014), http://www.uscourts.gov/statistics-reports/

federal-court-management-statistics-december-2014 (last visited June 15, 2015). If this case were transferred, the transferee Court's capacity to proceed as promptly is unknown.

Second, in all likelihood, the timing of trial and its conclusion will be determined by the speed with which the appropriate U.S. Court of Appeals resolves any interlocutory appeals arising from trial court decisions. As example, Defendants have indicated that they will likely file a pretrial motion to dismiss the indictment under the Constitution's Speech or Debate clause. The trial court's decision on that motion would be immediately appealable. *Helstoski v. Meanor*, 442 U.S. 500, 506-08 (1979). The median time from notice of appeal to disposition in the U.S. Court of Appeals for the Third Circuit is 7.1 months, whereas it is a much longer 13.7 months in the U.S. Court of Appeals for the District of Columbia Circuit. *See* United States Courts, Federal Court Management Statistics – Summary (Dec. 31, 2014), http://www.uscourts.gov/statistics-reports/ federal-court-management-statistics-december-2014 (last visited June 15, 2015). Given the obvious public interest and need in promptly resolving criminal charges brought against a sitting U.S. Senator, this disparity weighs heavily against transfer to the District of Columbia. Defendants fail to persuade the Court that this factor merits transfer.

   **8.  Other Special Elements**

Defendants advance three special elements as favoring transfer to Washington. First, Defendants assert that transfer from Newark to Washington would prevent "unnecessary interference" with the legislative and executive branches of the federal government. Defs.' Mem. 15. The Court recognizes that trial in Newark will impose a travel burden on a number of high-level government officials, but the potential disruption caused by one-hour flight or three-hour train ride is minor.

**FOR PUBLICATION**

Second, Defendants argue that "pervasive pre-trial publicity in New Jersey" favors transfer. Defs.' Mem. 16. Defendants do not claim that they will suffer prejudice from such publicity, but that "it is just obvious that it will be easier to seat a jury without strong views in support of or against Senator Menendez outside the state." *Id.* This is not as obvious to the Court. If this case were transferred, publicity would follow it to Washington and potentially affect the jury pool there. The Court has no reason to believe that New Jersey's jury pool will demonstrate more partisanship or bias than a jury pool in Washington.

Third, Defendants assert that a New Jersey jury may be prejudiced against Senator Menendez because the Government has described New Jersey citizens as "victims" of Senator Menendez's and Dr. Melgen's alleged crime of honest services fraud. Defs.' Mem. 16 n.9; Defs.' Reply 15 n.14. The indictment does not use the word "victim," but alleges that Defendants defrauded and deprived "the United States and the citizens of New Jersey of their right" to Senator Menendez's honest services. Indictment ¶ 263. This victimhood is broad and abstract, and any bias resulting from it in a putative juror will be identifiable during jury selection. Elected officials are routinely tried on honest services fraud charges before juries of people allegedly deprived of their honest services. *See United States v. Mariano*, 316 F. App'x 99, 103 (3d Cir. 2008); *United States v. Bryant*, 655 F.3d 232, 255 (3d Cir. 2011). These assertions by Defendants lack factual foundation and are, frankly, naked rhetoric.

In response, to the contrary, the defendant was re-elected to the office of U.S. Senator from the State of New Jersey in 2012, having occupied that position since 2006 because of a gubernatorial appointment and later election. In the political hierarchy of this state, that position of U.S. Senator, in the opinion of many, including this Court, may be considered nearly hegemonic with the office of Governor. Yet whether one agrees with the Court as to the relative status of the

17

defendant's office is really irrelevant. Regardless of how one ranks the pecking order, no reasonable person will deny that the defendant holds a very, very important statewide elective office.

And because of that—to develop the point—familiar synonyms of <u>convenience</u> come to mind: <u>fitness</u> and <u>suitability</u>. It is then <u>fit</u> that the trial of such an elected official, consistent with all constitutional requisites due him, be held before his peers, impartial citizens of his state, who will form the jury.

It is in the interest of justice to do so. But justice, to be truly meaningful and not academic or abstract, must be manifest. Its workings should be manifest, that is, clear, apparent, observable. Justice's workings, such as judicial proceedings, should be readily transparent when possible. It is <u>suitable</u> then that this trial be held in New Jersey so that the residents and citizens whom the defendant Menendez represents have the greater opportunity to be informed regularly, to receive news about his trial, and have an opportunity (limited) to attend the trial in state. Such convenience to the New Jersey public, its citizens and residents, is a special element against transfer.

## CONCLUSION

Facially, the defendants' arguments to transfer this matter appeared impressive, but they did not withstand pragmatic scrutiny in the evaluation of the *Platt* factors. Defendants' allegations were mostly naked without clothes of reality. This case will certainly not be better off in the District of Columbia. It follows that the Court concludes that the defendants have failed in their burden to persuade the Court to exercise its discretion to transfer this case to the District of Columbia. Their motion is denied. An appropriate order follows.

Date: June 16, 2015

United States Senior District Judge