# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>v.<br><br>ROBERT MENENDEZ<br><br>and<br><br>SALOMON MELGEN,<br><br>                              Defendants. | Crim. No. 2:15-cr-00155<br>Hon. William H. Walls |

### DEFENDANTS' MOTION TO DISMISS FOR FAILURE
### TO SCREEN FOR GRAND JURY BIAS
**(Motion to Dismiss No. 5)**

Abbe David Lowell
Jenny R. Kramer
Christopher D. Man
Scott W. Coyle
**CHADBOURNE & PARKE LLP**
1200 New Hampshire Avenue, N.W.
Washington, D.C. 20036
(202) 974-5600

Raymond M. Brown
**GREENBAUM ROWE SMITH & DAVIS LLP**
Metro Corporate Campus One
P.O. Box 5600
Woodbridge, NJ 07095
(732) 476-3280

Stephen M. Ryan
Thomas J. Tynan
**MCDERMOTT WILL & EMERY LLP**
500 North Capitol Street, N.W.
Washington, D.C. 20001
(202) 756-8000

*Counsel for Defendant*
*Senator Robert Menendez*

Kirk Ogrosky
Murad Hussain
**ARNOLD & PORTER LLP**
555 12th Street, N.W.
Washington, DC 20004
(202) 942-5330

Matthew I. Menchel
Michael C. Fasano
**KOBRE & KIM LLP**
2 South Biscayne Boulevard, 35th Floor
Miami, FL 33131
(305) 967-6108

*Counsel for Defendant*
*Dr. Salomon Melgen*

TABLE OF CONTENTS

INTRODUCTION ..........................................................................................................................1

ARGUMENT ..................................................................................................................................2

I.   COURTS HAVE RECOGNIZED THE IMPORTANCE OF SCREENING
     THE GRAND JURY FOR BIAS................................................................................................2

II.  GIVEN SENATOR MENENDEZ'S STATURE AND THE PUBLICITY
     SURROUNDING THE CASE, THE LIKELIHOOD OF BIAS IS
     EXTRAORDINARY AND EXTENSIVE GRAND JUROR SCREENING
     WAS NECESSARY ...................................................................................................................5

     A.   The Scandalous Public Accusations Against Defendants Posed
          A Likelihood Of Grand Juror Bias...........................................................................5

     B.   Public Opinion Polls Reveal A Likelihood Of Grand Juror Bias ............................8

     C.   The Unusual Public Nature Of This Case Risks Grand Juror Bias..........................9

     D.   The Timing Of Publicity And The Continuing Interest In This Highly
          Political Case Poses A Likelihood Of Grand Juror Bias .......................................12

     E.   Extensive Grand Jury Screening Was Necessary To Protect Defendants'
          Constitutional Rights .............................................................................................13

CONCLUSION..............................................................................................................................15

## TABLE OF AUTHORITIES

### CASES

Bank of Nova Scotia v. United States, 487 U.S. 250 (1988)............................................................3

Beck v. Washington, 369 U.S. 541 (1962) .....................................................................................3

Costello v. United States, 350 U.S. 359 (1956) ..............................................................................3

Estes v. Texas, 381 U.S. 532 (1963)................................................................................................4

Ford v. Kentucky, 469 U.S. 984 (1984)...........................................................................................3

Irvin v. Dowd, 366 U.S. 717 (1961) ..................................................................................... 4, 12-13

Lawn v. United States, 355 U.S. 339 (1958) ............................................................................... 2-3

Murphy v. Florida, 421 U.S. 794 (1975) .......................................................................................13

Nebraska Press Ass'n. v. Stuart, 427 U.S. 539 (1976) ....................................................................4

Patton v. Yount, 467 U.S. 1025 (1984)..........................................................................................12

Sheppard v. Maxwell, 384 U.S. 333 (1966) ...............................................................................4, 14

United States v. Green, 549 F. App'x 62 (3d Cir. 2014) .................................................................3

United States v. Hubbard, 474 F. Supp. 64 (D.D.C. 1979)...........................................................14

United States v. Maine Lobster Co., 160 F. Supp. 122 (D. Me. 1957)...........................................5

United States v. Serubo, 604 F.2d 807 (3d Cir. 1979).....................................................................3

United States v. Trochelmann, 1999 WL 294992 (S.D.N.Y. May 11, 1999).................................3

United States v. Waldbaum, Inc., 593 F. Supp. 967 (E.D.N.Y. 1984) ............................................5

Vasquez v. Hillery, 474 U.S. 245 (1986).................................................................................3-4, 14

Wells v. Murray, 831 F.2d 468 (4th Cir. 1987) .............................................................................14

### STATUTES

28 U.S.C. § 1866(c)(2)....................................................................................................................4

