# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

UNITED STATES OF AMERICA,

v.

ROBERT MENENDEZ

and

SALOMON MELGEN,

Defendants.

Crim. No.  2:15-cr-00155
Hon. William H. Walls

# DEFENDANTS' MOTION TO DISMISS THE INDICTMENT
## BASED ON PROSECUTORIAL AND INVESTIGATORY MISCONDUCT
### (Motion to Dismiss No. 6)

Abbe David Lowell
Jenny R. Kramer
Christopher D. Man
Scott W. Coyle
**CHADBOURNE & PARKE LLP**
1200 New Hampshire Avenue, N.W.
Washington, D.C. 20036
(202) 974-5600

Raymond M. Brown
**GREENBAUM ROWE SMITH & DAVIS LLP**
Metro Corporate Campus One
P.O. Box 5600
Woodbridge, NJ 07095
(732) 476-3280

Stephen M. Ryan
Thomas J. Tynan
**MCDERMOTT WILL & EMERY LLP**
500 North Capitol Street, N.W.
Washington, D.C. 20001
(202) 756-8000

*Counsel for Defendant*
*Senator Robert Menendez*

Kirk Ogrosky
Murad Hussain
**ARNOLD & PORTER LLP**
555 12th Street, N.W.
Washington, DC 20004
 (202) 942-5330

Matthew I. Menchel
Michael C. Fasano
**KOBRE & KIM LLP**
2 South Biscayne Boulevard, 35th Floor
Miami, FL 33131
 (305) 967-6108

*Counsel for Defendant*
*Dr. Salomon Melgen*

## **TABLE OF CONTENTS**

INTRODUCTION .................................................................................................1

INSTANCES OF GOVERNMENT MISCONDUCT ...................................................3

    1.  Improper Basis for the Investigation...................................................3

    2.  Government Agents' Intimidation and Coercion of Witnesses ...........................6

    3.  Government Agents Violated Dr. Melgen's Fourth Amendment Rights ...........................9

    4.  The Prosecution Flooded The Grand Jury Proceedings With Inflammatory Questions Regarding Sexual Relationships, Affairs, And Lavish Gifts Which Are Unrelated To The Charges Contemplated By The Government........................................10

    5.  The Government Abused Staff Members And Solicited Information Which Tainted The Grand Jury .................................................................14

    6.  Other Misconduct Before The Grand Jury.................................................16

    7.  Illegal Media Leaks Tainted And Prejudiced The Grand Jury Proceedings.....................17

ARGUMENT ...................................................................................................22

I.    THE INDICTMENT SHOULD BE DISMISSED IN ITS ENTIRETY DUE TO THE IMPROPER GOVERNMENT CONDUCT IN THIS CASE ...........................................22

    A.  The Cumulative Effect Of The Government's Misconduct Requires Dismissal Of The Indictment.................................................................24

    B.  The Government Has Engaged In "Outrageous Government Conduct," Which Mandates Dismissal Of The Indictment .................................................27

CONCLUSION.................................................................................................31

## TABLE OF AUTHORITIES

Ballard v. United States, 329 U.S. 187 (1946)....................................................................23

Bank of Nova Scotia v. United States, 487 U.S. 250 (1988)..................................22, 23

Berger v. United States, 295 U.S. 78 (1935) ....................................................................1, 31

Douglas Oil Co. of Ca. v. Petrol Stops Nw., 441 U.S. 211 (1979)............................28

In re Grand Jury Investig., 610 F.2d 202 (5th Cir. 1980) ........................................ 28-29

United States v. Breslin, 916 F. Supp. 438 (E.D. Pa. 1996) ...................................24-26

United States v. Calandra, 414 U.S. 338 (1974).............................................................17

United States v. Diaz-Carreon, 915 F.2d 951 (5th Cir. 1990) .......................................1

United States v. Hasting, 461 U.S. 499 (1983).................................................................22

United States v. Hill,1989 WL 47288 (S.D.N.Y. Mar. 22, 1989) ....................23, 25, 27

United States v. Hogan, 712 F.2d 757 (2d Cir. 1983) ............................................... 23-24

United States v. Omni Int'l Corp., 634 F. Supp. 1414 (D. Md. 1986)........................23

United States v. Payner, 447 U.S. 727 (1980) .................................................................22

United States v. Peralta, 763 F. Supp. 14 (S.D.N.Y. 1991)....................................24, 27

United States v. Russell, 411 U.S. 423 (1973)..................................................................28

United States v. Samango, 607 F.2d 877 (9th Cir. 1979) .......................................24, 27

United States v. Serubo, 604 F.2d 807 (3d Cir. 1979)..............................................1, 22

United States v. Twigg, 588 F2.d 373 (3d Cir. 1978).....................................................30

Vasquez v. Hillery, 474 U.S. 254 (1986)............................................................................23

Young v. U.S. ex rel. Vuitton et Fils S.A., 481 U.S. 787 (1987)...................................1

## <u>INTRODUCTION</u>

Between the private life of the citizen and the public glare of criminal accusation stands the prosecutor. That state official has the power to employ the full machinery of the state in scrutinizing any given individual. Even if a defendant is ultimately acquitted, forced immersion in criminal investigation and adjudication is a wrenching disruption of everyday life. For this reason, we must have assurance that those who would wield this power will be guided solely by their sense of public responsibility for the attainment of justice.

<u>Young v. U.S. ex rel. Vuitton et Fils S.A.</u>, 481 U.S. 787, 814 (1987).

Under well-settled law and basic principles of fairness, the prosecution must begin every investigation objectively. "The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern <u>impartially</u> is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done." <u>Berger v. United States</u>, 295 U.S. 78, 88 (1935) (emphasis added). The prosecutor has a "responsibility that easily can be abused" and, "while he may strike hard blows, he is not at liberty to strike foul ones. Because the prosecutor wields such great power, the opportunities for him to strike foul blows are many." <u>United States v. Diaz-Carreon</u>, 915 F.2d 951, 955-56 (5th Cir. 1990) (internal citation omitted). Because "the potential for abuse is so great . . . the obligation for the judiciary to <u>protect against even the appearance of unfairness</u> [is] correspondingly heightened." <u>United States v. Serubo</u>, 604 F.2d 807, 817 (3d Cir. 1979) (emphasis added).

These principles were not followed in this case. To the contrary, from the inception of this case, the prosecution has been curiously eager to pursue a federal investigation premised on,

among other things, wholly unsubstantiated allegations of underage prostitution fueled by an anonymous source adopting the not-so-humorous-name "Peter Williams" as an alias.[1]  Despite the improper and suspect nature of the allegations that launched this investigation, throughout each of its stages, the prosecution has stopped at nothing to pursue its case against Senator Menendez and Dr. Melgen.  Specifically, the prosecution has advanced salacious allegations of sexual misconduct, intimidated and coerced witnesses in the Dominican Republic with threats of criminal and immigration sanctions, intimidated Senator Menendez's own family members, harassed and abused staff members and other witnesses before the grand jury by asking inflammatory questions designed to infect the grand jury process, presented false testimony to the grand jury through the government's case agent, provided erroneous instructions to the grand jury on Speech or Debate Clause law and other issues, and in turn, circumvented the Third Circuit's remand on Speech or Debate Clause issues.  Perhaps most egregious in the parade of government misconduct are the intentional leaks of information relating to confidential grand jury proceedings, undoubtedly stripping the grand jury of any indicia of independence, which have resulted in an Inspector General and Office of Professional Responsibility ("OPR") inquiry inside the Justice Department and FBI.  (See Ex. A (Defs' 3/25/15 Ltr. to OPR Counsel).)  All this misconduct was inspired by what was apparently the government's insatiable need to bring the present charges against Senator Menendez and Dr. Melgen.  As set forth below, in the aggregate, the myriad instances of government misconduct mandate dismissal of the Indictment.

