# EXHIBIT 18

## SEALED AMENDED AFFIDAVIT

I, GREGORY J. SHEEHY, being duly sworn, do hereby depose and state:

1.     I am a Special Agent with the Federal Bureau of Investigation ("FBI").  I have worked for the FBI since February of 1997.  I have participated in and led numerous criminal investigations regarding violations related to Mail Fraud, Bank Fraud, Conspiracy, Bribery, and other corruption offenses, as well as numerous other federal crimes, and have conducted numerous investigations regarding government officials.  I have been the affiant on numerous arrest and search warrants.  I am currently assigned to the public corruption squad in the Newark Division, where I have been assigned since approximately March of 2011.

2.     I am personally involved in conducting a joint investigation with other Federal and state law enforcement agencies into the possible criminal activities of Dr. Salomon Emilio Melgen ("Dr. Melgen"), and United States Senator Robert Menendez ("Senator Menendez"). The statements contained in this Amended Affidavit are based upon a review of both public and private records and interviews/investigation conducted by myself and other federal and state law enforcement agents and analysts.  Because this Amended Affidavit is submitted for the limited purpose of establishing probable cause, I have not included all facts known to me in this Amended Affidavit, and have only set forth the facts that I believe are necessary to establish probable cause.

3.     This Amended Affidavit is written in support of an application for a warrant to search items seized from or imaged on January 29, 2013 at the three offices of  MelgenVitreo-Retinal Eye Center  (hereinafter referred to collectively as "VREC"), a medical company owned and operated by Dr. Melgen, with three locations:  2521 Metrocentre Boulevard, West Palm Beach, Florida 33407, 1751 SE Port St. Lucie Boulevard, Port St. Lucie, Florida 34952, and

6290 Linton Boulevard, Suite 103, Delray Beach, Florida 33484, which evidence is now located at the FBI's offices at 505 S Flagler Drive, West Palm Beach, FL, and at 16320 NW 2nd Avenue, North Miami Beach, FL, 33169.

4.     As set forth herein, your Affiant submits that there is probable cause to believe that the evidence seized from or imaged at VREC contains evidence that Dr. Melgen (1) did knowingly travel in interstate or foreign commerce with intent to promote, manage, establish, carry on, or facilitate the promotion, establishment, or carrying on of any unlawful activity, that is, prostitution offenses in violation of the laws of the United States, and that he thereafter promoted, managed, established, carried on, or facilitated the promotion, establishment, or carrying on of such unlawful activity, in violation of 18 U.S.C. § 1952; (2) did knowingly, in and affecting interstate or foreign commerce, recruit, entice, harbor, transport, provide, or obtain by any means a person, knowing or in reckless disregard of the fact that the person had not attained the age of 18 years and that the person would be caused to engage in a commercial sex act, in violation of 18 U.S.C. § 1591(a)(1); (3) did knowingly transport an individual in interstate or foreign commerce with intent that the individual engage in prostitution or in any sexual activity for which any person can be charged with a sexual offense, in violation of 18 U.S.C. § 2421; and (4) did knowingly conspire to commit any offense against the United States, in violation of 18 U.S.C. 371.  Further, there is probable cause to believe that the evidence seized from or imaged at VREC contains evidence that Dr. Melgen and Senator Menendez (5) did knowingly directly or indirectly give, offer, or promise anything of value, and directly or indirectly demand, seek, receive, accept, or agree to accept anything of value, with intent to influence any official act, in violation of 18 U.S.C. § 201(b); (6) did knowingly and willfully make any materially false, fictitious, or fraudulent statement or representation, in violation of 18 U.S.C. § 1001; (7) did

2

knowingly devise or intend to devise any scheme to defraud the public of Senator Menendez's honest services, and use the mails and wires in interstate or foreign commerce for the purpose of executing such scheme or artifice, in violation of 18 U.S.C. §§ 1341, 1343, & 1346; and (8) did knowingly travel in interstate or foreign commerce with intent to promote, manage, establish, carry on, or facilitate the promotion, establishment, or carrying on of any unlawful activity, that is, bribery in violation of the laws of the United States, and that they thereafter promoted, managed, established, carried on, or facilitated the promotion, establishment, or carrying on of such unlawful activity, in violation of 18 U.S.C. § 1952.

## THE ORIGINAL SEARCH WARRANT

5.     On January 31, 2013, the Court signed a warrant authorizing the search of items seized from or imaged on January 29, 2013 at VREC (hereinafter "the original search warrant"). Your Affiant hereby submits this Amended Affidavit in support of the attached Amended Search Warrant Application to correct the description, contained in the original search warrant affidavit, of certain items seized from VREC on January 29, 2013 (*see* paragraphs 31 and 32, *infra*). Moreover, since the execution of the original search warrant, the investigation has revealed additional facts that your Affiant has likewise included in this Amended Affidavit. None of these additional facts stemmed from the evidence seized and/or searched as a result of the original search warrant.

