## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

UNITED STATES OF AMERICA,

v.

ROBERT MENENDEZ

 and

SALOMON MELGEN,

Defendants.

Crim. No.  2:15-cr-00155
Hon. William H. Walls

## SENATOR MENENDEZ'S REPLY IN SUPPORT OF MOTIONS TO DISMISS THE INDICTMENT BASED ON THE SPEECH OR DEBATE CLAUSE
### (Motion to Dismiss Nos. 1 & 2, Dkts. 48 & 49)

Abbe David Lowell
Jenny R. Kramer
Christopher D. Man
Scott W. Coyle
**CHADBOURNE & PARKE LLP**
1200 New Hampshire Avenue, N.W.
Washington, D.C. 20036
(202) 974-5600

Stephen M. Ryan
Thomas J. Tynan
**MCDERMOTT WILL & EMERY LLP**
500 North Capitol Street, N.W.
Washington, D.C. 20001
(202) 756-8000

Raymond M. Brown
**GREENBAUM ROWE SMITH & DAVIS LLP**
Metro Corporate Campus One
P.O. Box 5600
Woodbridge, NJ 07095
(732) 476-3280

*Counsel for Defendant Senator Robert Menendez*

TABLE OF CONTENTS

INTRODUCTION ...................................................................................................................1

ARGUMENT .........................................................................................................................4

I.     THE PROSECUTION, NOT SENATOR MENENDEZ, HAS DISTORTED THE
       THIRD CIRCUIT'S REMAND ........................................................................................4

II.    THE SPEECH OR DEBATE CLAUSE CLEARLY SHIELDS VETTING
       PRESIDENTIAL NOMINEES, INFORMATION GATHERING AND
       LEGISLATIVE OVERSIGHT ..........................................................................................7

III.   THE CHARGES IN THE INDICTMENT AND EVIDENCE THE PROSECUTION
       SEEKS TO INTRODUCE ARE PROTECTED ...............................................................13

       A.      The Medicare Reimbursement Policy Issues Are Immunized..............................15

       B.      The Port Security Policy Issues Are Immunized ...................................................19

IV.    THE PROSECUTION CANNOT EVADE THE PRECLUSIVE BAR OF THE
       SPEECH OR DEBATE CLAUSE....................................................................................22

V.     THE PRESENTATION OF SPEECH OR DEBATE IMMUNIZED MATERIAL
       TO THE GRAND JURY WARRANTS DISMISSAL OF THE INDICTMENT.............24

CONCLUSION.....................................................................................................................25

## TABLE OF AUTHORITIES

### CASES

Bd. of County Com'rs, Wabaunsee County, Kan. v. Umbehr, 518 U.S. 668 (1996) .....................5

Gov't of the V.I. v. Lee, 775 F.2d 514 (3d Cir. 1985) ....................................................23

Helstoski v. Meanor, 442 U.S. 500 (1979) ..........................................................................1

In re Grand Jury Investigation (Menendez), 2015 WL 3875670
(3d Cir. Feb. 27, 2015) .......................................................................4-5, 10-12, 21, 24

In re Search of Elec. Comm's., No. 14-3752, slip op. (3d Cir. Sept. 2, 2015) ..............................1

Marshall Field & Co. v. Clark, 143 U.S. 649 (1892) ....................................................23

Tenney v. Brandhove, 341 U.S. 367 (1951) ..........................................................................23

United States v. Brewster, 408 U.S. 501 (1972) ..........................................................1-2

United States v. Dowdy, 479 F.2d 213 (4th Cir. 1973) ..........................................................2

United States v. Helstoski, 442 U.S. 477 (1979) ...............................................................1

United States v. Helstoski, 635 F.2d 200 (3d Cir. 1980) ..........................................................24

United States v. Jefferson, 674 F.3d 332 (4th Cir. 2012) ...............................................2

United States v. Johnson, 383 U.S. 169 (1966) .........................................................1, 4

United States v. McDade, 28 F.3d 283 (3d Cir. 1994) ..........................................................10, 12

United States v. Munoz-Flores, 495 U.S. 385 (1990) ....................................................23

United States v. Myers, 635 F.2d 932 (2d Cir. 1980) ....................................................2

United States v. Renzi, 651 F.3d 1012 (9th Cir. 2011) ....................................................7

Zivotsky v. Clinton, 132 S. Ct. 1421 (2012) ..........................................................................23

### MISCELLANEOUS

Gov't Br., United States v. Renzi, 2010 WL 6775540 (9th Cir. Aug. 18, 2010) ......................2, 8

**INTRODUCTION**

No matter how the prosecution's opposition may try to minimize it, there can be no mistaking the fact that this case raises substantial questions under the Speech or Debate Clause and that is because the prosecution is attempting to litigate this case in the same way the Supreme Court made clear it could not more than 40 years ago.  Since the Supreme Court's decisions in United States v. Johnson, 383 U.S. 169 (1966), and United States v. Brewster, 408 U.S. 501 (1972), any attempted prosecution must tread carefully in charging and trying a Member of Congress for bribery.  "The Court's holdings in United States v. Johnson and United States v. Brewster leave no doubt that evidence of a legislative act of a Member may not be introduced by the Government in a prosecution. . . ."  United States v. Helstoski, 442 U.S. 477, 487 (1979).  The Supreme Court emphasized that "all references" to Speech or Debate activities must be "eliminated" and "wholly purged" from an indictment, and that use of "the evidence . . . during trial" is forbidden.  Johnson, 383 U.S. at 173, 185.  As the Third Circuit recently and succinctly put it, the Speech or Debate Clause "bars civil and criminal liability for 'legislative acts'" and "bars the use of legislative-act evidence against a Member."  In re Search of Elec. Comm's., No. 14-3752, slip op. at 18 (3d Cir. Sept. 2, 2015).  This case's specific charges indicate that is being done.

