NOT FOR PUBLICATION

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>v.<br><br>ROBERT MENENDEZ and<br>SALOMON DR. MELGEN,<br><br>Defendants. | **OPINION**<br>Cr. No. 15-155 |

**Walls, Senior District Judge**

Defendant Salomon Melgen moves to dismiss the indictment in this criminal case and to suppress evidence, or, in the alternative, order a *Franks* hearing to determine the admissibility of evidence, resulting from a search and seizure conducted at his West Palm Beach, Florida medical offices. After oral argument on September 17, 2015, the Court denies this motion.

## PROCEDURAL AND FACTUAL BACKGROUND

Defendants Robert Menendez, who has represented New Jersey in the United States Senate since 2006, and Salomon Melgen, an ophthalmologist who resides and practices his profession in Florida, were indicted in the District of New Jersey on charges of bribery and related crimes on April 1, 2015. Indictment, EFC No. 1. The procedural history of this case, starting with its time before the grand jury, has already been discussed in the Court's opinion on Defendants' Speech or Debate Clause-related motions, ECF No. 117, and its findings are incorporated here.

The following undisputed facts regarding the West Palm Beach search and seizure are taken from the statement and counterstatement of facts included in the parties' memoranda of law in support of, and in opposition to, Dr. Melgen's motion to dismiss.

## I. The VREC First Warrant Execution

In 2012, acting on information provided by an anonymous source, the U.S. Department of Justice opened an investigation into allegations that Senator Menendez and Dr. Melgen had had sexual relationships with underage prostitutes at Dr. Melgen's home in the Dominican Republic. Def. Mem. Supp. Mot. Dismiss for Search and Seizure Violations ("Mot. Dismiss 15") ECF No. 64-1 at 7-8. In January 2013, federal agents in Florida began investigating separate allegations that Dr. Melgen had committed Medicare billing fraud. *Id.* at 8. At the same time, FBI agents in Newark, New Jersey, working with prosecutors from the Department of Justice's Public Integrity Section ("PIN"), investigated separate allegations that Dr. Melgen and Senator Menendez were involved in a bribery scheme. Opp. Mot. Dismiss 15, ECF No. 84 at 3. On January 28, 2013, agents involved in the PIN bribery investigation invited Dr. Melgen to participate in a voluntary interview. *Id.* On January 29, 2013, Special Agent Gregory Sheehy of the FBI traveled from Newark to West Palm Beach, Florida to interview Dr. Melgen regarding the PIN investigation, but the interview did not take place. *Id.* at 3-4. Also on January 29, 2013, FBI agents surveilled Dr. Melgen's ophthalmology practice in West Palm Beach, Florida, the Melgen Vitreo Retinal Eye Center ("VREC"), in anticipation of obtaining a search warrant in the Medicare billing investigation. *Id.* at 4. These agents observed shredding trucks outside VREC. *Id.* After confirming that documents from the office were shredded on a monthly basis, the FBI applied to Magistrate Judge James Hopkins of the U.S. District Court for the Southern District of Florida for a warrant to search VREC for items related to "healthcare fraud" and received a signed warrant at 9:07 pm that evening (the "First Warrant"). *Id.* The First Warrant authorized agents to seize eleven categories of items and records. Mot. Dismiss 15 at 9-10. Before the agents executed the First Warrant, Timothy Donovan, the Assistant Special Agent in Charge

("ASAC") of the FBI's Miami Field Division, briefed them on the prostitution and PIN bribery investigations. Opp. Mot. Dismiss Ex. 3, Aff. Timothy P. Donovan, ECF No. 84-3 at 2. At approximately 10 pm on July 29, 2013, agents arrived at VREC and began to execute the First Warrant. Mot. Dismiss 15 at 9. Dr. Melgen was present at the VREC when agents arrived, and his attorney traveled to the office. Opp. Mot. Dismiss at 4. In the course of the search for evidence related to the health care fraud investigation, agents discovered several items that appeared to be relevant to the prostitution and PIN investigations. *Id.* at 5. They recorded these items on a single inventory page bearing the FBI file number for the PIN corruption investigation (the "PIN Inventory"). Mot. Dismiss 15 at 1-2. As recorded in the PIN Inventory, these items included:

