NOT FOR PUBLICATION

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| UNITED STATES OF AMERICA,<br><br>v.<br><br>ROBERT MENENDEZ and<br>SALOMON DR. MELGEN,<br><br>Defendants. | **OPINION**<br>Cr. No. 15-155 |

**Walls, Senior District Judge**

Defendants Robert Menendez and Salomon Melgen move to dismiss the indictment in this criminal case because of alleged prosecutorial misconduct and errors in the investigation and grand jury proceedings. After oral argument on September 17, 2015, the Court denies this motion.

## PROCEDURAL AND FACTUAL BACKGROUND

Defendants Robert Menendez, who has represented New Jersey in the United States Senate since 2006, and Salomon Melgen, an ophthalmologist who resides and practices his profession in Florida, were indicted in the District of New Jersey on charges of bribery and related crimes on April 1, 2015. Indictment, EFC No. 1. The procedural history of this case, starting with its time before the grand jury, has already been discussed in the Court's opinion on Defendants' Speech or Debate Clause-related motions, ECF No. 117, and its findings are incorporated here.

On July 20, 2015, Dr. Melgen and Senator Menendez filed fifteen separate motions to dismiss the indictment in whole or in part under Fed. R. Crim. Pr. 12(b)(3). ECF No. 48-61. *See* Def. Summary Chart of Mot. Dismiss, ECF No. 47, for descriptions of each motion to dismiss.

NOT FOR PUBLICATION

The Court deals with the remaining motions separately. In Motions to Dismiss 3 and 6,

Defendants argue that the indictment must be dismissed for a number of reasons related to

claimed prosecutorial misconduct and errors in the grand jury proceeding, several of which are

discussed in greater detail in Defendants' other motions. In Mot. Dismiss 3, Defendants argue

that the indictment must be dismissed because (a) the Government knowingly presented false

testimony to the grand jury, (b) the Government over-relied on hearsay evidence brought in

through its case agent, Special Agent Gregory Sheehy of the FBI, (c) the Government

erroneously led the grand jury to believe it could not call live witnesses, (d) Agent Sheehy

inaccurately summarized legal issues for the grand jury, and (e) the Government improperly

commented on the evidence. Mem. Supp. Mot. Dismiss 3, ECF No. 50-1. In Motion to Dismiss

6, Defendants argue that the indictment must be dismissed because of other Government

misconduct. Specifically, Defendants argue that the Government (a) did not have a proper basis

to begin the investigation that led to the indictment, (b) intimidated and coerced witnesses, (c)

violated Dr. Melgen's Fourth Amendment rights, as alleged in greater detail in Mot. Dismiss 15,

ECF No. 64, (d) exposed the grand jury to inflammatory, irrelevant testimony regarding sexual

relationships and gifts, (e) "abused" witnesses and solicited information that tainted the grand

jury, and (f) biased the grand jury by illegally leaking information about the investigation to the

media. Def. Mem. Supp. Mot. Dismiss. 6, ECF No. 53-1. In Mot. Dismiss 6, Defendants also

claim that the Government (g) committed "other misconduct" before the grand jury, including

presenting false testimony to the grand jury, as alleged in greater detail in Mot. Dismiss 3, failing

to screen grand jurors for bias, as alleged in greater detail in Mot. Dismiss 5, ECF No. 42,

erroneously instructing the grand jury about the Speech or Debate Clause, as alleged in greater

detail in Mot. Dismiss 2, ECF No. 49, and over-relying on hearsay testimony, as alleged in

NOT FOR PUBLICATION

greater detail in Mot. Dismiss 3. ECF No. 53-1. The Court addresses the duplicitous Fourth

Amendment argument at ECF No. 121, the grand jury bias argument at ECF No. 125, and the

Speech or Debate Clause argument at ECF No. 117, and its findings are incorporated here. The

Court addresses the remaining arguments in Mot. Dismiss 3 and 6 here.

## STANDARD OF REVIEW

Generally, "[a]n indictment returned by a legally constituted and unbiased grand jury... if

valid on its face, is enough to call for trial of the charge on the merits." *United States v. Vitillo*,

490 F.3d 314, 320 (3d Cir. 2007) (emphasis omitted) (quoting *Costello v. United States*, 350 U.S.

359, 362 (1956)). Federal Rule of Criminal Procedure 12(b)(3) allows a defendant to move to

dismiss an indictment for an error in the grand jury proceeding. Fed. R. Crim. P. 12(b)(3)(A)(v).

"As a general matter, a district court may not dismiss an indictment for errors in grand jury

proceedings unless such errors prejudiced the defendants." *Bank of Nova Scotia v. United States*,

487 U.S. 250, 254 (1988).

When a defendant demonstrates that an error has resulted from prosecutorial misconduct,

the court "must then determine whether any sanction, such as the dismissal of the indictment and

suppression of evidence... is appropriate." *United States v. Martino*, 825 F.2d 754, 759 (3d Cir.

1987). Dismissal is "appropriate only 'if it is established that the violation substantially

influenced the grand jury's decision to indict' or if there is 'grave doubt' that the decision to

indict was free from the substantial influence of such violations." *Bank of Nova Scotia*, 487 U.S.

at 256 (quoting *United States v. Mechanik*, 475 U.S. 66, 106 (1986) (O'Connor, J., concurring)).

The *Bank of Nova Scotia* Court carved out a small exception to the "harmless error" rule for

errors so extreme that the "structural protections of the grand jury have been so compromised as

to render the proceedings fundamentally unfair, allowing the presumption of prejudice," *United*

NOT FOR PUBLICATION

*States v. Soberon*, 929 F.3d 935, 940 (3d Cir. 1991) (quoting *Bank of Nova Scotia*, 487 U.S. at 257), but the Supreme Court has only found this "presumption of prejudice" in instances where grand jurors were selected in a racially or sexually discriminatory manner. *Id.* (citing *Vazquez v. Hillery*, 474 U.S. 254, 260-64 (1986) (racial discrimination); *Ballard v. United States*, 329 U.S. 187, 195 (1946) (gender discrimination)).

