# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

UNITED STATES OF AMERICA,

v.

ROBERT MENENDEZ

and

SALOMON MELGEN,

Defendants.

Crim. No. 2:15-cr-00155
Hon. William H. Walls

## DEFENDANTS' MOTION TO DISMISS
## PURSUANT TO *MCDONNELL v. UNITED STATES*

Abbe David Lowell
Jenny R. Kramer
Christopher D. Man
**NORTON ROSE FULBRIGHT US LLP**
1200 New Hampshire Avenue, N.W.
Washington, D.C. 20036
(202) 974-5600

Raymond M. Brown
**GREENBAUM ROWE SMITH & DAVIS LLP**
Metro Corporate Campus One
P.O. Box 5600
Woodbridge, N.J. 07095
(732) 476-3280

Stephen M. Ryan
**MCDERMOTT WILL & EMERY LLP**
500 North Capitol Street, N.W.
Washington, D.C. 20001
(202) 756-8000

*Counsel for Defendant*
*Senator Robert Menendez*

Kirk Ogrosky
Murad Hussain
**ARNOLD & PORTER**
**KAYE SCHOLER LLP**
601 Massachusetts Avenue, N.W.
Washington, D.C. 20004
(202) 942-5330

Matthew I. Menchel
Samuel A. Stern
**KOBRE & KIM LLP**
2 South Biscayne Boulevard, 35th Fl.
Miami, FL 33131
(305) 967-6108

*Counsel for Defendant*
*Dr. Salomon Melgen*

TABLE OF CONTENTS

INTRODUCTION ...................................................................................................1

ARGUMENT .........................................................................................................1

I.     THE STREAM OF BENEFITS THEORY CANNOT BE SQUARED WITH *MCDONNELL* ....................................................................................................1

    A.    Origins Of The Stream Of Benefits Theory .......................................2

    B.    *McDonnell* Ended The Stream Of Benefits Theory ...........................6

        1.    *McDonnell* Background ...........................................................6

        2.    The Stream Of Benefits Theory Is Inconsistent With *McDonnell* ...............................................................................8

    C.    The Indictment In This Case Exaggerates The "Stream Of Benefits" Theory's Flaws In *McDonnell* ........................................................10

II.    The Indictment Fails To Properly Charge Official Acts Under *McDonnell* ...............12

    A.    The Charged Conduct Does Not Involve Senator Menendez's "Official Acts" ..................................................................................15

    B.    Advocacy Across Branches Of Government Is Not An Official Act .............17

    C.    The Official Acts Section Of The Indictment As A Whole Must Be Dismissed .......................................................................................21

CONCLUSION.......................................................................................................26

i

## TABLE OF AUTHORITIES

### CASES

*Austin v. United States*, 155 U.S. 417 (1894) ........................................................19

*Beck v. Prupis*, 529 U.S. 494 (2000) .....................................................................19

*Kansas v. Crane*, 534 U.S. 407 (2002) ..................................................................19

*Kimel v. Fl. Bd. of Regents*, 528 U.S. 62 (2000) ....................................................19

*Knote v. United States*, 95 U.S. 149 (1877) ...........................................................19

*Krupsk v. Costa Crociere S.p.A.*, 560 U.S. 538 (2010) ...........................................19

*McDonnell v. United States*, 136 S. Ct. 2355 (2016) ......................................... *passim*

*Rothensies v. Electric Storage Battery Co.*, 329 U.S. 296 (1946) ...........................19

*Skilling v. United States*, 130 S. Ct. 2896 (2010) ..............................................5–6

*United States v. Andrews*, 681 F.3d 509 (3d Cir. 2012) ..........................................6

*United States v. Birdsall*, 233 U.S. 223 (1914) ......................................................18

*United States v. Boyland*, 2017 WL 2918840 (2d Cir. July 10, 2017) .........13, 20–21

*United States v. Bryant*, 655 F.3d 232 (3d Cir. 2011) ..............................................6

*United States v. Ganim*, 510 F.3d 134 (2d Cir. 2007) ...............................................5

*United States v. McDonnell*, 2014 WL 6772486 (E.D. Va. Dec. 1, 2014) ...............7

*United States v. McDonnell*, 792 F.3d 478 (4th Cir. 2015) .......................................7

*United States v. Repak*, 2017 WL 1149100 (3d Cir. Mar. 28, 2017) .........................9

*United States v. Silver*, 2017 WL 2978386 (2d Cir. July 13, 2017) ...............17, 20–22, 24, 26

*United States v. Standefer*, 610 F.2d 1076 (3d Cir. 1979) .........................................3

*United States v. Stevens*, 559 U.S. 460 (2010) ......................................................17

*United States v. Sun-Diamond Growers of California*, 526 U.S. 398 (1999) ...................3–5, 8

*United States v. Tavares*, 844 F.3d 46 (1st Cir. 2016) ............................................25

*United States v. Wright*, 665 F.3d 560 (3d Cir. 2012) ..............................................6

ii

STATUTES

18 U.S.C. § 201 ............................................................................2, 4, 15, 18

18 U.S.C. § 1051 ...............................................................................................2

18 U.S.C. § 1346 ...............................................................................................2

OTHER AUTHORITIES

Albert W. Alschuler, *Criminal Corruption: Why Broad Definitions Of Bribery Make Things Worse*, 84 Fordham L. Rev. 463 (2015) .......................................................9

Robert Anello, *SCOTUS Quid Pro Quo Analysis in McDonnell May Broadly Affect Bribery & Insider Trading Prosecutions*, Forbes (July 13, 2016)...........................................12

Randall D. Eliason, *Surgery With A Meat Axe: Using Honest Services Fraud To Prosecute Federal Corruption*, 99 J. Crim. L. & Criminology 929 (2009) .........................3–5

Adam F. Minchew*, Who Put The Quo In Quid Pro Quo?:  Why Courts Should Apply McDonnell*'s *"Official Act" Definition Narrowly*, 85 Fordham L. Rev. 1793 (2017) .............9

Harvey A. Silvergate & Emma Quinn-Judge, *Tawdry or Corrupt? McDonnell Fails To Draw A Clear Line For Federal Prosecution Of State Officials*, 2016 Cato Sup. Ct. Rev. 189 (2016).....................................................................................9

## INTRODUCTION

Even before any trial evidence is heard, the Supreme Court's unanimous decision in *McDonnell v. United States*, 136 S. Ct. 2355 (2016), now requires dismissing the pending Superseding Indictment as written.  *McDonnell* and more recent lower court decisions have narrowed the scope of the federal bribery statute in two ways that are antithetical to the Superseding Indictment.  First, the "stream of benefits" (or "retainer") theory of *quid pro quo* bribery advanced in the Superseding Indictment, which the Supreme Court has never adopted, cannot be squared with the Supreme Court's analysis in *McDonnell*.  Second, the specific "official acts" charged here do not qualify as "official acts" within the meaning of the federal bribery statute, as *McDonnell* narrowed the construction of that term.  *McDonnell* was decided after this Court's ruling of October 8, 2015 (Dkt. 129), which denied Defendants' motion to dismiss for failure to allege an official act (MTD No. 10, Dkt. 57).  This supervening change in controlling law warrants this Court's reconsideration under the now clarified legal standard.