## **INTRODUCTION**

Senator Menendez and Dr. Melgen have both been the subject of intense and abnormal public scrutiny and prejudicial media coverage that required the Government to take special care in guarding their constitutional rights during the grand jury selection process. Senator Menendez has served the people of the State of New Jersey since 1974, as their United States Senator for the past 9 years, and previously as one of their Representatives in Congress, as a Member of the General Assembly and as a Member of the local School Board. Naturally, politicians of the Senator's stature are public figures that attract both loyal supporters and fierce detractors, and Senator Menendez is no different. In addition, New Jersey politics in particular often creates strong allegiances and oppositions based on political party. Furthermore, Senator Menendez has been vocal on issues that generate passionate public opinion, including his strong support of Israel, his strong opposition to a nuclear Iran, and his strong opposition to normalization of relations with Cuba until improvements to human rights and other issues are addressed. Consequently, there is a likelihood that a subset of the people called to jury service would begin with strong feelings for or against the Senator.

The sensational and prejudicial media coverage of this case and Senator Menendez's 20-year friendship with Dr. Melgen is an entirely separate source of abnormal public scrutiny. The media, with help from leaks by government investigators, has reported extensively on this case. In many instances the reporting was plainly designed to foment a political scandal. Certainly the media thrust Dr. Melgen into the public eye and cast him as a villain in the drama.

Starting right before Senator Menendez's re-election in November 2012, leaks and rumors about the friendship between Senator Menendez and Dr. Melgen began appearing in the media, raising false and prejudicial allegations (*e.g.*, allegedly hiring underage prostitutes).

1

While these reports were later proven to be false, the scandal and subsequent government investigation were extensively covered in the tabloids and mainstream media. This media coverage painted the Senator and Dr. Melgen in as negative a light as possible.

Given the vast media exposure concerning the facts at issue in this case, and the strong feelings many in New Jersey have about Senator Menendez in any event, it is likely that absent careful screening, the grand jury that heard and returned the Indictment was biased. Just as this Court would not proceed to sit a petit jury without ensuring an unbiased panel, the same should have occurred before a grand jury was asked to play its role of guarding against unfair charges. There is no indication that the prosecution took any steps to assure the empaneling of an impartial grand jury.[1] In fact, the prosecution continuously questioned certain witnesses in a manner to further encourage and utilize the grand jurors' possible biases.

## ARGUMENT

### I.   COURTS HAVE RECOGNIZED THE IMPORTANCE OF SCREENING THE GRAND JURY FOR BIAS

No trial judge would allow a petit jury to sit in this case without scrupulous selection methods to ensure fairness; this same process was required for the grand jury, and it did not occur. Without adequate screening, there was and is a real likelihood that grand jurors would vote for an indictment in this case influenced in large part by their views of Defendants and not whether there was probable cause that an actual crime had occurred.

There is no question that Defendants are constitutionally entitled to an unbiased grand jury. The Supreme Court has "several times" ruled on the importance of an indictment being "returned by a legally constituted and nonbiased grand jury." Lawn v. United States, 355 U.S.

---

[1]   Defendants have asked the government to provide additional discovery about the grand jury proceedings, but the government has declined to do so.

339, 349-50 (1958); see Costello v. United States, 350 U.S. 359, 360 (1956) ("legally constituted and unbiased grand jury"); United States v. Green, 549 F. App'x 62, 64 (3d Cir. 2014) (Fifth Amendment requires "an indictment be returned by a legally constituted and unbiased grand jury"); United States v. Serubo, 604 F.2d 807, 816 (3d Cir. 1979) ("In federal criminal proceedings, the right to indictment by an unbiased grand jury is guaranteed by the fifth amendment."); see also Ford v. Kentucky, 469 U.S. 984, 987 (1984) (Marshall, J., dissenting from denial of cert.) ("Given the potential power of the grand jury over the criminal defendant, there can be no question that due process requires state grand juries to be unbiased and impartial."); Beck v. Washington, 369 U.S. 541, 546 (1962) ("It may be that the Due Process Clause of the Fourteenth Amendment requires the State, having once resorted to a grand jury procedure, to furnish an unbiased grand jury.").

With this requirement, it is crucial to determine whether the government thoroughly screened the grand jury for bias because an improperly constituted grand jury is grounds for reversal. See Vasquez v. Hillery, 474 U.S. 245, 263 (1986) (reversing a conviction for discrimination in selecting the grand jury). There is usually a presumption of regularity in grand jury proceedings. United States v. Trochelmann, 1999 WL 294992, at *3 (S.D.N.Y. May 11, 1999). But "a reviewing court can neither indulge a presumption of regularity [of the grand jury] nor evaluate the resulting harm" when "constitutional error calls into question the objectivity of those charged with bringing a defendant to judgment." Vasquez, 474 U.S. at 263; see also Bank of Nova Scotia v. United States, 487 U.S. 250, 256–57 (1988) (finding that prejudice can be presumed and no harmless error analysis is necessary when "the structural protections of the grand jury have been so compromised as to render the proceedings fundamentally unfair").