---

[1]    "Pete Williams" was the nickname for Harrison "Pete" Williams, the New Jersey Senator tried and convicted in the corruption case known as "Abscam" in 1981.

## INSTANCES OF GOVERNMENT MISCONDUCT

With this impetus towards reaching a conclusion that some case, any case, had to be brought against Senator Menendez and Dr. Melgen, the prosecution engaged in conduct designed to prejudice the opinion of the grand jury and the public. Below are several instances of misconduct, all illustrating the pattern of egregious prosecutorial misconduct that, in total, militates in favor of dismissal of the Indictment.

1.    Improper Basis for the Investigation

In the normal course, it would not matter how the prosecution chooses to initiate an investigation, whether from an eyewitness report, anonymous tip or referral from another agency. But when an investigation starts, as it did here, with such easily disprovable allegations about something that would hardly be a federal crime even had it been true, the prosecution should proceed with great caution. Instead, the prosecution focused itself on Senator Menendez and Dr. Melgen and refused to relent until it did something unprecedented in law enforcement history[2] – that is, it brought a case alleging public corruption where the parties involved have enjoyed a close friendship spanning decades. Here, the alleged "bribes" were hospitality that Dr. Melgen showed to Senator Menendez over the course of their friendship, particularly travel and lodging so that they could spend time together – not cash, jewels, shopping sprees. Contrary to the Indictment's skewed narrative, Dr. Melgen's hospitality began long before his friend became "Senator" Menendez. The alleged "official acts" were simply actions that Senator Menendez took consistent with long-standing policy positions that have characterized his entire career.

---

[2]    The same zeal resulted in numerous other errors in the investigatory process, the grand jury presentation and actual charges in this case. (See MTD Nos. 2-5, 15 (addressing different forms of misconduct).)

The investigation cannot be divorced from how and why it began. As set forth above, this investigation was premised on the unsubstantiated musings of an anonymous source who is referred to as "Peter Williams." Specifically, in 2012, "Peter Williams" used the Federal Bureau of Investigation ("FBI") to spread false and salacious allegations about Senator Menendez that became the catalyst for this investigation.

In response to these unsubstantiated allegations, Senator Menendez repeatedly encouraged the Department of Justice ("DOJ") to investigate and determine the true identity of "Peter Williams," the anonymous source who was providing false information to the government. Indications were and media articles have reported that "Peter Williams" was an operative of those who opposed Senator Menendez's strong opposition to the Cuban government or his political opponents.[3]

The implications of allowing such a scheme to go unpunished are clear: a political opponent (or, as potentially was the case here, a foreign government) would not be deterred from seeking to discredit a public official on the eve of reelection by feeding unfounded, salacious rumors to the FBI.[4] There appears to be no one who has been identified or charged with being "Peter Williams." Rather than going after and charging this person(s) with providing false information, DOJ appeared more interested in using the rumors as fodder to continue a headline-

---

[3]    Carol D. Leonnig, "FBI Seeks Source of Prostitution, Corruption Allegations Against Sen. Robert Menendez," The Washington Post (May 16, 2013), http://www.washingtonpost.com/politics/fbi-seeks-source-of-prostitution-corruption-allegations-against-sen-robert-menendez/2013/05/16/72ad79a0-bbda-11e2-89c9-3be8095fe767_story.html.

[4]    Carol D. Leonnig, "Sen. Robert Menendez Seeks Probe of Alleged Cuban Plot to Smear Him," The Washington Post (July 7, 2014), http://www.washingtonpost.com/politics/sen-robert-menendez-seeks-probe-of-alleged-cuban-plot-to-smear-him/2014/07/07/e9ba25a0-efe8-11e3-914c-1fbd0614e2d4_story.html.

grabbing investigation. Indeed, as <u>The Washington Post</u> reported, DOJ certainly had leads to follow in tracking down "Pete Williams."[5] In fact, through independent means, counsel for Senator Menendez provided the DOJ with a list of internet-protocol addresses from which "Peter Williams" allegedly sent the libelous rumors to the FBI. Additionally, counsel for Senator Menendez wrote to the DOJ and disclosed the identity of potential individuals and entities that might have been part of the fraud. To the extent discovery in this case indicates witnesses were simply asked if they knew a "Peter Williams," that same discovery does not reflect any follow up. Even when the government identified a man who paid women to lie and say they had been hired to accuse the Defendants of soliciting underage prostitutes, there have been no charges filed against him or the women. It also does not appear that the prosecutors tried to go "up the chain" by asking the payor who was behind his efforts.[6] The government left no stone unturned in running down intimate details about Dr. Melgen's personal affairs, but it seems to have had a different approach in trying to get to the bottom of the false allegations made, fueled or funded by "Peter Williams."

In addition, so intent on finding something, anything, with which to charge Senator Menendez, the investigators sought anyone they could – no matter that person's own wrongdoing – to solicit dirt on Senator Menendez.[7] The government was not investigating a crime, it was

---

[5]    <u>Id.</u>

[6]    According to the FBI 302 dated February 22, 2013, there was an attempt to interview Melanio Figueroa, who represented two women who appeared on video circulating in the media. The FBI advised that it would try to reschedule and never did or did not provide its report.

[7]    Ken Thorbourne, "Busted in Bid Rig, ex-pol Guy Catrillo reflects on the scandal, life in prison and lessons learned," <u>The Jersey Journal</u> (May 12, 2015) http://www.nj.com/hudson/index.ssf/2015/05/busted_in_bid_rig_jersey_city_sometimes-pol_guy_ca.html (reporting one of the defendants in the Bid Rig scandal stated that he was told

investigating a person.  As then Attorney General Robert Jackson said to his prosecutors some 75 years ago:

> If the prosecutor is obliged to choose his cases, it follows that he can choose his defendants.  Therein is the most dangerous power of the prosecutor: that he will pick people that he thinks he should, rather than pick cases that need to be prosecuted.

Robert H. Jackson, Attorney General of the United States, Address at the Second Annual Conference of United States Attorneys: The Federal Prosecutor 4 (April 1, 1940), http://www.justice.gov/sites/default/files/ag/legacy/2011/09/16/04-01-1940.pdf.

### 2.    Government Agents' Intimidation and Coercion of Witnesses

Another instance of prosecutorial misconduct occurred in connection with the FBI's repeated harassment and coercion of witnesses in the Dominican Republic and in the United States.  In or around February 2013, the FBI improperly conducted custodial interrogations of at least three individuals in the Dominican Republic and, through the agents' questioning, tried to elicit false or inaccurate statements.  Two of Dr. Melgen's employees, Ms. Rosa de Jesus Acosta and Ms. Miriam Rivera, were interrogated at the Dominican National Police station by FBI agents.  At the time of their interviews, no government officials from the Dominican Republic were present in the rooms as required by Dominican law and the FBI failed to show these witnesses a subpoena or any other local authorizing documents.  See Código Procesal Penal de la

---

that if he would inculpate Senator Menendez and then-Jersey City Mayor Jerramiah Healy, he would "likely not have to serve any jail time"); see also Ken Thorbourne, "Convicted ex-pol: Feds offered me a deal to turn on Menendez, Healy" The Jersey Journal (May 12, 2015) http://www.nj.com/hudson/index.ssf/2015/05/catrillo_feds_offered_deal_but_i_wouldnt_lie_abo ut.html (same defendant reporting that he refused to lie about Senator Menendez and Jerramiah Healy in exchange for "getting out of the charges" which related to the Bid Rig scandal).