## PROBABLE CAUSE

### I.     The Anonymous Source: "Peter Williams"

6.     On April 9, 2012, an as-yet unidentified individual, using the name "Peter Williams," sent an email to Citizens for Responsibility and Ethics in Washington ("CREW"), a non-profit organization. In that email and in the emails that followed, Mr. Williams alleged that,

3

for several years, Senator Menendez had been traveling to the Dominican Republic to engage in sexual activity with prostitutes–some of whom were minors. According to Mr. Williams, Senator Menendez's travel to the Dominican Republic, and his sexual activities with these prostitutes, was facilitated by Dr. Melgen, a wealthy ophthalmologist who lives and works in South Florida. Specifically, Mr. Williams alleged that Senator Menendez had flown with Dr. Melgen on Dr. Melgen's private plane to the Dominican Republic on at least three occasions: during the Summer of 2009, the Spring of 2010, and late 2011. In these emails, Mr. Williams said that the sexual activity between Senator Menendez and the women Dr. Melgen provided often occurred at Dr. Melgen's home in Casa de Campo, a lavish retreat in the Dominican Republic. Mr. Williams also provided Dr. Melgen's home address, which the FBI has confirmed, and the purported names of some of the prostitutes.  Included in this list of names were two women who allegedly were minors when they acted as prostitutes for Dr. Melgen (respectively, "the first and second alleged minor victims").

7.    In addition, Mr. Williams supplied the names of two adult women, "Y.F." and "M.C.," who, Mr. Williams alleged, also worked as prostitutes for Dr. Melgen.  On April 24, 2012, Mr. Williams forwarded an email to CREW from "M.C." in which she described Dr. Melgen's home in the Dominican Republic, provided the names of some of Dr. Melgen's staff members who dealt directly with the prostitutes, described Senator Menendez as having a preference for young and new prostitutes, and alluded to an incident involving several prostitutes, Dr. Melgen, and Senator Menendez that occurred on a yacht.  On April 26, 2012, a member of CREW wrote directly via email to "M.C." asking for more details about Senator Menendez, whether any of the prostitutes were under 18, and provided a photo of Senator Menendez.  On April 28, 2012, "M.C." confirmed that Senator Menendez was the American who

participated in sexual activities with the prostitutes. She said that the youngest women involved were between 16 and 18 years old and gave dates in 2009 and 2010 when the sexual activity between Senator Menendez and these prostitutes allegedly occurred.

8.     Mr. Williams refused to provide his true name, and consistently refused to meet with CREW in person or to speak with CREW over the phone.

9.     On July 17, 2012, CREW forwarded Mr. Williams' emails to the FBI.

10.     On August 1, 2012, the FBI reached out to Mr. Williams via email. Over the next few months, Mr. Williams exchanged a number of emails with the FBI. In these emails, Mr. Williams reiterated his allegations about Senator Menendez's travel to the Dominican Republic, his relationship with Dr. Melgen, and his sexual activities in the Dominican Republic with minor females.

11.     Then, on September 11, 2012, Mr. Williams sent the FBI an email to which he attached what purported to be a letter, in Spanish, from an unnamed female. In the letter, the alleged female victim wrote that she was 19 years old, but that she had met, and had sex with, Senator Menendez in February or March of 2009, when she was 16 years old. The unidentified female went on to say that she had met Senator Menendez through Dr. Melgen at Dr. Melgen's home. This was the third minor female identified by Mr. Williams who allegedly had sex with Senator Menendez.

12.     On September 22, 2012, Mr. Williams sent the FBI another email, in which he laid out the names, telephone numbers, physical descriptions, and ages of some of the women that, he alleged, Dr. Melgen was using as prostitutes. Among the names Mr. Williams provided were those of "Y.F." and "Sveta" or, in his words, "Svetlana." In describing "Y.F.," Mr. Williams said that she was "Dominican, white, slim, 5'6' [sic] tall." In describing "Svetlana,"

Mr. Williams wrote that she was "Russian, blonde, around 22. She lives in Miami and travels frequently to New York. Of course, she also frequents DR mostly with Dr. Melgen in his private jet."

13.  On November 1, 2012, "The Daily Caller," an online political website, posted the videos of two women who claimed that Senator Menendez had paid them for sex in the Dominican Republic. According to one of the women, Senator Menendez agreed to pay her $500 for the sex acts, but, ultimately, she only received $100. In the video, both women's faces were concealed.