The Speech or Debate Clause does hold the prosecution to high evidentiary standards in prosecuting a Member of Congress for bribery, but nobody is suggesting the Clause provides "blanket protection shielding members of the Legislative Branch from any Executive Branch investigation."  (Dkt. 85 at 2.)  Nor would enforcing the Speech or Debate Clause consistent with the Supreme Court precedent result in "immunizing criminal activity on Capitol Hill," as the prosecution dramatically claims.  (Dkt. 85 at 42.)  The Supreme Court has made clear: "[A]

member of Congress may be prosecuted under a criminal statute provided that the Government's case does not rely on legislative acts or the motivation for legislative acts." Brewster, 408 U.S. at 512.  An agreement to engage in bribery is not a legislative act, so such an agreement can be charged as a crime and direct evidence of such an agreement can come into evidence. Id. at 526. "[I]t is taking the bribe, not performance of the illicit compact that is a criminal act," so "the Government need not show any act of [the Member] subsequent to the corrupt promise for payment." Id.  Indeed, that is precisely the manner by which the prosecution typically tries public corruption cases. See, e.g., United States v. Jefferson, 674 F.3d 332, 345 (4th Cir. 2012) (recordings of Congressman demanding bribes and testimony from bribe payor); Gov't Br., United States v. Renzi, 2010 WL 6775540, at *26, 34 (9th Cir. Aug. 18, 2010) (describing testimony from Congressman's extortion victims to Congressman's demand for bribes); United States v. Myers, 635 F.2d 932, 938 n.7 (2d Cir. 1980) (noting the ABSCAM cases involved "a film or videotape recording of critical events"); United States v. Dowdy, 479 F.2d 213, 219 (4th Cir. 1973) (bribe payor testified to agreement with the Congressman, and recorded conversations with the Congressman regarding the bribery agreement); see also, Gregory Wallace, The Real "American Hustle", USA Today (Jan. 21, 2014) (former ABSCAM prosecutor explaining video evidence of Congressmen taking bribes and saying things like "money talks," and stuffing their suit pockets with cash and asking, "does it show?").  But that is not how the prosecution is attempting to try this case.

What courts prohibit  – but what the prosecution nevertheless is attempting to do here – is to try to prove bribery by actually charging and introducing evidence of legislative acts.  Because Senator Menendez never had any sort of agreement to engage in bribery, the prosecution has no direct evidence that such an agreement existed.   The Indictment does not point to any

documentation of that agreement, any record of its existence, or any witness to such an agreement having been made.  The Indictment does not even attempt to guess at any of the supposed agreement's terms, or when or where it might have been negotiated.  Instead, the Indictment violates the Speech or Debate Clause by charging that Senator Menendez took various legislative acts and alleging that Senator Menendez received various gifts, and leaving the prosecution to ask the jury to infer that there must have been some sort of corrupt agreement linking the gifts with those acts.  Such an approach is flatly impermissible though because it requires the prosecution to charge and introduce evidence of legislative acts, and the Supreme Court has consistently held that is precluded by the Speech or Debate Clause.

The prosecution's claim that Senator Menendez "advances an interpretation of the Speech or Debate Clause with no limiting principle" is exaggerated rhetoric.  (Dkt. 85 at 1.) Senator Menendez has no quarrel with the limiting principle set by the Supreme Court itself in cases like Johnson and Brewster, which permit the prosecution to introduce direct evidence of a corrupt agreement, but not evidence of legislative acts.  Nor does Senator Menendez dispute that "the Speech or Debate Clause does not provide United States Senators with a constitutional right to accept bribes."  (Id.)  To be sure, if the prosecution sought to prove its case with direct evidence that he agreed to take bribes, Senator Menendez would vigorously dispute that evidence because the truth is that he never agreed to take or took any bribe.  The prosecution's argument would fail as a matter of fact, but would not be precluded as a matter of law by the Speech or Debate Clause.  It is the prosecution's effort to prove bribery through mere inferences based on legislative acts that the Supreme Court has found objectionable for more than 40 years. [1]

_____

[1]    This approach is a direct threat to the separation of powers.  Every Member of Congress accepts a multitude of *quids* (including campaign contributions) and every Member takes a

## ARGUMENT

I.   **THE PROSECUTION, NOT SENATOR MENENDEZ, HAS DISTORTED THE THIRD CIRCUIT'S REMAND**

The opposition tries to make the prior litigation in this case before the Third Circuit appear to be something different than what it was.  The prosecution's real purpose in litigating a motion to compel testimony from grand jury witnesses over Speech or Debate Clause objections – seeking to compel answers to innocuous questions the prosecutors already knew the answers to – was not lost on anyone.  The prosecution knew that it would face substantial obstacles in indicting Senator Menendez on bribery charges based on the Speech or Debate Clause because, without any <u>direct evidence</u> of bribery, it would have to build a case by asking a jury to infer corruption from Senator Menendez taking legislative acts that would happen to benefit one of his political supporters.  The prosecution hoped a motion to compel over the Speech or Debate Clause objection would provide it with a more favorable vehicle to clear the Speech or Debate Clause hurdle and would secure a green light to proceed with an indictment on that theory.

That strategy back-fired.  The prosecution disputes that it "lost" before the Third Circuit (Dkt. 85 at 27), but it cannot dispute that the Third Circuit refused to grant it the relief it sought and "vacated" its prior win.  <u>In re Grand Jury Investigation (Menendez)</u>, 2015 WL 3875670, at

---

multitude of *quos*, which typically serve the interests of their supporters (many of whom have provided *quids*).  If all that is necessary for the Executive Branch to charge a Member of Congress with bribery is to point to these everyday *quids* and *quos*, and then ask a jury to infer that the missing evidence of a corrupt agreement exists, then the Executive Branch is free to charge <u>any</u> and <u>every</u> Member of Congress with bribery.  Members of Congress would be no safer now than Members of Parliament were under the Stuart and Tudor monarchies.  By all accounts, the Framers incorporated the Speech or Debate Clause into the Constitution to prevent exactly this formula for abusive prosecutions.  <u>Johnson</u>, 383 U.S. at 178 (explaining the Clause was derived from the English Bill of Rights of 1689 and its history).  Bribery is a serious crime and the decision to charge it should be a serious decision that rests on credible evidence of a corrupt agreement.  Inferring corruption from everyday *quids* and *quos* should never be enough.

4

*2 (3d Cir. Feb. 27, 2015).  The prosecution hoped that by re-characterizing Senator Menendez's interactions with the Executive Branch as "advocacy," the Third Circuit would find the use of that label dispositive that those interactions were not legislative activity protected by the Speech or Debate Clause.  But the Third Circuit recognized the issue was more nuanced than that, and it remanded for "the District Court to make specific factual findings" as to whether the communications were protected by the Speech or Debate Clause, specifically whether the communications were mere case work "to assist Dr. Melgen" or were instead "focused on policy."  Id., at *2 & n.3 (3d Cir. Feb. 27, 2015); see also, Bd. of County Com'rs, Wabaunsee County, Kan. v. Umbehr, 518 U.S. 668, 679 (1996) (citing numerous cases for the proposition that constitutional rights cannot be side-stepped through labels that elevate form over substance).