- A fax transmission to Senator Menendez, Opp. Mot. Dismiss Ex. 12,
- File folders labeled "Menendez for Senate," "Congressman Bob Menendez," "Senator Robert Menendez," and "Sen Robert Menendez," *id.*,
- Unspecified email correspondence, *id.*,
- A "black bound notebook with handwritten notes," *id.*,
- A file folder labeled "Homephones," *id.*,
- A file folder containing "phone messages, notes, and news articles, bound immigration documents and correspondence," *id.*,
- Various "photos and emails of women," "modeling photographs," and a folder containing unspecified "photographs and [a] resume," *id.*, and
- A copy of a $58,500 check dated January 4, 2013 from Senator Menendez to DRM Med Assist, LLC, a company registered to Dr. Melgen, a corresponding deposit slip, and a

letter from Senator Menendez's attorneys representing that the check was "in reimbursement for flights" Senator Menendez took in 2010. Opp. Mot. Dismiss at 5.

ASAC Donovan ordered that these items be segregated from other evidence seized during the search. *Id.* at 6. In the early morning of January 30, 2013, Agent Sheehy was informed that material pertinent to the PIN investigation may have been found during the search. *Id.* He traveled to VREC and was shown several items, including the $58,500 check and corresponding documents. *Id.* at 7. On the advice of prosecutors, Agent Sheehy and ASAC Donovan placed the segregated items in a box. *Id.* ASAC Donovan then called Dr. Melgen's attorney, informed him that the FBI had discovered evidence related to the other investigations and intended to obtain a new warrant for this evidence, and requested consent to remove the evidence from VREC. *Id.* at 7. Dr. Melgen's attorney consented and requested a copy of the new warrant. *Id.* Agent Sheehy removed the box from VREC and stored it. *Id.*

## II. The Second Warrant

On January 30-31, 2013, Agent Sheehy and federal prosecutors prepared an affidavit for a warrant to search the segregated PIN Inventory items for evidence "related to a violation" of several public corruption and sexual offense statutes. Mot. Dismiss 15 at 12. The affidavit described the black bound notebook as a "ledger of prostitution activities" that included Senator Menendez's name on several pages, above "a list of several women, along with, again, these women's phone numbers, their nationalities, and their prices." *Id.* at 13. Magistrate Judge Hopkins approved the warrant on January 31, 2015 (the "Second Warrant"), and Agent Sheehy mailed a copy to Dr. Melgen's attorney. Opp. Mot. Dismiss at 8. On February 5, 2013, Dr. Melgen's attorney called a prosecutor working on the prostitution investigation and stated that

Dr. Melgen would "just allow [the Government] to review all the materials" included in the Second Warrant affidavit if the Government "quashed" the Second Warrant. *Id.* at 9. Dr. Melgen's attorney also proposed that the government "issu[e] a subpoena as an alternative to letting the warrant continue to authorize the search." *Id.* The Government rejected this request. *Id.*

## III. The Amended Second Warrant

After obtaining the Second Warrant, Agent Sheehy reviewed the PIN Inventory items. On February 15, 2013, Agent Sheehy submitted an amended affidavit to Magistrate Judge Hopkins with a revised description of the contents of the notebook that removed specific references to prostitution, though it identified at least one woman's name that appeared to be accompanied by a daily rate or price. *Id.* at 9-10 (citing Amended Second Warrant Affidavit, ECF No. 84 Ex. 18, ¶¶ 31-32). Magistrate Judge Hopkins approved the warrant (the "Amended Second Warrant"), and Agent Sheehy mailed a copy to Dr. Melgen's attorney. *Id.* Between July 2, 2015 and July 15, 2015, following Defendants' indictment on bribery and related charges, attorneys for Dr. Melgen and the Government exchanged correspondence regarding the timing of the search of the items at issue. Mot. Dismiss 15 at 15-18.