Federal Rule of Criminal Procedure 12(b) also allows a defendant to move to dismiss an indictment for "selective or vindictive prosecution." Fed. R. Crim. P. 12(b)(3)(A)(iv). Vindictive prosecution occurs when "the government penalizes a defendant for invoking legally protected rights." *United States v. Schoolcraft*, 879 F.2d 64, 68 (3d Cir. 1989). "The defendant bears the initial burden of proof in a vindictive prosecution claim and is required to establish the appearance of vindictiveness." *Id.* Prosecutorial vindictiveness does not exist "where the prosecutor's decision to prosecute is based on the usual determinative factors," *id.* at 67-68, and the defendant must make "a substantial threshold showing of an improper motivation on the prosecutor's part," *United States v. Mariani*, 121 F. Supp. 2d 803, 809 (M.D. Pa. 2000) (quoting *United States v. Difeaux*, 163 F.3d 725, 729 (2d Cir. 1998)). If the defendant makes this showing, the burden shifts to the prosecution to show that the decision to prosecute was justified. *Schoolcraft*, 879 F.3d at 68. Selective prosecution occurs when the decision to prosecute "is made on a discriminatory basis with an improper motive." *Id.* (citing *Government of Virgin Islands v. Harrigan*, 791 F.2d 34, 36 (3d Cir. 1986). The defendant bears the burden of proof on a selective prosecution claim and must (a) "provide evidence that persons similarly situated have not been prosecuted," and (b) "show that the decision to prosecute was made on the basis of an unjustifiable standard, such as race, religion, or some other arbitrary factor, or that the prosecution was intended to prevent his exercise of a fundamental right." *Id.*

4

NOT FOR PUBLICATION

Finally, Federal Rule of Criminal Procedure Rule 6(e) prohibits prosecutors from disclosing any "matter occurring before the grand jury." Fed. R. Crim. Pr. 6(e)(2)(B)(vi). A defendant may move for an evidentiary hearing or for dismissal of the indictment if he can establish a *prima facie* case that prosecutors leaked information to the media. To determine whether a defendant has demonstrated a *prima facie* violation of this "Grand Jury Secrecy Rule," the court examines, "among other factors: (1) whether the media reports disclose matters occurring before the grand jury; (2) whether the media report discloses the source as one prohibited under Rule 6(e); and (3) evidence presented by the government to rebut allegations of a violation of Rule 6(e)." *United States v. Rioux*, 97 F.3d 648, 662 (2d Cir. 1996). If a defendant demonstrates that prosecutors violated the Grand Jury Secrecy Rule, dismissal of the indictment is only appropriate if the defendant establishes that "there was a violation which 'substantially influenced the grand jury's decision to indict,' or if there is 'grave doubt' that the decision to indict was free from the substantial influence of such violations." *Id.* (quoting *Bank of Nova Scotia*, 487 U.S. at 256).

## DISCUSSION

### I.   Defendants do not demonstrate that the Government had an improper basis for the investigation.

Defendants first argue that the indictment must be dismissed because the Government began its initial investigation in response to "easily disprovable allegations about something that would hardly be a federal crime even had it been true." ECF No. 53-1 at 3. Defendants appear to be making either a vindictive or selective prosecution claim or a general allegation of prosecutorial misconduct. Regardless, Defendants fail to meet their burden.

NOT FOR PUBLICATION

Menendez and Melgen focus on the investigation's start with a tip from an anonymous informant, "Peter Williams," accusing them of engaging in sexual relations with underage prostitutes. *Id*. at 3-4. News outlets have since reported that "Peter Williams" was intentionally providing false information to the Government, and neither Melgen nor Menendez have been charged with misconduct related to these allegations. *Id.* at 4.

Essentially, Defendants argue that the Government should have realized that "Peter Williams" was not a credible source and should have ceased to investigate before the Government uncovered the information alleged in the indictment. Defendants baldly claim that the Government "refused to relent" in its investigation because it wanted to find "something, anything, with which to charge Senator Menendez." Defendants claim that the Government "was not investigating a crime, it was investigating a person." *Id*. at 3, 5.

This argument is without merit. Defendants offer no evidence that the Government had an improper motive to investigate Senator Menendez or Dr. Melgen, *Mariani*, 121 F. Supp. 2d at 809, nor do they show that people similarly situated to either of them have not been prosecuted for the same offenses, *Schoolcraft*, 879 F.3d at 68. And they rely entirely on information uncovered *after* the Government began its investigation to argue that the falsity of "Peter Williams'" accusation was too obvious for the Government to reasonably investigate. ECF No. 53-1 at 3, 5. In any event, Defendants do not demonstrate any errors in the grand jury proceeding: a grand jury investigation "may be triggered by tips, rumors, evidence proffered by the prosecutor, or the personal knowledge of the grand jurors." *United States v. Calandra*, 414 U.S. 338, 344 (1974). It is irrelevant whether the allegation of that defendants engaged in sexual relations with underage prostitutes – something that would certainly "be a federal crime… had it been true" – resulted in criminal charges.

NOT FOR PUBLICATION

## II.    Defendants do not demonstrate that the Government presented the testimony of coerced witnesses.

Defendants also claim that the indictment must be dismissed because the Government intimidated witnesses throughout its investigation. Specifically, Defendants claim that the Government (a) threatened to subpoena Senator Menendez's sister if she did not speak with FBI agents and then issued her a grand jury subpoena after she did, (b) interviewed Menendez's ex-wife "while she was still in her pajamas" and misinstructed her about the application of spousal privilege, and (c) harassed, threatened, illegally detained, and bribed three witnesses in the Dominican Republic.

Defendants cannot challenge the alleged violation of a witness's rights on the witness's behalf. *See Buckley v. Fitzsimmons*, 20 F.3d 789, 794-95 (7th Cir. 1994) ("Overbearing tactics may violate the right of the person being interrogated to be free from coercion. [Defendant] cannot complain that the prosecutors may have twisted [witness's] arm, any more than he can collect damages because they failed to read [witness] *Miranda* warnings or searched [witness's] house without a warrant.") (internal citations omitted). But defendants can challenge, on due process grounds, the introduction of any coerced witnesses' statements against at trial. *See United States v. Gonzales*, 164 F.3d 1285, 1289 (10th Cir. 1999).

With regard to Senator Menendez's sister, Defendants have not demonstrated any prosecutorial misconduct. Federal Rule of Criminal Procedure 17(a) authorizes the Government to issue a subpoena to compel the attendance of a witness at grand jury proceedings. Though the Rule does *not* allow the Government to subpoena a witness for an *ex parte* interview, *see United States v. LaFuente*, 54 F.3d 457, 461 (8th Cir. 1995), there is no indication that the Government threatened to do that here.