## ARGUMENT

### I.  THE STREAM OF BENEFITS THEORY CANNOT BE SQUARED WITH *MCDONNELL*

The Superseding Indictment in this case stretches the stream of benefits theory much farther than the indictment in *McDonnell*.  Governor McDonnell's indictment charged that he took acts "as opportunities arose" to assist a donor with the sole purpose of promoting the donor's product within the Governor's own Executive Branch.  By contrast, the Superseding Indictment here more broadly charges that Dr. Melgen gave things of value – including constitutionally protected political contributions – to his longtime friend Senator Menendez (a Legislative Branch official), in exchange for Senator Menendez's advocacy on Dr. Melgen's behalf "as opportunities arose" to officials in a *separate* Executive Branch.  The opportunities

1

that allegedly arose for Senator Menendez to advocate to these *separate* Executive Branch officials on Dr. Melgen's behalf span three completely *different* subjects over seven years – assisting Dr. Melgen obtain visas for friends, in enforcing a port security contract with the Dominican Republic, and in resolving a Medicare payment issue.

The Supreme Court's unanimous opinion in *McDonnell* leaves no room for the stream of benefits theory itself, where the *quo* is some unspecified act, not yet identified at the time of the allegedly corrupt exchange, that will emerge in the future as "opportunities" arise. Instead, it is now clear that the government must first prove "the public official agreed to perform an 'official act' *at the time of* the alleged *quid pro quo*," and that "official act" "must be something *specific and focused* that is 'pending' or 'may by law be brought' before a public official." *McDonnell*, 136 S. Ct. at 2371 (emphasis added); *see id* at 2365 ("[T]he offense is completed at the time when the public official receives a payment in return for his agreement to perform *specific* official acts. . . .") (emphasis added) (quoting *Evans v. United States*, 504 U.S. 255, 268 (1992)). *McDonnell* also imposed a second obligation on the government to prove the public official took an action, or agreed to do so, "on" that specific question. 136 S. Ct. at 2368. Thus, the stream of benefits theory is foreclosed by *McDonnell*, because it does not require any agreement to perform a "specific and focused" official act at the time of the allegedly corrupt agreement.

A.     **Origins Of The Stream Of Benefits Theory**

Part of the difficulty in the evolution of public corruption law is that there are a host of different statutes that prohibit conduct that is somewhat similar, including Hobbs Act extortion under color of official right (18 U.S.C. § 1051), the bribery and gratuity statute (18 U.S.C. § 201), and the honest services fraud statute (18 U.S.C. § 1346). As prosecutors have found certain theories of liability shut down by the courts under one statute, they have tried to resurrect

those theories of liability under a different statute.  That has been the case with the government's "stream of benefits" theory of liability, which lost its remaining viability in *McDonnell*.

The stream of benefits theory first emerged in the gratuities context, involving "what prosecutors used to call a 'status gratuity,' 'goodwill gratuity,' or 'currying-favor gratuity.'" Randall D. Eliason, *Surgery With A Meat Axe: Using Honest Services Fraud To Prosecute Federal Corruption*, 99 J. Crim. L. & Criminology 929, 941 (2009).  The theory was that a donor "providing a stream of things of value" to a public official had placed the public official "on retainer," as

> [o]ver time, the donor was hoping to build up goodwill with the official so that, when issues arose of interest to the donor, the official might look kindly on the donor and act in accordance with his interests. . . .  [A]ccording to this theory of prosecution, a gratuities charge was proper even though no firm link could be established between any specific payment and any specific official act.

*Id.*  That theory was initially accepted by the Third Circuit and several other courts, *see, e.g.*, *United States v. Standefer*, 610 F.2d 1076, 1080 (3d Cir. 1979), but this "theory of prosecution met its demise in the 1999 Supreme Court case of *United States v. Sun-Diamond Growers of California*[, 526 U.S. 398 (1999)]."  Eliason, *supra*, at 942.

*Sun-Diamond* explained that Section 201 contained "two separate crimes," one for "bribery" and another for "illegal gratuity."  526 U.S. at 404.  As the Court explained, a bribery charge under Section 201(b) "requires a showing that something of value was corruptly given, offered, or promised to a public official (as to the giver) or corruptly demanded, sought, received, accepted, or agreed to be received or accepted by a public official (as to the recipient) with intent, *inter alia*, 'to influence any official act' (giver) or in return for 'being influenced in the performance of any official act' (recipient)."  *Sun-Diamond*, 526 U.S. at 404.  "In other

words, for bribery there must be a *quid pro quo* – a specific intent to give or receive something of value *in exchange* for an official act." *Id.* at 404-05 (emphasis in original).

The government argued that a gratuity was different and that, "unlike the bribery statute, [the gratuity statute] did not require any connection between respondent's intent and a specific official act," because there was no *quid pro quo* requirement, but the Supreme Court rejected that view. *Id.* at 405. Rather than find such a nexus required by a *quid pro quo*, the Court found it in the phrase "official act," which is "carefully defined" in Section 201 itself. *Id.* at 406 (emphasis added). Section 201(a)(3) defines "official act" to mean:

> Any decision or action on any question, matter, cause, suit, proceeding or controversy, which may at any time be pending, or which may by law be brought before any public official, in such official's official capacity, or in such official's place of trust or profit.

18 U.S.C. § 201(a)(3). "The insistence upon an 'official act,' carefully defined, seems pregnant with the requirement that some particular official act be identified and proved." *Sun-Diamond*, 526 U.S. at 406.

*Sun-Diamond* created a conundrum for prosecutors who believed "[a]n ongoing pattern of personal gifts and official acts may signify a relationship that appears clearly unlawful, yet *Sun-Diamond*'s requirement of linking particular gratuities to particular official acts could prove to be an insurmountable obstacle to bringing charges under 18 U.S.C. § 201. Faced with such cases, prosecutors in the aftermath or *Sun-Diamond* had to consider alternative approaches," and the honest services fraud statute "stepped into the breach." Eliason, *supra*, at 929, 946.[1] But that

---

[1] Mr. Eliason handled public corruption cases for DOJ, and his articles generally favor the prosecution. He appreciated that *Sun-Diamond* left prosecutors having to shift its stream of benefits cases to the honest services fraud statute, and was rightly concerned that the Supreme

door was shut too by the Supreme Court a decade later in *Skilling v. United States*, 130 S. Ct. 2896 (2010).  *Skilling* limited the honest services fraud to bribery and kickbacks, and rather than defining bribery and kickbacks more broadly than the bribery and kickback statutes, the Supreme Court explained that the honest services fraud statute "draws content . . . from federal statutes proscribing – and defining – similar crimes," including Section 201.  *Id.* at 2906.