Such bias is commonly recognized in situations involving extensive pretrial publicity. In Sheppard v. Maxwell, 384 U.S. 333 (1966), the Supreme Court granted a writ of habeas corpus when the defendant suffered harm from the "massive, pervasive, and prejudicial publicity that attended his prosecution." Id. at 335. In that case, media reports characterized the defendant as a "Jekyll-Hyde" personality with a "fiery" temper, and also commented on the strength of the government's case, anticipating "bombshell witnesses" and their "probable testimony." Id. at 361. In reversing the denial of habeas corpus, the Court stated:

> [W]e note that unfair and prejudicial news comment on pending trials has become increasingly prevalent. Due process requires that the accused receive a trial by an impartial jury free from outside influences. Given the pervasiveness of modern communications and the difficulty of effacing prejudicial publicity from the minds of the jurors, the trial courts must take strong measures to ensure that the balance is never weighed against the accused.

Id. at 362.

Subsequent Supreme Court cases have adopted the view that pretrial publicity can sufficiently prejudice a jury in such a way that steps must be taken to ensure impartiality. See, e.g., Nebraska Press Ass'n. v. Stuart, 427 U.S. 539, 564 (1976) (noting that, where adverse pretrial publicity has taken place, the law requires "searching questioning of potential jurors . . . to screen out those with fixed opinions as to guilt or innocence"); Estes v. Texas, 381 U.S. 532, 538 (1963); Irvin v. Dowd, 366 U.S. 717, 722 (1961); see also Vasquez, 474 U.S. at 263 (comparing racial bias to the bias caused by pretrial publicity and noting that "when a petit jury has been selected upon improper criteria or has been exposed to prejudicial publicity, we have required reversal of the conviction because the effect of the violation cannot be ascertained").

The law regarding petit jury bias is applicable to grand jurors because the statutory standards governing the exclusion of biased jurors are the same for both grand jurors as for petit jurors. See 28 U.S.C. § 1866(c)(2) (court may exclude a juror from a grand or petit jury "on the

4

ground that such person may be unable to render impartial jury service"); see also United States v. Waldbaum, Inc., 593 F. Supp. 967, 971 (E.D.N.Y. 1984) (citing petit jury bias cases in its discussion of possible grand jury bias); United States v. Maine Lobster Co., 160 F. Supp. 122, 125 (D. Me. 1957) (dismissing grand juror for cause when grand juror "might have been one of the aggrieved parties against whom the alleged conspiracy was directed, a position from which [his] prejudice might well be presumed"). Only the government could have taken steps to protect the constitutional rights of Defendants by eliminating the possibility of grand jury bias, and it appears it did not do so.

## II. GIVEN SENATOR MENENDEZ'S STATURE AND THE PUBLICITY SURROUNDING THE CASE, THE LIKELIHOOD OF BIAS IS EXTRAORDINARY AND EXTENSIVE GRAND JUROR SCREENING WAS NECESSARY

### A. The Scandalous Public Accusations Against Defendants Posed A Likelihood Of Grand Juror Bias

Before the Indictment was returned on April 1, 2015, public sentiment toward Defendants was exceptionally negative based on highly inflammatory allegations about them in the press -- allegations that were later proven false. Since 2012, Senator Menendez and Dr. Melgen have been the victims of a smear campaign designed to hurt the Senator politically and destroy both men's reputations and good names. On November 1, 2012, The Daily Caller, an inexplicably well-read conservative news website, ran an article entitled "Women: Sen. Bob Menendez paid us for sex in the Dominican Republic," which accused Senator Menendez of visiting with Dr. Melgen in the Dominican Republic and then hiring and having sex with underage prostitutes.[2] This was the first of a series of articles run by The Daily Caller from November 2012 to

---

[2] Matthew Boyle, "Women: Sen. Bob Menendez paid us for sex in the Dominican Republic," The Daily Caller (Nov. 1, 2012), http://dailycaller.com/2012/11/01/women-sen-bob-menendez-paid-us-for-sex-in-the-dominican-republic/.