República Dominicana, Art. 158.[8]  One can hardly imagine a situation where the Dominican Republic police would come to the United States and put a U.S. citizen in an interrogation room or situation like that.  The FBI agents questioned the women about whether Senator Menendez attended parties with prostitutes at Dr. Melgen's home.  When the women denied these allegations, the agents responded with threats, indicating that the "truth" was that the Senator attended parties with prostitutes.  For example, both Ms. Acosta and Ms. Rivera reported that the questions of foreign agents were

> directed to or obliged [her] to state that the American gentleman Robert Menendez, during his visits to Villa Ingenio … and as guest of Dr. Melgen, participated in parties with women and prostitutes, which [she] refuted many times, affirming that that was a big lie, given that when visiting, Mr. Menendez only played golf and spent most of his time reading and resting.  Although I insisted more than once, they tried pressuring me psychologically by telling me that I could be arrested if I didn't tell them what they wanted to be told.

(Ex. B at 1 (Acosta and Rivera Affidavits and Translations)).

Ms. Soraya Sanchez Colon, the third witness, was similarly harassed when interrogated on two occasions in the Dominican Republic.  Although she had reached out to her lawyer by sending a text message, the FBI agent told Ms. Sanchez Colon that she did not need a lawyer present because it would require a "complaint" being filed, a hassle the agent did not want.  Without her lawyer present, the agent continued questioning Ms. Sanchez Colon about her sexual history.  The second time she was interviewed, the FBI imaged her personal computer, cell phone and tablet, and continued to ask her drug and sex-based questions.  The FBI even subjected Ms. Sanchez Colon to a lie detector test, telling her they had to "test" the machine and she had to respond "yes" to all the questions.  During the execution of the polygraph, Ms.

---

[8]    http://fiscaliadeldistrito.gob.do/web/contenido/Codigo_Procesal_Penal_Dominicano.pdf.

Sanchez Colon refused to respond to the question inquiring as to whether she had "seen the doctor with prostitutes" as responding in the affirmative would have been a false statement. Ms. Sanchez Colon also reported that the agents became increasingly angry and threatened her with "federal problems." Ultimately, the FBI agent suggested he might be able to help with her financial problems if she testified as they wished about the Senator's alleged activities. (See Ex. C (Colon Affidavit and Translation).)

Rosiell Polanco and Korall Polanco, two sisters from the Dominican Republic, were similarly intimidated before having to testify before the grand jury. Prior to testifying, in or around September 2013, the Polanco sisters were detained at JFK airport after arriving to visit family. While detained, they were interrogated. Federal agents later visited the residence where they were staying. The Polanco sisters were interrogated yet again when they were leaving the country. Unaware of their legal rights, the Polanco sisters cooperated with the interrogations. FBI agents told both sisters they would be required to testify before a grand jury, and if they did not, they could lose their visas or be incarcerated. (See K. Polanco 10/03/2013 Tr. at 40:3-21.)

The government's witness intimidation also extended to treatment of Senator Menendez's family members in the United States. FBI agents visited Senator Menendez's former spouse, Jane Jacobsen, while she was still in her pajamas. When Ms. Jacobsen asked if the spousal privilege applied to her answers, she was told by the interviewing agent that because she and the Senator were divorced, it "wasn't clear" if the privilege applied and it was then suggested that in any event, the privilege only protected "pillow talk." FBI agents also visited Senator Menendez's seventy-year old sister, Ms. Caridad Gonzalez, and employed similar aggressive tactics to speak with her. Ms. Gonzalez stated that she did not want to talk to the agents. In response, a federal agent informed her that she could either speak with the agents or be

subpoenaed to testify before the grand jury. Although Ms. Gonzalez answered the agents' questions, she was still subpoenaed to testify.

        3.    <u>Government Agents Violated Dr. Melgen's Fourth Amendment Rights</u>

As explained in Dr. Melgen's MTD No. 15, on January 29 and 30, 2013, FBI agents executed a healthcare-related search warrant on Dr. Melgen's medical practice in south Florida. Although that warrant authorized only the search and seizure of materials related to allegations of Medicare fraud, FBI agents used the warrant as an opportunity to rummage through Dr. Melgen's practice, in violation of his Fourth Amendment rights. Ultimately the agents seized evidence beyond the scope of the warrant that they believed to be related to (1) Dr. Melgen's friendship with Senator Menendez and (2) the baseless allegations of sexual misconduct made by the anonymous "Peter Williams."

On January 31, just one day after the search, the government's case agent in this matter, FBI Special Agent Gregory Sheehy – a member of the public corruption unit in the FBI's Newark, New Jersey office – applied for a new warrant from the same south Florida magistrate judge who authorized the healthcare warrant. This new warrant applications sought permission for the Public Integrity Section to review the materials that were seized during the healthcare search (including the illegally seized documents). Agent Sheehy supported this application with his own sworn affidavit, which attempted to establish probable cause to review the illegally seized evidence by relying on and mischaracterizing the very same illegally seized evidence as evidence of prostitution, and by relying on the unverified and uncorroborated political rumors spread by "Peter Williams." Ultimately, Agent Sheehy's affidavit contained blatant mischaracterizations of the seized evidence, which were undoubtedly relied upon by the magistrate judge who concluded that the FBI had found evidence of prostitution. Most

egregiously, Agent Sheehy's affidavit falsely characterized a handwritten notebook of contact information for many of Dr. Melgen's family, friends, and business associates as a "ledger of prostitution activities." Then, on February 14, 2013, Agent Sheehy returned to the magistrate judge with an "amended" affidavit that, among other things, maintained the false suggestion that the illegally seized notebook was a prostitution ledger, but which deleted the explicit mischaracterization of it as such and substituted new misstatements and misleading omissions, none of which hold up to a moment's scrutiny. The violation of Dr. Melgen's rights is yet another example of the misconduct that pervaded this investigation.

4.    The Prosecution Flooded The Grand Jury Proceedings With Inflammatory Questions Regarding Sexual Relationships, Affairs, And Lavish Gifts Which Are Unrelated To The Charges Contemplated By The Government

By March 2013, when major news outlets reported that escorts in the Dominican Republic recanted their claims and admitted they had been paid to make the false allegations against Senator Menendez, the prosecution was then on notice that the allegations of sexual misconduct were untruthful and entirely unfounded. Nevertheless, during the grand jury proceedings the prosecution relied heavily on particularly salacious and inflammatory lines of questioning in an effort to prejudice the grand jury against Senator Menendez and Dr. Melgen. Separate and apart from the wholly unsubstantiated manner in which this investigation was ignited, the prosecution's strategic decisions ranging from presentation of witnesses before the grand jury to improper lines of questioning of such witnesses invite suspicion of their motives. Indeed, throughout the course of the grand jury process, the prosecution was laser-focused on salacious topics, as opposed to presenting relevant testimony germane to the allegations of official misconduct in the Indictment. For example, of the 36 witnesses called to testify before the grand jury, 3 of them were women whom Dr. Melgen allegedly dated and 3 were women

whom Senator Menendez allegedly dated after his divorce.  Moreover, only approximately 5 witnesses were subpoenaed to testify about the real issues related to the allegations of improper official conduct at the Centers for Medicare & Medicaid Services ("CMS"), Department of State, ("DOS"), or the Customs and Border Patrol ("CBP"), and all were from the Senator's own staff. Conspicuously absent from the prosecution's witness list were <u>any</u> witnesses from CMS, DOS, the Department of Health & Human Services ("HHS"), or the CBP who could undoubtedly provide critical and relevant testimony.