14.  On January 13, 2013, Mr. Williams sent the FBI an email to which he attached what he said was the transcribed and translated statement of a fourth minor victim. In that statement, this fourth unidentified female said that she was 19 years old, but that she had been a professional escort since she was 16 years old, when she met Dr. Melgen. Since meeting Dr. Melgen, she said, she exclusively attended his parties. In her interview, this fourth alleged victim said that she met and had sex with Senator Menendez on five occasions–all in the Dominican Republic: in February, May, and June of 2009; in May of 2010; and in December of 2011. She went on to describe the various parties she attended at Dr. Melgen's home in the Dominican Republic. She said that the parties were attended by Dr. Melgen and his friends, including Senator Menendez, and high-priced escorts like herself. She added that many of these women were from countries other than the Dominican Republic, and some were minors. Among the women this fourth victim named as having attended these parties was the same "Y.F." Mr. Williams had identified. In describing "Y.F.," the fourth alleged victim said that she is "Dominican and the exclusive girl of Salomon Melgen."

6

15.     As of the writing of this Amended Affidavit, Mr. Williams has refused to meet with the FBI, either by phone or in person.  Mr. Williams has not disclosed enough information for the FBI to identify any minors.

**II.     Investigation**

16.     During the course of this investigation, the FBI has confirmed many of the details Mr. Williams and the two unidentified alleged victims have provided.

17.     For example, the FBI was able to confirm that Senator Menendez was in fact in the Dominican Republic in February of 2009, May of 2009, May of 2010, and December of 2011. Although Senator Menendez was not in the Dominican Republic in June of 2009, he was there very close to June, having left the Dominican Republic on May 27, 2009.

18.     Moreover, the FBI was able to obtain the IP addresses that were used by the "M.C." email account referred to in paragraph 7, *supra*.   All of the IP addresses indicated that the "M.C." email account had only been accessed from the Dominican Republic.  By comparing the IP addresses used by the "M.C." email account to the IP addresses used by Peter Williams, the FBI was able to determine that the "M.C." email account was not being accessed either from the same locations or at the same times as Mr. Williams' email account.   It would appear, therefore, that "M.C." and Peter Williams are in fact different people.

19.     In addition, as mentioned, "The Daily Caller" posted the video interviews of two women who claimed to have been paid by Senator Menendez for sex in the Dominican Republic. According to both women, Dr. Melgen had put them in touch with Senator Menendez.

20.     A search of publicly available information in the Dominican Republic has confirmed that a woman named "Y.F.," approximately fitting the description provided by Mr. Williams, does live in the Dominican Republic. On February 2, 2013, FBI agents interviewed

Y.F.," who confirmed that she had been a girlfriend of Dr. Melgen's and that, in this context, she had met Senator Menendez on two occasions. Specifically, "Y.F." said that she had met Senator Menendez at Dr. Melgen's home in Casa de Campo, in the Dominican Republic, which, Dr. Melgen told her, he would lend from time to time to Senator Menendez. "Y.F." confirmed that Dr. Melgen often threw parties at his home in Casa de Campo, and that several of Dr. Melgen's friends, some of whom were in the Dominican government, would attend these parties. According to "Y.F.," young women—though not minors—would join the men at these parties. "Y.F." denied that she had ever worked as a prostitute. She also said that she never saw Dr. Melgen or Senator Menendez in the company of any prostitutes or underage females.

21.     The FBI has confirmed that the "Svetlana" Mr. Williams described is Svitlana Buchyk, a blonde Ukranian model and actress who in fact has traveled to and from South Florida on Dr. Melgen's private plane. For example, according to flight manifests stored on the Treasury Enforcement Communication System ("TECS") pertaining to Dr. Melgen's private plane (CL-600 Challenger assigned N-Number 900LG), on February 27, 2012, Buchyk traveled from the Bahamas to South Florida on Dr. Melgen's private plane.  Photographs on Buchyk's Facebook page confirm that she was in Casa de Campo, in the Dominican Republic, on February 26, 2012, the day before she flew back into the United States on Melgen's plane.