It is no "brazen misrepresentation" to suggest that the reason the Third Circuit did not affirm the district court's ruling in the prosecution's favor was that it rejected the prosecution's broad argument that the Senator's actions were simply "advocacy" for a particular person.  (Dkt. 85 at 28.)  The Third Circuit plainly held that "informal legislative fact-finding and informal oversight" is constitutionally protected, even though that conduct may "look very much like unprotected political acts."  In re Grand Jury Investigation (Menendez), 2015 WL 3875670, at *1.  If those constitutionally protected categories did not exist, or if merely labelling conduct "advocacy" was sufficient to knock it out of those protected categories, the Third Circuit would have affirmed.  A remand was necessary because the Third Circuit did not have "factual findings" before it to assess the "legislative or non-legislative character" of the conduct to determine whether the conduct fell into those protected categories or some unprotected category.  Picking on the word "lost," the government cannot avoid that the Third Circuit refused the simple formula that it put forward there and wants this Court to adopt now.  (Dkt. 85 at 27-28.)

The prosecution frequently labels some perceived action or omission by Defendants as "telling" (see, e.g., Dkt. 83 at 18, 21, 45; Dkt. 85 at 29, 39), but if anything in this case is "telling" it is the prosecution's decision to ignore the Third Circuit's remand.  The prosecution knew it would fail to overcome the Speech or Debate Clause test set by the Third Circuit on remand, so it did not even try (and even went around the directed process through the hearsay testimony of its case agent).  The prosecution also knew a holding that the subject matter of the questions was protected by the Speech or Debate Clause would doom its theory of the case, and mean that it had already improperly dumped an enormous volume of privileged material before the grand jury.  (MTD No. 2.)  Rather than accept that it should not indict a high-profile case that would not pass judicial muster, the prosecution instead chose to bypass the Third Circuit's remand by proceeding outside the remand that the Third Circuit ordered.

Quick to condemn the defense, it is the prosecution's explanation for why it ignored the Third Circuit's remand that is not credible.  The prosecution claims:  "Defendant Menendez's Speech or Debate assertions had already delayed the investigation by many months, and continued litigation over whether his staffer would be compelled to answer a few questions would have unnecessarily delayed the investigation by many more months."  (Dkt. 85 at 30.) The truth is that Senator Menendez's objections had not delayed the prosecution's investigation at all, as the prosecution already knew the answers it sought to compel and the grand jury was hardly hindered in moving forward without the testimony.  Indeed, as the prosecution concedes, the grand jury never got the testimony that prosecutors sought to compel and "the grand jury ultimately did not need that staffer's answers to those particular questions in order to find probable cause."  (Id. at 27.)  The prosecution had spent years on the case and, Judge Thompson was ready to proceed with the remand expeditiously, a record already had been compiled, and

only a few questions remained in dispute, so there is no reason to believe that a remand would have delayed anything by "many more months."  (Id.)  The prosecution's tactic only delayed the outcome the Third Circuit's remand would have produced sooner, a judicial finding that its theory of the case is barred by the Clause it hoped to circumvent.

## II.   THE SPEECH OR DEBATE CLAUSE CLEARLY SHIELDS VETTING PRESIDENTIAL NOMINNEES, INFORMATION GATHERING AND LEGISLATIVE OVERSIGHT

Senator Menendez extensively briefed the fact that it is well-settled law that the Speech or Debate Clause protects a Senator's vetting of a Presidential nominee, information gathering and legislative oversight.  (MTD No. 1 at 4-13.)  The prosecution does not directly take issue with this case law or that these categories are privileged, but tries to undercut them with a slight of hand by arguing the Clause "does not protect future legislative acts – whether promised, threatened, or contemplated," and that "an act that is merely a precursor to a legislative act is not itself a legislative act."  (Dkt. 85 at 4.)  This case does not concern precursors to legislative acts, it concerns legislative acts themselves.  To be sure, the vetting of a Presidential nominee may be a precursor to a vote on the nomination, and information gathering or legislative oversight may be a precursor to the holding of a hearing, the introduction of a bill, a speech on the Senate floor or some other legislative act, but these so-called precursors are themselves legislative acts.  The case law on that is clear.  (MTD No. 1 at 4-13.) [2]

---

[2]      The prosecution likes United States v. Renzi, 651 F.3d 1012 (9th Cir. 2011), because it is a recent case that found no violation of the Speech or Debate Clause.  But the prosecution's suggestion that the Ninth Circuit rejected "strikingly similar" arguments to those raised by Senator Menendez is just wishful thinking.  (Dkt. 85 at 23.)  Congressman Renzi was accused of bribery concerning a private bill that would exchange federal land for privately-held land.  The prosecution introduced evidence of Renzi's negotiation of the bribe – the agreement itself – rather than introduce evidence of his official acts (which the district court precluded under the Speech or Debate Clause).  It is true that Congressman Renzi unsuccessfully tried to claim his

If this were a typical case, where the prosecution had indicted a Member and sought to prove that the Member made a "promise" to take an official act in exchange for a bribe, the prosecution's argument would have some force.  But the prosecution is not seeking to introduce evidence of Senator Menendez making such a promise here.  The prosecution is not seeking to introduce a document, email or recording of Senator Menendez making such a promise, or the testimony of any witness to such a promise having been made.  Such evidence does not exist.  Instead, the prosecution seeks to introduce legislative acts that already occurred – communications vetting a Presidential nominee, information gathering, and oversight activities – acts protected by the Speech or Debate Clause.

The prosecution also seeks to distort the case law by suggesting that "advocacy to the Executive Branch" or efforts to "influence the Executive Branch" are not protected because they are "political in nature rather than legislative."  (Dkt. 85 at 4 (internal quotations omitted).)  But stated that broadly, the prosecution's claim proves too much.  As even the prosecution concedes, some of what it calls "advocacy" by a Senator is protected by the Speech or Debate Clause.  (Id. at 9 (explaining Senator "Menendez has performed numerous acts protected by the Speech or Debate Clause. . . .  Some of this protected legislative activity includes advocacy on behalf of defendant Melgen, such as chairing a Senate subcommittee hearing in which he raised defendant Melgen's contract dispute with the Dominican Republic.").)