## IV. Motion to Dismiss 15

On July 20, 2015, Dr. Melgen and Senator Menendez filed fifteen separate motions to dismiss the indictment in whole or in part under Fed. R. Crim. Pr. 12(b)(3). ECF No. 48-61. *See* Def. Summary Chart of Mot. Dismiss, ECF No. 47, for descriptions of each motion to dismiss. The Court deals with the remaining motions separately. In Motion 15, Dr. Melgen alone moves to dismiss the indictment and for suppression of evidence or for a *Franks* hearing. In this

opinion, the Court considers (a) whether the PIN Inventory items were unconstitutionally searched and seized in the January 29-30 execution of the First Warrant or subsequent removal of the PIN Inventory box from VREC, (b) whether deficiencies in the Second and Amended Second Warrants require the suppression of PIN Inventory evidence without first holding a *Franks* hearing, (c) whether to hold a *Franks* hearing, and (d) whether to dismiss the indictment because it relies on inadmissible evidence. *See* Mot. Dismiss 15.

**STANDARD OF REVIEW**

In assessing a warrant affidavit for probable cause, the magistrate judge is:

> [T]o make a practical, common sense decision whether, given all the circumstances set forth in that affidavit before him... there is a fair probability that contraband or evidence of a crime will be found in a particular place. And the duty of the reviewing court is simply to ensure that the magistrate had a 'substantial basis... for conclud[ing]' that probable cause existed.

*United States v. Kepner*, 843 F.2d 755, 762 (3d Cir. 1988) (quoting *Illinois v. Gates*, 462 U.S. 213, 238-39 (1983)). The reviewing court is not engage in "after-the-fact scrutiny" that "take[s] the form of *de novo* review," *Illinois v. Gates*, 462 U.S. 213, 236 (1983), but instead is to afford great weight and deference to the neutral magistrate's determination and uphold the warrant so long as the magistrate judge had a "substantial basis" for concluding by a "fair probability" that contraband or evidence of a crime would be found in a particular place. *United States v. Conley*, 4 F.3d 1200, 1205 n. 2 (3d Cir. 1993).

"[W]here the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request." *Franks v. Delaware*, 438 U.S. 154, 155-56 (1978). The same requirements for a hearing apply when the

case concerns omissions. *United States v. Frost*, 999 F.2d 737, 743 n. 2 (3d Cir. 1993). "In order to make this preliminary showing, the defendant… must present an offer of proof contradicting the affidavit, including materials such as sworn affidavits or otherwise reliable statements from witnesses." *United States v. Yusuf*, 461 F.3d 374, 383 n. 8 (3d Cir. 2006). At the *Franks* hearing, the defendant must prove by a preponderance of the evidence: "(1) that the affiant knowingly and deliberately, or with a reckless disregard for the truth, made false statements or omissions that create a falsehood in applying for a warrant; and (2) that such statements or omissions are material, or necessary to the finding of probable cause." *Sherwood v. Mulvihill*, 113 F.3d 396, 399 (3d Cir. 1997) (citing *Franks*, 438 U.S. at 171-72).

## DISCUSSION

As an initial matter, a defendant is not entitled to have an indictment dismissed simply because the Government submitted evidence obtained in violation of the Fifth Amendment to the grand jury. *In re Grand Jury Proceedings, Harrisburg, Pa.*, 450 F.2d 199, 205 (1971) (citing *United States v. Blue*, 384 U.S. 251, 255 (1965)). Instead, the defendant may "pursue his Fifth Amendment claim through motions to suppress and objections to evidence" at trial. *Blue*, 384 U.S. at 256. The Court rejects Dr. Melgen's motion to dismiss but will consider his motion to suppress evidence and for a *Franks* hearing.

### I. The items on the PIN Inventory were not illegally searched and seized during the First Warrant execution on January 29 and 30, 2013.

Dr. Melgen argues first that the PIN Inventory items were unlawfully seized during the First Warrant execution on January 29 and 30 because (a) these items were not specified as objects within the scope of the First Warrant, and (b) an exception to the warrant requirement does not apply.