NOT FOR PUBLICATION

There was also no misconduct with regard to Jane Jacobsen, Senator Menendez's ex-wife. Agents interviewed Jacobson at "8:00 in the morning or 9:00." ECF No. 83 at 30 (quoting Ex. 21, Jacobson Tr. (06/11/14) at 27). As the Government points out, Federal Rule of Criminal Procedure 41 authorizes officers to begin executing a search warrant at 6:00 am without showing exceptional circumstances. Fed. R. Crim. Pr. 41(a)(2)(B). In comparison, 8:00 or 9:00 am is not an unreasonable time for a voluntary interview, even if Jacobsen was still wearing pajamas when agents arrived at her house. Jacobsen's FBI Form 302 also indicates that Jacobsen was not given erroneous instructions about spousal privilege. *See* ECF No. 83 at 30-31 ("Jacobsen was told that interviewing agents wanted Jacobsen to provide information based only on what she (Jacobsen) personally experienced, but that she should not provide the interviewing agents with the contents of any private conversations between herself and Menendez during the time of their marriage.") (quoting Jacobsen 05/15/2014 FBI 302 at 1). Finally, Defendants' claim that agents should not have interviewed Jacobsen because she "could not have had relevant information in the case" is completely unsupported by any fact. Def. Rep. Mem. Supp. Mot. Dismiss 6, ECF No. 96.

More troubling are Defendants' allegations about the interrogation of Dominican witnesses Soraya Velma Sanchez Colon, Rosa de Jesus Acosta, and Miriam Rivera. Acosta and Rivera claim they were detained by Dominican police officers and interrogated by FBI agents at a Dominican police station, and that they were threatened with arrest if they didn't tell the agents "what they wanted to be told." ECF No. 53-1 at 7 (quoting Ex. B, Acosta and Rivera Affidavit and Translation). Sanchez Colon claims that she was interviewed twice and that the FBI imaged her computer, cell phone, and tablet, subjected her to a polygraph test, offered her a bribe to give incriminating answers, threatened to cancel her U.S. visa if she did not "tell them what they

8

NOT FOR PUBLICATION

wanted to hear," and asked irrelevant questions about whether she "used marijuana" or "was a lesbian." ECF No. 53-1 Ex. C, Sanchez Colon Affidavit and Translation.

Sanchez Colon, Acosta, and Rivera could certainly seek to assert their own rights in this matter. And Senator Menendez and Dr. Melgen could argue that these interviews were coerced and that the introduction of any evidence resulting from them at trial would violate their own due process rights. *Gonzales*, 164 F.3d at 1289. But the Government asserts that none of these witnesses will be called at trial, ECF No. 83 at 32, and Defendants make no showing that any of the allegedly coerced statements were introduced in the grand jury inquiry or had anything at all to do with any charges in the indictment. For these reasons, Defendants have not established that they suffered any prejudice as the result of these interviews.

### III.   Defendants do not demonstrate that the Government knowingly provided false testimony to the grand jury.

Defendants also argue that the indictment must be dismissed because the Government knowingly introduced "false and inaccurate" testimony from Agent Sheehy to the grand jury about meetings between Senator Menendez and officials at the Department of Health and Human Services ("HHS") and Centers for Medicare and Medicaid Services ("CMS"). ECF No. 50-1 at 5.

In the leading case on this subject, *United States v. Basurto*, the Ninth Circuit held that a defendant's Fifth Amendment rights are violated when he must stand trial on an indictment based partially on perjured testimony when (a) the Government knows the indictment is based partially on perjured testimony, (b) the perjured testimony is material, and (c) jeopardy has not attached. 497 F.2d 781, 785 (9th Cir. 1974); *see also United States v. Rodriguez*, 88 F. App'x 548, 549 (3d Cir. 2004) (citing *Basurto* without explicitly adopting standard and holding that

9

NOT FOR PUBLICATION

challenged testimony was not perjurious); *United States v. Ciambrone*, 601 F.2d 616, 623 (2d

Cir. 1979) (citing *Basurto* for holding that "the prosecutor . . . may not obtain an indictment on

the basis of evidence known to him to be perjurious"); *United States v. Liciardello*, 2015 WL

13333964, at *1-2 (E.D. Pa. March 20, 2015) (citing and applying *Basurto* in refusal to dismiss

indictment because perjurious testimony was not material).

"[T]he presentation of . . . allegedly perjured testimony to the grand jury does not fall

into the narrow category of cases in which dismissal of charges without a showing of prejudice is

warranted." *Soberon*, 929 F.3d at 940. Defendants must demonstrate (a) that Agent Sheehy

provided false testimony to the grand jury, (b) that the Government knew this testimony was

false, and (c) that this testimony was material to the grand jury's decision to indict and creates

"grave doubt" that the decision to indict was free from the influence of the testimony. *Bank of*

*Nova Scotia*, 487 U.S. at 256.

Agent Sheehy testified about statements made by CMS Acting Administrator Marilyn

Tavenner, HHS Secretary Kathleen Sebelius, and HHS official Jonathan Blum regarding

Defendant Menendez's meetings with CMS and HHS. Defendants claim that Agent Sheehy

mischaracterized these statements and misrepresented the nature of the meetings. Specifically,

Defendants challenge the following testimony by Agent Sheehy:

- "Did Marilyn Tavenner confirm that during this meeting, Dr. Melgen [sic] was advocating on behalf of Dr. Melgen and his Medicare dispute?" "Yes." ECF No. 50-1 at 9 (quoting Sheehy Tr. (05/07/14) at 58).

- "And did Jonathan Blum confirm during the interview that the purpose of this call [with Blum in June 2009] that Senator Menendez initiated, that his office initiated, was to advocate on behalf of Dr. Melgen?" "Yes." *Id.* at 9 n.4 (quoting Sheehy Tr. (05/07/14) at 57-58).

- "Senator Menendez made the arguments on behalf of Dr. Melgen, similar arguments that had previously been made to Jonathan Blum and Marilyn Tavenner." *Id.* at 15 (quoting Sheehy Tr. (05/07/14) at 65).

NOT FOR PUBLICATION

- "Was it also clear that the meeting [with HHS Secretary Kathleen Sebelius] was about Dr. Melgen?" "Perfectly clear. . . . It was all about Dr. Melgen, the meeting." *Id.* at 15 (quoting Sheehy Tr. (05/07/14) at 66).

- "[D]id your investigation reveal that Senator Menendez met with HHS Secretary Sebelius and Senator Reid about Dr. Melgen's Medicare billing dispute?" "Yes." *Id.* at 16 (quoting Sheehy Tr. (04/01/15) at 23).