Prior to *Skilling*, lower courts also had read *Sun-Diamond* narrowly as somehow limited to the gratuities context.  For example, in *United States v. Ganim*, the defendant appealed convictions for Hobbs Act extortion under color of right and federal programs bribery (18 U.S.C. § 666) under a stream of benefits theory.  510 F.3d 134, 137 (2d Cir. 2007).  The Second Circuit treated *Sun-Diamond*'s requirement to identify a specific official act in gratuities cases as distinct from the requirements for bribery.[2]  The Second Circuit believed that *Sun-Diamond*

> offered a strictly worded requirement that the government show a link to a 'specific official act' to supply a limiting principle that would distinguish an illegal gratuity from a legal one.  The same limiting principle is not needed in the extortion or bribery contexts, however, because it is the requirement of an act in exchange for a benefit – i.e., the quid pro quo requirement – that distinguishes those crimes from both legal and illegal gratuities.

*Id.* at 146-147.  Thus, in the Second Circuit's view, *Sun-Diamond* foreclosed a stream of benefits theory in gratuity cases by adding a "limiting principle" to those case by adding a judicial gloss on them, but the stream of benefits theory survived in bribery cases because the Court did not

---

Court would reject this theory under that statute too.  He suggested that Congress amend the gratuities statute to authorize stream of benefits based convictions.  Eliason, *supra*, at 979.  Congress did not do so.

[2]     As discussed below, that reading of *Sun-Diamond* is flawed because the Supreme Court found the obligation to identify a specific official act based on Section 201's definition of "official act," and that definition applies to both bribery and gratuities under Section 201.  *Sun-Diamond*, 526 U.S. at 404.  There was no special judicial gloss applied to gratuity offenses alone.

add that gloss to them and bribery's unique *quid pro quo* requirement did not require that level of specificity.  The Supreme Court's decision in *Skilling* cited to then-Judge Sotomayor's opinion in *Ganim*, which many courts read as the Supreme Court blessing that view.  *Skilling*, 561 U.S. at 413; *see United States v. Andrews*, 681 F.3d 509, 527 (3d Cir. 2012) (stream of benefits theory survives *Skilling* in honest services cases); *United States v. Wright*, 665 F.3d 560, 567-68 (3d Cir. 2012) (same); *United States v. Bryant*, 655 F.3d 232, 244-46 (3d Cir. 2011) (same).

### B.  *McDonnell* Ended The Stream Of Benefits Theory

#### 1.  *McDonnell* Background

The indictment in *McDonnell* alleged that Star Scientific and its CEO, in particular (who did not know the Governor prior to his election) provided extraordinary gifts to Governor McDonnell (e.g., cash, shopping sprees, a Rolex watch) "in exchange 'for performing official actions on an as-needed basis, as opportunities arose, to legitimize, promote, and obtain research studies for Star Scientific's products,'" namely the product Anatabloc.  *McDonnell*, 136 S. Ct. at 2365 (quoting *McDonnell* indict. ¶110).  The indictment then alleged that Governor McDonnell committed at least five official acts, as "opportunities arose":  (1) arranging meetings with "subordinates of the Governor, to discuss and promote Anatabloc"; (2) hosting events at the Governor's Mansion "designed to encourage Virginia university researchers to initiate studies of anatabine and to promote Star Scientific's products to doctors for referral to their patients"; (3) "contacting other government officials in the [Governor's Office] as part of an effort to encourage Virginia's state research universities to initiate studies of anatabine"; (4) "promoting Start Scientific's products and facilitating its relationships with Virginia government officials" by allowing its CEO to invite persons to events at the Governor's Mansion; and (5) "recommending that senior government officials in the [Governor's Office] meet with Star

Scientific executives to discuss ways that the company's products could lower healthcare costs." *Id.* at 2365-66 (quoting *McDonnell* indict. ¶111(c)(i)-(v)) (alterations in *McDonnell*). Although Governor McDonnell was charged (and convicted) of honest services fraud, "[t]he parties agreed that they would define honest services fraud with reference to the federal bribery statute, 18 U.S.C. § 201." *McDonnell*, 136 S. Ct. at 2365. Governor McDonnell challenged his conviction because the jury instructions provided "an erroneous understanding of 'official act'" and "allowed a conviction on the theory that [he] accepted things of value that were given for future unspecified action." *Id.* at 2367.

The district court rejected Governor McDonnell's attack on the lack of specified future action by noting that the Fourth Circuit had accepted a stream of benefits theory of liability, whereby "each payment need not be correlated with a specific official act," so long as the gifts were "made with the intent of securing a specific *type* of official action or favor in return." *United States v. McDonnell*, 2014 WL 6772486, at *2 (E.D. Va. Dec. 1, 2014) (quoting *United States v. Jennings*, 160 F.3d 1006, 1014 (4th Cir. 1998)) (emphasis in *McDonnell*). The jury instructions stated "an official act is no less official because it is one in a series of steps to exercise influence or achieve an end," and the district court explained that it was sufficient that the indictment charged that the payments were made to induce the Governor "to adopt a specific *course of action.*" *Id.* at *5 (emphasis in original) (citation omitted). The Fourth Circuit upheld these instructions, and specifically reaffirmed its stream of benefits theory of liability. *United States v. McDonnell*, 792 F.3d 478, 510, 514 (4th Cir. 2015). Before the Supreme Court, the Governor continued his attack on the stream of benefits theory, Pet. Br., *McDonnell v. United States*, 2016 WL 825553, at *54 (U.S. filed Feb. 24, 2016), and the government continued to object that the Governor's proposed "specificity requirement is inconsistent with precedent

establishing that 'the government need not show that the defendant intended for his payment to be tied to specific official acts, so long as the payments 'were made with the intent of securing a specific *type* of official action' in return," Gov't Br., *McDonnell v. United States*, 2016 WL 1358962, at *54-55 (U.S. filed Mar. 30, 2016) (quoting *Jennings*, 160 F.3d at 1014).

### 2. The Stream Of Benefits Theory Is Inconsistent With *McDonnell*

The stream of benefits theory that the government brought in pre-*McDonnell* cases (including this one) cannot be reconciled with *McDonnell*'s construction of "official acts." As the Supreme Court had previously explained in *Sun-Diamond*, it is Section 201's definition of "official act," rather than the definition of bribery or gratuity, that provided the basis for its specificity requirement: "The insistence upon an 'official act,' carefully defined, seems pregnant with the requirement that some particular official act be identified and proved." *Sun-Diamond*, 526 U.S. at 406. In *McDonnell*, clearly arising in the bribery context and not the gratuity context of *Sun-Diamond*, the Supreme Court unanimously reiterated that construction of Section 201 (even Justice Sotomayor joined, who had written *Ganim* as a lower court judge).