5

February 2013 that accused the Senator and Dr. Melgen of soliciting prostitutes, participating in wild "sex orgies," and hosting lavish parties involving drugs, alcohol and sex in the Dominican Republic.[3]

Although the accusations leveled against the Senator and Dr. Melgen by The Daily Caller were later proven to be completely fabricated,[4] national mainstream media gave wide coverage to the alleged "scandal."  For example, CBS News, CNN, Politico, and Fox News all ran several segments and articles on their websites detailing the allegations of prostitution made against Senator Menendez,[5] and the Washington Post published a February 2013 article noting that the "scandal" involved "underage prostitutes and sex parties."[6]

---

[3]  Matthew Boyle, "Dominican government official: Sen. Bob Menendez a frequent guest at 'sex, hookers and drinking' parties," The Daily Caller (Nov. 5, 2012), http://dailycaller.com/2012/11/05/dominican-government-official-sen-bob-menendez-a-frequent-guest-at-sex-hookers-and-drinking-parties/; David Martosko, "Dominican prostitute: Sen. Bob Menendez 'likes the youngest and newest girls'," The Daily Caller (Jan. 31, 2013), http://dailycaller.com/2013/01/31/dominican-prostitute-senator-bob-menendez-likes-the-youngest-and-newest-girls/; Conchita Sarnoff, "Long-time escort confirms Sen. Bob Menendez paid her for sex," The Daily Caller (Feb. 24, 2013), http://dailycaller.com/2013/02/24/long-time-escort-confirms-senator-bob-menendez-paid-her-for-sex/.

[4]  Carol D. Leonnig, "Escort says Menendez prostitution claims were made up," Wash. Post (March 4, 2013), http://www.washingtonpost.com/politics/escort-says-menendez-prostitution-claims-were-made-up/2013/03/04/31299fe2-8514-11e2-999e-5f8e0410cb9d_story.html.

[5]  Stephanie Condon, "Scandal drags down Menendez's approval ratings," CBS News (February 21, 2013),  http://www.cbsnews.com/news/scandal-drags-down-menendezs-approval-rating/; "FBI investigating prostitution claims against Sen. Menendez," CBS News (Feb. 18, 2013), http://www.cbsnews.com/news/fbi-investigating-prostitution-claims-against-sen-menendez/; Michael Goodwin, "Menendez is about to find out who his friends in Washington really are," Fox News (Feb. 7, 2013), http://www.foxnews.com/opinion/2013/02/07/menendez-is-about-to-find-out-who-his-friends-in-washington-really-are.html; Bill O'Reilly, "How will the media cover the Robert Menendez scandal?," Fox News (Feb. 4, 2013), http://www.foxnews.com/transcript/2013/02/05/how-will-media-cover-robert-menendez-scandal/; Kevin Robillard, "Robert Menendez denies prostitute 'smears'," Politico (Feb. 4, 2013),  http://www.politico.com/story/2013/02/bob-menendez-denies-prostitute-smears-87168.html; Alan Duke, "Mystery source, high stakes as Menendez denies prostitutes allegations," CNN (Feb. 1, 2013), http://www.cnn.com/2013/01/31/politics/senator-menendez/; Bill O'Reilly, "Bill O'Reilly: Senator Robert Menendez in big trouble," Fox News (Jan. 31,

Perhaps even more damaging to Defendants and their right to an unbiased grand jury pool in this case, local New Jersey media outlets also gave wide coverage to the alleged prostitution "scandal." The Star-Ledger, the largest newspaper in the State of New Jersey, ran multiple articles in January and February 2013 highlighting the allegations of prostitution made by The Daily Caller against Senator Menendez and Dr. Melgen.[7] Likewise, The Asbury Park Press, The Times of Trenton, and The Record all ran multiple stories and editorials on the scandal,[8] and

---

2013), http://www.foxnews.com/transcript/2013/02/01/bill-oreilly-senator-robert-menendez-big-trouble/; Serafin Gomez, "Menendez denies prostitution claims after FBI raid on donor's office," Fox News (Jan. 30, 2013), http://www.foxnews.com/politics/2013/01/30/fbi-raids-office-doctor-tied-to-sen-menendez/.

[6] Carol D. Leonnig, "FBI probing allegations Sen. Menendez patronized prostitutes in Dominican Republic," Wash. Post (Feb. 15, 2013), http://www.washingtonpost.com/politics/fbi-probing-allegations-sen-menendez-patronized-prostitutes-in-dominican/2013/02/15/49b64e7c-77c5-11e2-8f84-3e4b513b1a13_story.html.

[7] Christopher Baxter, "For Sen. Robert Menendez, allegations tarnish a shining moment," The Star-Ledger (Feb. 3, 2013), http://www.nj.com/politics/index.ssf/2013/02/robert_menendez_fbi_doctor_pro.html; Christopher Baxter, "Menendez, friend keep low profile in wake of accusations," The Star-Ledger (Feb. 1, 2013), http://blog.nj.com/politics_impact/print.html?entry=/2013/02/menendez_friend_keep_low_profi.html; Matt Friedman, "Menendez campaigns linked to doctor accused of setting up trysts with prostitutes," The Star-Ledger (Jan. 30, 2013), http://www.nj.com/politics/index.ssf/2013/01/robert_menendez_prositution_sc.html.