In contrast, questioning about Dr. Melgen's alleged girlfriends and particulars of their relationships was routine for the government throughout the course of the grand jury proceedings.  Some examples of the inflammatory questions are set forth below:

- <u>The witnesses' romantic relationships with Dr. Melgen</u> (see, e.g., Lopes-Leite 5/23/13 Tr. at 12:15-24 ("Q: Does that include a sexual relationship? A: Yes."); <u>id.</u> at 60: 10-15 ("Q. So, and just ask a very pointed question: While you were down at Casa de Campo, did you ever see anything like the things you read about, like prostitution parties? A. Never, never."); Buchyk 2/28/13 Tr. at 23:24-24:05 ("Q: [] you became intimate with Dr. Melgen, correct? A: For one month. Q: Is that a yes? A: For one month, yes."); <u>id.</u> at 23: 20-23 ("Q. Did he ask you to be his girlfriend? A. That was with purpose just to protect me."); <u>id.</u> at 24-26 (Questioning Ms. Buchyk extensively about whether Dr. Melgen paid for her New York apartment and, after this was confirmed, probing into whether she had contract for repayment with Dr. Melgen.); R. Polanco 10/03/13 Tr. at 7:16-21 ("Q: What kind of relationship did you have with [Dr. Melgen]? A: I was his girlfriend.  [. . .] Q: How old is he?  A: He's 58.  I don't have exactly the – his age.  Q: Okay, but you dated him for approximately eight years?  A: Yeah.  Q: But you don't know his exact age?  A: No.") Beck 03/12/2014 Tr. 4-: 16-23 ("Q. So we'll get to more of that in just a minute, but you described Dr. Melgen as an alcoholic adulterer . Did you know that even though he was married he had girlfriends? A. He had a mistress as far as I know. Q. Who was the mistress that you -- A. I don't know her. Q. how did you know about the mistress? A. I saw her once. And I thought it was his cousin . . . ."); Illsley 04/30/2014 Tr. 15: 17-22 ("Q. Ms. Illsley, are you familiar with any of Dr. Melgen's girlfriends? A. Yes. Q. How many? A. I can remember maybe about three or four from years and years ago."); <u>id.</u> 16-22 (Prosecutor questions Ms. Illsley about "some other girls," including Buchyk, Polanco, and Lopes-Leite).)

- Inquiries regarding whether Dr. Melgen's wife was aware of the relationships: (see, e.g., Buchyk 3/28/13 Tr. at 62:08-63:21 ("Q: Does [Dr. Melgen] have other girlfriends and his wife knows about it? Is that part of the agreement? A: That, I don't know. I wasn't one of the girlfriends, so I don't know."); Lopes-Leite 05/23/13 Tr. at 65:16-23 ("Q. Did you become boyfriend/girlfriend during that time? A. Yes. Q. Now, at that time were you aware that Dr. Melgen is married? A. Yes. Q. When did you find that out? A. He always told me from the beginning. But the story with the marriage is that -- it's a long story he told me. . . ."); id. at 83:02-05 ("Q: Do you know whether Sal has told . . . his wife, about you? A: The story he tells me is they don't talk about those things. . ."); R. Polanco 10/03/13 Tr. at 22:24-23:09 ("Q: Did you know whether Dr. Melgen had any other girlfriends? A: No. Q: Did you ever meet Dr. Melgen's wife? A: No. Q: Did she know about you or the relationship that Dr. Melgen had with you? A: I don't know").)

Senator Menendez also was the object of similar lines of questioning and attempts to tarnish him on issues totally unrelated to public misconduct. On July 2, 2014, while questioning Maria Almeida, the Senator's staff member of approximately fifteen years, DOJ Prosecutor Monique Abrishami repeatedly inquired as to whether she ever had a romantic relationship with the Senator, and whether they slept in the same room when they traveled.

> Q:    When you went to stay at Dr. Melgen's house, did you have your own room?
> A:    Yes.
> Q:    Did Senator Menendez stay in his own room?
> A:    Yes.
> Q:    Did you have a romantic relationship while you were there?
> A:    No.
> Q:    Have you ever had sex with Senator Menendez?
> A:    No.
> Q:    Okay. So, no part of that entire week involved anything romantic whatsoever?
> A:    No.
> Q:    So, it was just a trip for a valued employee?
> A:    That's correct.

(Almeida 7/02/14 Tr. at 68:24-69:13.) This line of questioning regarding the parameters of their personal relationship, which was further explored during Ms. Almeida's return to testify before the grand jury on October 8, 2014, served only to create an atmosphere of some suggested (but

unfounded) moral wrongdoing and infected the grand jury proceedings by implying some illicit

relationship between Senator Menendez and Ms. Almeida (completely unrelated to an improper

bribery scheme with Dr. Melgen). Again, the prosecution went so far as to elicit testimony from

a pilot about his personal thoughts about the age of guests who flew on Dr. Melgen's plane.

After asking Mohammed Butt, a pilot who flew a Hawker jet for Dr. Melgen, about whether

"nice" or "expensive alcohol" was served on the plane, Ms. Abrishami asked the following

questions:

> Q:    Who would Mr. Melgen fly with? Did he ever have guests on the plane?
> A:    Yes, sometimes.
> Q:    Who were his guests when he would have them?
> A:    He would have his family, sometimes his friends.
> Q:    Were any women ever with him on the plane?
> A:    Yes.
> Q:    What were those women like?
> A:    Young girls.
> Q:    Young, as in you think they were under age?
> A:    I wouldn't know their age. They're young girls.
> Q:    What were those young girls like?
> A:    They look like escorts.
> Q:    What made you say that?
> A:    Because every time they would be different girls.
> Q:    Was there something about the women that you would see that made you believe they were escorts?
> A:    Yes.
> Q:    What was it about them that made you believe they were escorts?
> A:    Well, the way they were dressed.
> Q:    How would they be dressed, for example?
> A:    Sometimes in shorts, miniskirts.
> Q:    Was there anything else, other than the way they were dressed, that they would change frequently that made you believe they were escorts?

(Butt 3/07/13 Tr. at 8:24-9:22.) Ms. Abrishami continued to inquire about the method of

transportation the "girls" arrived in and other lines of improper questions designed to inflame the

jury and pepper the proceedings with wholly irrelevant and prejudicial innuendo. (Id. at 9:24-

10:16.)  Again, this and similar lines of questioning pervaded and ultimately tainted the grand

jury process.

>        5.      The Government Abused Staff Members And Solicited Information Which
>                Tainted The Grand Jury

While not calling to the grand jury any of the Executive Branch people alleged to have

been the objects of Senator Menendez's official misconduct, the prosecution called a number of

Senator Menendez's own staff.  All were asked baseless, improper and irrelevant questions –

including those of a sexual nature – that tainted the grand jury proceedings.  For example, the

repeated questions to Ms. Almeida about whether she had a romantic relationship with the

Senator were irrelevant and designed to create an air of suspicion simply by being asked.

In addition, rather than asking what they saw, said or did, DOJ Prosecutor Koski argued

with the staff when they gave him answers to questions he did not like.  For example, on July 2,

2014, during Patricia Enright's testimony before the grand jury, Mr. Koski, after receiving

straightforward answers to his questions, tried to force Ms. Enright to change her answers, by

injecting his own conclusory, irrelevant and prejudicial beliefs into the line of continued

questioning as opposed to accepting her answer and moving on.