22.     Buchyk's close relationship with Dr. Melgen was further confirmed by the fact that, on July 1, 2010, Buchyk was involved in a traffic accident in South Florida while she was driving a vehicle belonging to Flor Melgen, Dr. Melgen's wife. In addition, according to the Driver and Vehicle Identification Database ("DAVID"), on November 18, 2010, Buchyk was issued a Florida identification card, in which she listed her address as ████████████ ██████████████████████ which is Dr. Melgen's address. Moreover, on February 22, 2007,

Buchyk submitted an application for a B1/B2 visa, in which she listed "Dr. Salomon Melgen" as her "contact name." On May 10, 2011, Buchyk again listed "Dr. Salomon Mrlgrn [evidently, a typographical error]" as the "contact name" on her B1/B2 visa application. Buchyk has listed her employment as being involved with a modeling company and has a website which appears to advertise her as a model, actress, and singer.  Finally, between July 28, 2010 and April 13, 2011, Dr. Melgen sent various wire transfers to Buchyk's bank account in Madrid, Spain.

23.    On February 6, 2013, FBI agents interviewed Buchyk. Buchyk said that she had been a girlfriend of Dr. Melgen's, and that she had traveled on various occasions on Dr. Melgen's private plane to his house in Casa de Campo. Buchyk said that she met Senator Menendez in Casa de Campo.  According to Buchyk, Dr. Melgen often gave Senator Menendez gifts. Buchyk specifically remembered that Dr. Melgen once gave Senator Menendez some perfumes. Buchyk did not remember seeing Senator Menendez pay for anything while he was in the Dominican Republic. Buchyk denied, however, that she had ever worked as a prostitute, and she said that she never saw Dr. Melgen or Senator Menendez in the company of either prostitutes or underage females.

24.    The FBI has confirmed that Senator Menendez has traveled on at least eight separate flights on one of Dr. Melgen's private planes (two times on Dr. Melgen's Hawker Siddeley, model BH 125-400a, assigned N-Number 854SM, and six times on Dr. Melgen's CL-600 Challenger assigned N-Number 900LG). For example, according to TECS records pertaining to Dr. Melgen's first plane (N854SM), on August 24, 2006, Senator Menendez and his son flew on this private plane from La Romana, in the Dominican Republic, to Palm Beach International Airport. Then, on September 4, 2008, Senator Menendez and a woman flew on this same plane (N854SM) from La Romana to Palm Beach. In addition, according TECS records

9

pertaining to Dr. Melgen's second private plane (N900LG), on May 14, 2010, Dr. Melgen and Senator Menendez flew on that plane from Atlanta, Georgia, to La Romana. Two days, later, on May 16, 2010, Dr. Melgen and Senator Menendez flew on that plane from La Romana to San Juan, Puerto Rico. On August 6, 2010, Dr. Melgen and Senator Menendez flew on that private plane (N900LG) from Palm Beach International Airport to La Romana. On August 9, 2010, Dr. Melgen and Senator Menendez returned on that plane from La Romana to Palm Beach. Then, on September 3, 2010, Dr. Melgen and Senator Menendez flew on this plane from Palm Beach to Punta Cana, in the Dominican Republic, and they returned to Palm Beach on this plane on September 6, 2010.  One hour after arriving in Palm Beach, Florida, the plane flew from Palm Beach to Teterboro, New Jersey. As of the date of this Amended Affidavit, the FBI has not yet confirmed whether, aside for the 2010 flights (*see* paragraph 33, *infra*), Senator Menendez ever paid for these flights.

25.    In June of 2012, the FBI's Legat in the Dominican Republic met with Dr. Melgen in the Dominican Republic and confirmed, through conversations with Dr. Melgen, that Dr. Melgen has been a close friend of Senator Menendez's for approximately twenty years and are as close as brothers. According to the Legat, Dr. Melgen surrounded himself with women in their mid-twenties and claimed to have twelve different girlfriends.  At the time that the Legat met Dr. Melgen, he was entertaining a number of current and retired officers of the Armed Forces of the United States, whom Dr. Melgen had brought to the Dominican Republic on his private plane. Several young women purportedly from the Domican Republic were also present during this meeting.  At one point during their meeting, Dr. Melgen invited the FBI Legat to a party at his home in Casa de Campo. The Legat declined the invitation. According to the Legat, however, one of Dr. Melgen's guests, who is a retired colonel in the United States Army, accepted Dr.

10

Melgen's invitation and traveled to Dr. Melgen's home in Casa de Campo. The next day, the colonel sent a text message to the FBI Legat, in which he said that the party had lasted into the early morning hours and that women were present.

### III.    Dr. Melgen and Senator Menendez

26.    During the June 2012 conversation with the Legat described in paragraph 25, *supra*, Dr. Melgen advised that he has business interests in the Dominican Republic, and specifically mentioned his efforts to secure a contract with the Dominican government to implement a container security program at Dominican seaports. Dr. Melgen also mentioned that, in his effort to win this contract, he enlisted the assistance of Senator Menendez. During this conversation, Dr. Melgen said that he wanted the Legat to meet Senator Menendez. During this meeting with the Legat, Dr. Melgen was accompanied by several females. During a later conversation with Dr. Melgen and Dr. Melgen's brother, Dr. Melgen took a call on his cell phone that the Legat believes could have been from Senator Menendez. During a later conversation, Dr. Melgen explained to the Legat that various business competitors in the Dominican Republic were trying to sway Senator Menendez's re-election and to prevent Dr. Melgen from securing the port security contract.