_____

negotiation of a bribe in exchange for a bill was part of the protected legislative activity of preparing legislation.  The prosecution argued the record was "barren of evidence" of a legislative investigation, as the only subject of the negotiation was securing a benefit for Renzi.  Gov't Br., United States v. Renzi, 2010 WL 6775540, at *26 (9th Cir. Aug. 18, 2010).  Not surprisingly, the Ninth Circuit distinguished unprotected efforts to negotiate a bribe from protected efforts in preparing legislation.  651 F.3d at 1023-26.  Here, the prosecution has not charged or sought to introduce any evidence of Senator Menendez negotiating a bribe.  That evidence does not exist.

8

Whether that "advocacy" or efforts to "influence" the Executive branch are "political in nature rather than legislative" depends on what the Member is seeking from the Executive Branch.  Where a Senator is advocating or seeking to influence the Executive Branch to provide him with information or for them to properly follow the law, the Senator is engaged in legislative information gathering and legislative oversight, which makes those activities of a protected legislative nature rather than political.  This is true even if it is an individual's case, matter or dispute that informs the legislative oversight.  To hold otherwise would require the Court to overrule all those cases holding that legislative information gathering and legislative oversight are constitutionally protected.

There are circumstances where a Member's advocacy or efforts to influence the Executive Branch would be political in nature, rather than legislative, and appropriately would not be privileged by the Speech or Debate Clause.  Those are cases that have nothing to do with policy.  The prosecution, for example, notes that <u>Johnson</u> held that "Congressmen 'exert[ing] influence on the Department of Justice to obtain the dismissal of pending indictments' was 'in no wise related to the due functioning of the legislative process' and therefore unprotected activity." (Dkt. 85 at 17 (quoting 383 U.S. at 172).)  It also noted that in <u>Jefferson</u>, a Congressman's efforts to persuade an Executive Branch agency "to grant a company financial assistance 'simply does not question any legislative acts.'"  (<u>Id.</u> (citing 546 F.3d at 304).)  But those activities were in fact nothing more than mere case work, where Members sought to do favors for friends, which did not have a policy nexus to how the law should be applied as a general matter.  Those individuals alone would benefit from the mercy of being spared from prosecution or by being awarded financial assistance, but no policy change impacting others would result.  The prosecution should recognize that the holdings of those cases are no broader than their facts.

The prosecution erroneously suggests that the Third Circuit has held there is some categorical rule that "the Speech or Debate Clause does not apply to efforts by members of Congress to influence the Executive Branch." (Dkt. 85 at 17 (quoting United States v. McDade, 28 F.3d 283, 299 (3d Cir. 1994)).  McDade demonstrates the inquiry is far more nuanced than the prosecution suggests.  There, the Court considered whether the Clause applied to letters to the Executive Branch that implicated government programs within the jurisdiction of committees on which then-Congressman McDade sat.  28 F.3d at 297-302.  The first letter "openly lobbie[d] on behalf [of a particular company] in the defendant's district," but the second did not refer to "any particular business."  Id. at 300.  Instead, the second "discusse[d] the broader policy question whether the Army should award such a contract."  Id. (emphasis added).  As a result, "whatever the defendant's motivation in writing the [second] letter, the letter appear[ed] on its face to fall into the above-described middle category of oversight activities."  Id.  Thus, the line suggested by McDade is whether the Member was simply trying to assist a "particular" person or whether the Members was addressing a "broader policy question."  Id. at 300.  And in either case, whether Executive Branch officials could characterize the efforts as assisting individual was not the way a decision on Speech or Debate Clause protection was decided.

Significantly, the prosecution made this exact same argument, using the exact same language, to the Third Circuit in the prior appeal of this case, and the Third Circuit rejected it. (Compare Dkt. 85 at 17, with Gov't Br., In re Grand Jury Investigation (Menendez), No. 14-4678, at 40 (3d Cir. filed Feb. 6, 2015).)  The Third Circuit explained that "[s]ome acts by Members of Congress, such as speaking on the House or Senate floor, are 'manifestly legislative such that the Speech or Debate Clause obviously applies to them."  In re Grand Jury Investigation (Menendez), 2015 WL 3875670, at *1.  Citing to McDade and Gov't of the V.I. v.

Lee, 775 F.2d 514 (3d Cir. 1985), the Third Circuit went on to explain:  "But other acts, such as informal legislative fact-finding and informal oversight, are not manifestly legislative, and indeed can look very much like unprotected political acts.  In these latter cases, district courts must make factual findings regarding the content and purpose of the acts and communications in question to assess their legislative and non-legislative character."  Id.  In this particular case, the Third Circuit noted "[t]here is evidence supporting the Government's and the Senator's positions regarding the legislative nature of these communication," with some evidence supporting the prosecution's "inference that at least one purpose of the meeting was to assist Dr. Melgen" and other evidence supporting Senator Menendez that "the discussions focused on policy, not Dr. Melgen's case."  Id. at *2 n.3.  The Third Circuit intended the District Court to make factual findings as to what actually occurred on remand.  Id.

If the Third Circuit had accepted the prosecution's argument that a Member's efforts to influence the Executive Branch are categorically unprotected, the Third Circuit would have affirmed the District Court rather than order a remand to flesh out the factual record.  There was no debate in the prior appeal over the fact that Senator Menendez had sought to influence the Executive Branch, rather the debate was over whether he did so purely to assist Dr. Melgen or for policy reasons that would make those efforts protected legislative activity.[3]

Although the Third Circuit's decision in McDade, Lee and the prior appeal of this case provide a limiting principle that distinguishes between protected legislative policy

---

[3]     The prosecution mistakenly claims that Senator Menendez treats everything as falling into McDade's middle category as protected.  (Dkt. 85 at 65.)  He has not.  McDade explained the middle category is between the poles of conduct that is manifestly legislative and protected on one end and plainly unprotected on the other end.  As McDade itself explained in analyzing the two letters in question, more careful analysis of conduct in the middle category is required to determine whether it is or is not protected.  The prosecution's hope that labeling something "advocacy" or legislative activity affecting an individual is all that is needed is not the law.

communications and unprotected routine errands for individuals, the prosecution accuses Senator Menendez of advancing "an interpretation of the Speech or Debate Clause with no limiting principle" when he asks this Court to apply those Third Circuit precedents. (Dkt. 85 at 1.) But the Third Circuit's rule plainly establishes a limiting principle, even if it is one the prosecution does not like.[4] Indeed, Senator Menendez has demonstrated that limiting principle by agreeing that his routine casework on visas is not protected by the Speech or Debate Clause precisely because it did not involve questions on policy. Moreover, the prosecution's contention that the line drawn by the Third Circuit is somehow flawed is better directed to the Third Circuit than to Senator Menendez or this Court, as only the Third Circuit or the Supreme Court can change it.