The Fourth Amendment prohibits unreasonable searches and seizures. *See Illinois v. Rodriguez*, 497 U.S. 177, 183 (1990); *Payton v. New York*, 445 U.S. 573, 586 (1980). Except in certain "exceptional circumstances," *Johnson v. United States*, 333 U.S. 10, 14-15 (1948), "a search of private property without proper consent is 'unreasonable' unless it has been authorized by a valid search warrant." *Camara v. Municipal Court of City and County of San Francisco*, 387 U.S. 523, 528-29 (1967). A valid search warrant under the Fourth Amendment must (a) be "based on probable cause," (b) be "supported by a sworn affidavit," (c) particularly describe the place of the search, and (d) provide a particularized "description of the type of evidence sought." *Groh v. Ramirez*, 540 U.S. 551, 557 (2004). "By limiting the authorization to search to the specific areas and things for which there is probable cause to search, the requirement ensures that the search will be carefully tailored to its justifications, and will not take on the character of the wide-ranging exploratory searches the Framers intended to prohibit." *Maryland v. Garrison*, 480 U.S. 79, 84 (1987). In other words, "the scope of a lawful search is 'defined by the object of the search and the places in which there is probable cause to believe that it may be found.'" *Id.* (quoting *United States v. Ross*, 456 U.S. 798, 824 (1982)). A search is valid if it "fits within the literal terms of the warrant and is a reasonable means of obtaining the objects described in the warrant." *United States v. Menon*, 24 F.3d 550, 560 (3d Cir. 1994).

One exception to the warrant requirement is the "plain-view doctrine," which holds that "[i]f an article is already in plain view" during an otherwise lawful search, "neither its observation nor its seizure would involve any invasion of privacy." *Horton v. California*, 496 U.S. 128, 133 (1990). "An example of the 'plain view' doctrine is the situation in which the police have a warrant to search a given area for specified objects, and in the course of the search come across some other article of incriminating character." *Id.* at 135 (internal quotations and

citations omitted). This doctrine applies even when an officer "is interested in an item of evidence" outside the scope of a warrant and "fully expects" to find it during a search that is "confined in area and duration by the terms of a warrant or a valid exception to the warrant requirement." *Id.* at 138.

**A. Several PIN Inventory items were within the scope of the First Warrant.**

Several items recorded on the PIN Inventory were validly seized on July 29-30, 2013 because they fit "within the literal terms" of the First Warrant. *Menon*, 24 F.3d at 560. Attachment A to the First Warrant, incorporated by reference into the warrant itself, gave a particular description of the "places to be searched" that included the entire VREP building. ECF No. 84-1 Ex. 1 at 4. Attachment B, also incorporated by reference, described eleven categories of "items and records" to be seized. *Id.* Ex 2. at 6-7.

The copy of the $58,000 check from Senator Menendez to DRM Med Assist, LLC, an organization owned by Dr. Melgen, and related documentation fall within the "literal terms" of Attachment B Category 5 ("financial records, documents, and materials related to [VREC]… including but not limited to… copies of checks… and records of transfers of funds") *Id.* The bound notebook, which included names and telephone numbers, could have reasonably been found to fall within the "literal terms" of Attachment B Category 9 ("telephone numbers… and other documents that reflect the names and identifying information" of employees or agents) and Category 10 ("call logs (regardless of format) or diaries of Dr. Salomon Melgen"). *Id.* It follows that the First Warrant validly authorized the search and seizure of both of these items. That Agent Sheehy later sought an additional warrant to search the items suggests an abundance of caution, but it does not move these items outside the scope of the First Warrant.

**B. The remaining items are protected by the plain view doctrine.**

The remaining PIN Inventory items do not fall within the scope of the First Warrant, but the Court finds that their initial search and seizure during the January 29-30 search is protected under the plain view doctrine.

The Government claims that agents discovered all items on the PIN Inventory – the notebook, $58,500 check, photographs, flight records, email from Dr. Melgen's assistant to Senator Menendez, thank-you note from Senator Menendez, and other assorted documents related to Senator Menendez – while searching for items listed on Attachment B "in locations within [Dr. Melgen's] ophthalmology practice where agents could reasonably expect to find documents within the scope of Attachment B," including "on top of desktops and inside desk drawers, inside cabinets, atop shelves, and elsewhere." Opp. Mot. Dismiss at 13.