- "And did your investigation reveal that during that meeting Senator Menendez advocated on behalf of Dr. Melgen's position in his Medicare billing dispute focusing on Dr. Melgen's specific case and asserting that Dr. Melgen was being treated unfairly?" "Yes." *Id.* at 16 (quoting Sheehy Tr. (04/01/15) at 23).[1]

Defendants claim that statements in Tavenner, Sebelius, and Blum's FBI Form 302s contradict this testimony and demonstrate that Menendez's communications were about Medicare policy, not Dr. Melgen's $8.9 million Medicare billing dispute. *See* ECF No. 50-1 at 7 (regarding Senator Menendez's call with Blum before the meeting with Acting Administrator Tavenner, "Blum could not recall whether anyone mentioned a specific doctor's name.... Menendez was focused on the policy.") (quoting ECF No. 83 Ex. 9, Blum 2/13/13 FBI 302 at 3, 4); *id.* at 10 ("Tavenner did not recall Menenzez [sic] specifically mentioning Melgen's name") (quoting ECF No. 83 Ex. 8, Tavenner 2/13/13 FBI 302 at 3); *id.* at 16-17 (regarding the meeting with Secretary Sebelius, the "focus of the conversation was on the policy, which Reid and Menendez said was vague. Menendez and Reid said that they (Menendez and Reid) were not there to talk about a particular case; they were there to talk about policy") (quoting Blum 2/13/13 FBI 302 at 5); *id.* at 17 (Sebelius "could not recall whether Melgen's name specifically came up in the meeting" and "could not recall what Menendez specifically wanted") (quoting ECF No. 83 Ex. 7, Sebelius 4/15/13 FBI 302 at 5).

---

[1] Defendants acknowledge that a seventh challenged statement by Agent Sheehy, that Acting Administrator Tavenner told Menendez CMS "*wouldn't* allow the appeal process to go forward," (quoting Sheehy Tr. (05/07/14) at 59) (emphasis added), was actually a typographical error in the transcript. ECF No. 93 at 11 n. 4.

NOT FOR PUBLICATION

But Defendants ignore contemporaneous emails and memoranda between Senator Menendez, his staffers, Dr. Melgen's associates, and HHS officials, all presented to the grand jury and cited in the indictment, that support Agent Sheehy's characterization of the meetings. *See* Indictment, ECF No. 1 ¶¶ 166-68, 70-71 (emails and memoranda regarding call with Blum, including "talking points" memorandum mentioning Melgen by name and asking that CMS "not punish him retroactively"); *id.* ¶¶ 201-203, 205-208 (emails and memoranda regarding meeting with Acting Administrator Tavenner, including "talking points" memorandum prepared by Menendez staffer and reviewed by lobbyist representing Melgen "talking about payments made in 2007-2008" and arguing that CMS multi-dose "policies didn't exist before and don't apply during the 2007-2008 period. Therefore they don't have any bearing on the issue at hand."); *id.* ¶¶ 211-12, 214, 217-220 (emails regarding meeting with Secretary Sebelius, including email from Senator Menendez about trying not to "raise expectation" of Melgen before meeting and email request for "further briefing" from Melgen lobbyist after the meeting).

More importantly, Defendants also omit sections of the same 302s they cite that support Agent Sheehy's characterizations. *See* ECF No. 83 at 18 (regarding conversation with Blum, "Blum knew that the call [with Menendez] would relate to a doctor in Florida, but Blum was not sure whether he (Blum) knew Melgen's name at this point. . . . Blum knew that there was an approximately $9 million overpayment involving this doctor and the drug Lucentis. . . . Menendez talked about policy in general, but it focused on one doctor) (quoting Blum 2/13/13 FBI 302 at 2, 3-4); *id.* (regarding conversation with Acting Administrator Tavenner, "Tavenner first learned about Melgen when Senator Robert Menendez wanted to discuss the issue") (quoting Tavenner, 2/13/13 FBI 302 at 2); *id.* at 17 (regarding conversation with Secretary Sebelius, "Menendez was advocating on behalf of Melgen and used his (Melgen's) situation as

NOT FOR PUBLICATION

an example. Sebelius did not recall Menendez using any other examples other than Melgen's

example.") (quoting Sebelius 4/15/13 FBI 302 at 4).

Given the contemporaneous emails presented to the grand jury and additional statements

in the Form 302s cited by the Government, the Court finds that Agent Sheehy did not give "false

or inaccurate testimony" regarding Menendez's meetings with CMS and HHS officials.

Defendants also challenge testimony by Agent Sheehy regarding former Senator Tom

Harkin's follow-up conversation with CMS after a meeting with Defendant Menendez. ECF No.

50-1 at 19-20 n. 14. Defendants claim Sheehy's statement that Senator Harkin "did not advocate

on behalf of Dr. Melgen" when discussing multi-dosing with CMS, "could have misled the jury

into believing that Senator Harkin had refused a request from Dr. Melgen to assist him." *Id.*

(quoting Sheehy Tr. (05/07/14) at 49). Even if this argument were true, Defendants do not

explain how Senator Harkin's refusal or non-refusal to assist Dr. Melgen is material to any of the

charges in the indictment. Because the statement is not material, it does not provide a basis to

dismiss the indictment. *Basurto*, 497 F.2d at 785.

### IV.   Defendants do not demonstrate that the Government over-relied on hearsay evidence.

Defendants also argue that the indictment must be dismissed because "the only

meaningful testimony the grand jury heard about [Senator Menendez's alleged communications

with Executive Branch officials] was hearsay that came in through a case agent, who had no

first-hand knowledge, and who for the most part was simply agreeing with prosecutors who were

really the ones testifying through their leading questions." ECF No. 50-1 at 20-21.

Generally, indictments may not be challenged "on the ground that there was inadequate

or incompetent evidence before a grand jury." *United States v. Williams*, 504 U.S. 36, 54 (1992)

NOT FOR PUBLICATION

(quoting *Costello v. United States*, 350 U.S. 359, 363-64 (1956)). "There is no prohibition on the use of hearsay by a grand jury . . . unless (1) non-hearsay is readily available; and unless (2) the grand jury was also misled into believing it was hearing direct testimony rather than hearsay; and unless (3) there is also a high probability that had the jury heard the eye-witness it would not have indicted the defendant." *United States v. Ismaili*, 828 F.2d 153, 164 (3d Cir. 1987) (citing *Costello*, 350 U.S. 359, *United States v. Wander*, 601 F.2d 1251, 1260 (3d Cir. 1979)). Nor is there a prohibition on the use of leading questions in the grand jury. *See United States v. Samuel*, 1998 WL 401705, at *2 (E.D. Pa. July 1, 1998) (citing *United States v. Pantone*, 634 F.2d 716, 722 (3d Cir. 1980)).

Here there is no indication that the grand jury was misled into believing that Agent Sheehy's testimony was "direct testimony rather than hearsay," so there is no error. *Ismaili*, 828 F.2d at 153; *see also United States v. Steele*, 685 F.2d 793, 806 (3d Cir. 1983) (affirming refusal to dismiss indictment where "government did not misrepresent the hearsay testimony as a more reliable form of evidence"); *United States v. Breslin*, 916 F. Supp. 438, 442 (E.D. Pa. 1996) (citing *Ismaili* and finding that use of hearsay evidence did not warrant dismissal because "grand jury was not misled here" about nature of hearsay evidence).