Rather than address official acts that may present themselves in the future as opportunities arise, the Supreme Court emphasized that the focus is "whether the public official agreed to perform an 'official act' *at the time of* the alleged *quid pro quo*." *McDonnell*, 136 S. Ct. at 2371 (emphasis added). And to qualify as an official act that is agreed upon "at the time of the alleged *quid pro quo*," the act "must also be something *specific and focused* that is 'pending' or 'may by law be brought' before a public official. To qualify as an 'official act,' the public official must make a decision or take an action *on that* 'question, matter, cause, suit, proceeding or controversy,' or agree to do so." *Id.* at 2372 (emphasis added); *see id* at 2365 ("[T]he offense is completed at the time when the public official receives a payment in return for his agreement

to perform specific official acts. . . .") (quoting *Evans*, 504 U.S. at 268)).[3]  Already the Third Circuit has described this "specific and focused" language as one of the "key clarifications" made by *McDonnell*.  *United States v. Repak*, 2017 WL 1149100, at *14 (3d Cir. Mar. 28, 2017).[4]  The Supreme Court made clear that the official act "must be more specific and focused than a broad policy objective," and that the jury instructions were flawed for "including acts 'in furtherance of longer-term goals' or in a series of steps to exercise influence or achieve an end.'" *McDonnell*, 136 S. Ct. at 2373-74.

Thus, it would not be sufficient for the public official to know the donor's ultimate goal and take actions to further that goal as they arose, instead the act or acts to be taken must be established at the time of the *quid pro quo*.  The Supreme Court emphasized that it was reversing the convictions because the jury instructions did not require the jury "to find that he made a

---

[3]     Although lower courts have not yet addressed this issue, scholars have.  *See, e.g.*, Adam F. Minchew, *Who Put The Quo In Quid Pro Quo?: Why Courts Should Apply McDonnell's "Official Act" Definition Narrowly*, 85 Fordham L. Rev. 1793, 1818 (2017) ("In making reference to *Evans*, the *McDonnell* Court conspicuously chose to embrace the 'specific official acts' language, rather than the broader 'official acts' language relied on by many circuit courts in establishing the implicit quid pro quo standard outside the campaign contribution context. . . . *McDonnell* provides that to fulfill the quid pro quo requirement, the quo (i.e., the official act) need not be explicit, but it must be 'specific and focused.'"); Harvey A. Silvergate & Emma Quinn-Judge, *Tawdry or Corrupt? McDonnell Fails To Draw A Clear Line For Federal Prosecution Of State Officials*, 2016 Cato Sup. Ct. Rev. 189, 2087-08 (2016) ("While *McDonnell* did not squarely address the issue, one fair reading of the decision is that it silently rejected the stream of benefits theory."  Citations to support that theory are "conspicuously absent from *McDonnell*," and the decision clarifies that "although 'the means' need not be specified, it appears that 'an' official act must be specified."); *see also* Albert W. Alschuler, *Criminal Corruption: Why Broad Definitions Of Bribery Make Things Worse*, 84 Fordham L. Rev. 463, 480 (2015) (arguing that *Evans'* "specific official acts" language and *Sun-Diamond*'s "some particular official act" language (later quoted again in *McDonnell*) are inconsistent with the "stream of benefits" theory).

[4]     In *Repak*, this "specific and focused" inquiry was satisfied where particular government contracts were recommended by the Executive Director (a subordinate) to be awarded by an agency Board of Directors.  *Repak*, 2017 WL 1149100, at *15.

decision or took an action – or agreed to do so – *on* the identified 'question, matter, cause, suit, proceeding, or controversy,' as we have construed that requirement." *Id.* at 2374 (emphasis in original). Again, the Supreme Court reiterated that the focus must be on what "Governor McDonnell agreed to do *at the time* he accepted the loans and gifts. . . ." *Id.* (emphasis added). While the Supreme Court acknowledged that "this case is distasteful," the Court emphasized its decision reflected its concern "with the broader legal implications of the Government's boundless interpretation of the federal bribery statute." *Id.* at 2375.

### C. The Indictment In This Case Exaggerates The "Stream Of Benefits" Theory's Flaws In *McDonnell*

The Superseding Indictment in this case not only tracks the stream of benefits theory in the *McDonnell* case, but expands upon it wildly. Rather than the one objective in *McDonnell* of assisting a donor with its product, the indictment here alleges the stream of benefits was to secure three different objectives "as needed" (Dkt. 149 ¶19) and "as opportunities arose" (*id.* ¶¶227, 229, 231, 233, 235, 237, 239; *see* Dkt. 87 (prosecution noting "the extensive factual allegations in paragraphs 1 through 227 [of original Indictment] that outline the 'official acts, as opportunities arose'")) – i.e., assisting Dr. Melgen secure visas for his friends, with a port security issue in the Dominican Republic, and with a Medicare payment issue. And as discussed further in the following section, while the Supreme Court in *McDonnell* criticized the indictment in that case for having five paragraphs that attempted to treat each individual piece of evidence as its own official act, the Indictment in this case has a separate heading entitled "Official Acts" (unlike in *McDonnell*) and the government boasts that "[t]he indictment then proceeds with 157 paragraphs outlining the official acts that defendant Menendez performed in exchange for the things of value he accepted. . . ." (Dkt. 87 at 1 (Indict. ¶¶70-227).) In the Superseding

Indictment, the "Official Acts" section has been reduced to 153 paragraphs, renumbered paragraphs 68-225.  (Dkt. 149.)

The government has left no doubt that it is pursuing the same sort of stream of benefits theory that it pursued in and is now foreclosed by *McDonnell*.  It has told this Court that the initial Indictment charges an agreement involving "a stream of benefits, in which defendant Melgen gave a series of things of value to keep defendant Menendez on retainer, such that he would continue to perform official acts as opportunities arose."  (Dkt. 87 at 6.)  The government justified this "stream of benefits" theory claiming that it does not need to prove a *quid* "be linked to as specific *quo*, or act" or "was provided with the intent to prompt a specific official act."  (*Id.* (quoting pre-*McDonnell* case law); (*see id.* at 16 (claiming it does not have to tie specific *quids* to *quos* "under the 'stream of benefits' theory of bribery charged").)

In doing so, the government repeated the now discredited narrow reading of *Sun-Diamond*, claiming that "decision turned on the different scienter requirement in the gratuity statute, which is not present in the bribery statute.  *Sun-Diamond* did not impose a requirement that the Government prove a link between a thing of value and a specific official act in *bribery* cases."  (Dkt. 87 at 18.)  And the government highlighted that this "stream-of-benefits theory" that it charged had been upheld by the Third Circuit post-*Skilling*.  (*Id.*)  Without the benefit of *McDonnell*, this Court accepted the government view, upholding the Indictment "[u]nder the stream of benefits doctrine."  (Dkt. 129 at 8.)  The Court found that "'the incorporation of 157 'acts' into each" of the separate bribery counts "together show a 'pattern of official actions' that the government alleges as evidence of the '*quo*' that Defendants intended to result from the bribes," and that this adequately charged an agreement "to retain Menendez's services on an as needed basis."  (*Id.* (internal citations omitted).)  Both the government (Dkt. 87 at 23-25) and this

11

Court (Dkt. 129 at 7) relied upon the Fourth Circuit's decision in *McDonnell*, which had not yet been overturned by the Supreme Court.

While no one can criticize the government's reliance upon cases that had not yet been overruled, and no one would question that this Court did its best to read the tea leaves as to the direction the Supreme Court was headed, the fact remains that the Supreme Court's decision in *McDonnell* is widely recognized to have changed the legal landscape. *See, e.g.*, Robert Anello, *SCOTUS Quid Pro Quo Analysis in McDonnell May Broadly Affect Bribery & Insider Trading Prosecutions*, Forbes (July 13, 2016) ("The Court's decision in *McDonnell* dramatically narrows the scope of political corruption laws and is almost certain to have a significant ripple effect to federal bribery laws in general."). This Superseding Indictment clearly rested on the *McDonnell*-style stream of benefits theory, which is no longer viable. Accordingly, it should be dismissed.