[8] Malia Rulon Herman, "Menendez says allegations he used prostitutes are 'smears'," The Asbury Park Press, Feb. 5, 2013, at A3.; Malia Rulon Herman, "Mendez paid donor last month," The Asbury Park Press, Feb. 1, 2013, at A1.; Asbury Park Press Editorial Board, "Get to bottom of allegations," The Asbury Park Press, Feb. 2, 2013, at A11.; Paul Mulshine, "It's time to put up or shut up for Menendez," The Times of Trenton, Feb. 4, 2013, at A9.; Matt Friedman, "FBI raid puts N.J. senator on defensive Menendez denies allegations that he used prostitutes," The Times of Trenton, Feb. 31, 2013, at A1.; Herb Jackson, "More Eyes on Menendez," The Record, Feb. 2, 2013, at A1.; Herb Jackson, "Ethics Group Says Senator Violated Rules," The Record, Feb. 1, 2013, at A1.; Salvador Risso, "Menendez: All those smears are absolutely false— As senator confronts prostitution allegations, women at center of scandal can't be found," The Record, Feb. 5, 2013, at A1.

local television stations WNBC, WCAU, and WCBS ran segments and articles on their websites discussing the allegations of prostitution made against Defendants.[9]

This ubiquitous national and local media coverage of the scandalous accusations made by The Daily Caller undoubtedly biased public opinion against Senator Menendez and Dr. Melgen. Absent appropriate screening, the likelihood of grand jury bias is obvious. Yet, it appears that even after this torrent of publicity, the prosecutors failed to conduct any screening.

### B.  Public Opinion Polls Reveal A Likelihood Of Grand Juror Bias

Public opinion polls demonstrate that, absent careful screening by the government, the grand jury was likely biased against Senator Menendez, and by extension, Dr. Melgen. In January 2013, Senator Menendez held a 51% approval rating among New Jersey residents.[10] But, after the mainstream media began to report on the accusations made by The Daily Caller and the FBI's ensuing investigation, Senator Menendez's popularity plummeted. A poll conducted among New Jersey residents in February 2013 found that Senator Menendez's popularity had dropped by 15 points, with only 36% of those polled having a favorable impression of the Senator while 41% of those polled held an unfavorable view.[11] While Senator

---

[9]  "Sen. Menendez Linked to Doctor Under Investigation," WNBC (Jan. 30, 2013), http://www.nbcnewyork.com/video/#!/on-air/as-seen-on/Sen--Menendez-Linked-to-Doctor-Under-Investigation/189115311; "Menendez Denies Allegations Related to Florida Doctor," WNBC (Jan. 30, 2013), http://www.nbcnewyork.com/video/#!/on-air/as-seen-on/Menendez-Denies-Allegations-Related-to-Florida-Doctor/189133911; "NJ's Sen. Menendez Denies He Was With Dominican Prostitutes," WCAU (Jan. 30, 2013), http://www.nbcphiladelphia.com/news/politics/Menendez-Prostitution-Denial-189078551.html; "Menendez On Prostitution 'Smears': They're 'Absolutely False…Bottom Line,'" WCBS (Feb. 4, 2013), http://newyork.cbslocal.com/2013/02/04/menendez-smears-about-alleged-relations-with-prostitutes-are-absolutely-false/.

[10]  "Donor Controversy Takes Toll on NJ Senator, Quinnipiac University Poll Finds; Booker Tops Rivera 2-1 in 2014 Senate Race," Quinnipiac Univ. Polling Inst. (Feb. 21, 2013), http://www.quinnipiac.edu/images/polling/nj/nj02212013.pdf.

[11]  Id.

8

Menendez's popularity among New Jersey residents did recover to a degree, his approval rating never approached the 51% pre-scandal level.[12] In the days following the April 1, 2015 Indictment, the Senator's approval/disapproval rating among New Jersey residents was at a 35/46 margin, the Senator's worst net approval rating ever.[13] Unquestionably, public opinion in New Jersey strongly disfavored Senator Menendez at the time of his Indictment and polling suggests many on the grand jury would have been biased against the Senator absent careful screening.[14]

### C. The Unusual Public Nature Of This Case Risks Grand Juror Bias

On March 14, 2013, a <u>Washington Post</u> article entitled "Grand jury investigating Sen. Robert Menendez (D-N.J.), people familiar with probe say," reported that a federal grand jury