> Q:    During the time that you've been in the office, what's been your
>       impression of Senator Menendez's ethics and integrity?
> A:    My impression is that he has the utmost ethics and integrity and
>       trustworthiness.
> Q:    What is that based on?
> A:    It's based on – it's just based on my impression of the way that he handles
>       himself in his office and his job, and that I've never – on any occasion
>       have not believed that he doesn't come in every day to do what he thinks
>       is right for the people of New Jersey.  And I want to say, I've worked for a
>       lot of politicians, and I will say I can't – I would not say that about all of
>       them.  But, you know, he's somebody who came from nothing and has
>       fought his way to where he is.  And, you know, he's a fighter.
> Q:    Well, let me clarify.  When I ask you about his ethics and integrity, I'm
>       not referring to whether he had to work his way up from nothing to be a

14

> U.S. Senator or whether you think he works on behalf of his constituents in New Jersey. I'm referring more specifically to his ethics and integrity with respect to accepting gifts, for example, that he should not be accepting, or developing relationships with people that he should not be developing. What's your opinion of Senator Menendez's ethics with respect to the first category, with respect to the receipt of gifts?
>
> A:    I don't know any – I have no factual facts to even speculate or answer that question. I don't know anything about –
>
> Q:    So you don't have an opinion one way or the other on Senator Menendez's ethics and integrity with respect to his receipt of gifts, or with respect to whether he has improper or corrupt relationships with anyone?
>
> A:    I don't really have any opinion because – it sounds a little leading to me. So, if I don't have any knowledge of him accepting gifts that would be unethical, and I can't really base an opinion on it, then I'd – I have no reason to believe that he's not an ethical person.

(Enright 7/02/2014 Tr. at 13:19-15:6.)

The prosecution also asked various witnesses about the "corrupt relationship" between Dr. Melgen and Senator Menendez. Rather than soliciting relevant testimony by asking genuine questions, the prosecutors essentially made closing arguments in front of the grand jury by repeatedly asserting that the Senator "advocated on behalf of Dr. Melgen." (Enright 7/02/14 Tr. at 24:18-20 ("Q: There were allegations that Senator Menendez used his senate office to advocate on behalf of Dr. Melgen and his financial interests, correct?"); Barnard 8/13/14 Tr. at 53:1-4 ("Q: Mr. Barnard, Senator Menendez had some meetings with senior officials at CMS and HHS in order to advocate on behalf of Dr. Melgen in his $8.9 million Medicare dispute. Isn't that right?").)

Finally, the prosecution asked the staff to provide totally irrelevant personal opinions or "thoughts" regarding whether Senator Menendez's actions were "ethical" or not. For example, during Ms. Almeida's July 2, 2014 testimony, Ms. Abrishami asked generally about her understanding of Senator Menendez's financial situation and specifically, in connection with flights on Dr. Melgen's plane that he allegedly took but did not report, whether that affected her

15

opinion about his "ethics or integrity." (Almeida 7/02/14 Tr. at 51:2-20.) Notably, Ms. Almeida answered that the alleged nondisclosure or repayment of the flights did <u>not</u> affect her opinion about the Senator's ethics or integrity. (<u>Id.</u>) In addition, while testifying in front of the grand jury, Senator Menendez's former wife, Ms. Jacobsen was asked a series of open-ended questions about the Senator's "ethics." When Ms. Jacobsen said that the Senator's ethics had been "impeccable" during their marriage, the prosecutor then asked Ms. Jacobsen about the Senator's ethics after their divorce, as if the divorce might prompt Ms. Jacobsen to change her opinion. (Jacobson 6/11/2014 Tr. at 33:4-10.) Once again, as opposed to focusing the investigation on the presentation of evidence related to the alleged "corrupt" relationship between Senator Menendez and Dr. Melgen, the prosecution clearly preferred to divert the attention away from such topics.

      6.    <u>Other Misconduct Before The Grand Jury</u>

In addition to the above instances of misconduct, in its pursuit to bring this case against Senator Menendez and Dr. Melgen, the prosecution knowingly presented false testimony to the grand jury through the government's case agent, refused to screen grand jurors for bias after fueling prejudicial news articles through improper leaks, provided erroneous instructions to the grand jury on Speech or Debate clause law and other issues, and in turn, circumvented the Third Circuit's remand relating to such issues. (MTD Nos. 2-5). As set forth more fully in the corresponding Motions to Dismiss, the prosecution failed to call witnesses who could provide relevant and critical testimony regarding the actual facts of this case, the prosecution, and instead essentially testified through case agent Sheehy by asking narrative questions based upon excessive hearsay, ultimately painting a wildly inaccurate picture for the grand jury. (MTD No. 3.)

Moreover, the prosecution also elicited from Agent Sheehy testimony as to what key witnesses had told him or other agents that grossly distorted or contradicted what the actual witnesses had said. And by failing to call the actual witnesses and improperly informing the grand jury they could not hear from those witnesses, the prosecution ensured that the grand jury would never learn what those witnesses actually said. (See MTD Nos. 3-4.)

Absent any direct evidence of a "corrupt agreement" between Senator Menendez and Dr. Melgen, the prosecution made sure that Agent Sheehy answered "yes" to a series of leading questions wholly unsupported and indeed contradicted by Agent Sheehy's own accounts of witness interviews as memorialized in his notes and corresponding FBI 302 reports. (MTD No. 3.) In addition, the prosecution "compromised the independence of the grand jury and its ability to fairly determine probable cause by providing the grand jury erroneous legal instructions as to what conduct can be charged and by restricting the scope of what the grand jury could deliberate." (MTD No. 4.) Yet another instance of misconduct occurred when the prosecution inundated the grand jury with material that is privileged by the Speech or Debate Clause, and those privileged materials unquestionably influenced the grand jury's decision to indict. (MTD No. 2.) In total, these other instances of misconduct resulted in a grand jury that was tainted in so many ways, it could hardly be seen to act as the protector of a person's rights. United States v. Calandra, 414 U.S. 338, 343 (1974) (the grand jury provides two important functions in the criminal justice system, it determines "whether there is probable cause to believe a crime has been committed" and protects citizens against "unfounded criminal prosecutions").

    7.    <u>Illegal Media Leaks Tainted And Prejudiced The Grand Jury Proceedings.</u>

As if the aforementioned instances of misconduct were not enough, from the outset of the "Peter Williams" days, law enforcement officials on this case have been more than willing to

17

assist those seeking damage to Senator Menendez and Dr. Melgen in the court of public opinion. Perhaps most disturbing about the instances of misconduct are the leaks that have pervaded the prosecution's investigation since at least the beginning of 2013.

Specifically, on February 6, 2013, The Daily Caller reported that "two FBI sources" disclosed that the investigation of Senator Menendez had moved to New Jersey and "pressure is mounting from the highest levels of the Justice Department to pursue the investigation."[9] Thereafter, on March 15, 2013, The Daily Caller again reported that "an FBI agent in a supervisory position on the East Coast" disclosed his awareness of a grand jury investigation of the Senator.[10]  As the leaks clearly cited law enforcement sources, the Senator's defense counsel notified Mr. Koski to see if they would be stopped.[11]  He responded that he had not seen "any references to law enforcement personnel" in the media and it appears he took no further action. Yet media articles about developments in the investigation continued into 2014 and into the summer,[12] and in an especially shocking incident, emails and documents from the Senator's office were published online.[13]

---

[9]     David Martosko, "FBI sources: Menendez investigation moved to Newark, NJ," The Daily Caller (Feb. 6, 2013), http://dailycaller.com/2013/02/06/fbi-sources-menendez-investigation-moved-to-newark-nj/.

[10]    David Martosko, "FBI sources confirm grand jury investigation of Sen. Bob Menendez," The Daily Caller (Mar. 15, 2013), http://dailycaller.com/2013/03/15/fbi-sources-confirm-grand-jury-investigation-of-sen-bob-menendez/.

[11]    See id.