27.    During two telephonic conversations with the FBI, Dr. Melgen similarly explained that allegations that he and Senator Menendez had used underage prostitutes were generated by his business competitors in the Dominican Republic in an effort to prevent Dr. Melgen from securing the port security contract.

28.    Both Dr. Melgen and Senator Menendez have denied the accusations made by the unidentified minor females, the two women whose videos were posted on "The Daily Caller," and Peter Williams.

11

## IV.   Interviews of Military Personnel

29.   On January 30, 2013, following up on the information provided by the FBI Legat, the FBI conducted an interview of Richard Rodriguez, a retired Colonel based in Tampa, Florida. Rodriguez stated that he met Dr. Melgen during the month of October 2012.  At the time Rodriguez was accompanied by Mark Holten and William Coultrup, two of his friends.  Holten is an active duty Lieutenant Colonel in the U.S. Air Force Reserves, based in Tampa, Florida, and Coultrup is an active duty Colonel in the U.S. Army based at the Pentagon, in Washington D.C.  The purpose of the trip was to seek out Dr. Melgen as a potential investor in a think tank project that Holten is trying to organize.  Rodriguez, Holten, and Coultrup flew to the Dominican Republic on Dr. Melgen's private jet and spent four days there.  During his time in the Dominican Republic, Rodriguez attended several gatherings.  At one of these gatherings, which took place at Dr. Melgen's residence, Rodriguez came into contact with four young individuals who appeared to be Dr. Melgen's acquaintances.  Two of the individuals were young women, approximately in their 20s.  Rodriguez did not remember the names of the two young women, but recalls speaking to one, who told him that she was in college and that she had known Dr. Melgen for approximately one and a half years.  Rodriguez stated that these two young women attended several of the gatherings Rodriguez participated in with Dr. Melgen.  All the expenses of the trip, including the flights to and from the Dominican Republic, were paid for by Dr. Melgen.

30.   On January 30, 2013, the FBI also interviewed Coultrup. Coultrup admitted that he had taken one trip to the Dominican Republic on Dr. Melgen's private plane. Coultrup said that Holten had invited him onto the trip for the purpose of seeking Dr. Melgen's financial backing for a Latin American "think tank." According to Coultrup, on three separate occasions

12

during that trip, there were two girls present (all above 18) with the group. Coultrup never observed the girls engage in any type of sexual behavior with any of the men and never saw money exchange hands. Coultrup denied that the women were there for the purpose of engaging in prostitution. Coultrup claimed that the women were there to "chat up" the men. According to Coultrup, the women did not speak English and often looked bored. Coultrup said that, although Dr. Melgen's wife had traveled to the Dominican Republic with Coultrup, Holten, Rodriguez, and Dr. Melgen, she was never present when the younger women were there. Coultrup never met Senator Menendez. Coultrup was invited on the trip by Mark Holton and the purpose was to request financial backing from Dr. Melgen for a think tank.

## V.    The Health Care Fraud ("HCF") Search Warrant

31.    On January 29, 2013, the FBI executed a search warrant ("the HCF search warrant") at VREC. The search warrant stemmed from allegations that Dr. Melgen was engaging in health care fraud. During the execution of the search warrant at 2521 Metrocentre Boulevard, West Palm Beach, Florida 33407, the agents recovered several pieces of evidence that further corroborated Mr. Williams' account of Dr. Melgen's and Senator Menendez's close relationship. For example, in Dr. Melgen's office, on the lowest shelf of a bookcase, the agents recovered a notebook that they opened for the purpose of determining whether it contained evidence of health care fraud, in violation of 18 U.S.C. § 1347, as they were permitted to do under the HCF search warrant. In that notebook, the agents noticed that Senator Menendez's name was listed along with his phone number. Based on a description provided by fellow agents, and in reliance upon their training and experience in prostitution investigations, your Affiant described the notebook in the original search warrant affidavit as a notebook that "looked to be a ledger of prostitution activities." After personally viewing the notebook, your Affiant knows that the

13

notebook does contain the names of several women. Many women are denoted simply by a single name in quotation marks. Nearly all of the female names have an associated phone number. Some, though less than a majority, also include a nationality. The name of one woman, "Dixi," appears to be accompanied by a daily rate or price of "1200-1500." The notebook also contains several men's names and associated phone numbers, including the name and phone number of Senator Menendez, which appears on nine separate pages. On each of those pages, Senator Menendez's name appears along with the names and phone numbers of several women and men. On one of these pages, one of the women's names is accompanied by her nationality, "Spain"; on a second page, one of the women's names is accompanied by the name of a city in the Dominican Republic, "Macoris"; and on a third page, one of the women's names is listed in quotation marks as "Jaditza."