Moreover, it is the prosecution's test that is unworkable. Given that everyone seems to recognize that some communications between Members and the Executive Branch are legislative and protected by the Speech or Debate Clause, it cannot be that those communications lose their immunity if they are inspired by individual cases or when individual cases are noted in calling for broader change. That will always be the case. Policy is not made in an abstract vacuum. It is tweaked and adjusted based on real world experience, where real people have been impacted

---

[4]     The prosecution laments that Senator Menendez "[u]nhelpfully . . . fails to provide a workable definition of 'oversight'" (Dkt. 85 at 21), but Senator Menendez perhaps mistakenly assumed all sides were working from the same definition of "oversight" used by the Third Circuit. In the prior appeal in this case, the Third Circuit addressed "informal oversight" and cited to McDade. In re Grand Jury Investigation (Menendez), 2015 WL 3875670, at *1 (citing McDade, 28 F.3d at 300.) On the page cited of McDade, the Third Circuit explained "the definition of 'oversight,' . . . as usually employed, appears to have a broad meaning. . . . [T]he term is used to refer to 'a variety of techniques' for monitoring components of the Executive Branch, ranging from 'formal procedures or processes, such as committee hearings,' to 'informal' techniques, 'such as communications with agency personnel by staff or committee members' and even 'casework' and program evaluations performed by private individuals or groups." 28 F.3d at 299-300 (quoting Joel Aberbach, Keeping a Watchful Eye – the Politics of Congressional Oversight 130, 132 (1990)). The Third Circuit's definition appears quite workable, particularly with the illustrated distinction it drew between "routine casework for constituents" and oversight that addresses a "broader policy question." Id. at 300.

for better or for worse. If a Senator advising HHS that its regulations should encourage multi-dosing because that makes for good policy by preventing waste is protected by the Speech or Debate Clause as legislative – and it should be – it makes no sense to strip those communications of protection simply because the Senator learned from a particular doctor how waste could be prevented or that the doctor's experience is pointed out to HHS by the Senator.

## III. THE CHARGES IN THE INDICTMENT AND EVIDENCE THE PROSECUTION SEEKS TO INTRODUCE ARE PROTECTED

Senator Menendez has extensively briefed why the Indictment is permeated with allegations that he engaged in legislative acts protected by the Speech or Debate Clause. (MTD No. 1.)[5] The prosecution argues that all the charged activities "were undertaken for one purpose: to assist Dr. Melgen" and this was Senator Menendez's "singular purpose." (Dkt. 85 at 8, 10.) But the information the prosecution put before the grand jury is to the contrary. The prosecution does not dispute the fact that Danny O'Brien, Senator Menendez's Chief of Staff, testified that Dr. Melgen approached the Senator with numerous ideas, but the staff would act as a filter and

---

[5]     Despite taking this issue head-on and briefing it extensively, the prosecution nevertheless asserts that Senator Menendez has "conceded that the indictment charges only non-legislative conduct unprotected by the Speech or Debate Clause." (Dkt. 85 at 8.) Rather, as Senator Menendez explained, the prosecution's use of the term "advocacy" is unclear and so it addressed it in two separate motions addressing two different flaws. To the extent that the prosecution is alleging Senator Menendez engaged in conduct that constitutes legislative oversight, as much of that conduct appears to be, he explained "it would be an official legislative activity protected by the Speech or Debate Clause." (MTD 10 at 1 n.1.) To the extent that "advocacy" is not protected activity, like the purported advocacy concerning visas, Senator Menendez does not contest that such activity is unprotected by the Speech or Debate Clause, but he does argue that such unofficial activities are not "official acts" for purposes of the bribery laws. (Id.) Nor does this distinction leave the government unable to prosecute genuine cases of bribery. The government can still prosecute, as it always has been able to prosecute, promises to take official acts in exchange for bribes by introducing direct evidence of the corrupt agreement, rather than by introducing official acts. The absence of facts on the prosecution's side does not "immunize Members of Congress from prosecution of bribery" or produce any outlandish result (Dkt. 87 at 21), it simply means the prosecution has no case here.

would not pursue those that did not have "a public policy dimension" or "have merit."  (MTD No. 1 at 15-16.)  With respect to the Medicare policy and port security policies alleged in the Indictment, Senator Menendez addressed those issues on the policy level.  Even those who disagreed with Senator Menendez on policy (the Executive Branch officials involved) acknowledge that his communications with the Executive Branch on these issues were policy related.  This is not a case where a Member of Congress was seeking a benefit that would be limited to a friend, such as leniency by the Department of Justice (Johnson) or to steer an agency to award a government contract to a friend (Jefferson).

With respect to both the Medicare policy and port security issues, Senator Menendez has never disguised the fact that it was Dr. Melgen who brought these issues to his attention and it was no secret that Senator Menendez's position on those issues were aligned with Dr. Melgen's position or that Dr. Melgen might "benefit" from the government adopting the right policy.  It just does not matter.  In almost every circumstance, some policy issue is brought to the attention by a Member who has some stake in the policy, and whatever policy position is taken by a Member will stand to benefit some constituency.  Often, persons with a stake in the policy issues will hire lobbyists to educate Members on the issues and try to persuade them to take up their cause.  That is inevitable and routine politics in Washington and elsewhere.  The prosecution cannot dismiss all policy work undertaken by a Member of Congress as mere casework, unprotected by the Speech or Debate Clause, simply because it comes to the Member's attention from someone who would benefit from the Member's advocacy or because a Member uses the example of specific individuals to highlight the need for a policy change.[6]

_____

[6]     It is the norm that short-comings in legislation impact real people who bring the need for new laws to the attention for Members of Congress.  We have Amber Alerts today because

The prosecution states that Senator Menendez would apply the Speech or Debate Clause too broadly by simply labelling all acts as involving "policy," but the prosecution simply labels every action as "advocacy" or pointing out a policy's impact on "Melgen" to destroy the protection of the Clause.  Courts should not have difficulty looking past form to substance and determining whether Members were pursuing changes at a policy level or only addressing one-off matters for an individual.