This is precisely a "situation in which the police have a warrant to search a given area for specified objects, and in the course of the search come across some other article of incriminating character." *Horton*, 496 U.S. at 133 (quotations and citations omitted). Under the plain view doctrine, the agents executing the First Warrant were authorized to seize other incriminating items they came across while searching though "the places in which there [was] probable cause to believe that [the items listed on Attachment B may have been] found." *Garrison*, 480 U.S. at 84.

Dr. Melgen, focusing primarily on the notebook, argues that the plain view doctrine does not apply to this search because (a) the agents executing the search "had no basis, immediately apparent or otherwise, to believe the items seized for the PIN inventory were evidence of any crime," and (b) the agents could not have "*attempt[ed]* to find probable cause without impermissibly scrutinizing" the items. Mot. Dismiss 15 at 20. The Court has already found that

the notebook and $58,500 were validly searched and seized under the literal terms of the First Warrant but will consider these arguments for the remaining PIN Inventory items.

The agents executing the First Warrant search did have a basis to believe that what Dr. Melgen calls "routine communications" and "non-criminal photographs," *id.* at 21, were evidence of crimes. Before the agents began the First Warrant execution, ASAC Donovan briefed them on the PIN corruption investigation and prostitution investigation, giving them the necessary context to identify the PIN Inventory items as evidence of other crimes. Ex. 3, Aff. Timothy P. Donovan, ECF No. 84-3 at 2. That the agents may have expected to find evidence relevant to other investigations does not make the plain view doctrine inapplicable. *California*, 496 U.S. 128, 138; *United States v. Smith*, 62 F. App'x 419, 422 (3d Cir. 2003) (plain view doctrine protected seizure of rifles found during warranted search for handgun, where police knew rifles had been stolen from nearby home earlier that day).

Dr. Melgen correctly argues that the "very fact that FBI agents *searched for* and located every document with Senator Menendez's name on it" would be enough to invalidate the seizure of PIN Inventory items outside the scope of the First Warrant. Def. Rep. Supp. Mot. Dismiss 15, ECF No. 97 at 3 (emphasis added). But he makes nothing more than a conclusory allegation that agents *searched for* any of these documents. In fact, the email from Assistant United States Attorney Barbara Martinez Dr. Melgen cites in his reply indicates that agents were instructed to do the exact opposite. *Id.* at 3 (citing ECF No. 84-11 Ex. 11 ("please make sure to stress to the WPB agents executing the warrant that we would have to obtain an additional search warrant *if they see in plain view or later discover* electronic evidence of other non-HCF crimes such as travel to the DR, contact lists of persons in the DR, etc.") (emphasis added)).

Dr. Melgen also argues repeatedly that, because many of the PIN Inventory items have no "inherently 'incriminating character'" and are merely "document[s] with Senator Menendez's name on [them]," agents could not possibly have believed they were evidence of a crime. Rat 3-4, 10. But "evidence, to be relevant to an inquiry, need not conclusively prove the ultimate fact in issue, but need only have 'any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.'" *New Jersey v. T.L.O.*, 469 U.S. 325, 345 (1985) (quoting Fed. Rule. Evid. 401). And the agents only needed "probable cause to believe that the item[s] in question [were] evidence" to seize them under the plain view doctrine. Arizona v. *Hicks*, 480 U.S. 321, 323 (1987). Where agents were aware of two investigations involving Dr. Melgen's allegedly criminal dealings with Senator Menendez, there was nothing unreasonable about the belief that these items would probably tend to make the existence of a fact demonstrating a crime more likely.