Additionally, unlike several cases offered by Defendants, *see, e.g.*, *United States v. Samango*, 607 F.2d 877 (9th Cir. 1979) (grand jurors returned indictment after reading transcript of previous grand jury proceeding and hearing live, hearsay testimony from single witness), the grand jury in this case received more than just hearsay testimony. In addition to Agent Sheehy, the Government called 35 other witnesses, ECF No. 83 at 23, even if none of them were "Executive Branch official[s] who attended the meetings" in question. ECF No. 93 at 5 n. 2. More importantly, to repeat, the Government introduced emails and memoranda written by

NOT FOR PUBLICATION

Menendez, Melgen, and their associates that provided additional information about the nature and content of Menendez's Executive Branch discussions. ECF No. 83 at 27-28. Because of this evidence and the foundation of Agent Sheehy's statements, there is not a "high probability" that the grand jury would have refused to indict if given direct testimony. *Ismaili*, 828 F.2d at 164.

### V.   Defendants do not demonstrate that the Government erroneously led the grand jury to believe it could not call live witnesses.

Defendants also argue that the indictment must be dismissed because the Government led the grand jury to believe it could not call live witnesses. Defendants point to a single incident in which, after the Government read back the prior testimony of several witnesses, a grand juror asked, "Can I ask you a question? Eventually are these people going to come here?" the Government responded, "No," and the grand juror said, "Never? Okay." ECF No. 50-1 at 22 (quoting Sheehy Tr. (02/26/14) at 144).

"[I]t is axiomatic that a grand jury has the right to call live witnesses." *Breslin*, 916 F. Supp. at 444. Mistakenly instructing jurors that they cannot call witnesses could interfere with the jury's independence. *See id.* (finding error where prosecutor repeatedly told grand jurors that witnesses were "not really available on short notice," "didn't testify live in front of you because we read everything to you," and that grand jury "didn't get a lot of live witnesses… since they had already testified.").

Here it is possible that, based on the single question and answer cited by Defendants, grand jurors developed the impression that they were not able to call live witnesses. But it is at least as likely that they did not. All that is evident from the grand juror's question and follow-up "Okay" is that one grand juror wanted to know if the Government planned to call several specific witnesses into the grand jury. All that is evident from the Government's answer is that the

NOT FOR PUBLICATION

Government did not plan to call the witnesses. There is no indication that the questioning grand juror either (a) *wanted* to call these, or any, live witnesses or (b) wanted to know if he *could* call live witnesses. There is also no indication that, after the Government's answer, any of the grand jurors believed they could *not* call live witnesses.

### VI.   Defendants do not demonstrate that the Government's characterization of the Medicare billing dispute prejudiced the grand jury.

Defendants also claim that the Government and Agent Sheehy inaccurately summarized "important legal issues" relating to Dr. Melgen's practice of multi-dosing Lucentis. They argue that the Government should have called witnesses from HHS, presented CMS and Food and Drug Administration ("FDA") guidance, and cited "decisions from U.S. Courts" to better explain CMS's multi-dosing policy and whether Melgen's practices were clearly in violation. ECF No. 50-1 at 26.

The Court finds that the Government did not inaccurately summarize this issue. The Government *did* cite a federal court decision, *Vitreo Retinal Consultants of the Palm Beaches, P.A. v. U.S. Dep't of Health and Human Services*, 2015 WL 1608458 (S.D. Fl. Apr. 10, 2015), where the District Court rejected a motion to reconsider its grant of summary judgment against Melgen and discussed the merits of Melgen's claim. ECF No. 83 at 34-35. That Melgen has appealed the decision to the Eleventh Circuit does not change its validity. Through hearsay testimony from Agent Sheehy, the Government also *did* present the opinions of witnesses from HHS, including Secretary Sebelius herself. *Id.* at 36 ("this rule was a 'slam dunk'; why should Medicare pay for the same vial of medication more than once and why would Medicare want to risk patient safety by having doctors share the vials between patients") (quoting Sebelius 4/15/13 FBI 302 at 6).

16

NOT FOR PUBLICATION

Regardless, the merits of Dr. Melgen's billing dispute are immaterial to this case. It is

relevant whether Senator Menendez advocated on behalf of Dr. Melgen in his dispute, not

whether Melgen's position was "legitimate." ECF No. 93 at 13. Defendants are charged in the

District of New Jersey with bribery and related offenses, not with multi-dosing or with making

bad legal arguments. Defendants provide no evidence that by "erroneously characterizing the

merits of Dr. Melgen's litigation position" – to the extent any mischaracterization occurred,

which the Court finds it did not – the Government actually "prejudiced the grand jury against Dr.

Melgen, to both Defendants' detriment." *Id*. at 14.

**VII.   Defendants demonstrate that the Government introduced some**
**inappropriately inflammatory testimony.**

Defendants also object to the questioning of several witnesses about their sexual

relationships with Defendants Menendez and Melgen and about the gifts received by Menendez,

arguing that the Government was "laser-focused on salacious topics, as opposed to presenting

relevant testimony germane to the allegations of official misconduct in the Indictment." ECF No.

53-1 at 10; ECF No. 50-1 at 33-34.

"[E]vidence, to be relevant to an inquiry, need not conclusively prove the ultimate fact in

issue, but need only have 'any tendency to make the existence of any fact that is of consequence

to the determination of the action more probable or less probable than it would be without the

evidence.'" *New Jersey v. T.L.O.*, 469 U.S. 325, 345 (1985) (quoting Fed. Rule. Evid. 401). *Cf*

*United States v. Gagliardi*, 285 F. App'x 11, 17 (3d Cir. 2008) (finding grand jury testimony

regarding relationship between co-conspirators sufficiently relevant where it was "arguably

connected to the offenses the government sought to charge."). "Many of the rules and restrictions

that apply at a trial do not apply in grand jury proceedings. This is especially true of evidentiary

NOT FOR PUBLICATION

restrictions." *United States v. R. Enterprises*, 498 U.S. 292, 298 (1991). "A grand jury 'may compel the production of evidence or the testimony of witnesses as it considers appropriate.'" *Id.* (quoting *Calandra,* 414 U.S. at 343). At trial, where the Federal Rules of Evidence do apply, a court may exclude inflammatory evidence even if it is relevant, but only "if its probative value is substantially outweighed by a danger of . . . unfair prejudice." F.R.E. 403. "Rule 403 does not provide a shield for defendants who engage in outrageous acts, permitting only the crimes of Caspar Milquetoasts to be described fully to a jury. It does not generally require the government to sanitize its case, to deflate its witnesses' testimony, or to tell its story in a monotone." *United States v. Cross*, 308 F.3d 308, 325 (3d Cir. 2002) (quoting *United States v. Gartmon*, 146 F.3d 1015, 1021 (D.C. Cir. 1998)).