## II.   THE INDICTMENT FAILS TO PROPERLY CHARGE OFFICIAL ACTS UNDER *MCDONNELL*

Beyond the flawed structure of the "stream of benefits" charge, the three ultimate official acts charged in this case are not official acts at all and are even less so than the acts charged in the *McDonnell* case. In *McDonnell*, each of the charged official acts were alleged to have provided a donor with the Governor's assistance in lobbying one of the Governor's subordinates, and the unanimous Supreme Court concluded that none of those acts constituted "official acts." The acts in this case are even farther removed from *McDonnell*, as none of the official acts that Senator Menendez allegedly sought to influence were acts that he could take or that even could be taken by anyone within the Legislative Branch. Instead, the Superseding Indictment alleges that Dr. Melgen provided gifts to Senator Menendez to enlist his help in persuading decision-makers in the Executive Branch to take favorable official acts on matters ranging from visas, to port security, to Medicare payment policy. Placing calls and having meetings to discuss these

issues, even if to encourage others to take a particular action – something any citizen can do – are not "official acts" by Senator Menendez under *McDonnell*. *McDonnell*, 136 S. Ct. at 2371 ("expressing support" is not an official act). In fact, in another recent case, the government itself has conceded that jury instructions that treat a public official "lobbying other governmental agencies, and advocating for his constituents" as an official act is erroneous under *McDonnell*. *United States v. Boyland*, 2017 WL 2918840, at *6-7 (2d Cir. July 10, 2017). Here, such "lobbying other government agencies" and "advocating" is the entire basis of all the charges.

Additionally, the Superseding Indictment in this case follows the same flawed structure as in *McDonnell*, but amplifies its defects. At oral argument in *McDonnell*, Justice Kagan took issue with "the way this indictment was structured" because instead of simply stating that "the 'official act' is getting the University of Virginia to do clinical studies," the indictment used five paragraphs to take "a lot of different pieces of evidence that might relate to that 'official act' and charges them as 'official acts' themselves, so that the party becomes an 'official act' or calling somebody just to talk about the product becomes an 'official act.'" Tr. of Oral Arg. at 53, *McDonnell v. United States*, 136 S. Ct. 2355 (2016). She was "troubled by these particular charges and instructions, which seem[] to make every piece of evidence that you had an 'official act,' rather than just saying the 'official act' was the – was the attempt to get the University of Virginia to do something that they wouldn't have done otherwise." *Id.* at 53-54. Nevertheless, the Deputy Solicitor General claimed there "was nothing wrong . . . in the way that the indictment structured the crime in this case" because it was structured to address official acts "as opportunities arose." *Id.* at 55-56. The Superseding Indictment in this case magnifies the *McDonnell* error by including a 153 paragraph stand-alone "Overt Acts" section that claims

every action taken by anybody (the Senator, staff, outside people) concerning Dr. Melgen's visa, port security, or Medicare issues was an official act.

Ultimately, the Supreme Court rejected the government's interpretation of "official act," and held that "setting up a meeting, calling another public official, or hosting an event does not, standing alone, qualify as an 'official act.'" *McDonnell*, 136 S. Ct at 2368.  First, the Supreme Court emphasized that the list of terms in the definition of "official act" "connote a formal exercise of governmental power, such as a lawsuit, hearing, or administrative determination" and explained that "it seems clear that a typical meeting, telephone call, or event arranged by a public official does not qualify as a 'cause, suit, proceeding or controversy.'"  *Id.*   The further requirement that the official act be "'[p]ending' and 'may by law be brought' suggests something relatively circumscribed – the kind of thing that can be put on an agenda, tracked for progress, and then checked off as complete."  *Id.* at 2369.  "Second, the Government must prove that the public official made a decision 'on' that question, matter, cause, suit, proceeding, or controversy, or agreed to do so."  *Id.* at 2368.

The Supreme Court found that three questions or matters qualified as official acts in *McDonnell*:  Virginia universities initiating a study, having a Virginia Commission fund a study, and whether the health insurance plan for state employees should add coverage for Anatabloc. *Id.* at 2369-70.   Nevertheless, the Court rejected that any of the Governor's alleged acts "qualifies as a decision or action on any of those three questions or matters."  *Id.* at 2370.  It is not sufficient to host an event, meet with other officials, or speak to interested parties, "even if the event, meeting or speech is related to a pending question or matter."  *Id.*  "Simply expressing support for the research study at a meeting, event, or call – or sending a subordinate to such a meeting, event, or call – similarly does not qualify as a decision or action on the study, as long as

14

the public official does not intend to exert pressure on another official or provide advice, knowing or intending such advice to form the basis for an 'official act.'" *Id.* at 2371.

### A.    The Charged Conduct Does Not Involve Senator Menendez's "Official Acts"

Under the proper *McDonnell* framework for analyzing this Superseding Indictment, any discernable "exercise of governmental power, such as a lawsuit, hearing, or administrative determination," that would constitute an official act would be the official act of someone in the Executive Branch. *McDonnell*, 136 S. Ct. at 2368. It is up to the Executive Branch to issue a visa, change Medicare policy, or for its State Department to encourage the Dominican Republic to protect port security. The Supreme Court rejected the notion that all the various steps in advancing these long-term goals would independently constitute official acts. *Id.* at 2373-74. And that is where this Superseding Indictment fails.

The Superseding Indictment charges Senator Menendez with violating 18 U.S.C. § 201(b)(2)(A), which prohibits a public official from accepting a bribe "in return for being influenced in the performance of any official act," and the charges reflect an understanding that it must be Senator Menendez's official acts that are "being influenced." The Superseding Indictment alleges the bribes were "to influence *Menendez*'s official acts" (Dkt. 149 ¶9(b) (emphasis added)), and that he violated his obligation "to *perform* the duties and responsibilities of *his* office free from corrupt influences," (*id.* ¶2 (emphasis added)). The alleged bribes were for "requested exercises of *Menendez*'s official authority" (*id.* ¶16 (emphasis added)), requests for "official action from *Menendez and Menendez*'s Senate staff as needed" (*id.* ¶19 (emphasis added)), and updating Dr. Melgen "on the status and progress of *Menendez*'s official action on Melgen's behalf," (*id.* ¶20 (emphasis added)).