---

[12] "Bridgegate Takes One-Year Toll On New Jersey Gov, Quinnipiac University Poll Finds; 92 Percent Say Rail Tunnel Repair Is Important," <u>Quinnipiac Univ. Polling Inst.</u> (Jan. 25, 2015), http://www.quinnipiac.edu/images/polling/nj/nj01212015_Nk88mxjg.pdf; "New Jersey Voters Want Rail Tunnel, But No Gas Tax Hike, Quinnipiac University Poll Finds; Christie Approval Rating Stuck In Traffic," <u>Quinnipiac Univ. Polling Inst.</u> (Dec. 10, 2014), http://www.quinnipiac.edu/images/polling/nj/nj12102014_N5ghq49.pdf; "Clinton Blooms Over Christie In Garden State, Quinnipiac University Poll Finds; Booker Tops Little-Known Challenger By 10 Points," <u>Quinnipiac Univ. Polling Inst.</u> (Aug. 6, 2014), http://www.quinnipiac.edu/images/polling/nj/nj08062014_nt63gr.pdf; "New Jersey Bridgegate Probes: Whitewash V. Witch Hunt, Quinnipiac University Poll Finds; Gov. Christie's Approval Is Down, Bully-Meter Is Up," <u>Quinnipiac Univ. Polling Inst.</u> (Apr. 9, 2014), http://www.quinnipiac.edu/images/polling/nj/nj04092014_krta97.pdf; "Sandy Won't Change Their Vacation Plans, New Jersey Voters Tell Quinnipiac University Poll; Menendez Gets Small Bounce After Big Drop," <u>Quinnipiac Univ. Polling Inst.</u> (Mar. 27, 2013), http://www.quinnipiac.edu/images/polling/nj/nj03272013.pdf2187.

[13] "New Jersey Voters Say Menendez Should Resign, Quinnipiac University Poll Finds; Voters Back President Obama on Cuba, Iran," <u>Quinnipiac Univ. Polling Inst.</u> (Apr. 16, 2015), http://www.quinnipiac.edu/news-and-events/quinnipiac-university-poll/new-jersey/release-detail?ReleaseID=2187.

[14] Polling also demonstrates a need for careful screening of the petit jury in this case. A survey of New Jersey residents was conducted on April 30, 2015, roughly one month after the Indictment. The survey found that 58% of those polled believed the Senator was guilty of the crimes for which he was indicted and only 19% believed the Senator was innocent. "Hot Water for Menendez?" <u>Fairleigh Dickinson Univ.</u> (Apr. 30, 2015), http://publicmind.fdu.edu/2015/they-all-do-it/.

9

investigation into Senator Menendez and his friendship with Dr. Melgen was underway.[15] The article stated "FBI agents were conducting interviews in the Dominican Republic and the United States concerning allegations against Menendez" and that "federal agents have questioned witnesses about the interactions between Menendez and Melgen, who contributed $700,000 last year to Menendez and other Senate Democrats."[16] The widely-circulated article went on to chronicle details about testimony presented to the grand jury and identified subjects of the investigation. While the article's sources were kept secret, described only as "three people aware of the probe," it is highly probable that the leaked information would be perceived as coming from a knowledgeable government source.

On March 6, 2015, CNN, relying on an anonymous source likely from within the Department of Justice,[17] reported that former Attorney General Eric Holder had "signed off" on prosecutors' requests to bring criminal charges against the Senator.[18] Press accounts that the Attorney General had personally vouched for the charges the prosecutors wanted to bring likely

---

[15] Carol D. Leonnig, "Grand jury investigating Sen. Robert Menendez (D-N.J.), people familiar with probe say," Wash. Post (Mar. 14, 2013), http://www.washingtonpost.com/politics/grand-jury-investigating-sen-robert-menendez-d-nj-people-familiar-with-probe-say/2013/03/14/2eb4fad4-8b24-11e2-9838-d62f083ba93f_story.html.

[16] Id.

[17] Manu Raju, "Robert Menendez's defiant survival strategy," Politico (Mar. 10, 2015), http://www.politico.com/story/2015/03/bob-menendez-responds-federal-investigation-115944.html?hp=l3_3; Chase Brush, "Menendez wants an investigation into DOJ leak," Politicker NJ (Mar. 10, 2015), http://politickernj.com/2015/03/menendez-wants-an-investigation-into-doj-leak/; Jordain Carney, "Graham: Something 'doesn't smell right' about Menendez leak," The Hill (Mar 10, 2015), http://thehill.com/blogs/floor-action/senate/235218-graham-something-doesnt-smell-right-about-menendez-reports.

[18] "Feds prepare corruption charges against Sen. Menendez," CNN (March 6, 2015), http://www.cnn.com/videos/politics/2015/03/06/nr-perez-menendez-justice-department-criminal-corruption-charges.cnn.

10

compromised the ability of the grand jury to weigh the evidence objectively, as they should have been doing at this time.  This government leak triggered a wave of articles, news reports, and op-ed pieces that were obviously prejudicial to Senator Menendez and Dr. Melgen.[19]  For example, a Washington Post article published later that same month detailed key facts in the government's case and asserted that "Menendez appeared to use his position to help Melgen."[20]  Another article seemingly endorsed the government's case, stating that "Mr. Menendez also took actions that stood to enrich Dr. Melgen, who has given hundreds of thousands of dollars to benefit Mr. Menendez and the Democratic Party."[21]  Due to this ubiquitous and highly prejudicial media coverage—which described facts, testimony, and legal theories related to the case—the likelihood of grand jury bias is obvious.