[12]    See, e.g., Jonathan Dienst, "Exclusive: Federal Probe Into New Jersey Sen. Menendez is Widening," NBC (May 18, 2015), http://www.nbcnewyork.com/investigations/bob-menendez-federal-probe-nj-senator-i-team-241721381.html.

[13]    See http://en.calameo.com/read/003645141d11507536d30 (materials are still online).

In August 2014, a reporter called Senator Menendez's defense counsel in August 2014, stating that the Senator's staff members were testifying before the grand jury, and asked for counsel's comments about whether the staff would invoke the protections of the Speech or Debate Clause. Mr. Koski and his superiors at DOJ were informed of this egregious breach of grand jury secrecy. Despite being put on notice of the leaks, the government failed to take any action, and the leaks continued.

Indeed, the leaks continued with a vengeance. There was no more critical time in the case than when the government was making its decision about whether or not to bring charges in 2015. In a case of this profile with the types of legal issues involved (*e.g.*, allegations of legal campaign contributions as bribes), it was not only normal, but it was to be expected, that Senator Menendez and Dr. Melgen would seek review of any proposed prosecution from those higher than the line attorneys working the case. The Defendants sought this review in the orderly way that should occur: first, their attorneys met with the Chief of the Public Integrity Section, Jack Smith, on June 13, 2014 and September 12, 2014; then, their attorneys met with Assistant Attorney General for the Criminal Division, Leslie Caldwell, on January 23, 2015.

On March 4, 2015, prosecutors notified Senator Menendez's counsel that the Criminal Division had decided to pursue a case. When his counsel was finally able to get in touch with Assistant Attorney General Caldwell to discuss that decision and decide on further review, Ms. Caldwell asked if – as had been discussed when they met – defense counsel wanted to arrange a meeting with the Deputy Attorney General (and then on to the Attorney General if needed). To this point, the internal DOJ review that had been occurring had not gotten any publicity, as was proper. Clearly, media articles about a tentative prosecutorial decision and the up-the-line review would be prejudicial to the Senator and Dr. Melgen and could be potentially

embarrassing to government officials if they had to defend a decision to refuse a case that line attorneys (or FBI agents) were pushing. It certainly would not make it easier for any politically-appointed official to countermand or overrule a recommendation of a career prosecutor. That is what someone in the government (which includes the FBI) must have thought as well.

When defense counsel asked Ms. Caldwell on March 6, 2015 for the review and a meeting with the Deputy Attorney General to further evaluate the case, the result was yet another leak, and this one was very deliberately timed. Presumably Ms. Caldwell would have communicated defense counsel's request to others on the investigation team (so that charges would not be brought before a review could occur). The same day that Ms. Caldwell offered to facilitate a review, law enforcement sources leaked the government's decision that a case was going to be filed. CNN reported that DOJ "is preparing to bring criminal corruption charges against New Jersey Sen. Robert Menendez" and "[p]eople briefed on the case say Attorney General Eric Holder has signed off on prosecutors' request to proceed with charges."[14] By the afternoon, the New York Times, The Washington Post, Los Angeles Times and CBS News had published similar stories reporting that "law enforcement officials" and the like confirmed that, indeed, the government would bring corruption charges against Senator Menendez.[15] So, at the

---

[14]  See "First on CNN: Feds Prepare Criminal Corruption Charges Against Senator Bob Menendez," CNN (Mar. 6, 2015), http://www.cnn.com/videos/politics/2015/03/06/nr-perez-menendez-justice-department-criminal-corruption-charges.cnn/video/playlists/robert-menendez-troubles/.

[15]  See Kate Zernike, "Menendez Is to Face Corruption Charges, U.S. Officials Say," The N.Y. Times (Mar. 6, 2015), http://www.nytimes.com/2015/03/07/us/menendez-expected-to-face-federal-corruption-charges.html ("law enforcement official" said that charges would be filed "within a month"); Sari Horowitz, "Menendez Expected to Face Criminal Corruption Charges," The Washington Post (Mar. 6, 2015), http://www.washingtonpost.com/blogs/post-politics/wp/2015/03/06/menendez-expected-to-face-criminal-corruption-charges/ (last accessed

exact moment Defendants' counsel had asked for the review that might have stopped a prosecution, some in law enforcement engineered a leak to thwart that review.

At this point – three weeks before the actual indictment – the grand jury presumably had not yet been convened to consider or vote on charges.  Yet members of the grand jury – when logging online, flipping through television channels, talking to their family or friends, or glancing at their newspapers – undoubtedly heard the announcement that their "decision" had already been made for them.  As for the further review by the Deputy Attorney General (who had not yet been confirmed and was not seeking any new controversy) or the Attorney General (who was days away from leaving and was not looking for new public battles), whatever review they might engage in was now overshadowed by the specter of the government's public decision that, for all intents and purposes, was final.

All the leaks in the case were deliberate and improper and the last one especially so.  Only after that last leak and Defendants' attorneys' specific requests did the DOJ finally begin an internal investigation which has not led to any discipline of any of those involved.  In sum, the government failed to take any substantive action to investigate or stop these pervasive leaks from occurring, which warrants dismissal of the Indictment.

---

7/15/2015) ("a U.S. official" confirmed that the DOJ "is planning to bring criminal corruption charges"); Richard A. Serrano, "Sen. Robert Menendez, Likely to Face Corruption Charges, Denies Wrongdoing," L.A. Times (Mar. 6, 2015), http://www.latimes.com/nation/nationnow/la-na-nn-corruption-charges-menendez-20150306-story.html (report according to "two sources familiar with the case"); "Justice Dept. Proceeding With Corruption Charges Against Bob Menendez," CBS News (Mar. 6, 2015), http://www.cbsnews.com/news/sen-bob-menendez-justice-department-proceed-charges-criminal-corruption/ ("law enforcement official" reported to CBS News).

## ARGUMENT

**I.    THE INDICTMENT SHOULD BE DISMISSED IN ITS ENTIRETY DUE TO THE IMPROPER GOVERNMENT CONDUCT IN THIS CASE**

Federal courts possess a general supervisory power with respect to the administration of justice in federal judicial proceedings.  See United States v. Hasting, 461 U.S. 499, 505 (1983); United States v. Payner, 447 U.S. 727, 734–36, 735 n.8 (1980).

Dismissing an indictment is among the appropriate remedies for prosecutorial misconduct because it is an essential tool to limit the government's power.  The Third Circuit explained:

> We recognize that dismissal of an indictment may impose important costs upon the prosecution and the public. . . .  But the costs of continued unchecked prosecutorial misconduct are also substantial.  <u>This is particularly so before the grand jury, where the prosecutor operates without the check of a judge or a trained legal adversary, and virtually immune from public scrutiny</u>. . . .  <u>Where the potential for abuse is so great, and the consequences of a mistaken indictment so serious, the ethical responsibilities of the prosecutor, and the obligation of the judiciary to protect against even the appearance of unfairness, are correspondingly heightened.</u>  We suspect that dismissal of an indictment may be virtually the only effective way to encourage compliance with these ethical standards, and to protect defendants from abuse of the grand jury process.

Serubo, 604 F.2d at 817 (emphasis added).

Generally, an indictment may not be dismissed unless it can be shown that prosecutorial misconduct resulted in prejudice to the defendant.  Bank of Nova Scotia v. United States, 487 U.S. 250, 254 (1988).  Prejudice is presumed, however, where the structural protections of the grand jury are "so compromised as to render the proceedings fundamentally unfair," for example, where there is racial or gender discrimination in the jury selection process.  Id. at 257; see Vasquez v. Hillery, 474 U.S. 254 (1986) (dismissal of indictment mandated by racial discrimination in selection of grand jurors); Ballard v. United States, 329 U.S. 187 (1946) (indictment dismissed because women were excluded from grand jury).  To find prejudice, the

district court must establish that "'the violation substantially influenced the grand jury's decision to indict,' or . . . there is 'grave doubt' that the decision to indict was free from the substantial influence of such violations." Bank of Nova Scotia, 487 U.S. at 256 (quoting United States v. Mechanik, 475 U.S. 66, 78 (1986)).