32.   Inside Dr. Melgen's desk, the agents executing the HCF search warrant also found a large number of what appeared to be professional photos of women—some in lingerie.  Four of these photos were accompanied by printed information describing the women's physical measurements, including bust and waist size.

33.   During the execution of the HCF search warrant, which authorized the agents to seize "[a]ny and all financial records, documents, and materials related to Melgen Vitreo Retinal Eye Center also known as Vitreo-Retinal Consultants of the Palm Beaches, P.A.," the agents discovered a copy of a check in the amount of $58,500 from Senator Menendez, drawn from his Congressional Federal Account, payable to DRM Med Assist, LLC, a company registered to Dr. Melgen and listed as the registered owner of Dr. Melgen's jet, a CanadaAir LTD, CL-600 Challenger, with N-Number 900LG and serial number 1036.  The memo line of the check noted: "Reimbursement for Flights of Sept 3+6, 2010, Aug 6+9, 2010."  The check was dated January

14

4, 2013, and was accompanied by a copy of the deposit slip, dated January 8, 2013, which noted that the check was deposited into a DRM Med Assist, LLC, account at Northern Trust. The deposit slip had the following handwritten annotation: "Sen. Menendez reimbursement." The check and deposit slip were accompanied by a letter dated January 4, 2013, which said that the check was to verify compliance with Senate rules and which requested that Dr. Melgen deposit the money as soon as possible. Behind the letter was a printout of an email from Dr. Melgen's assistant, Eduardo Rodriguez, to Senator Menendez, breaking down the costs of the 2010 travel. This email was dated November 26, 2012, days after "The Daily Caller" first published an article reporting the allegations of sex trafficking against Dr. Melgen and Senator Menendez.

34.     During the execution of the HCF search warrant, agents also discovered in plain view a printout of an email from Elio E. Muller, the president of Diesel 2 Gas Inc., to Dr. Melgen and several others describing legislation that Senator Menendez was pushing forward.

## VI.     Financial Disclosure Reports

35.     As part of the Ethics in Government Act, Senator Menendez is required to complete financial disclosure reports on an annual basis. For his form covering calendar year 2010, Senator Menendez checked the "No" box in response to the following two questions: (1) "Did you, your spouse, or dependent child receive any reportable gift in the reporting period (*i.e.*, aggregating more than $335 and not otherwise exempt)?," and (2) "Did you, your spouse, or dependent child receive any reportable travel or reimbursements for travel in the reporting period (*i.e.*, worth more than $335 from one source)?" Senator Menendez signed this form on May 16, 2011. Above the signature line, the financial disclosure form admonishes that "Any individual who knowingly and willfully falsifies, or who knowingly and willfully fails to file this report

15

may be subject to civil and criminal sanctions. (*See* 5. U.S.C. app 6, 104, and 18 U.S.C. § 1001)."

36.    On January 30, 2013, following the execution of the searches at VREC, Senator Menendez's office issued the following public statement: "Dr. Melgen has been a friend and political supporter of Senator Menendez for many years. Senator Menendez has traveled on Dr. Melgen's plane on three occasions, all of which have paid for and reported appropriately. Any allegations of engaging with prostitutes are manufactured by a politically-motivated right-wing blog and are false."

## COMPUTERS AND ELECTRONIC STORAGE

37.    As described above, this application seeks permission to search and seize records, in whatever form they are found, that were seized from, or imaged at, VREC (as noted above, VREC refers to all three of Dr. Melgen's clinics) and which are now located at the FBI's offices at 505 S Flagler Drive, West Palm Beach, FL, and 16320 NW 2nd Avenue, North Miami Beach, FL, 33169.   Computers and electronic storage media were found on these premises and were seized or "imaged" on-site.   Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files.   Imaging a computer permits the agents to obtain an exact copy of the computer's stored data without actually seizing the computer hardware.   I submit that there is probable cause to believe that records described above will be stored in computers or electronic storage media seized from VREC or imaged on-site, for at least the following reasons:

a.    Based on actual inspection of VREC premises by other FBI agents during the execution of another search warrant, I am aware that computer equipment was used to generate, store, and print email communications between Senator Menendez and Dr. Melgen at

the West Palm Beach location, which were unrelated to his medical business. All three locations of VREC contained computers, electronic storage media, and personal offices for Dr. Melgen. Based on my experience, I know that evidence of crimes may be intermingled with business materials, especially those that are stored electronically.