A.     **The Medicare Reimbursement Policy Issues Are Immunized**

The prosecution claims that all of Senator "Menendez's communications with HHS officials were attempts to influence them regarding defendant Melgen's financial dispute" (Dkt. 85 at 10), but that is simply not true.  The "$8.9 million Medicare billing dispute" that the prosecution repeatedly alludes to refers to a matter that was being litigated administratively at the time in question and concerned Dr. Melgen's past billing practices.  (Dkt. 85 at 9.)  The evidence is uncontroverted that Senator Menendez never asked anyone at HHS – not HHS Secretary Sebelius, nor CMS Administrator Tavenner – to intervene in that administrative billing dispute.  And the prosecution was repeatedly told by numerous people at HHS (Sebelius, Tavenner and Jonathan Blum) that because the administrative appeals process is separate, there was nothing

_____

Amber Hagerman's parents fought for them after their daughter was tragically abducted and murdered.  We have a Ryan White CARE Act providing assistance to people with HIV/AIDS because Ryan demonstrated a profound need for that assistance.  We have a Lilly Ledbetter Fair Pay Act because Lilly's experience demonstrated a need to redress sex discrimination.  Amber, Ryan and Lilly may have inspired these laws, and they or their families certainly lobbied for them, but nobody would mistake the efforts to pass those laws as anything other than legislative because they were directed at helping a multitude of people, not just helping Amber, Ryan or Lilly, or their families.  (Lilly is alive and may personally stand to benefit from the Act bearing her name.)  The line separating whether a Member's conduct is legislative or routine casework is not determined by the personal story that inspires action or by who lobbies for the change, but by whether the Member seeks to remedy the problem in a way that is targeted to helping a particular person or is legislative in that it seeks to create a policy benefitting a class of persons.

they could do to intervene in those administrative proceedings in any event.  (MTD No. 3 at 7-8 n.3 (Blum); id. at 14-15 (Tavenner); id. at 18 (Sebelius).)

Michael Barnard, Senator Menendez's policy analyst, explained that Senator Menendez argued that the existing policy was vague and he was seeking to clarify the policy going <u>forward</u>. (MTD No. 1 at 16.)  In Senator Menendez's discussion with everyone at HHS (Blum, Tavenner and Sebelius) about the issue, the evidence is uncontroverted that the Senator argued the policy was unclear, should be clarified going forward, and that the policy should allow for multi-dosing because it was safe and would avoid wasting perfectly good medicine.  (MTD No. 1 at 16-25; MTD No. 2 at 11-16; MTD No. 3 at 5-20.)  While a change in policy going forward may have been beneficial to Dr. Melgen in his efforts to multi-dose in the future, the prosecution never denies the fact that such a change to the policy going forward would not directly impact Dr. Melgen's $8.9 million billing dispute concerning his actions in the past.  (MTD 1 at 18; MTD No. 3 at 7-8.)

To the contrary, each of the HHS witnesses denied that Senator Menendez asked them to intervene in Dr. Melgen's administrative appeal.  Blum was clear that he understood Senator Menendez to be seeking a clarification of the policy going forward, and that he was not asking HHS to intervene in Dr. Melgen's administrative appeal.  (MTD No. 3 at 7-8 n.3 (Blum).) Tavenner said she and Senator Menendez did "not specifically discuss Dr. Melgen," she was not sure Dr. Melgen's name even came up, and that Senator Menendez's ask was for her "to change CMS' policy."  (MTD No. 3 at 10.)  Indeed, Barnard was at that meeting with Tavenner and corrected the prosecutor when he mischaracterized that meeting before the grand jury.  Barnard testified:  "Your characterization was that the meeting was called to discuss Dr. Melgen, when <u>in fact that was not the case</u>."  (Barnard 8/13/14 Tr. at 55 (emphasis added).)  Like every other first-

16

hand account, Barnard repeatedly said that Dr. Melgen's name was never mentioned because the meeting was about the overall policy and not his case.  (Id. at 55-56.)

Similarly, nobody could recall whether Dr. Melgen's name even came up in Senator Menendez's meeting with Secretary Sebelius.  (MTD No. 3 at 15-19.)  Blum told the FBI that, at this meeting, the "focus of the conversation was on the policy, which REID and MENENDEZ said was vague.  MENENDEZ and REID said that they (MENENDEZ and REID) were not there to talk about a particular case; they were there to talk about policy."  (Blum 2/13/13 FBI 302 at 5 (emphasis added) (Dkt. 83, Ex. 9).)  Secretary Sebelius told the FBI that the Senators did address the impact of the policy on a particular doctor, although she could not remember whether Dr. Melgen was mentioned by name, but she emphasized that they "spoke more broadly about how it was unfair to healthcare providers."  (MTD No. 3 at 17.)  Not only did Senator Menendez not ask Sebelius to intervene in Dr. Melgen's administrative appeal, but Sebelius on her own noted that she could not do anything to help the doctor already harmed by the policy because it was already in the administrative appeals process.  (Id. at 18.)  In response, Senator Reid said that was a "cop out" because they were talking about a current flaw in the policy and Secretary Sebelius could change that policy going forward.[7]  (MTD No. 1 at 25.)

Even when HHS refused to follow Senator Menendez's policy recommendations, HHS did so as a matter of general policy.  Nobody from HHS complained that they believed Senator Menendez was singling out Dr. Melgen for some sort of peculiar benefit.  Instead, HHS clung to the misguided policy notion that multi-dosing would require Medicare to pay more than once for

---

[7]   It trivializes the importance of the issue for the prosecution to argue whether the name "Melgen" was used or not used disposes of the Speech or Debate Clause protection.  Whether any Executive Branch official knew the policy did or did not also impact Dr. Melgen or his case does not refute the fact that the discussion was about the government's multi-dosing policy and the inconsistent manner in which it was being applied.

a vial of medicine (it would not cost Medicare even a penny more) or that it would be unsafe (despite the fact that HHS had previously found the practice safe, still allowed multi-dosing of similar drugs, and its guidance to the contrary concerned the irrelevant practice of sharing needles).  (MTD No. 1 at 23-24.)  Regardless of who was right on the policy question, the point is that Senator Menendez was having a policy debate with HHS, and that constitutes legislative oversight that is protected by the Speech or Debate Clause.

Aside from the fact that these discussions were all about policy, the communications with Tavenner are privileged by the Speech or Debate Clause because they were manifestly legislative, as part of Senator Menendez's vetting process of her Presidential nomination to a post that would require Senate confirmation.  (MTD No. 1 at 20, 23.)  Maria Martino of CMS told the FBI that <u>she</u> reached out to Senator Menendez's office to schedule that meeting on behalf of Tavenner, as part of Tavenner's confirmation process.  (MTD No. 3 at 8.)  The Senator's calendar reflected that this meeting was "re: her nomination before the Finance Committee."  (MTD No. 1 at 20.)  And when prosecutors asked Barnard a leading question about that meeting being scheduled so that Senator Menendez could "advocate on behalf of Dr. Melgen . . . in his $8.9 million Medicare dispute," Barnard testified:  "That is incorrect."  (MTD No. 3 at 11 n.7.)  Instead he testified that the purpose of that meeting was "[t]he consideration of her nomination."  (<u>Id.</u>)  Try as they might to call it something different, the meeting was part of the confirmation process.