There is no indication that the agents impermissibly scrutinized any of the PIN Inventory items during their search. Again focusing on the notebook, Dr. Melgen compares the review of these items to the impermissible moving of a turntable to read a not-otherwise visible serial number in *Hicks*, 480 U.S. at 323, and to the unauthorized examination of a folded piece of paper and closed notebook in *United States v. Johnson*, 784 F.dd 416, 419 n.2 (1st Cir. 1986). But both *Hicks* and *Johnson* involved items clearly outside the scope of the authorized searches. *See Hicks*, 480 U.S. at 325 (in warrantless search for weapons, shooting suspect, and victims, officers immediately knew that turntable was outside the scope of their search); *Johnson*, 784 F.3d at 419 n.2 (officers executing warrant for marijuana and "marijuana deratives" [sic] could not search inside folded piece of paper and closed notebook because neither were places where marijuana

was likely to be found). In contrast, each page of Dr. Melgen's notebook could have contained an item within the scope of the First Warrant. Similarly, agents were entitled to open file folders and skim emails and faxes because all of these items could have contained "personnel records," "correspondence," "call logs," or other items listed on Attachment B. Opp. Mot. Dismiss at 30. *See Menon*, 24 F.3d at 560 ("[a]ny reasonable agent looking for evidence in a clearly circumscribed area would continue the search until she was certain that no more evidence existed[,] which could not happen until the entire desk was searched."); *Smith*, 62 F. App'x at 422 (plain view doctrine applied to rifles found under mattress during search for pistol).

All of the items on the PIN Inventory were found in places where agents had probable cause to believe the objects of the First Warrant search would be found, so the search and seizure of these items was valid.

**II. The FBI did not commit an illegal search or seizure by removing the PIN Inventory items from VREC because Dr. Melgen's attorney consented to the seizure.**

To the extent Dr. Melgen also argues that the Government impermissibly seized the PIN Inventory items by removing them from VREC instead of returning them before obtaining the Second Warrant, *see* Mot. Dismiss 15 at 27, this argument is precluded because Dr. Melgen's counsel expressly consented to the removal. Consent is an exception to the "requirements of both a warrant and probable cause." *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973). When seeking to rely upon consent to justify the lawfulness of a search, the Government must prove that consent was "freely and voluntarily given." *Id.* at 222 (internal quotations omitted). Whether consent was voluntarily given is a "question of fact to be determined from the totality of all the circumstances." *Id.* at 227. The Court looks at a variety of factors to determine whether consent was voluntary, including "the age of the accused, his education, his intelligence, [and] whether he was advised of his constitutional rights…" *United States v. Kim*, 27 F.3d 947, 955 (3d Cir.

1994). While knowledge of the right to refuse consent is "one factor to be taken into account," this factor alone is not dispositive. *Schneckloth*, 412 U.S. at 227. "The individual giving consent must also possess the authority to do so." *United States v. Stabile*, 633 F.3d 219, 230 (3d Cir. 2011).

Here Dr. Melgen argues that the "limited consent" his attorney gave was invalid because agents would otherwise have "shuttered his client's offices" until obtaining a warrant to remove the PIN Inventory items from the premises, but he does not explain how this could render an otherwise informed, voluntary consent invalid. Rep. Sup. Mot. Dismiss 15 at 8. Nor does Dr. Melgen argue that his attorney was unauthorized to give consent on his behalf. The Government has demonstrated that consent was "freely and voluntarily given," and there was no violation of Dr. Melgen's rights from the removal of the PIN Inventory items from VREC.

Dr. Melgen argues that, even if his attorney consented to the removal of the PIN Inventory items, he did not give the agents permission to search the items, correctly claiming that "an officer's authority to possess a package is distinct from his authority to examine its contents." *Id.* at 7 (quoting *United States v. Bush*, 647 F.2d 357, 369 n. 17 (3d Cir. 1981)) (quotations omitted). This is of no matter. As the Court will explain, the Second and Amended Second Warrants authorized the search of the PIN Inventory items.

### III. The Second and Amended Second Warrants were not issued because of false statements or misleading omissions, and a *Franks* hearing is unnecessary.

Dr. Melgen argues that the Second Warrant and Amended Second Warrant were both invalid because (a) the warrants contained references to "tainted evidence," a.k.a. the content of the PIN Inventory items, and (b) the remaining information in the warrants was insufficient to establish probable cause. Mot. Dismiss 15 at 26-30. Alternatively, Dr. Melgen argues that the Court should hold a *Franks* hearing to determine whether Magistrate Judge Hopkins issued the

warrants because of false statements or knowing omissions in Agent Sheehy's affidavits about the content of PIN Inventory items. *Id.* at 31.