Defendants object to (a) questions posed to three girlfriends of Dr. Melgen about their sexual relationships with Melgen and whether Melgen's wife was aware of the relationships, ECF No. 53-1 at 11-12, (b) questions posed to a Menendez staffer about whether she had a sexual relationship with Menendez, *id*. at 12-13, and (c) questions posed to witnesses about the luxurious nature of Dr. Melgen's private plane and home in the Dominican Republic. *Id*. at 13; ECF No. 50-1 at 33-35.

The Government's questions about Dr. Melgen's plane and Casa de Campo home were relevant because they involved the "things of value" that Senator Menendez allegedly received in exchange for his official acts. Despite Defendants' claim that the Government should have focused only on "allegations of official misconduct" in the grand jury, ECF No. 53-1 at 10, the *quid* is as essential to the bribery charges as the *quo*. Questions to the pilot of Dr. Melgen's plane about the "expensive alcohol" and passengers on the plane, ECF No. 53-1 at 13, and questions to Casa de Campo guests about the golf courses, polo fields, spa, and other amenities at the resort,

NOT FOR PUBLICATION

ECF No. 50-1 at 34 n. 19 (citing Sheehy Tr. (3/11/15) at 6-7), all helped establish the potential

"value" of the things Melgen allegedly gave to Senator Menendez. *See United States v. Williams*,

705 F.2d 603, 622-23 (2d Cir. 1983) (approving instructions in gratuities case relating to the

"value that the defendants subjectively attached to the items received").

Regarding the questions about witnesses' relationships with the Defendants, the Court

notes as an initial matter that evidence of a sexual or extramarital relationship is not necessarily

prejudicial. Defendants have cited no cases supporting this proposition or demonstrating that, in

New Jersey in 2015, such evidence is likely to bias grand jurors against a defendant. But

assuming that such evidence could be prejudicial, *see*, e.g., *United States v. Bistrup*, 449 F.3d

873, 883 (8th Cir. 2006) (affirming district court's refusal to allow defendant to introduce

evidence of co-conspirator husband's affair); *United States v. Cass*, 127 F.3d 1218, 1225 (10th

Cir. 1997) (finding that testimony of defendant's extramarital affairs was prejudicial, but that

admission of testimony, followed by limiting instructions, was harmless error), the Court finds

that only the questions about Dr. Melgen's wife were "substantially" more prejudicial than

relevant.

The questions to Maria Almeida, a staffer for Senator Menendez, about the nature of her

relationship with Menendez were relevant because Ms. Almeida allegedly traveled with

Menendez on Dr. Melgen's jet and stayed with Menendez at Melgen's estate. ECF No. 83 at 10-

11. The nature of Ms. Almeida's relationship with Senator Menendez helps establish the "value"

of the flights and stays to Senator Menendez; presumably, these "things of value" would be more

valuable to the Senator if he were accompanied by a romantic partner than by a "valued

employee," Almeida Tr. (7/02/14) at 69:12-13, just as they would be more valuable if he were

accompanied by a "valued employee" than by a stranger. This does not mean, of course, that

NOT FOR PUBLICATION

repeated questions about whether Ms. Almeida "had a romantic relationship" with Menendez, "ever had sex with Senator Menendez," or engaged in "anything romantic" while in the Dominican Republic with him, *id.* at 68:24-69:13, did not have the potential to prejudice the jury. At trial, these repeated questions might violate Rule 403. But Defendants have not shown that they prejudiced the grand jury such that they "substantially influenced" the grand jury's decision to indict. *Bank of Nova Scotia*, 487 U.S. at 254.

The challenged questions about witnesses' romantic and sexual relationships with Dr. Melgen are similarly relevant because these witnesses all benefitted from Senator Menendez's "official acts," as alleged in the indictment. According to the Government, each of the challenged witnesses received Senator Menendez's assistance obtaining a U.S. visa. ECF No. 83 at 10. These questions help establish Dr. Melgen's motive for offering Menendez things of value in exchange for his assistance; presumably, Melgen would not ask Senator Menendez to help a stranger obtain a visa.

But the Government has not explained the relevance of questions about whether Dr. Melgen's wife was aware of his relationships with the witnesses. ECF No. 53-1 at 12 (citing various points in grand jury transcript). At oral argument, the Government suggested that these questions help establish Senator Menendez's motive for "with[holding] information from his Senate staff to conceal the extent of his official action on Melgen's behalf," as charged in the indictment. ECF No. 1 ¶ 18. This is unpersuasive. These questions might explain why Menendez would conceal his actions from Dr. Melgen's wife, but not why he would conceal his actions from his staff. The Senator's actions, as alleged in the indictment, were equally corrupt – and equally worthy of being concealed – whether Dr. Melgen's wife knew about the visa applicants or not. The Court finds that these questions had no probative value and were potentially

NOT FOR PUBLICATION

prejudicial. As the Court will discuss later, these questions alone did not 'substantially influence[
] the grand jury's decision to indict.'" *Breslin*, 916 F. Supp. at 446 (quoting *Samango*, 607 F.3d
at 884).

**VIII.    Defendants do not demonstrate that the Government "abused" Menendez's
staff members or made comments about the evidence that tainted the grand
jury.**

Defendants accuse the Government of several other types of "abuse" of witnesses: asking
Senator Menendez's staff members "baseless, improper, and irrelevant questions," ECF No. 53-1
at 14, trying to "force" them to change their answers on the stand, *id.*, and injecting improper
characterizations of Defendants' conduct into their questions. *Id.* at 15-16. Relatedly, Defendants
claim that the Government made "inflammatory speeches" to the grand jury, instead of simply
presenting substantive facts. ECF No. 50-1 at 32-33.