The linchpin of the government's theory is that "official acts" include those acts that would fall short of what *McDonnell* described as "a formal exercise of governmental power." The *McDonnell* decision pulled that linchpin.  Setting up meetings, hosting events, or calling an official to discuss an issue or "gather additional information," or "[s]imply expressing support" for an outcome "do not qualify" as official acts.  *McDonnell*, 136 S. Ct. at 2371.[5]

The Supreme Court noted the importance of having a safe harbor around these sorts of activities as they are not only commonplace, but part of the "basic compact underlying representative government [that] *assumes* that public officials will hear from their constituents and act appropriately on their concerns."  *Id.* at 2372.  The Court found that the government's broad theory "could cast a pall of prosecution over these relationships" and that "[t]his concern is substantial."  *Id.*  "Officials might wonder whether they could respond to even the most commonplace requests for assistance, and citizens might shrink from participating in democratic discourse."  *Id.*  At oral argument, Justice Kennedy told the government:  "You're going to tell the Senators, the officials with the lunches, that, don't worry.  The jury has to be convinced beyond a reasonable doubt, and that's tough."  *McDonnell* Tr. at 37 (noting laughter followed). Justice Breyer followed up to say that it is not enough to say "we're going to let you 12 people work out what was really in the Senator's mind.  I say that is a recipe for giving the Department

---

[5]      As Justice Breyer explained at oral argument, "every day of the week politicians write on behalf of constituents letters to different parts of the government, saying, will you please look at the case of Mrs. So-and-so who was evicted last week.  And that's so common, you can't pick that up," or an official tells another official "we would appreciate it if you would review that and take action.  And the elected official says to [the constituent], I did my best on this.  And [the constituent] thinks, good, he's used his influence."  *McDonnell* Tr. at 15-16.  As Justice Breyer then said in answering his own question:  "A crime?  My goodness."  *Id.* at 16.  Likewise, Justice Kennedy complained that the government's position "puts at risk behavior that is common, particularly when the quid is a lunch or a baseball ticket, throughout this country."  *Id.* at 32.

of Justice and the prosecutors enormous power over elected officials who are not necessarily behaving [dis]honestly [sic]."  *Id.* at 38.  If there is not going to be this sort of chill over basic governmental operations, elected officials must know that courts will dismiss unfounded indictments and not subject them to protracted trials adjudicated by 12 jurors.  *Cf. McDonnell*, 136 S. Ct at 2372-73 ("We cannot construe a criminal statute on the assumption that the Government will 'use it responsibly.'"); *United States v. Stevens*, 559 U.S. 460, 480 (2010).

Based on *McDonnell*'s clarification of the narrow nature of the term "official act", the Second Circuit last week reversed a conviction where the government treated "*any action* taken or to be taken under color of official authority" as an official act because it is "overbroad." *United States v. Silver*, 2017 WL 2978386, at *12 (2d Cir. July 13, 2017) (emphasis in original). But that any exercise of "official authority" theory that was rejected by the Second Circuit is the same theory that animates the Superseding Indictment in this case, with its 153 paragraphs that treat everything Senator Menendez did as "exercises of Menendez's official authority" in which "Menendez used the prestige, authority, and influence of his status as a United States Senator." (Dkt. 149 ¶¶ 16, 22.)  If the government intends to proceed with this prosecution, it should do so by securing a new indictment, one that pairs the "official acts" charged down to only those that comport with *McDonnell*.

### B.    Advocacy Across Branches Of Government Is Not An Official Act

*McDonnell* involved the Governor, as head of the Executive Branch, making requests of his subordinates within the Executive Branch, and a legal issue arose of whether the Governor could be deemed to have taken an official act by influencing the decision of his subordinates. Merely asking a subordinate to take a meeting or have a phone call to hear someone's views is not an official act, nor is "simply expressing support" for what the subordinate would be asked to

do at that meeting or call.  *McDonnell*, 136 S. Ct. at 2371.  But in the context of a Governor directing a subordinate, the Court added:  "[I]f a public official uses his position to provide advice to another official, knowing or intending that such advice will *form the basis* for an 'official act' by another official, that too can qualify as a decision of action for purposes of § 201(a)(3)."  *Id.* at 2370 (emphasis added); *see id.* at 2371 (restating the "form the basis for an 'official act'" language).  In doing so, the Court cited a case for the flip-side of that proposition, *United States v. Birdsall*, 233 U.S. 223 (1914), which *McDonnell* explained found "'official action' on the part of subordinates where their superiors 'would necessarily rely largely upon the reports and advice of subordinates . . . who were more directly acquainted with' the 'facts and circumstances of particular cases.'"  136 S. Ct. at 2370 (quoting *Birdsall*, 233 U.S. at 234); *see also id.* at 2371 (declining to give *Birdsall* the government's "more expansive interpretation").

 *McDonnell* and *Birdsall* makes sense as intra-Branch decisions, given that Section 201 is personal in referring to a public official accepting a bribe "in return for being influenced in the performance of any official act."  18 U.S.C. § 201(b)(2)(A).  The Governor, as head of the Executive Branch, has essentially taken an official act himself, if he has directed what the subordinate should do, by supplying the basis for the decision.  An instruction to do something from the boss is what would "form the basis" for the subordinate's decision.  Likewise, a subordinate has essentially been delegated the authority to take the official act when their advice to their superior is such that the superior will "necessarily rely largely" upon it.

 But the Court should be careful not to extend this language to advice given or, to use the Superseding Indictment's word "advocacy," from a Member of the Legislative Branch to someone in the Executive Branch, where the decision is not one for the Legislative Branch to make either officially or by designation.  It is an inarguable proposition that language in opinions

must be read in its context.  *See, e.g.*, *Krupsk v. Costa Crociere S.p.A.*, 560 U.S. 538, 552 (2010); *Kansas v. Crane*, 534 U.S. 407, 414 (2002); *Beck v. Prupis*, 529 U.S. 494, 503 n.7 (2000); *Kimel v. Fl. Bd. of Regents*, 528 U.S. 62, 75 (2000).  Likewise, it has long been held that in construing Supreme Court opinions, "[a]ny language which seemingly admits to a broader interpretation must be restricted to the facts of the case."  *Knote v. United States*, 95 U.S. 149, 156 (1877); *see Rothensies v. Electric Storage Battery Co.*, 329 U.S. 296, 400 (1946); *Austin v. United States*, 155 U.S. 417, 429 (1894).  In cases where it is a person in one Branch trying to influence a decision by an official in another Branch, it is no longer the public official who received the *quid* who is "being influenced in the performance of an official act," as Section 201 requires.

Such a construction also would invite the same kinds of harm to the democratic process and of having elected officials be responsive to constituents that the Supreme Court characterized as a "substantial" concern in *McDonnell*.  136 S. Ct. at 2372.  As Justice Breyer noted at oral argument, "elected officials" send out letters "by the dozens" to Executive Branch officials, "to the secretary of HUD, to the secretary of – of HHS," and so forth requesting action on a constituent's behalf, and the elected officials convey that to the constituents who think "good, he's used his influence" – and that cannot be a crime.  *McDonnell* Tr. at 16.  In this case, for example, the government has charged as a felony sending what it calls a "general letter of support" for visa applications as a crime, where the letter merely concludes, "I appreciate very much your giving these applications all due consideration within the requirements of the law." (Dkt. 149 ¶¶86-87.)  If the prosecution can infer a bribe whenever even such a routine letter is sent for anyone who has done even the most basic of favors for a Congressman (including providing campaign contributions, as is charged here) then the prosecution can indict every Member of Congress and, more alarmingly, whichever Members they choose to target.