---

[19]     Matt Friedman, "With corruption charges reportedly looming, Menendez talks jobs and says he did nothing wrong," The Star Ledger (Mar. 23, 2015), http://www.nj.com/politics/index.ssf/2015/03/with_corruption_charges_reportedly_looming_menende.html; Richard A. Serrano, "Sen. Robert Menendez case tests Justice Department's anti-corruption unit," L.A. Times (Mar. 22, 2015), http://www.latimes.com/nation/la-na-menendez-probe-20150322-story.html#page=1; Times of Trenton Editorial Board, "Editorial: Troubling federal investigation looms over U.S. Sen. Robert Menendez yet again," The Star Ledger (Mar. 10, 2015), http://www.nj.com/opinion/index.ssf/2015/03/editorial_cloud_of_federal_investigation_hangs_ove.html; Matt Friedman, "The Menendez saga: How it got to this," The Star Ledger (Mar. 6, 2015), http://www.nj.com/politics/index.ssf/2015/03/the_menendez_scandal_how_it_got_to_this_point.html.

[20]     Sean Sullivan, "Sen. Menendez to face charges in corruption case," Wash. Post (Mar. 6, 2015), http://www.washingtonpost.com/politics/justice-department-reportedly-preparing-charges-against-senator/2015/03/06/6b3eff72-c43e-11e4-9271-610273846239_story.html.

[21]     Matt Apuzzo, "In Menendez Inquiry, Government Renews Push for Friend's Cooperation," N.Y. Times (Mar. 26, 2015),  http://www.nytimes.com/2015/03/27/us/politics/in-menendez-inquiry-government-renews-push-for-friends-cooperation.html.

### D. The Timing Of Publicity And The Continuing Interest In This Highly Political Case Poses A Likelihood Of Grand Juror Bias

Courts have held that the risk of bias is especially strong when there has been little temporal attenuation between the time of the negative publicity and the time of legal proceedings. Compare Patton v. Yount, 467 U.S. 1025, 1032 (1984) (noting a four year lapse in time between the events giving rise to the trial and the jury selection "had a profound effect on the community and, more important, on the jury, in softening or effacing opinion"), with Irvin, 360 U.S. at 725 (finding prejudice where the "six or seven months preceding trial" were plagued by a "barrage" of negative publicity). In Irvin, the Supreme Court held that a defendant's conviction could not stand where pretrial publicity biased the jury. In that case, the defendant was accused of multiple murders, and the crimes were "extensively covered by news media in the locality" and "aroused great excitement and indignation." 366 U.S. at 719. The six or seven months preceding the trial involved an especially heavy media focus on the defendant, and the public was overwhelmed by "a barrage of newspaper headlines, articles, cartoons and pictures" depicting the defendant in a negative light. Id. at 725. Media attention in the case was not merely limited to fact-reporting; instead, editorial comment vilified the defendant, with many reports speculating on his apparent guilt. Id. at 727 ("[s]pectator comments, as printed by the newspapers, were 'my mind is made up'; 'I think he is guilty'; and 'he should be hanged'").

As in Irvin, Senator Menendez and Dr. Melgen suffered from negative publicity just prior to their indictment that was contemporary and continuing, and they remained the subject of constant media scrutiny. This case received extensive coverage in New Jersey before it was filed, and the initial court date was covered by over 100 reporters and photographers. Like Mr. Irvin, Senator Menendez and Dr. Melgen suffered a "barrage of inflammatory publicity" around the time of the grand jury Indictment and endured a "huge . . . wave of public passion" as a result

12

of prejudicial leaks from the government during this investigation. Also, as in Irvin, media coverage of Senator Menendez and Dr. Melgen has not been limited to fact-reporting, and has instead been characterized by negative editorializing, tabloid cover stories, and even name-calling—the sort of publicity that often results in bias.[22] Murphy v. Florida, 421 U.S. 794, 801 n.4 (1975) (distinguishing "largely factual publicity" from that which is "invidious or inflammatory"). Given the ongoing negative publicity that Senator Menendez and Dr. Melgen experienced at the time of the grand jury Indictment, the prosecutors needed to take particular measures to screen for bias. Irvin, 366 U.S. at 728 ("[I] is not requiring too much that petitioner be tried in an atmosphere undisturbed by so huge a wave of public passion . . . ."). Based on the record, however, they failed to do so.