Courts have found prejudice, and dismissed indictments, based on misconduct similar to what occurred in the grand jury proceedings here. Such misconduct includes reliance on prejudicial, unrelated evidence introduced for the purpose of inflaming the grand jury, as well as abusing and intimidating witnesses in such a way that influences the witnesses' testimony. See, e.g., United States v. Hogan, 712 F.2d 757, 761-62 (2d Cir. 1983) (indictment dismissed where, in addition to other misconduct, prosecutor called defendant a "real hoodlum" that should be indicted "as a matter of equity"); United States v. Hill, 1989 WL 47288, at *6-8 (S.D.N.Y. Mar. 22, 1989) (dismissing drug-related counts of indictment where evidence as to defendant's alleged drug use and neglect of girlfriend and child were "extremely inflammatory," "irrelevant" and "unduly prejudicial," and where defendant was not originally charged with drug offenses, and introduction of same evidence with second grand jury was also irrelevant because it concerned events antedating drug conduct charged and author of letter had repudiated contents); United States v. Omni Int'l Corp., 634 F. Supp. 1414, 1436-37 (D. Md. 1986) (dismissing indictment where one instance of misconduct was government's surprise interview of a witness in order to catch her off-guard so that she might violate attorney-client privilege; such a tactic was "patently improper" and "outrageous conduct").

Even where individual acts of misconduct on their own may be insufficient to cause prejudice, the "cumulative effect" of multiple instances of misconduct may still prejudice the defendant and mandate dismissal of the indictment. See, e.g., Hogan, 712 F.2d at 761-62

(dismissing indictment, post-conviction, based on cumulative instances of misconduct, where government relied extensively on hearsay and double hearsay regarding speculation of defendant's involvement in criminal activity, and where prosecutor called defendant a "real hoodlum" that should be indicted "as a matter of equity"); United States v. Samango, 607 F.2d 877, 884 (9th Cir. 1979) ("[t]he cumulative effect of the above errors and indiscretions, none of which alone might have been enough to tip the scales, operated to the defendants' prejudice by producing a biased grand jury"); United States v. Breslin, 916 F. Supp. 438, 446-47 (E.D. Pa. 1996) (dismissing indictment where prosecution engaged in multiple acts of misconduct, the "cumulative effect" of which was to mislead the grand jury and prejudice defendant); United States v. Peralta, 763 F. Supp. 14, 21 (S.D.N.Y. 1991) (defendants were seriously prejudiced by the "cumulative effect of the government's misleading statements of law and its use of inaccurate hearsay testimony").

### A.   The Cumulative Effect Of The Government's Misconduct Requires Dismissal Of The Indictment

The Indictment should be dismissed because the "cumulative effect" of the government's misconduct biased the grand jury and prejudiced Senator Menendez and Dr. Melgen. Breslin is particularly instructive. In Breslin, the prosecutor engaged in various instances of misconduct, bringing donuts to the grand jury; frequently implying that his time was limited, which might have had a chilling effect on questions; making characterizations about the evidence and inserting his own opinions; referring to a television documentary about the defendant, which might imply that he was guilty; repeatedly referring to transcripts of testimony, which suggested that the grand jury did not have the right to hear live testimony; pressuring the grand jury by stating that the statute of limitations was about to run; and instructing the grand jury that it did

not need to conclude that the evidence supported everything stated in the indictment, but rather only the critical parts. Breslin, 916 F. Supp. at 443-46. Although each instance alone may have been insufficient to justify dismissal of the indictment, the court was "deeply concerned by the misconduct from the first day the grand jury met continuing through the day the superseding indictment was presented." Id. at 446. The court dismissed the indictment, holding that the "cumulative effect of the many instances of misconduct can fairly be said to have substantially influenced the grand jury's decision to indict." Id.

Indeed, as set forth above, as part of its pattern of egregious conduct, the prosecution repeatedly injected sexual innuendo and other irrelevant lines of questioning into this case that have only served to distract from the charges actually at issue. Testimony regarding alleged sexual relationships between Dr. Melgen and his alleged "girlfriends," as well as the financial support that he allegedly gave them, is gratuitous and wholly irrelevant to the charges contained in the Indictment. This testimony inflamed the grand jury, the prejudicial spillover of which undeniably influenced the grand jury against Senator Menendez and Dr. Melgen.

Irrelevant and inflammatory testimony certainly can prejudice the grand jury against the defendant. See Hill, 1989 WL 47288, at *3 ("[s]peculative references to the accused's association with other crimes not under investigation by the grand jury" are "fundamentally unfair."). In Hill, the district court dismissed three counts of an indictment relating to drug offenses in light of "extremely inflammatory" and "irrelevant" evidence regarding defendants' alleged drug abuse and neglect of his girlfriend that had been introduced to the grand jury. Id. at *6-8. The inflammatory evidence – consisting of a letter written by defendants' girlfriend accusing him of selling "crack" and failing to support her and her children – was introduced at two grand jury proceedings. Id. at *6. At the first proceeding, the prosecution was not seeking

to charge defendant with any drug offenses. Although the defendant's girlfriend repudiated the veracity of the letter at the grand jury proceeding, its contents were read aloud to the grand jury. Id. At the second grand jury proceeding, the prosecution did seek to charge the defendant with drug offenses and introduced the letter and the girlfriend's testimony again. Id. The district court held that the letter was not only "extremely inflammatory" because "it contained irrelevant and unduly prejudicial references to the defendant's neglect of [his girlfriend] and her children," but also because it concerned events antedating the alleged drug conduct charged. Id. The court also opined that it was "improper" for the prosecutor to introduce the letter and girlfriend's testimony at the second proceeding, given the prosecutor's knowledge that she had denied the truth of the letter. Id. at *6. Due to the small amount of evidence presented – one eyewitness informer and "a sampling of hearsay testimony" – the court expressed its "grave doubt that the decision to indict the defendant on these drug charges was free from the substantial influence of the irrelevant, prejudicial matter." Id. at *7.

Here, as in Hill, there is "grave doubt" that the decision to indict Senator Menendez and Dr. Melgen was free from the "substantial influence" of  irrelevant and inflammatory testimony relating to Dr. Melgen's alleged indiscretions with girlfriends and his wife's ignorance of his alleged infidelity or from the attempts to suggest wrongdoing in quotes about who Senator Menendez was dating. These facts have absolutely no bearing on the allegation that Dr. Melgen bribed Senator Menendez or the allegation that Senator Menendez advocated on Dr. Melgen's behalf. This testimony regarding women had no legitimate purpose other than to incense the jury. Indeed such testimony is completely irrelevant to the charges, as it implies wrongdoing by suggesting infidelity. See Hill, 1989 WL 47288, at *3. Because the jury was prejudiced by the irrelevant and inflammatory testimony, the Indictment should be dismissed in its entirety.

In addition to the instance of misconduct above, as in <u>Breslin</u>, there are various aspects of the prosecution's wrongful conduct, which cumulatively tainted the process. Inflammatory testimony, witness intimidation, arguing with staff, eliciting excessive hearsay, leading the case agent to provide false testimony, dissuading grand jurors from calling live witnesses, giving improper instructions were all part of the process. (MTD Nos. 3-5; <u>see also</u> <u>Samango</u>, 607 F.2d at 883-84 (dismissing indictment due to the "cumulative effect" of various "errors and indiscretions," including a lack of live testimony and "supplying" testimony to case agents); <u>Peralta</u>, 763 F. Supp. at 21 (dismissing indictment in part based on government's use of "inaccurate hearsay testimony")). The "cumulative effect" of all this misconduct was, by design, to bias the grand jury against Senator Menendez and Dr. Melgen. Accordingly, the Indictment must be dismissed.