      b.     Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a hard drive, deleted or viewed via the Internet. Electronic files downloaded to a hard drive can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using readily-available forensics tools. This is so because when a person "deletes" a file on a home computer, the data contained in the file does not actually disappear; rather, that data remains on the hard drive until it is overwritten by new data.

      c.     Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space-that is, in space on the hard drive that is not currently being used by an active file-for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

      d.     Similarly, files that have been viewed via the Internet are typically automatically downloaded into a temporary Internet directory or "cache." The browser often maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages or if a user takes steps to delete them.

      e.     Computer hardware and software may be utilized for purposes of communication among persons involved in criminal activity. These communications include, but are not limited to: e-mail, voice mail systems, facsimile software, paging software, and other

17

systems whereby communications or messages may be communicated. These systems may be networked together or facilitated through a third party commercial system.

38.    I know that when an individual uses a computer to engage in criminal activity, the individual's computer will generally serve both as an instrumentality for committing the crime, and also as a storage device for evidence of the crime. The computer is an instrumentality of the crime because it is used as a means of committing the criminal offense. The computer is also likely to be a storage device for evidence of crime. From my training and experience, I believe that a computer used to commit the kinds of crimes described in this Amended Affidavit may contain: data that is evidence of how the computer was used; data that was sent or received; notes as to how the criminal conduct was achieved; records of Internet discussions about the crime; and other records that indicate the nature of the offense. Therefore, it will be necessary to search for evidence of ownership, use, and control of said computers, as evidence that tends to establish or confirm the identity of the perpetrator(s).

39.    Based upon my knowledge, training and experience, I know that searching for information stored in computers often requires agents to seize most or all electronic storage devices to be searched later by a qualified computer forensic examiner in a controlled environment. This is often necessary to ensure the accuracy and completeness of such data, and to prevent the loss of the data either from accidental or intentional destruction. Additionally, to properly examine those storage devices in a controlled setting, it is often necessary that some computer equipment, peripherals, instructions, passwords and software be seized and examined in the controlled setting. This is true because of the following:

a.    The volume of evidence. Computer storage devices (like hard disks or CD-ROMs) can store the equivalent of millions of pages of information. Additionally, a suspect

may try to conceal criminal evidence; he or she might store it in random order with deceptive file names. This may require searching authorities to peruse all the stored data to determine which particular files are evidence or instrumentalities of crime. This sorting process can take weeks or months, depending on the volume of data stored, and it would be impractical and invasive to attempt this kind of data search on-site.

       b.    Various forms of data storage. Computer hardware and a\software may be utilized to store records, including, but not limited to, records relating to business activities, criminal activities, associate names and addresses, and the identity and location of assets illegally gained through criminal activity. These records may be more fully described as information or data stored in the form of electronic or magnetic coding on computer media or on media capable of being read by a computer or computer related equipment. This media includes, but is not limited to, fixed hard drives, removable hard drives, diskettes, compact discs ("CDs"), digital versatile discs ("DVDs"), universal serial bus ("USB") storage devices, and other related media capable of storing magnetic coding;

       c.    Various types of software. Accompanying software and instruction manuals must be seized, since it would be impossible without examination to determine whether standard, commercially available software was utilized by the computer owner/operator. It is possible that the computer forensic examiner assigned to this case would not have the software or instruction manuals available, as there are dozens of software applications available to the casual consumer. In order to examine the computer related equipment, it is necessary to have the software used to create data files and records in order to read the files and records. In addition, without examination, it is impossible to determine that the disc purporting to contain standard commercially available software programs has not been used to store records instead.

d.      Passwords.      System password or keys must also be seized, as it would be impossible to access the system if it is password protected or if other encryption devices are in place.  Users often record passwords or keys on material found near the computer system.  These passwords or keys could be names or a combination of characters or symbols.

e.      Technical requirements.      Searching computer systems for criminal evidence sometimes requires highly technical processes requiring expert skill and properly controlled environment.  The vast array of computer hardware and software available requires even computer experts to specialize in some systems and applications, so it is difficult to know before a search which expert is qualified to analyze the system and its data.  In any event, however, data search protocols are exacting scientific procedures designed to protect the integrity of the evidence and to recover even "hidden," erased, compressed, password-protected, or encrypted files.  Because computer evidence is vulnerable to inadvertent or intentional modification or destruction (from either external sources or destructive code imbedded in the system as a "booby trap"), a controlled environment may be necessary to complete an accurate analysis.