The prosecution does not deny that the vetting of a Presidential nominee is protected by the Speech or Debate Clause, but instead suggests that "when defendant Menendez transitioned during that meeting from vetting her nomination to seeking to influence her decision making" he entered an unprotected zone.  (Dkt. 85 at 18.)  The conversation, however, <u>never</u> transitioned

away from the vetting process. Part of Senator Menendez's vetting of Tavenner was evaluating her judgment and whether she would listen to reason with respect to his views on the multi-dosing policy. A Senator is well within his right to consider such a factor, or even whether he could (to use the prosecution's language) "influence her," in deciding whether to vote for her nomination. A Senator is constitutionally vested with unfettered discretion to consider whatever factor the Senator deems appropriate in deciding whether to confirm a Presidential nominee, and neither the Executive Branch nor the Judicial Branch can dictate what a Senator can consider as part of the vetting process or when legitimate vetting starts and stops. One can hardly imagine that it will be individual prosecutors in individual cases who can decide what topics discussed in the confirmation process are part of a Senator's "advise and consent" function and which are not.

### B.     The Port Security Policy Issues Are Immunized

The prosecution's argument that Senator Menendez's historical legislative commitment to port security issues "is of no moment" is a contrived attempt to divorce the Dominican port security issue from its context. (Dkt. 85 at 21.) As with everything else in life and in law, context matters. New Jersey has some of the busiest ports in the nation and, while a House Member on the Foreign Affairs Committee and later as Chairman of the Senate Foreign Relations Committee, Senator Menendez has made port security a signature issue, particularly after 9/11 revealed the disastrous consequences that could befall the country if we are not vigilant about such issues. (MTD No. 1 at 25-29.) The prosecution does not question any of this, but fails to see its relevance to the policy issue at hand. That is simply puzzling.

As even the Indictment makes clear, the Senator had expressed serious policy concerns about the Dominican Republic – "concerns about what is flowing through the ports either unobserved or with tacit permission," he believed their "current scanners are inadequate and the

port security is deteriorating quickly" and the "customs director is highly corrupt," and that enforcement of the port security "contract would help INL meet drug interdiction and port security objectives in the region." (MTD No. 1 at 29 n.20, 30 (quoting Indict.).) Senator Menendez raised the issue with the State Department that the contract was "being blocked by corrupt officials" and raised a concern there is an "ulterior purpose" at work by Dominicans "who do not want to increase security in the DR." (Id. at 29 n.20, 30.) Senator Menendez viewed the situation as quite significant and advised the State Department that he wanted to learn of a solution to the problem soon or he would "call a hearing to discuss it." (Id. at 29 n.20, 30.)

The Senator's staff wrote CBP that they were concerned "there is some effort by individuals who do not want to increase port security in the DR to hold up the contract's fulfillment," and "[t]hese elements (possibly criminal) want CBP to give the government equipment because they believe the government use of the equipment will be less effective than the outside contractor. My boss is concerned that the CBP equipment will be used for this ulterior purpose and asked that you please consider holding off on the delivery of any such equipment until you can discuss this matter with us – he'd like a briefing." (Indict. ¶ 133; see Talbot 3/16/15 Tr. at 17 (clarifying the email is just seeking "information," not asking them "never" to donate).)

This was not the Senator or his staff "advocating" that Dr. Melgen should get a contract, get paid, make money, or have some economic benefit at all. Quite plainly, Senator Menendez's request for information and for the Executive Branch to take action to protect our national security are policy-related legislative oversight. Nevertheless, the prosecution complains that Senator "Menendez fails to provide a workable definition of 'oversight' or 'policy'" and leaves no "limiting principle that clearly divides protected conduct from unprotected conduct." (Dkt. 85 at 21-22.) The prosecution also criticizes the notion that a Senator can claim a Speech or

Debate privilege whenever they can "imagine a policy rationale" for taking some action.  (<u>Id.</u> at 21-22.)  The line is not ambiguous as the prosecution imagines it to be, and Senator Menendez's conduct on the port security issues was safely on the side of Speech or Debate Clause protection and nowhere close to any gray area near that line.  This is the significance of the Senator's demonstrable record on port security.  It shows the efforts to be protected.

The limiting principle is the same it always has been – whether conduct is purely casework on behalf of an individual or whether it has broader policy implications.  There should be no question that national security is a serious policy issue, or that a Senator would be concerned that "corrupt officials" are allowing port security to deteriorate quickly and were thwarting efforts that would improve port security.  By any definition, those are policy issues.

Moreover, it is hard to imagine any conduct by a Senator that would be better characterized as "informal legislative fact-finding and informal oversight" than this.  <u>In re Grand Jury Investigation (Menendez)</u>, 2015 WL 3875670, at *1.  As Chairman of the Senate Foreign Relations Committee, Senator Menendez was requesting "information" and a "briefing" from the State Department, and made clear his "informal" legislative fact-finding and oversight would become formal through a "hearing" if he did not receive satisfactory answers.  The issue of port security is not one that falls squarely within the discretion of the Executive Branch, as is the situation with most case work.  Instead, it is a subject of considerable legislation and oversight by Congress.  Efforts by a Senator to obtain information from the Executive Branch that inform the need for further hearings or legislation on an issue where Congress is competent to act constitutes oversight.

Although it is beyond question that legislative fact-finding and oversight are protected Speech or Debate Clause activities (MTD No. 1 at 4-13), the prosecution again attempts to erase

that body of case law through a slight of hand.  The prosecution argues that "although holding a hearing is a legislative act threatening to call a hearing in the future is not" and "an act that is merely a 'precursor' to a legislative act is not a legislative act itself."  (Dkt. 85 at 23.)  Holding a hearing is a legislative act, but so is what the Third Circuit called "informal legislative fact-finding and informal oversight" in this very case.  In re Grand Jury Investigation (Menendez), 2015 WL 3875670, at *1.  Informal fact-gathering and oversight include what Senator Menendez did here in seeking "information" and a "briefing," and putting teeth in these informal oversight activities by threatening to engage in formal oversight activities if the State Department would not provide the information he sought informally.  Senator Menendez was taking a legislative act protected by the Speech or Debate Clause when he advised the State Department he would escalate his oversight to a formal hearing.  In no sense is this situation like Brewster, where the Supreme Court held that the promise of some future official act (which the prosecution equates with a threat of a future official act) in exchange for a bribe is unprotected by the Speech or Debate Clause.  (Dkt. 85 at 23.)