A defendant is entitled to a *Franks* hearing if he "makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for truth, was included by the affiant in the warrant affidavit" *and* if "the allegedly false statement is necessary to the finding of probable cause." *Franks*, 438 U.S. at 155-56. A "substantial showing of the *informant's* untruthfulness is not sufficient to warrant a *Franks* hearing. The Supreme Court made clear throughout *Franks* that a substantial preliminary showing of intentional or reckless falsity *on the part of the affiant* must be made." *United States v. Brown*, 3 F.3d 673, 677 (3d Cir. 1993) (affirming denial of *Franks* hearing where defendant challenged veracity of informant but not police officer affiant). The showing "must be more than conclusory and must be supported by more than mere desire to cross-examine," and allegations "must be accompanied by an offer of proof," such as "[a]ffidavits of sworn or otherwise reliable statements of witnesses." *Franks*, 438 U.S. at 171. Even if a defendant makes a substantial showing of falsity, a warrant will be upheld without a hearing if the false statements are not essential to the finding of probable cause. *See Brown*, 3 F.3d at 678 n.5 ("[E]ven if the misstatements in the affidavit's reliability section were reckless or intentional, they are not sufficiently material to defeat probable cause") (citing *Franks*, 438 U.S. at 155-56 (to support suppression of evidence, false statements must be necessary to finding of probable cause), *United States v. Calisto*, 838 F.2d 711, 715 (3d Cir. 1988) (warrant must be upheld if, after excising false statements, warrant was still based on probable cause), *United States v. Southard*, 700 F.2d 1, 9 (1st Cir. 1983) (assuming misstatements in search affidavit were intentional or reckless, they were not material to a finding of probable cause and therefore were not grounds for a *Franks* hearing)).

"Direct, first-hand evidence" in an affidavit is not necessary to establish probable cause, *United States v. Ritter*, 416 F.3d 256, 262 (3d Cir. 2005), and the Supreme Court has directed reviewing courts to look at the "totality of the circumstances" to determine whether an affidavit could support a magistrate's finding of probable cause. *Gates*, 462 U.S. at 239. Though the "veracity" and "reliability" of an anonymous informant are both relevant considerations, "these elements should [not] be understood as entirely separate and independent requirements to be rigidly exacted in every case," and "a deficiency in one [element] may be compensated for, in determining the overall reliability of a tip, by a strong showing as to the other, or by some other indicia of reliability." *United States v. Stearn*, 597 F.3d 540, 555 (3d Cir. 2010) (quoting *Gates*, 462 U.S. at 230, 233). Details corroborating an anonymous tip are relevant even if they appear to be "innocent activity." In "making a determination of probable cause the relevant inquiry is not whether particular conduct is 'innocent' or 'guilty,' but the degree of suspicion that attaches to particular types of noncriminal acts." *United States v. Nelson*, 284 F.3d 472, 479 (3d Cir. 2002) (quoting *Gates*, 462 U.S. at 245 n. 13 (affirming magistrate's finding of probable cause where anonymous source correctly predicted non-criminal details and future actions of defendant)).

The Court finds that, even without the challenged descriptions of PIN Inventory items, the allegations in the Second Warrant and Amended Second Warrant affidavits create a "substantial basis" for concluding by a "fair probability" that the PIN Inventory items contained evidence relevant to the PIN corruption and prostitution investigations. It follows that a *Franks* hearing is unnecessary, the Court defers to Magistrate Judge Hopkins's finding of probable cause, and Dr. Melgen's motion to suppress is denied.

### A. The Second Warrant was not issued because of false statements or misleading omissions.

Dr. Melgen again focuses mostly on the notebook, calling the description in the Second Warrant Affidavit both "the fruit[ ] of an illegal seizure" Mot. Dismiss 15 at 27, and a "false statement," *id.* at 31. As explained, the notebook was not illegally seized. And though Dr. Melgen points out numerous inaccuracies in Agent Sheehy's description of the notebook contents, he fails to make a "substantial showing" that Agent Sheehy falsified the description intentionally or recklessly. Dr. Melgen offers no sworn affidavits or witness statements supporting his claim, *Franks*, 438 U.S. at 171. He also does not challenge the truthfulness of the *affiant*: as the Government points out, Agent Sheehy had not yet read the notebook when he applied for the Second Warrant, and the affidavit only offers other agents' descriptions of the contents. Opp. Mot. Dismiss at 23; ECF No. 84-14 at 11-12.