Though the Government may not "make statements or argue in a manner calculated to
inflame the grand jury unfairly against the accused," *United States v. Hogan*, 712 F.2d 757, 759
(1983), none of the statements or questions challenged by Defendants rise to the level of
prosecutorial misconduct. *Compare Hogan,* 712 F.2d at 760 (finding prosecutorial misconduct
where prosecutor told grand jurors defendant was a "hoodlum" who should be prosecuted "as a
matter of equity," and where prosecutor acted as an unsworn witness to suggest, with no
evidentiary basis, that defendant had committed unrelated, uncharged crimes referenced in a
newspaper article); *United States v. Serubo*, 604 F.2d 807, 814-16 (3d Cir. 1979) (finding
prosecutorial misconduct where prosecutor, with no evidentiary basis, repeatedly asked witness
whether defendants were members of the Philadelphia mafia and whether they had engaged in
loan sharking, an unrelated, uncharged offense); *Breslin*, 916 F. Supp. at 443-44 (finding

21

NOT FOR PUBLICATION

prosecutorial misconduct when, among other actions, prosecutor repeatedly "inserted his opinions regarding the strength and weight of the evidence," told witnesses it would not be useful to read superseding indictment, and recounted complete story of the case, including characterization of defendant's action as "an outright lie," before ever presenting grand jury with evidence); *with United States v. Gagliardi*, 285 F. App'x 11, 17 (3d Cir. 2008) (no misconduct where prosecutor elicited testimony regarding criminal actions not charged in the indictment because testimony "was founded on [witness's] personal knowledge and "was arguably connected to the offenses the government sought to charge"); *United States v. Fisher*, 692 F. Supp. 495, 503 (E.D. Pa. 1988) (no misconduct where prosecutor told grand jury defendant was involved in kickback scheme "from day one" where statement was arguably true).

Here all of the questions and statements Defendants challenge were "arguably connected to the offenses" charged in the indictment. *Fisher*, 692 F. Supp. at 503. The Court has discussed one supposed example of "baseless, improper, and irrelevant" questioning: the questions posed to Maria Almeida about the nature of her relationship with Senator Menendez. Defendants also challenge questions posed to Ms. Jacobsen and Ms. Almeida about Menendez's "ethics" as "totally irrelevant." ECF No. 53-1 at 15-16. But in a prosecution for bribery and fraud – particularly one where Defendant Menendez is accused of concealing corrupt acts from his own staffers, ECF No. 1 ¶ 18, and failing to disclose gifts received from Melgen in financial disclosure forms submitted to the Senate, *id*. ¶¶ 266-72 – questions about ethics were certainly relevant.

The only attempt by the Government to "force" a witness to change her answers that Defendants claim is a series of follow-up questions about staffer Patricia Enright's basis for stating that Menendez "has the utmost ethics and integrity and trustworthiness." ECF No. 53-1 at

NOT FOR PUBLICATION

14-15 (quoting Enright Tr. (07/02/2014) at 13:19-15:6). Some of these follow-up questions were leading, *see id.* ("So you don't have an opinion one way or the other on Senator Menendez's ethics and integrity with respect to his receipt of gifts, or with respect to whether he has improper or corrupt relationships with anyone?"), as were the questions Defendants claim improperly characterized their actions, *see id.* at 15 ("There were allegations that Senator Menendez used his senate office to advocate on behalf of Dr. Melgen and his financial interests, correct?") (quoting Enright Tr. (07/02/2014) at 53:1-4); and that Defendants claim simply served to "inflame" the jurors, *see* ECF No. 50-1 (Q. "So on the merits here, although Dr. Melgen has had many bites at the apple, he has lost every step of the way, correct?" A. "Correct." Q. "But throughout his efforts, he has had one true champion, correct?" A. "Yes." Q. "Who has that champion been?" A. "Senator Robert Menendez.") (quoting Sheehy Tr. (05/07/14) at 24-25).

But the Government is allowed to ask leading questions in the grand jury. *Pantone*, 634 F.2d at 722; *Samuel*, 1998 WL 401705, at *2. And all of the factual allegations and characterizations made by the Government in these questions were already supported – arguably – by evidence or witness testimony. *Cf. Breslin*, 916 F. Supp. at 443-44. The Government did not introduce any unsupported facts or offer unsupported characterizations. The Court finds that none of these challenged statements amount to prosecutorial misconduct.

NOT FOR PUBLICATION

### IX.   Defendants do not demonstrate that the Government leaked grand jury information to the press.

Defendants finally contend that Government has repeatedly leaked information about the investigation and grand jury proceedings to the press in violation of Federal Rule of Criminal Procedure 6(e). ECF No. 53-1 at 17-21, 27-30.

To determine whether Defendants allege a *prima facie* violation of the Grand Jury Secrecy Rule, the Court looks at "(1) whether the media reports disclose matters occurring before the grand jury; (2) whether the media report discloses the source as one prohibited under Rule 6(e); and (3) evidence presented by the government to rebut allegations of a violation of Rule 6(e)." *United States v. Rioux*, 97 F.3d 648, 662 (2d Cir. 1996).

Importantly, courts have differentiated between matters occurring in the grand jury proceeding itself, which are secret, and matters occurring during independent related investigations, which are not. Rule 6(e) "is designed to protect from enclosure only the essence of what takes place in the grand jury room." *In re Grand Jury Investigation*, 630 F.2d 996, 1000 (3d Cir. 1980); *see also In re Sealed Case No. 99-3091*, 192 F.3d 995, 1002 (D.C. Cir. 1999) ("It is therefore necessary to differentiate between statements by a prosecutor's office with respect to its own investigation, and statements by a prosecutor's office with respect to a *grand jury's* investigation") (citing *Rioux,* 97 F.3d at 662 ("Most of the media surrounding the Rioux investigation ... discussed federal 'investigations,' without actually discussing matters before the grand jury")); *United States v. DiBona*, 601 F. Supp. 1162, 1165 (E.D. Pa. 1984) (government disclosure of materials obtained by grand jury subpoena did not violate Rule 6(e), even though these records were "not developed independently of the grand jury process, but were the end

NOT FOR PUBLICATION

result of the specific investigative tools the grand jury had at its disposal," because these materials did "not reveal the inner workings of the grand jury process").

Defendants point to several supposed leaks by the Government: they cite February and March 2013 articles about the Government's investigation that attributed information to "two FBI sources" and "an FBI agent in a supervisory position on the East Coast." ECF No. 53-1 at 18. Defendants undermine their claim that the Government leaked this information by stating, in a separate motion, that these articles "were later proven to be completely fabricated." ECF No. 83 at 50-51 (quoting Def. Mem. Supp. Mot. Dismiss 5, ECF No. 52-1 at 6). Defendants also cite the 2014 publication of documents from Senator Menendez's office by an unknown source, ECF No. 53-1 at 18, August 2014 questions from a reporter to Menendez's defense counsel reflecting knowledge of the grand jury proceedings, *id*. at 19, and the widespread reporting in March 2015, based on information from "people briefed on the case" and "law enforcement officials," that the Government had already decided to bring charges ahead of Defendants' attempt to persuade the the Deputy Attorney General to close the investigation. *Id*. at 19-21.