This Court previously explained that the crux of the Indictment charges Senator Menendez with what it calls "advocacy" to the Executive Branch concerning visas, port security, and Medicare payment policy, and that remains true of the Superseding Indictment.  (Dkt. 3 at 2.)  But *McDonnell* clarifies that "official act" does not include the various steps that lead to "a formal exercise of governmental power," such as the meetings and phone calls with interested parties that precede it, but only those formal exercises of power themselves.  *McDonnell*, 136 S. Ct. at 2368.  Here, the official acts would be granting visas, the State Department encouraging ports to protect port security, and modifying Medicare payment policy – all of which are Executive Branch determinations.  As such, none are "official acts" of Senator Menendez and all charges in the Superseding Indictment based on bribery should be dismissed.

Recently, the government acknowledged its agreement with these principles by confessing error in a case before the Second Circuit involving jury instructions, although maintaining that the error was not plain in that pre-*McDonnell* case.  *See United States v. Boyland*, 2017 WL 2918840, at *6-7 (2d Cir. July 10, 2017).  In *Boyland*, the government highlighted the problematic portion of the jury instructions: "*The term 'official act' includes the decisions [on] actions generally expected of a public official, including but not limited to contacting or lobbying other governmental agencies, and advocating for his constituents*."  Gov't Br., *United States v. Boyland*, No. 15-3118, at 45 (2d Cir. filed Nov. 9, 2016) (alterations and emphasis in original).  The government then advised the Second Circuit:  "The government concedes that after *McDonnell*, the district court's instruction on the honest service charge that 'the term 'official act' includes . . . decisions [on] actions generally expected of a public official, including but not limited to contacting or lobbying other governmental agencies, and advocating for his constituents' was erroneous."  *Id.* at 51 (alterations in original); *see also Silver*, 2017 WL

20

2978386, at *12 n.84 (noting *Boyland* "rejected overbroad jury instructions" that, among other things, treated an official "lobbying other governmental agencies, and advocating for his constituents" as an official act).[6]   That concession, based on the government's reading of *McDonnell*, is dispositive here, as each of the alleged "official acts" taken by Senator Menendez would at most fall into that same category of merely "*lobbying other governmental agencies, and advocating for his constituents*."

### C.   The Official Acts Section Of The Indictment As A Whole Must Be Dismissed

In contrast to even the flawed *McDonnell* indictment, the Superseding Indictment here has a stand-alone "Official Acts" section, containing 153 paragraphs "outlining the official acts that defendant Menendez performed in exchange for the things of value he accepted."  (Dkt. 87 at 1; *see id.* at 4 (citing ¶¶70-227 of the initial Indictment as "the official acts that defendant Menendez performed in exchange for those things of value").)  But the Superseding Indictment takes the flawed approach Justice Kagan described in *McDonnell* of treating every individual piece of evidence as its own stand-alone "official act."  *McDonnell* Tr. at 53-54.  *McDonnell* makes clear that none of the charged conduct constitutes "official acts," which "must involve a formal exercise of government power."  136 S. Ct. at 2372.  "[A] typical meeting, call, or event" does not qualify.  *Id.* at 2368.

---

[6]    The Second Circuit affirmed under plain error review because the government official had done more than engage in advocacy, he "promised that he would ensure that all of the necessary governmental actions occurred."  *Boyland*, 2017 WL 2918840, at *9; *see Silver*, 2017 WL 2978386, at *14 n.98 (differentiating the affirmance in *Boyland* as a case where the official "agreed to ensure that favorable decisions would be made," from the reversal in *Silver* where the official only offered to help "'navigate' the permit process").  The *Boyland* defendant claimed he was "in control" of the official actions to be taken and guaranteed outcomes, not just advocacy.  Gov't Br., *United States v. Boyland*, No. 15-3118, at 19, 63 (2d Cir. filed Nov. 9, 2016).  This is obviously not the charge or case here.

In the Superseding Indictment, the "Official Acts" section is Paragraphs 68 through 225, and while each paragraph identified some act, none are official acts by Senator Menendez. Indeed, many of these paragraphs make no mention of Senator Menendez at all. For example, Paragraphs 112-14 discuss Dr. Melgen's history in the port security business, and Paragraphs 143-45 discuss Dr. Melgen's billing practice for the drug Lucentis and the government's initial investigation of that practice. There is no mention of Senator Menendez in those paragraphs whatsoever. Paragraphs like these that make no mention of Senator Menendez, much less him taking any "official acts," litter the supposed "Official Acts" section. (*See, e.g.,* Dkt. 149 ¶¶69-71, 76, 78-80, 106-108, 110, 116-19, 126-27, 174-76, 188-89.) Often, when Senator Menendez's name is mentioned, it is simply to note something inconsequential, such as where Senator Menendez met friends of Dr. Melgen (*id.* ¶¶77, 105), or to address merely preparatory acts, such as meeting or conversing with lobbyists to better understand the issues (*id.* ¶¶ 149, 153, 161, 166, 172, 187, 190-91, 194-95, 197, 199-201, 203-06, 209-10, 212, 213, 215-16).[7]

The majority of the paragraphs describe actions by Senator Menendez's staffers, not Senator Menendez, and many involve trivial functions rather than official acts. (*See, e.g., id.* ¶¶98 (Staffer 3 emails Melgen that he has not heard back from the embassy about a visa); 156-57 (two staffers discussing what they think should be done for Dr. Melgen); 168-169 (one staffer telling another that Dr. Melgen seemed upset).) Even more attenuated, the Superseding Indictment charges conduct by "a former Menendez staffer" as somehow within the "Official

---

[7]     In *Silver*, the Second Circuit reversed a conviction based on a possibility "the jury improperly concluded that the meeting between Silver and [donor's] lobbyist was an official act," because "[s]imply meeting to discuss the terms of the Rent Act of 2011, without more, does not qualify as a 'decision' or action' under *McDonnell*."  2017 WL 2978386, at *16.

Acts" section of the Superseding Indictment, even though the former staffer did not work for Senator Menendez at the time and the government does not charge that Senator Menendez encouraged or even knew what the staffer was doing.  (*See, e.g.*, *id.* ¶¶11-19.)

Under *McDonnell*, and particularly with its rejection of the stream of benefits theory, the government simply cannot maintain that every act taken by anyone (frequently not Senator Menendez) in these 153 paragraphs is an official act of Senator Menendez.  Defendants believe the Superseding Indictment is hopelessly vague and defective if a jury can find that Senator Menendez took an official act based on everything charged in the "Official Acts" section of the Superseding Indictment, ranging from acts taken by others or acts as innocent as meeting friends of Dr. Melgen, and there is no meaningful way to prepare for a trial involving what breaks down into literally hundreds of individual acts by the government's count.

Even if the Superseding Indictment could be viewed as charging official acts at a higher level, involving visas, port security, and Medicare payment policy, the "official acts" would be of officials in a different branch of government from Senator Menendez and would not constitute Senator Menendez's "official acts."  The various charged acts that Senator Menendez is alleged to have taken on these three issues fall outside *McDonnell*'s interpretation of an official act.