### E.  Extensive Grand Juror Screening Was Necessary To Protect Defendants' Constitutional Rights

In Skilling v. United States, the Supreme Court reaffirmed the importance of jury screening when it considered jury bias in the context of the highly-publicized collapse of Enron. 130 S. Ct. 2896 (2010). Even though four years had passed since the company's failure and the "decibel level of media attention" had dissipated, the trial court nonetheless recognized the "widespread community impact" caused by Enron's collapse. Id. at 2916–17. Accordingly, the trial court went to great lengths to identify and inspect prospective juror's connections to the company and utilized an "extensive screening questionnaire" and "follow-up voir dire." Id.

---

[22] Bob Ingle, "Menendez, corruption have a long history," My Central N.J. (Mar. 13, 2015), http://www.mycentraljersey.com/story/opinion/columnists/bob-ingle/2015/03/13/menendez-corruption-long-history/70214140/; Paul Mulshine, "Bob Menendez and the Mideast madmen: senator tries to spin his way out of scandal," The Star Ledger (Mar. 10, 2015), http://www.nj.com/opinion/index.ssf/2015/03/as_bob_menendez_and_the_mideast_madmen_senator_tri.html; Inquirer Editorial Board, "Friends Indeed?" The Philadelphia Inquirer (Mar. 10, 2015), http://articles.philly.com/2015-03-11/news/59974909_1_melgen-menendez-harrison-pete-williams.

13

Satisfied that these prophylactic steps protected the defendant's constitutional rights, the Supreme Court upheld the jury's verdict against Mr. Skilling, the company's former chief executive officer. Id. at 2923.[23]

In this case, the "decibel level of media attention" was and remains loud and constant. To eliminate those grand jurors who would indict Senator Menendez and Dr. Melgen based upon prejudice rather than the merits of the government's case, it was essential to voir dire all potential grand jurors.[24] Given the background of the target and the nature of the charges being sought, specific questions should have been asked to elicit the conscious and unconscious prejudices of the grand jurors. Sheppard, 384 U.S. at 362; Wells v. Murray, 831 F.2d 468, 472 (4th Cir. 1987) ("when external events such as pretrial publicity raise a strong possibility of jury bias, the court has a duty to determine whether the accused may have a fair trial. Inquiry into jury bias typically entails an evaluation of the pre-trial publicity complained of and its impact, if any, on the jury, as developed through adequate voir dire examination of the jurors. . . ."); United States v. Hubbard, 474 F. Supp. 64, 78 (D.D.C. 1979) ("Voir dire is the appropriate means for determining whether a fair and impartial jury can be selected"). If the government did not conduct a proper voir dire in screening the grand jury that indicted Defendants, the Constitution mandates that this Court dismiss the Indictment because "we simply cannot know that the need to indict would have been assessed in the same way by a grand jury properly constituted." Vasquez, 474 U.S. at 264.

---

[23] Such steps also would be required in selecting a petit jury in this case.

[24] These steps to filter bias from the grand jury in this case could have been as simple as a one page questionnaire or even a show of hands before proceedings began.

14

## **CONCLUSION**

Because of the normal influence that politics can have and the extensive press surrounding Senator Menendez and Dr. Melgen, the population from which the grand jury was selected in this case has been reported to have (and polling confirms did have) strong feelings about Senator Menendez and Dr. Melgen.  Just as the Court will not allow that pool to serve as trial jurors without careful screening for bias, so should the grand jury have been screened, if a grand jury process is supposed to have any meaning at all.  There is no indication that the government did anything of the kind.  Accordingly, unless the government can demonstrate that it did screen for such bias and eliminated bias grand jurors from the process, the Indictment should be dismissed for constitutional error.

Respectfully submitted,

/s/ Abbe David Lowell
Abbe David Lowell
Jenny R. Kramer
Christopher D. Man
Scott W. Coyle
**CHADBOURNE & PARKE LLP**
1200 New Hampshire Avenue, N.W.
Washington, D.C. 20036
adlowell@chadbourne.com
(202) 974-5600

Raymond M. Brown
**GREENBAUM ROWE SMITH & DAVIS LLP**
Metro Corporate Campus One
P.O. Box 5600
Woodbridge, NJ 07095
rbrown@greenbaumlaw.com
(732) 476-3280

Stephen M. Ryan
Thomas J. Tynan
**MCDERMOTT WILL & EMERY LLP**
500 North Capitol Street, N.W.
Washington, D.C. 20001

/s/ Kirk Ogrosky
Kirk Ogrosky
Murad Hussain
**ARNOLD & PORTER LLP**
555 12th Street, N.W.
Washington, DC 20004
Kirk.Ogrosky@aporter.com
(202) 942-5330

Matthew I. Menchel
Michael C. Fasano
**KOBRE & KIM LLP**
2 South Biscayne Boulevard, 35th Floor
Miami, FL 33131
matthew.menchel@kobrekim.com
(305) 967-6108

sryan@mwe.com
(202) 756-8000

*Counsel for Defendant*  *Counsel for Defendant*
*Senator Robert Menendez*  *Dr. Salomon Melgen*