### B. The Government Has Engaged In "Outrageous Government Conduct," Which Mandates Dismissal Of The Indictment

Dismissal of the Indictment is warranted based upon the cumulative effect of misconduct addressed above. In addition to that basis, the Supreme Court has recognized there may be instances where "the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction." <u>United States v. Russell</u>, 411 U.S. 423, 431–32 (1973). This narrow exception is derived from the Fifth Amendment's substantive due process protections. <u>Id.</u> at 432.

Here, the prosecution's actions, including the illegal and pervasive leaks during grand jury proceedings which violated Federal Rule of Criminal Procedure 6(e) and presentation of false evidence to the grand jury, constitute "a demonstrable level of outrageousness." Of course,

the presentation of false testimony is a direct threat to the integrity of grand jury proceedings and would widely be regarded as outrageous.

As to the leaks themselves, "the proper functioning of our grand jury system depends upon the secrecy of the grand jury proceedings."  Douglas Oil Co. of Ca. v. Petrol Stops Nw., 441 U.S. 211, 218 (1979).  "Disclosures which expressly identify when an indictment would be presented to the grand jury, the nature of the crimes which would be charged, and the number of persons who would be charged run afoul of the secrecy requirements codified in Rule 6(e)."  In re Grand Jury Investigation, 610 F.2d 202, 218 (5th Cir. 1980) (emphasis added).  Such was the nature of the government's pervasive leaks here.  On March 6, 2015 – less than one month before Senator Menendez was indicted – both CNN and The Washington Post published articles that described the grand jury proceedings in detail:

> The Justice Department is preparing to bring criminal corruption charges against New Jersey Sen. Robert Menendez, alleging he used his Senate office to push the business interests of a Democratic donor and friend in exchange for gifts.  People briefed on the case say Attorney General Eric Holder has signed off on prosecutors' request to proceed with charges, CNN has learned exclusively.  An announcement could come within weeks.  Prosecutors are under pressure in part because of the statute of limitations on some of the allegations.

See "First on CNN: Feds Prepare Criminal Corruption Charges Against Senator Bob Menendez," CNN (Mar. 6, 2015) (emphasis added), http://www.cnn.com/videos/politics/2015/03/06/nr-perez-menendez-justice-department-criminal-corruption-charges.cnn/video/playlists/robert-menendez-troubles.

> The Department of Justice is planning to bring criminal corruption charges against Sen. Robert Menendez (D.N.J.), a U.S. official confirmed Friday, casting renewed attention on the question of whether the senator used his powers to improperly benefit a close ally and political donor.  The charges, which the Justice Department could unveil within weeks, are expected to stem from an investigation involving Menendez and Salomon Melgen, a Florida-based

ophthalmologist who has donated to Menendez and other Democrats and is a close friend of the senator's.

Sari Horwitz, "Menendez Expected To Face Criminal Corruption Charges," <u>The Washington Post</u> (Mar. 6, 2015) (emphasis added), http://www.washingtonpost.com/blogs/post-politics/wp/2015/03/06/menendez-expected-to-face-criminal-corruption-charges/.

The <u>Los Angeles Times</u>, <u>CBS News</u>, <u>ABC News</u>, <u>The New York Times</u>, and <u>Politico</u> all published articles the same day describing "law enforcement officials" that forecasted charges "within weeks," or similar language. Moreover, on March 23, <u>NBC New York</u> reported that "<u>Corruption-related charges against U.S. Senator Robert Menendez</u>, a New Jersey Democrat, <u>could come as soon as this week, sources familiar with the investigation</u> tell NBC 4 New York."[16]

The government's leaks run directly afoul of the secrecy mandate of Rule 6(e). As set forth above, not only did the leaks identify <u>when</u> an indictment would be presented ("within weeks"), but they also identified the <u>actual charges</u>, i.e., corruption-related charges" stemming from Senator Menendez's relationship with Dr. Melgen,. See <u>In re Grand Jury Investig.</u>, 610 F.2d at 218. Moreover, it is clear that the leaks came from sources whose secrecy is mandated by Rule 6(e), that is, government personnel close to the investigation, or even government attorneys (<u>e.g.</u>, "people briefed on the case" and "sources familiar with the investigation").

Dismissal of the Indictment is warranted where, as here, the pervasive leaks – which began as early as February 2013 – evidence the government's blatant disregard for Rule 6(e). There is no doubt that the grand jurors were prejudiced by the dozens of media accounts. The

---

[16]    "Charges Against Sen. Robert Menendez Could Come This Week," <u>NBC New York</u> (Mar. 23, 2015) (emphasis added), http://www.nbcnewyork.com/news/local/Corruption-Charges-New-Jersey-Senator-Robert-Menendez-Salomon-Melgen-297204111.html.

grand jurors – whether on TV, the internet, or the paper – saw that they were <u>expected</u> to indict Senator Menendez, with the blessing of the Attorney General personally, and they followed suit. In the face of the report of the Attorney General "sign[ing] off" on the charges – giving the impression that an indictment was warranted – the grand jurors undoubtedly understood that their decision had been made for them. The pervasive leaks on the eve of indictment, even in the face of defense counsel's repeated calls for an investigation into the leaks, evidence "a demonstrable level of outrageousness" that merits dismissal of the Indictment. <u>See</u> <u>United States v. Twigg</u>, 588 F.2d 373, 380 (3d Cir. 1978). The cumulative effect of the government's various instances of misconduct constitutes outrageous government conduct. <u>See</u> <u>id</u>.

<u>CONCLUSION</u>

As set forth above, the totality of circumstances -- from the "Peter Williams" start to the review-ending leaks demonstrates a conscious disregard for the overriding government interest that "justice shall be done" in criminal prosecutions. <u>Berger</u>, 295 U.S. at 88. The ends of bringing this case do not justify the means by which it was done. Consequently, the Indictment should be dismissed in its entirety.

Respectfully submitted,

/s/ Abbe David Lowell
Abbe David Lowell
Jenny R. Kramer
Christopher D. Man
Scott W. Coyle
**CHADBOURNE & PARKE LLP**
1200 New Hampshire Avenue, N.W.
Washington, D.C. 20036
adlowell@chadbourne.com
(202) 974-5600


Raymond M. Brown
**GREENBAUM ROWE SMITH & DAVIS LLP**
Metro Corporate Campus One
P.O. Box 5600
Woodbridge, NJ 07095
rbrown@greenbaumlaw.com
(732) 476-3280


Stephen M. Ryan
Thomas J. Tynan
**MCDERMOTT WILL & EMERY LLP**
500 North Capitol Street, N.W.
Washington, D.C. 20001
sryan@mwe.com
(202) 756-8000


*Counsel for Defendant*
*Senator Robert Menendez*

/s/ Kirk Ogrosky
Kirk Ogrosky
Murad Hussain
**ARNOLD & PORTER LLP**
555 12th Street, N.W.
Washington, DC 20004
Kirk.Ogrosky@aporter.com
 (202) 942-5330


Matthew I. Menchel
Michael C. Fasano
**KOBRE & KIM LLP**
2 South Biscayne Boulevard, 35th Floor
Miami, FL 33131
matthew.menchel@kobrekim.com
 (305) 967-6108


*Counsel for Defendant*
*Dr. Salomon Melgen*

31