40.      In light of these concerns, I hereby request the Court's authorization to search the computer hardware, associated peripherals, and electronic storage media that was seized or the mirrored images created on-site at VREC, which are believed to contain some or all of the evidence described in the warrant.  I also request permission to search software, instruction manuals and passwords in order to conduct a thorough examination of the seized computer media.

41.      Searching computer systems for the evidence described in Attachment A may require a range of data analysis techniques.  In some cases, it is possible for agents and computer

20

analysts to conduct carefully targeted searches that can locate evidence without requiring a time-consuming manual search through unrelated materials that may be commingled with criminal evidence. In other cases, however, such techniques may not yield the evidence described in the warrant. Criminals can mislabel or hide files and directories, encode communications to avoid using key words, attempt to delete files to evade detection, or take other steps designed to frustrate law enforcement searches for information. These steps may require agents or other computer analysts with appropriate expertise to conduct more extensive searches, such as scanning areas of the disk not allocated to listed files, or peruse every file briefly to determine whether it falls within the scope of the warrant. In light of these difficulties, the FBI intends to use whatever data analysis techniques appear necessary to locate and retrieve the evidence described in Attachment A.

## POTENTIALLY PRIVILEGED MATERIAL

42.     Your Affiant is alerting the Court that Dr. Melgen is represented by an attorney, and that communications between Dr. Melgen and attorneys were found and seized from VREC. These materials may be subject to limited privileges relating to the attorney-client privilege. This privilege is not absolute however. For example, documents might relate to the attorney-client relationship but may not be privileged because they further an ongoing crime or fraud. In addition, documents that might relate to the attorney-client privilege may be commingled with evidence of a crime, which makes the segregation of evidence from privileged documents difficult and time consuming. If documents are found on any computer that can arguably be categorized as privileged, they will be handled in a manner consistent with the policies of the United States Attorney's Office and the Department of Justice regarding the implementation and supervision of taint teams in criminal investigations.

21

## CONCLUSION

43.    Based on the foregoing facts, your Affiant submits that there is probable cause to believe that evidence seized from or imaged at VREC on January 29, 2013 contains evidence that Dr. Melgen (1) did knowingly travel in interstate or foreign commerce with intent to promote, manage, establish, carry on, or facilitate the promotion, establishment, or carrying on of any unlawful activity, that is, prostitution offenses in violation of the laws of the United States, and that he thereafter promoted, managed, established, carried on, or facilitated the promotion, establishment, or carrying on of such unlawful activity, in violation of 18 U.S.C. § 1952; (2) did knowingly, in and affecting interstate or foreign commerce, recruit, entice, harbor, transport, provide, or obtain by any means a person, knowing or in reckless disregard of the fact that the person had not attained the age of 18 years and that the person would be caused to engage in a commercial sex act, in violation of 18 U.S.C. § 1591(a)(1); (3) did knowingly transport an individual in interstate or foreign commerce with intent that the individual engage in prostitution or in any sexual activity for which any person can be charged with a sexual offense, in violation of 18 U.S.C. § 2421; and (4) did knowingly conspire to commit any offense against the United States, in violation of 18 U.S.C. 371. Further, there is probable cause to believe that the evidence seized from or imaged at VREC contains evidence that Dr. Melgen and Senator Menendez (5) did knowingly directly or indirectly give, offer, or promise anything of value, and directly or indirectly demand, seek, receive, accept, or agree to accept anything of value, with intent to influence any official act, in violation of 18 U.S.C. § 201(b); (6) did knowingly and willfully make any materially false, fictitious, or fraudulent statement or representation, in violation of 18 U.S.C. § 1001; (7) did knowingly devise or intend to devise any scheme to defraud the public of Senator Menendez's honest services, and use the mails and wires in

interstate or foreign commerce for the purpose of executing such scheme or artifice, in violation of 18 U.S.C. §§ 1341, 1343, & 1346; and (8) did knowingly travel in interstate or foreign commerce with intent to promote, manage, establish, carry on, or facilitate the promotion, establishment, or carrying on of any unlawful activity, that is, bribery in violation of the laws of the United States, and that they thereafter promoted, managed, established, carried on, or facilitated the promotion, establishment, or carrying on of such unlawful activity, in violation of 18 U.S.C. § 1952.

FURTHER YOUR AFFIANT SAYETH NAUGHT

Gregory J. Sheehy
Special Agent, FBI

Sworn to and Subscribed before me this _____ 14 _____ day of February, 2013.

JAMES M. HOPKINS
UNITED STATES MAGISTRATE JUDGE

23