## IV. THE PROSECUTION CANNOT EVADE THE PRECLUSIVE BAR OF THE SPEECH OR DEBATE CLAUSE

The prosecution does not take issue with the fact that the Second and Fourth Circuits have held that "so long as conduct is purportedly legislative, it enjoys the full protection of the Speech or Debate Clause," or the fact that Senator Menendez would prevail under that standard, but instead argues "that the Third Circuit rejected this contention thirty years ago in Lee."  (Dkt 85 at 6-7 (quoting United States v. Biaggi, 853 F.2d 89, 103 (2d Cir. 1988), and United States v. Dowdy, 479 F.2d 213, 226 (4th Cir. 1973); see also, MTD 1 at 6-8 (advancing the argument that the Court need not inquire further to find the Speech or Debate Clause applicable if it is purportedly legislative).)  But the Circuit split is not as deep as the prosecution imagines, and

Senator Menendez's conduct should be found legislative no matter how much scrutiny it receives.

The Third Circuit in Lee did quarrel with Dowdy's language, but not its result.  Lee explained that the prosecution in Dowdy was alleging a Congressman had engaged in a "sham investigation" and that his "motives for conducting the investigation were illicit," and Lee agreed with Dowdy that "inquiry [] into the motivation for an admittedly legislative act[] is precisely what the Speech or Debate Clause forbids."  Gov't of the V.I. v. Lee, 775 F.2d 514, 524 (3d Cir. 1985).  The prosecution here is repeating the mistake in Dowdy, which was condemned in Lee.  The prosecution is simply questioning Senator Menendez's motives for taking legislative activity.  Vetting a Presidential nominee is plainly a legislative act, as is pressing HHS to clarify its Medicare reimbursement policy and follow the law or seeking a briefing from the State Department on port security issues and threatening to hold oversight hearings if State did not comply with his informal oversight requests.  But the prosecution questions Senator Menendez's motives, accusing him of making "contrived policy arguments" when he was really just advocating on behalf of Dr. Melgen.  (Dkt. 85 at 14; see also, id. at 18 (suggesting he Senator Menendez was not really vetting Tavenner), 21 ("imagine a policy rationale") 42 (calling the policy claims "tricks").)  Lee agrees with Biaggi and Dowdy that when an activity appears to be legislative, as is the case here, it would offend separation of powers and the Speech or Debate Clause to deprive that apparent legislative act of its privilege by questioning a Senator's motives.  Indeed, the Supreme Court has much more recently confirmed that it is inappropriate for one Branch to question the motive of a Member of another Branch in this manner.  See Zivotsky v. Clinton, 132 S. Ct. 1421, 1433 (2012) (Sotomayor, J., concurring); United States v. Munoz-Flores, 495 U.S. 385, 410 (1990) (Scalia, J., concurring); see also Marshall Field & Co. v. Clark,

143 U.S. 649, 672 (1892); <u>Tenney v. Brandhove</u>, 341 U.S. 367, 374 (1951) (quoting <u>Coffin v. Coffin</u>, 4 Mass. 1, 27 (Mass. 1808)). If the Executive Branch could overcome the Speech or Debate Clause by simply calling a Member of Congress a liar, and let a jury sort out what the Member was really thinking, the Speech or Debate Clause would not provide any protection at all.

Moreover, the prosecutions claim that there is some way of "excising" protected statements from unprotected statements is off-base in this context. (Dkt. 85 at 6.) All the conduct addressed in this Motion is protected by the Speech or Debate Clause, so there is nothing that would remain once the privileged parts are excised. Moreover, the prosecution provides no suggestion as to how this could be done here. While excising can be done "if possible," the Third Circuit recognizes that where what is privileged and unprivileged is "inseparable," the conduct is privileged if it "contained a significant legislative component" and will remain immune even if "some personal exchanges transpired" that would not be privileged. <u>In re Grand Jury Investigation (Menendez)</u>, 2015 WL 3875670, at *1 (quoting <u>Lee</u>, 775 F.2d at 525). The prosecution does not identify anything part of the Indictment or evidence it could seek to admit after excising the offensive parts, and none appears to exist. Consequently, the only appropriate remedy is the dismissal of the Indictment.

## V.    THE PRESENTATION OF SPEECH OR DEBATE IMMUNIZED MATERIAL TO THE GRAND JURY WARRANTS DISMISSAL OF THE INDICTMENT

The prosecution takes issue with whether the material it presented to the grand jury was protected by the Speech or Debate Clause, but it does not dispute what the remedy should be if that material is protected by the Speech or Debate Clause. The motion and this reply demonstrate the volume and significance of the material given the grand jury to indict this case, and that the appropriate remedy is dismissal of the Indictment. (<u>See, e.g.</u>, MTD No. 2; <u>United</u>

24

States v. Helstoski, 635 F.2d 200, 205-206 (3d Cir. 1980) (dismissing indictment for excessive presentation of Speech or Debate Clause materials to grand jury).

## CONCLUSION

Because every Count in the Indictment alleges conduct that is immunized by the Speech or Debate Clause or would require the introduction of evidence privileged by the Clause, the Indictment as a whole must be dismissed.  (MTD No. 1.)  The extensive presentation of evidence immunized by the Speech or Debate Clause to the grand jury also requires the Indictment be dismissed.  (MTD No. 2.)

Respectfully submitted,

/s/ Abbe David Lowell
Abbe David Lowell
Jenny R. Kramer
Christopher D. Man
Scott W. Coyle
**CHADBOURNE & PARKE LLP**
1200 New Hampshire Avenue, N.W.
Washington, D.C. 20036
adlowell@chadbourne.com
(202) 974-5600

Stephen M. Ryan
Thomas J. Tynan
**MCDERMOTT WILL & EMERY LLP**
500 North Capitol Street, N.W.
Washington, D.C. 20001
sryan@mwe.com
(202) 756-8000

Raymond M. Brown
**GREENBAUM ROWE SMITH & DAVIS LLP**
Metro Corporate Campus One
P.O. Box 5600
Woodbridge, NJ 07095
rbrown@greenbaumlaw.com
(732) 476-3280

*Counsel for Defendant Senator Robert Menendez*