In any event, the notebook description is not material to Magistrate Judge Hopkins's finding of probable cause. The Second Warrant affidavit contains (a) a description of prostitution allegations against Senator Menendez and Dr. Melgen from the anonymous sources "Peter Williams" and "M.C.," Sheehy Aff., ECF No. 84-14 Ex. 14 at 3-5; (b) allegations that Senator Menendez traveled on Dr. Melgen's private plane on six separate occasions in 2010, *id.* at 8; (c) allegations that Senator Menendez failed to report his 2010 trips on Dr. Melgen's plane on financial disclosure forms as required by the Ethics in Government Act, *id.* at 13; (d) allegations that Senator Menendez publicly stated that he had taken, paid for, and properly reported three trips on Dr. Melgen's plane, *id.*; and (e) allegations that Dr. Melgen told an FBI Legal Attaché that Senator Menendez had helped him obtain a port security contract in the Dominican Republic, *id.* at 9. The affidavit also contains corroborating information, including (a) confirmation of the existence and/or identities of several individuals listed as prostitutes by

"Peter Williams," (b) information about visa applications submitted by one of these individuals that listed Dr. Melgen as a contact, (c) allegations that Dr. Melgen sent wire transfers to this same individual, (d) evidence that this same individual drove a car registered to Dr. Melgen's wife, and (e) allegations that, based on IP address analysis, "Peter Williams" and "M.C." were different sources. *Id.* at 6-8.

The allegations regarding Senator Menendez's trips on Dr. Melgen's private plane, failure to report these trips, and assistance securing a government contract alone were sufficient to give Magistrate Judge Hopkins a "reasonable basis" for concluding that probable cause existed to search the folders, communications, and check relating to Senator Menendez for evidence relevant to the PIN corruption investigation. Dr. Melgen challenges whether Magistrate Judge Hopkins could also have relied on what he calls the "unsubstantiated rumors" of "Peter Williams" and "M.C." Mot. Dismiss 15 at 28. But although the affidavit does not corroborate any *criminal* allegations, it does corroborate several details, listed earlier, suggesting that the anonymous information was reliable. *See Gates*, 462 U.S. at 245 n. 13. Witness statements that they had *not* seen Dr. Melgen with prostitutes in the Dominican Republic, ECF No. 84-14 at 10-11, were not dispositive; Magistrate Judge Hopkins was able to consider these facts along with the facts supporting probable cause and reach a "reasonable" determination that probable cause existed even without the disputed notebook description. There is no need for a *Franks* hearing.

**B. The Amended Second Warrant was not issued because of false statements or misleading omissions.**

The Court upholds Magistrate Judge Hopkins's decision to grant the Amended Second Warrant. The Amended Second Warrant affidavit repeats the factual allegations discussed and contains a revised, more accurate description of the notebook. Dr. Melgen takes issue with the affidavit's description of a notebook page that includes the name "Dixi" next to a "flat fee,"

arguing that Agent Sheehy should have discovered that Dixi was the name of a Dominican waste collection agency, not a person, Mot. Dismiss 15 at 23, but he makes no showing that Agent Sheehy was "reckless" in failing to conduct this outside research. Regardless, the Amended Second Warrant affidavit establishes probable cause to search the PIN Inventory items even with the "Dixi" reference excised. A *Franks* hearing is not necessary.

**CONCLUSION**

Defendant Melgen does not establish that any items from the PIN Inventory were illegally searched or seized, that the Second and Amended Second Warrants were not supported by probable cause, or that a *Franks* hearing is necessary. Motion to Dismiss 15 is denied. An appropriate order follows.

DATE: September 28, 2015

William H. Walls
Senior United States District Court Judge