Of these supposed leaks, only the August 2014 reporter's questions about the grand jury and March 2015 reports about the Government's decision to bring charges arguably involve "the essence of what takes place in the grand jury room." *In re Grand Jury Investigation*, 630 F.3d at 1000. The rest involve information relating to Government investigations, not the "inner workings of the grand jury process." *DiBona*, 601 F. Supp. at 1165. Although, as the Court will discuss, these leaks could still have prejudiced grand jurors, Defendants have not shown that the Government violated Rule 6(e).

Defendants also fail to establish a *prima facie* Rule 6(e) violation with regard to the August 2014 reporter's questions because they do not claim the reporter "disclose[d]" that "the

NOT FOR PUBLICATION

source" of her background information was the Government; Defendants do not claim the

reporter disclosed any source of information at all. *Rioux*, 97 F.3d at 662. Though Defendants

informed the Government "of this egregious breach of grand jury secrecy" after receiving the

reporter's phone call, ECF No. 53-1 at 19, they offer no basis to infer that the Government was

responsible for the supposed leak and not, for example, a grand juror, a witness, or anyone else

who had access to the proceedings.

The March 2015 articles about the Government's decision to pursue an indictment do

meet the second prong of the *prima facie* 6(e) test. The articles attribute the information to

"government officials," "a U.S. official," and "people briefed on the case." *Id.* at 20-21.

But the Court also considers "evidence presented by the government to rebut allegations

of a violation of Rule 6(e)," *Rioux*, 97 F.3d at 662, and the Government vehemently denies

intentionally leaking any of this information. ECF No. 83 at 48. The Government also rebuts

Defendants' claim that the Government "engineered [the] leak to thwart" the Deputy Attorney

General's review of their case, ECF No. 53-1 at 21, explaining that reporters actually contacted

the Government for comment on the allegedly leaked information the day *before* Menendez's

attorney requested a meeting with the Deputy Attorney General. ECF No. 83 at 53.

Additionally, though Defendants claim that the Government "failed to take any

substantive action to investigate or stop these pervasive leaks from occurring," ECF No. 53-1 at

21, the Government says that it took numerous steps to combat leaks: it sent an email reminding

its investigative team not to communicate with the media in 2014, ECF No. 83 at 48, sent an

"URGENT" email to the court and the clerk's office when the Third Circuit mistakenly

published a sealed opinion containing grand jury information in 2015, *id.* at 49, and referred

potential leaks to outside investigators on two occasions, first to the Office of the Inspector

NOT FOR PUBLICATION

General ("OIG") on April 5, 2013, and then to the OIG and the Department of Justice's Office of

Professional Responsibility in March 2015. *Id.* at 48-49. Given the Government's multiple

preventive and corrective measures and denial of the March 2015 leaks, the Court finds that

Defendants have not demonstrated a *prima facie* violation of the Grand Jury Secrecy Rule.

In any event, as discussed in the Court's opinion on Defendants' motion to dismiss for

grand jury bias, ECF No. 125, Defendants have not demonstrated that any press reports, leaked

or otherwise, caused *actual* grand jury bias that would warrant dismissal of the indictment. Nor

have Defendants or the Court found any cases, outside of those involving intentional violations

of the Grand Jury Secrecy Rule, in which a court dismissed an indictment for bias caused by

negative press coverage. *See United States v. Burke*, 700 F.2d 70, 82 (2d Cir. 1983) ("The grand

jury need not deliberate in a sterile chamber… and a criminal conviction appealed on grounds of

adverse preindictment publicity will not be overturned unless the moving party can bear the

heavy burden of demonstrating that he has suffered actual prejudice as a result of the publicity")

(internal citations and quotations omitted); *United States v. Frumento*, 409 F. Supp. 136, 142-43

(E.D. Pa. 1976) ("It is not enough that a defendant alleges, or even demonstrates, massive or

prolonged pre-indictment publicity concerning his case. . . . In the absence of specific evidence

of actual prejudice among the grand jurors, of which the record here is completely devoid, there

will be no relief granted.").

Defendants attempt to argue that the March 2015 leaks prejudiced defendants because the

grand jurors – who Defendants assume must have paid attention to news coverage – "saw that

they were *expected* to indict Senator Menendez, with the blessing of the Attorney General

personally, and they followed suit." ECF No. 53-1 at 30. But this misrepresents the modern

relationship between prosecutor and grand jury. In an age where "dramatic confrontations

NOT FOR PUBLICATION

between prosecutors and jurors in grand jury proceedings [have] become rare" and "grand jurors

no longer perform any other function but to investigate crimes and screen indictments," *United*

*States v. Navarro-Vargas*, 408 F.3d 1184, 1195 (9th Cir. 2005), grand jurors' knowledge that the

Government was going to seek an indictment based on the evidence it had presented to them

could hardly be prejudicial.

    Because Defendants have not demonstrated that any of the Government's supposed press

leaks – about grand jury matters or otherwise – actually prejudiced them in any way, they have

failed to meet their burden to persuade the Court that these leaks "substantially influenced the

grand jury's decision to indict" such that dismissal would be warranted. *Rioux*, 97 F.3d at 662

(quoting *Bank of Nova Scotia*, 487 U.S. at 256).

    **X.**    **The "cumulative effect" of the misconduct alleged by Defendants was not to**

            **prejudice the grand jury.**

    In the main, Defendants' claims of prosecutorial misconduct and grand jury error are

without merit. Defendants do not demonstrate that the Government (a) had an improper basis for

the investigation, (b) presented information from coerced witnesses to the grand jury, (c)

provided false testimony to the grand jury, (d) over-relied on hearsay evidence, (e) led the grand

jury to believe it could not call live witnesses, (f) mischaracterized the Medicare billing dispute,

(g) "abused" Menendez's staff members or inappropriately commented on evidence when asking

questions, or (h) leaked grand jury information to the press. Defendants do demonstrate that the

Government asked witnesses irrelevant and inflammatory questions about whether they knew Dr.

Melgen's wife. But the "cumulative effect" of these errors cannot "fairly be said to have

'substantially influenced the grand jury's decision to indict.'" *Breslin*, 916 F. Supp. at 446

NOT FOR PUBLICATION

(quoting *Samango*, 607 F.3d at 884). Defendants have failed to establish prejudice sufficient to warrant dismissal of the indictment.

## CONCLUSION

Defendants do not establish that the Government committed errors in the grand jury proceedings or engaged in misconduct that prejudiced the grand jury. Motions to Dismiss 3 and 5 are denied. An appropriate order follows.

DATE: *28 September 2015*

William H. Walls
Senior United States District Court Judge