**Visas**

As noted above, the entire section of the Superseding Indictment charging Senator Menendez's involvement in visa issues is indefensible post-*McDonnell*.  (Dkt. 149 ¶¶68-111.) Sending "general letters of support" asking for a visa application to be considered (*id.* ¶87) is no different from Justice Breyer noting the commonplace letters, asking "please look at the case of Mrs. So-and-so who was evicted last week," or "please look at Mrs. Smith's eviction notice," and explaining that the government should not have the "freedom to go and do these ridiculous

cases." *McDonnell* Tr. at 16, 18, 59; *see Silver*, 2017 WL 2978386, at *14 ("But using government letterhead is not, by itself, a formal exercise of government power on a matter similar to a hearing or lawsuit," and sending general "recommendation letters" is not an official act.). These routine letters are of such a "prolific and perfunctory nature" that they are more appropriately considered as "*de minimis quos* unworthy of a *quid*." *Silver*, 2017 WL 2978386, at *14. The assistance with visas merely illustrates the *McDonnell* decision's point that "conscientious public officials arrange meetings for constituents, [and] contact other officials on their behalf" all the time, and criminalizing this sort of conduct could cause those involved to "shirk from participating in the democratic discourse." *McDonnell*, 136 S. Ct. at 2355.

**Port Security**

Senator Menendez's assistance on the port security issue may be less common, but it is no different in kind, and *McDonnell* forecloses this basis for the Superseding Indictment as well. (Dkt. 149 ¶¶112-141.) *McDonnell* made clear that arranging a meeting or a call "merely to talk about a research study or to gather additional information" does not qualify as an official act. 136 S. Ct. at 2371. That is all that Senator Menendez and his staff are alleged to have done here.

The Superseding Indictment claims Senator Menendez's staff wanted to set up a meeting between Senator Menendez and the State Department because "he continues to have concerns about what is flowing through their ports either unobserved or with tacit permission." (Dkt. 149 ¶121.) At the meeting, Senator Menendez relayed a concern that the port screening contract was "being blocked by corrupt officials" who wanted to facilitate contraband and he wanted to know what could be done to help. (*Id.* ¶122.) The State Department told him it was "working up some sort of port initiative" and would update him once it "had a concrete initiative," and Senator Menendez said "he wanted to hear of a solution" within a couple of weeks. (*Id.* ¶ 123.)

These contacts do not constitute "official acts."  They are simply requests for information about a problem and the potential for a solution, which *McDonnell* makes clear is not an official act.  *See United States v. Tavares*, 844 F.3d 46, 56-57 (1st Cir. 2016) (explaining *McDonnell* makes clear that an "official act" "requires more than mere discussion").  There is not even "something specific and focused" being proposed, such that it could constitute an official act under *McDonnell*.  136 S. Ct. at 2372.  Moreover, given the national security implications, *McDonnell*'s warning about chilling these sorts of activities takes on even more force.

The Superseding Indictment also focuses on an email exchange from Senator Menendez's Chief Counsel to the State Department asking it to "hold[] off on the delivery" of a rumored delivery of security equipment "until you can discuss this matter with us – he'd like a briefing."  (Dkt. 149 ¶131.)  She explained that Senator Menendez was concerned the equipment was being sought for an "ulterior purpose" by "possibly criminal" elements in the Dominican Republic "who do not want to increase security in the DR to hold up that contract's fulfillment." (*Id.*)  That is nothing more than a request for a briefing before an action would be taken, something that could be – and was – resolved quickly.  The rumored delivery was "incorrect," it was not occurring, and the matter was resolved the same day.  (*Id.* ¶ 138.)  Thus, this is nothing more than the sort of protected information gathering addressed in *McDonnell*, and on the sort of national security issues where discussion should not be chilled.

**Medicare Payment Policy**

Similarly, the allegations concerning Medicare payment policy should be dismissed.  (*Id.*. ¶¶142-225.)  The issue here is more than just of interest to the supporter who reached out for assistance, as in the visa context.  The issue concerned policy issues with Medicare paying for wasted medicine and inefficiency.  The existing policy resulted in higher costs to Medicare,

where a change in the multi-dosing rules would save money by avoiding payments to pharmaceutical companies for medicine that was thrown away and, in Senator Menendez's view, payments to physicians also could be reduced as the cost of treatment was reduced. Senator Menendez's office was highlighting the "confusing and unclear policy issue" that needed clarity. (*Id.* ¶165.) The Superseding Indictment charges that Senator Menendez and his staff exchanged calls and emails, and met with officials administering Medicare, but *McDonnell* makes clear that "setting up a meeting, calling another public official, or hosting an event does not, standing alone, qualify as an 'official act.'" 136 S. Ct. at 2368. That remains true even if the public official is "expressing support" for an action from those who are contacted. *Id.* at 2371; *see Silver*, 2017 WL 2978386, at *15 ("Taking a public position on an issue, by itself, is not a formal exercise of governmental power, and is therefore not an 'official act' under *McDonnell*."), *id.* at *15 n.111 ("publicly stating his opposition" to a project is not an official act). Given that the government now has conceded that a public official's "lobbying other governmental agencies, and advocating for his constituents" does not constitute an "official act," *Boyland*, 2017 WL 2918840, at *6, the government can no longer credibly maintain that Senator Menendez's alleged "advocacy" to HHS that it improve and clarify its Medicare policy can be prosecuted as a felony, (Dkt. 149 Count One, Section III(C)). Whether viewed as efforts to improve Medicare policy or to help a political supporter, they are the kinds of activities that *McDonnell* excluded from being considered "official acts."

## CONCLUSION

*McDonnell* has changed the legal landscape for bribery prosecutions predicated on Section 201, and this pre-*McDonnell* Superseding Indictment cannot be reconciled with the Supreme Court's guidance in *McDonnell*. The Superseding Indictment should be dismissed.

DATED: July 18, 2017

Respectfully submitted,

/s/ Abbe David Lowell
Abbe David Lowell
Jenny R. Kramer
Christopher D. Man
**NORTON ROSE FULBRIGHT US LLP**
1200 New Hampshire Avenue, N.W.
Washington, D.C. 20036
(202) 974-5600

Raymond M. Brown
**GREENBAUM ROWE SMITH & DAVIS LLP**
Metro Corporate Campus One
P.O. Box 5600
Woodbridge, N.J. 07095
(732) 476-3280

Stephen M. Ryan
**MCDERMOTT WILL & EMERY LLP**
500 North Capitol Street, N.W.
Washington, D.C. 20001
(202) 756-8000

*Counsel for Defendant*
*Senator Robert Menendez*

/s/ Kirk Ogrosky
Kirk Ogrosky
Murad Hussain
**ARNOLD & PORTER**
**KAYE SCHOLER LLP**
601 Massachusetts Avenue, N.W.
Washington, D.C. 20004
(202) 942-5330

Matthew I. Menchel
Samuel A. Stern
**KOBRE & KIM LLP**
2 South Biscayne Boulevard, 35th Fl.
Miami, FL 33131
(305) 967-6108

*Counsel for Defendant*
*Dr. Salomon Melgen*

27